ORIGINAL

FILED

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DARREN J. ROBBINS (168593)
DOUGLAS R. BRITTON (188769)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@csgrr.com
dougb@csgrr.com

Lead Counsel for Plaintiffs

[Additional counsel appear on signature page.]

2009 AUG 28 PM 3:26

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
RIVERSIDE

BY F___

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| MARCELO CUNHA, Individually and on Behalf of All Others Similarly Situated, | No. ED-CV-08-01249-SGL(JCx) |
| Plaintiff, | CLASS ACTION |
| vs. | |
| HANSEN NATURAL CORPORATION, RODNEY C. SACKS, HILTON H. SCHLOSBERG, and THOMAS J. KELLY, | |
| Defendants. | DEMAND FOR JURY TRIAL |

CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF FEDERAL SECURITIES LAWS

**INTRODUCTION**

1.    This is a federal class action on behalf of purchasers of Hansen Natural Corporation's ("Hansen" or the "Company") common stock between November 9, 2006, and November 8, 2007, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Defendants include Rodney C. Sacks (Hansen's Chairman and Chief Executive), Hilton H. Schlosberg (Hansen's Vice Chairman and President), and Thomas J. Kelly (Hansen's Vice President of Finance).    Each defendant either made false or misleading statements during the Class Period or sold Hansen stock while in possession of material non-public information.

2.    Throughout the Class Period, defendants misrepresented to investors the success and benefit that Hansen was deriving from a new distribution agreement with Anheuser-Busch ("AB") and strong sales of Hansen's "Allied" brand of energy drinks. Defendants entered the agreement with AB to stem declining sales growth in Hansen's popular Monster Energy ("Monster") drink line, which was almost single-handedly responsible for driving Hansen's stock price up more than 5,000% in the four years before the Class Period, and specifically told investors that the agreement included not only Monster but also Hansen's "Allied" energy drinks, including Lost Energy, Rumba Energy Juice and another that they would determine later. Defendants then went on to tell investors that the arrangement with AB was "continu[ing] to help [Hansen]" and was "progressing well," that strong sales of its Allied products were contributing to "record revenues" and would even offset margin pressure in the Monster line. Defendants went so far as to claim that "'[AB] has been an outstanding business partner for the last eight months'" and explained that Hansen was entering into an expanded agreement with AB, which analysts cheered and estimated would add $50 million in incremental revenue for Hansen once fully established. Defendants' statements reversed a decline in Hansen's stock price and drove 173% during the Class Period.

1    3.    Defendants' statements about Hansen's relationship with AB were false.

2  Far from benefitting Hansen, the AB relationship was damaging the Company since

3  AB wanted only Hansen's Monster Energy drink and, according to witnesses, had no

4  interest in distributing any of Hansen's Allied products.[1]  Indeed, defendants entered

5  into a supplemental agreement with AB to give AB exclusive rights to distribute

6  Monster beverages to the "on-premise" channel (e.g., to bars and restaurants) even

7  though defendants wanted far more access to distribute Monster to the far more

8  lucrative "off-premise" channel (e.g., to convenience and grocery stores).  While

9  defendants emphasized the relationship as a boon to Hansen and downplayed any

10  problems as "hiccups" that were caused by "transition" issues with "prior distributors"

11  and AB "holdouts" that were not awarded Monster, the reality was that defendants

12  entered the agreement to try to incentivize AB to distribute Hansen's Allied products,

13  which AB practically abandoned after signing the original agreement.

14    4.    Unfortunately for investors, defendants' plan failed.  Despite the

15  expanded on-premise agreement for Monster, AB was interested in the much more

16  lucrative "off-premise" distribution rights for Monster.  And the on-premise

17  agreement did not appease AB.  In fact, former employees of Hansen and former AB

18  distributors explained that AB had no interest in Hansen's Allied lines and was not

19  distributing those lines because the products were not well-known or well-received in

20  the market place.  And to make matters worse, AB was restricted from distributing

21  Hansen's products, including Monster, in many areas because of strict alcohol

22  regulations, requiring Hansen employees to undertake obligations and costs that

23  should have been borne by the distributors.  While defendants pushed the relationship

24  as a positive move for Hansen, it was far from it.

25

26  _____

27  [1]    All employee witnesses referenced in this Complaint are former employees of
Hansen and/or AB distributors.

28

5.    Defendants' claims about the strength of its Allied energy line were also false. Contrary to defendants' claims, defendants knew the entire Allied line was suffering not only from Hansen's problems with AB but also because defendants abandoned marketing the Allied line. Numerous former Hansen employees have described a state of disinterest by the marketplace because defendants simply refused to market the product, devoting 90% of Hansen's marketing budget to Monster and the remaining 10% to *all other Hansen products*, including sodas, juices, lemonade, iced teas, and the like. At the same time that defendants were promoting the strength of the Allied line, they were abandoning promotions because of poor Allied sales, chastising sales representatives for poor Allied sales, and extending once-short term and extraordinary Allied promotions in a desperate attempt to increase sales. Defendant Sacks was specifically identified as having scolded sales representatives for poor Allied sales at a company-wide summer sales meeting at a casino near the Company's headquarters in Corona, California. The Company ultimately docked bonuses by 50% and tied future bonuses to increased Allied sales.

6.    In 2Q07, despite problems with the AB distribution and poor Allied sales, Hansen announced extraordinary financial results that exceeded analyst estimates by an unheard of *$0.10 earnings per share* ("EPS"). These results followed a quarter where defendants witnessed Hansen's stock price collapse 17% in response to missing analyst estimates by a single penny. But Hansen's 2Q07 results were artificial. In fact, a former Hansen employee has reported that he was instructed to withhold promotional expenses for an enormous account to ensure that Hansen would exceed expectations in the quarter. Hansen's extraordinary results, which included lower than expected expenses, drove its stock price up 20% in a single day of trading on volume of eight million shares as analysts claimed that the results should "stem investors' concern about the beverage firm's slowing expansion over the previous four to six quarters." Defendants then took advantage of these falsified results by dumping $75 million worth of their stock after the announcement.

7.    Then, on November 8, 2007, defendants shocked investors by announcing results for 3Q07 that again missed analyst estimates. Sales came in $11 million below estimates and earnings were off by $0.03 per share – far greater than the $0.01 misses that pummeled Hansen's stock in August 2006 and May 2007. Their disclosures were stunning. Defendants admitted that they had put the brake on the AB transition because AB was focusing on its own products instead of Hansen's, and explained that Hansen's Allied products had missed internal expectations by $10 million. Hansen's stock collapsed 32.5% in response.

## STATEMENT OF THE CASE

**Background**

8.    Defendant Hansen, through its operating subsidiaries, develops, markets, sells, and distributes beverages in the United States and Canada. The Company owns the following brand names:  Monster Energy, Lost Energy, Joker Mad Energy, Unbound Energy and Ace, as well as Rumba Energy Juice.  The Company also markets, sells and distributes the Java Monster line of non-carbonated dairy-based coffee drinks, as well as natural sodas, premium natural sodas with supplements, organic natural sodas, seltzer waters, sports drinks, and energy drinks under the Blue Sky brand name.

9.    The Company has two reportable segments: Direct Store Delivery ("DSD"), whose principal products comprise energy drinks (*i.e.*, the Monster and Allied energy lines), and Warehouse ("Warehouse"), whose principal products comprise juice-based and soda beverages. The DSD segment develops, markets and sells products primarily through an exclusive distributor network, whereas the Warehouse segment develops, markets and sells products directly to retailers.

10.    Hansen's recent success has been dependent entirely on one product – its Monster Energy drink, which has more caffeine and energy boosters in a single can than in eight cups of coffee.  Before Monster's arrival, Hansen was a mediocre

- 4 -

1  beverage company that struggled to survive. In fact, Hansen even filed for bankruptcy
2  in 1998 because it was apparently unable to pay its payroll taxes.

3      11.    Defendants Rodney C. Sacks ("Sacks") and Hilton H. Schlosberg
4  ("Schlosberg") purchased Hansen in 1992 and immediately began chasing beverage
5  trends with ill-conceived new products to remake Hansen into a growth company. As
6  *Fortune* magazine put it, "[a]t first Sacks was content to chase whatever beverage
7  trend was in vogue, but he knew Hansen's me-too products had little chance of
8  standing out. 'We needed to create something different,' he recalls." But Hansen
9  continued to languish under Sacks and Schlosberg. In fact, Hansen's stock traded as
10 low as $0.59 and never reached higher than $7 before the introduction of Monster.

11     12.    Defendants stumbled on Monster in 2002 and changed Hansen's
12 fortunes. Hansen's sales surged quarter after quarter from 2002 through 2006, and so
13 did its stock price. Monster almost single-handedly drove Hansen's revenues from
14 $138 million in 2001 to $696 million in 2006 and its highly caffeinated stock price
15 jumped more than 5,000% in response. Monster had thus thrown a once barely
16 profitable penny stock into a wildly successful growth company. But with the benefit
17 of such a dramatic turnaround, came intense pressure to sustain the growth.
18 Defendants desperately tried to do so as Monster's growth began to slow.

19 **Hansen Cannot Build on Monster's Success**

20     13.    After Monster's introduction, defendants attempted to build on Hansen's
21 success by introducing a plethora of new products. Hansen's Securities and Exchange
22 Commission ("SEC") filings read like a graveyard of products long forgotten and
23 abandoned. Countless products either failed miserably and were withdrawn, or
24 languished under the weight of Monster. And those products that did survive were
25 relegated to other divisions. If the product fell within the umbrella of Hansen's
26 energy drinks, it was almost exclusively designated as an "Allied" product, and
27 relegated behind Monster. While defendants treated Monster to its own segment,
28

- 5 -

1  defendants grouped Lost Energy, Joker Mad Energy, Rumba Energy Juice, Unbound

2  Energy and Ace under the "Allied" segment.

3      14.    While some of its new products did survive, Hansen remained almost

4  entirely dependent on Monster for its growth.  Unfortunately for defendants and

5  investors, the velocity behind Monster was starting to slow leading up to the Class

6  Period.  In fact, the DSD division's quarterly net sales growth declined from 160% in

7  3Q05 to 106% by 2Q06.  While these numbers were impressive, they signaled

8  Monster's descent and the need to take action to continue the Company's strong

9  growth.

10  **Defendants Sign Distribution Agreement with AB to Boost Waning Sales**

11      15.    On May 9, 2006, defendants signed a distribution deal with Anheuser-

12  Busch ("AB") to increase sales and market exposure.  The agreement covered both

13  "off-premise" distribution (*e.g.*, convenience and grocery stores) and "on-premise"

14  distribution (*e.g.*, bars and restaurants).  Defendants promoted the new relationship as

15  a huge boon for Hansen.  Its press release claimed that AB's "'first-class distribution

16  system . . . will enable Hansen to expand availability and improve the presence of our

17  products *across all channels*, particularly in areas where our brands have historically

18  been under-represented.'"    Analysts agreed.   The day of the announcement, a

19  Canaccord Adams analyst noted that Hansen "[r]eport[ed] yet another strong quarter,

20  above our estimate and more above Street," but added that "*[t]he bigger news is*

21  *announced distribution deal with Anheuser-Busch*," which the analyst estimated

22  would increase Hansen's distribution to 90% of the country and strengthen its

23  distribution in underperforming areas.  The analyst raised his revenue and earnings

24  estimates for Hansen the following day because of the AB deal:

25          *We are increasing our revenue and EPS estimates to reflect* the

26          higher Q1 results (revenue 9% ahead of estimate and EPS 5% ahead of

27          our forecast) and *the increased distribution expected due to the A-B*

28          *deal*.

- 6 -

16.    But the relationship was not as beneficial as defendants led the market to believe. While defendants allowed AB to distribute Monster in limited areas, they largely restricted AB's access to the coveted product. For example, a Regional Sales Manager for Hansen in Texas explained that in his region, AB was allowed to distribute Monster for all on-premise sales (except for existing accounts that Cadbury Schweppes handled) and all of the off-premise distribution for Allied. Its off-premise distribution of Monster, however, was only 50% of the region because Hansen also had an off-premise distribution agreement with Cadbury Schweppes. It was clear, however, that AB wanted more access to Monster. In fact, the president of AB's domestic subsidiary, August A. Busch IV, was quoted in the *St. Louis Post-Dispatch* as saying that AB would "initially" be able to distribute Monster in half of the country, which was a clear statement that he believed AB's access to Monster would expand. And he added that "'[t]here will be larger footprints for Lost and Rumba.'" But according to a Senior Marketing Manager at Hansen, AB's interest was in the highly popular Monster and little else.

17.    According to a Regional Sales Manager in Texas, the most significant disagreement between Hansen and AB pertained to the distribution of Monster. In this Sales Manager's region of Texas, AB was restricted to the "on-premise" distribution of Monster, which included bars, restaurants, nightclubs and casinos. The "off-premise" sales were much more lucrative, however, but Hansen shut AB out of this market segment when it came to Monster. Hansen allowed AB to do the off-premise distribution of the Allied lines, and even offered AB exclusive rights to distribute Unbound, but that did not appease AB. Not only was the on-premise channel less lucrative than the off-premise channel, but also that channel was dominated by Red Bull, which locked up a large part of the channel with exclusivity agreements and had a reputation for being litigious in defending those agreements. And to make matters worse, a Senior Marketing Manager explained that the Allied line was not designed to succeed as Hansen created it only to appease the companies

1  that had been distributing Monster before AB, which were upset when Hansen took

2  Monster away. The witness further explained that the Allied line was designed to take

3  up "shelf space" that would have otherwise been occupied by Monster's competitors.

4      18.    Not surprisingly, the AB agreement did not cure Hansen's problems. As

5  the relationship progressed, Monster's growth rates continued to plummet. The DSD

6  division, where Monster and the Allied brands reside, collapsed from a year-over-year

7  quarterly growth rate of 139.8% in 1Q06 to just 79.84% by 3Q06. And in August

8  2006, defendants witnessed Hansen's stock collapse for the first time since it

9  introduced Monster when Hansen missed analysts' estimates *by only a penny* in

10  2Q06. In fact, Hansen's stock dropped 35% in two days on volume of 67 million

11  shares.

12  **Defendants Tried to Reverse the Company's Fortunes and Drive Its Stock
Price Back Up**

13

14      19.    Since this was the first time in Hansen's history with Monster that its

15  stock had suffered a severe collapse, defendants set out to reverse the slide in

16  Hansen's stock – and their own personal fortunes. On November 9, 2006, the start of

17  the Class Period, Hansen reported financial results for its 3Q06 that, not surprisingly,

18  were in line with analyst expectations. Defendants used the opportunity to

19  misrepresent the success of the AB relationship. They told investors that the

20  relationship with AB was "going to continue to help us" and stated that they were

21  confident that the relationship would improve the quality and quantity of product

22  being sold:

23      We think that the transition to Anheuser-Busch is really going to

24      continue to help us.

25                      *       *       *

26      We really are very happy with the transition. The Anheuser-

27      Busch group are really a professional group. We're getting good

28      information from them. We really do see that they're very motivated at

- 8 -

1    the distributor level, and we are very confident that will improve both the

2    quality and the quantity of product being sold by them and distributed.

3          20.    Defendants also misled investors about the strength of its Allied energy

4 drinks. They told investors that "[t]he key is to build up our *other [Allied] supporting*

5 *products* so that hopefully we end up with a shelf plus or shelf and a half of Monster

6 *and probably a shelf for our other brands*." They also emphasized that Lost "is still

7 one of the top 10 selling brands in the country," with sales "up on last year" (despite

8 some "disruption" that the Company was experiencing with the AB transition), and

9 claimed that the demand for Hansen's Allied brands was strong enough to offset

10 margin pressure in the Monster line:

11     In the energy category, we're still very positive about Lost. . . . Joker is

12     at a good velocity and so is Unbound. . . . We really do believe that

13     those products do have good opportunity.

14                  \*       \*       \*

15     [W]e do believe that Rumba has got a lot of legs.

16                  \*       \*       \*

17     [W]e're hoping that we will also be able to offset some of that

18     percentage [of lost margin in Monster] by the increased sales in Ace,

19     Joker and Unbound . . . so we think those will also help improve our – on

20     the other side would help improve it. . . . other brands like Unbound are

21     going through the traditional channel and Joker and Rumba those will

22     help pick up some margins.

23          21.    Defendants' statements about Hansen's relationship with AB and the

24 success of its Allied products were false. Contrary to their claims about the AB

25 relationship helping Hansen and proceeding smoothly, it was actually harming the

26 Company. According to a Senior Marketing Manager for Hansen, when the Company

27 entered into the agreement with AB, it required AB to take on distribution of Lost and

28 other energy drinks. AB agreed because it wanted Monster. But after the deal was in

1  place, AB did nothing with Lost and it cost the Company considerable market share.
2  In fact, when Hansen announced the first agreement with AB in May 2006, it claimed
3  that Lost was the eighth largest energy brand in the United States; by 1Q07, a short
4  eight months later, Lost had fallen to number 10. Indeed, defendants admitted that
5  sales of Lost had suffered in 2006 and early 2007, but blamed it on *original*
6  *distributors* losing focus on the brand and "spotty" *initial* execution by AB
7  distributors adjusting to distributing non-alcoholic beverages.

8      22.    This explanation was patently false. What defendants knew and
9  concealed was that the "disruption" was actually caused by AB's disinterest in
10 Hansen's non-Monster brands. In fact, many AB distributors and Hansen former
11 employees have reported that AB had no interest in Hansen's Allied brands because
12 they lacked name recognition and were not selling well. Indeed, one Trade
13 Development Manager with Hansen in Louisiana whose job was to get the
14 independent distributors and the AB sales reps "fired up" and "focused" on the
15 Monster and Allied products, reported that AB chose not to distribute Lost at all in
16 Louisiana. And a Vice President of an AB distributor in North Carolina confirmed
17 that they never tried to sell Lost to their customers because it was not a well-known
18 brand. The distributor added that they were loathe to jeopardize their market share by
19 pushing an unpopular and unproven product like Lost because customers (*i.e.*,
20 retailers) are not happy if a product is not selling. And for those retailers who did
21 agree to place an initial order for Lost, a Trade Development Manager in Louisiana
22 explained that it was difficult to get the retailer to order more Lost because it simply
23 did not sell as well as the much more popular and recognized Monster beverages.

24     23.    Witnesses confirmed that these problems were happening throughout the
25 country, including in Louisiana, Michigan, and North Carolina. And a Regional Sales
26 Manager in Texas confirmed that the Company's sales of Lost suffered because
27 Hansen took away the distribution rights from Dr. Pepper Snapple and gave them to
28 AB in Texas and California. The Sales Manager explained that AB was not interested

- 10 -

1    in Lost and the brand languished for about five or six months and lost momentum
2    because of these issues until Hansen took the distribution rights back from AB. The
3    Sales Manager added that the loss of momentum was notable in California, which was
4    Lost's biggest market because of the drink's tie-in with surfboards and a related
5    clothing line.

6        24.    Despite a year of turmoil with AB under the first agreement, Hansen
7    announced a new on-premise agreement with AB on February 9, 2007 that they
8    claimed "'opens a significant new and incremental sales channel for Monster Energy®
9    that will play an essential role in continuing the development of the image and
10   personality of our Monster Energy® brand.'" Defendants led investors to believe that
11   the relationship was still proceeding smoothly and that the new agreement would
12   bring in certain AB "holdouts" who were "sort of" not taking Lost because they were
13   not awarded Monster. They claimed that "'Anheuser-Busch has been an outstanding
14   business partner for the last eight months'" and added that "'we are excited to expand
15   our relationship with [AB] to include the on-premise channel.'"

16       25.    Like the first agreement, analysts cheered the announcement. That day, a
17   Canaccord Adams analyst reiterated his BUY rating on the Company and claimed that
18   the agreement was "a clear positive for Hansen" and that it "could add roughly $50
19   million in incremental revenue once fully established":

20           We view the expanded agreement with Anheuser-Busch as a clear
21           positive for Hansen, as the company gains access to a significant new
22           segment, estimated at 13% of the total energy drink category. We
23           believe that the agreement could add roughly $50 million in incremental
24           revenue once fully established, if Hansen gains market share similar to
25           other channels of distribution.

26       26.    Throughout this time period, Hansen's performance continued to
27   deteriorate. Its 4Q06 results were barely in line with analyst expectations and its
28   1Q07 results missed analysts' estimates again by one penny. Like before, the market

- 11 -

1    reacted and punished Hansen stock by up to 17%. Thus, a Company that had been
2    used to dramatic increases in its stock price (jumping 1,000% between January 2005
3    and July 2006), suddenly found its stock price languishing as analysts downgraded the
4    stock.

5         27.    Defendants were desperate to reverse the Company's slide. Sacks and
6    Schlosberg even granted a rare interview to analysts despite their practice of largely
7    limiting their public comments about the Company to press releases and earnings
8    conference calls. JP Morgan analyst Dara Mohsenian reiterated an overweight rating
9    on Hansen stock on May 23, 2007, "following a recent positive management meeting
10   with CEO Rodney Sacks and CFO Hilton Schlosberg."    During this meeting,
11   defendants pushed the strength of its relationship with AB and its energy products as a
12   whole. They told Ms. Mohsenian that the benefits of transitioning to AB distributors
13   were starting to ramp up after initial "hiccups" in the second half of 2006 and
14   attributed the "hiccups" to prior distributors losing focus and spotty "initial execution"
15   by AB, which they represented had been resolved:

16        **Benefits from A-B Wholesaler Off-Premise Distribution are**
17        **Ramping Up**

18             Hansen's commentary was positive regarding the ongoing
19        transition of Monster distribution to Anheuser-Busch distributors on a
20        selective basis. There were initial hiccups in a number of transition
21        markets in H2 of 2006 as ***prior distributors*** lost their focus on Hansen
22        products prior to changes, and A-B distributors' ***initial execution*** was
23        spotty given the challenges in adjusting to distribute non-alcoholic
24        products for a distribution system previously focused on alcoholic
25        products.

26        28.    Defendants also told Ms. Mohsenian that its "on-premise agreement with
27   Anheuser-Busch should start to ramp up by the end of Q2." And when Hansen
28   reported its 2Q07 results on August 8, 2007, defendants claimed that they were

- 12 -

1    continuing to increase market share because of the relationship.    While they

2    mentioned that the on-premise agreement was taking more time than they would have

3    liked, they confirmed that the agreement was "getting going" and that "we're starting

4    to open accounts." Sacks added that "[e]verything takes time," and although in "some

5    markets we have disappointments, by and large we're happy with the improvement,

6    our sales have improved pretty much in most of the bu[d] markets."

7        29.    Defendants also continued to misrepresent the success of its Allied

8    product line.  They told investors that they were "look[ing] forward to working

9    together [with AB] to *build on the success* of Monster Energy® *and our other energy*

10    *drink brands*."    They claimed that Hansen's 1Q07 "record revenues reflected

11    continued strong sales of Monster Energy® brand energy drinks, *as well as the*

12    *expansion of distribution of Unbound® brand energy drinks*."    And while they

13    discussed lower sales of Lost offsetting strong sales of Monster in 1Q07, they again

14    gave investors comfort by attributing the decrease in sales to the transition from

15    existing distributors to AB distributors. They also claimed that Lost "is still one of the

16    top 10 brands and will *continue to grow*" and suggested that the decline could be

17    offset by new packaging and products under the Lost name:

18            We have looked at the [Lost] brand, we have addressed whether

19        there are any packaging issues.  We're going to freshen up some

20        packaging issues.  We're going to look at introducing a new product.

21        We really do believe that that brand can increase and can be a serious

22        player, albeit at a much lower level, but it could be a real serious player

23        still in the Energy category.

24        30.    Defendants' statements about its relationship with AB were again false.

25    In addition to AB's disinterest in Hansen's Allied brands damaging Lost's market

26    share, Hansen was faced with a new round of problems in the off-premise arena

27    because of AB's position as an alcohol distributor.  A Regional Sales Manager in

28    Texas explained that the state's alcohol laws restricted AB's ability to distribute

- 13 -

1  Monster, which benefitted Hansen's competition.  While Coca-Cola and Pepsico
2  would pay $200 to $250 a month for a shelf in a refrigerated container like those
3  found in convenience stores, AB distributors were limited to offering free product
4  because AB was not allowed to pay for shelf space.  In fact, the state's alcohol laws
5  also restricted AB's ability to distribute Monster and Allied beverages in major
6  grocery chains, such as Kroger and Randall's.  A Trade Development Manager in the
7  Midwest corroborated this account and confirmed that liquor laws in Michigan
8  hindered AB from distributing Hansen beverages to certain locations.  For example,
9  the witness explained that laws prohibiting the sale of alcohol at gas station
10 convenience stores unless the gas pumps are a certain distance from the alcohol sold
11 in the convenience store prohibited AB's alcohol distributors from distributing non-
12 alcoholic beverages, such as Monster, to these locations.

13      31.    A Senior Marketing Manager in the Company's headquarters in Corona,
14 California further explained that AB had trouble distributing Monster in states with
15 strict alcohol laws.  Because AB was a distributor of alcohol, it had to find non-
16 alcohol distributors to distribute Hansen's products in those areas, which increased
17 costs and minimized distribution.  AB's attempts to do so lead to territorial squabbles
18 between distributors.    The witness believed that these limitations to the AB
19 distribution agreement were the reasons Hansen eventually entered into an off-premise
20 distribution agreement with Coca-Cola in 2008.

21      32.    AB was also unable or unwilling to perform critical tasks as a distributor
22 because of alcohol distribution regulations.  In fact, two Regional Sales Managers in
23 Texas confirmed that these limitations imposed obligations and costs on Hansen that
24 should have been undertaken by AB distributors, such as renting third-party trucks
25 without AB insignia, supplying coolers and guides, and paying slotting and shelving
26 fees with no influence or assistance from AB.  One Regional Sales Manager in Texas
27 reported receiving stacks of invoices (as many as 80 pages) from AB requesting
28 reimbursement for the costs relating to renting trucks and other expenses.  And a Vice

1  President of Sales for an AB distributor in North Carolina added that the AB deal was

2  good for AB since it did not have to utilize its own resources, but still received

3  payments for Hansen sales. What was good for AB was certainly not for Hansen.

4      33.    To make matters worse, AB's hope of breaking into the on-premise

5  market was not coming to fruition.  According to a Senior Marketing Manager,

6  Hansen entered into the distribution agreement with AB to increase Monster's

7  presence in the on-premise market (bars and restaurants). But the Company ended up

8  damaging its off-premise business as a result.  The witness explained that Hansen

9  found AB attractive as a distributor because it had connections to bars and restaurants

10  through its own network of wholesalers.  But AB did not have connections with

11  restaurants or stores (both on-premise and off-premise establishments) that did not sell

12  alcohol and were often restricted from developing these connections because of strict

13  regulations.   Defendants also found out quickly that bars and restaurants were

14  increasingly "segmenting" their distributors, which meant that they might buy from

15  Pepsico for their soda products, Coca-Cola for bottled water (Dasani), and AB for

16  alcoholic beverages.  As a result, AB's wholesalers could not automatically sell

17  Monster into establishments in which AB already distributed beer. In fact, a Regional

18  Sales Manager in Texas confirmed that on-premise marketing plans, which involved

19  giveaways and promotional displays, were not working because Red Bull already had

20  exclusive agreements with on-premise accounts in place and it was hard for

21  AB/Hansen to "get its foot in the door."

22      34.    Defendants' statements about Hansen's Allied products were also false.

23  Contrary to their claims about the success of the Allied products, numerous former

24  employees have described a state of disinterest by the market in those brands,

25  especially because Hansen decided not to market those products.  Despite the

26  existence of Allied line, Hansen devoted almost all of its resources to promoting

27  Monster. A Regional Sales Manager in Texas reported that in 2006 and 2007, the

28  Company began shifting a significant amount of its marketing budget to the Monster

- 15 -

1   line. And a Senior Marketing Manager explained that Hansen paid anywhere from

2   $10,000 a year to $3.5 million a year as a sponsor, with the most lucrative agreements

3   reserved for the most well known athletes. Athletes were also eligible for additional

4   payments if they appeared on television talk shows wearing Monster gear, or if they

5   appeared in magazine photographs wearing and/or drinking Monster products.

6   Defendants left nothing for the Allied line. Indeed, a Regional Sales Manager with

7   responsibility in Arizona, Las Vegas, and California confirmed that there were no

8   high-profile marketing initiatives for Allied, such as sponsorships of athletes as was

9   the case with Monster.

10        35.    The Sales Manager in Northern California explained that based on

11   interactions with Hansen personnel, the emphasis on Monster produced an obvious

12   negative effect on the sales of non-Monster products. In fact, 90% of Hansen's

13   marketing budget went to Monster sponsoring race car drivers and other extreme

14   sports athletes. A Senior Marketing Manager placed the marketing budget for

15   Monster at $38 million compared to only $7 million for *all other Hansen products*.

16   The Company devoted approximately two or three marketing employees to all non-

17   Monster products (including Allied), compared to the approximate seven it devoted to

18   Monster. The Allied line had so little marketing resources, the witness explained,

19   because it never gained enough market share for the Company to justify spending

20   more. The consensus among three Regional Sales Managers and two National

21   Account Managers was universal – Hansen effectively sacrificed Allied for Monster

22   success. In fact, a Regional Sales Manager explained that it was clear that Allied

23   products were not being supported because there were no high-profile marketing

24   initiatives for the Allied brand.

25        36.    As a result of defendants' singular focus on Monster, retailers and

26   consumers had no interest in Allied. For example, a National Account Manager, who

27   handled the Walmart account, explained that Walmart refused Hansen's four-pack of

28   Lost because it did not want to take on more Lost products. And Regional Sales

1   Managers in Texas and Arizona have confirmed that Hansen's Rumba line suffered
2   the same fate as the Company struggled to determine whether to market it as an
3   energy drink or a juice beverage; sales were down because defendants did not market
4   Hansen's juice beverages.    This was true despite deep buy three get one free
5   discounts. As one Regional Sales Manager in Northern California put it, promotions
6   and incentives rarely ever included an Allied-related display.

7       37.    Hansen and its distributors found it difficult to place Allied products on
8   retailers' shelves since these brands were not well known, were relatively new, and
9   did not have a proven track record or brand name recognition.    According to a
10  National Account Manager for the Monster and Allied lines in Northern California,
11  there was not enough shelf space for Hansen's lesser known (*i.e.*, Allied) brands,
12  which were competing not only with the Monster beverages but also its main
13  competitors Rockstar and Red Bull. The National Account Manager explained that
14  the national chains to which he sold, such as Safeway, are "particular" about the
15  products they carry and want proven brand names on their shelves. And the Allied
16  beverages could not gain traction because Hansen did not provide adequate
17  promotional support when they were launched. As the National Account Manager
18  explained, the Company was high on Monster and neglected the other energy drinks.
19  The National Account Manager could not recall ever seeing Lost, Unbound or other
20  Allied beverages on store shelves in his area of responsibility.  And he added that
21  slotting fees to Safeway in the amount of $50,000 only applied to products within the
22  Monster line because the Manager would not waste Safeway's time on the Allied
23  lines.

24      38.    A Regional Sales Manager in Texas corroborated this account. The Sales
25  Manager explained that retailers were not interested in lesser known brands like
26  Allied, which were hard to place because many were relatively new and did not have a
27  proven track record or name brand recognition.  Allied sales languished due to the
28  lack of promotional support provided by Hansen and overall disinterest of both off-

premise and on-premise customers compared to Monster, which enjoyed much greater promotional support from Hansen, AB, and AB's distributors. Without any meaningful marketing support, Allied simply did not stand out among the 100-plus energy products available to consumers. Hansen executives knew or recklessly disregarded that their statements regarding the increased sales were false since these lines lacked any meaningful visibility or sales, without which the products simply could not achieve meaningful visibility among consumers.

39.   According to a Regional Sales Manager, the only Allied product to receive any marketing attention was Lost. But sales declines occurred not only from a lack of marketing but also because Hansen sold the product in states with no relation to surfing. A Regional Sales Manager in Texas corroborated this account, explaining that Lost only did well in coastal locations as it was associated with the Lost clothing and surfboard lines. And a Trade Development Manager in the Midwest with responsibility for Michigan confirmed that the Company did not launch any significant marketing campaigns for Lost east of the Mississippi River because the brand was associated with the surf culture as it was a tie-in product with the surfboard and clothing company of the same name. Marketing in these regions was critical since, as a Regional Sales Manager in Arizona put it, energy drink consumers in states like Kansas, Iowa and elsewhere that are not near a body of water do not necessarily know or care about the Lost surfboard company.

40.   By April 2007, sales of Lost were so bad that Hansen abandoned a Toyota FJ Cruiser promotion for Lost because its sales did not justify giving away such an expensive car. According to a Regional Sales Manager in Arizona, Hansen began working on the promotion around the beginning of the year. A Senior Marketing Manager confirmed that Hansen did, in fact, abandon the promotion in March or April 2007, adding that the Company scrapped the deal because it would have to pay for the Cruiser outright.

41.    By July 2007, Hansen started offering deep discounts for Allied products in an effort to drive sales.  A National Account Manager in Northern California explained that the Company started offering a $12 promotion on cases of Allied products, which was essentially a 50% price cut for distributors, and kept that deal in place until the end of the year despite the fact that such promotions would only be in place typically for about a month.  The National Account Manager believed that offering this promotion for six months signaled that the Company was desperate to sell Allied products.  The National Account Manager mentioned that Hansen offered additional discounts (*e.g.*, mark downs for higher volume orders) to large customers in an effort to sell more of the non-Monster energy drinks, but still Hansen struggled to achieve its sales targets for Lost, Unbound and Ace.  These promotions were initiated by Hansen's Vice President in charge of Lost who would issue internal memos to all of the National Account Managers with the expectation that the National Account Managers communicate these offers to the customers.  Although they in turn communicated the offers, none of the National Account Managers expected to achieve substantial sales of Lost, Ace or Unbound because of the paltry sales of the Allied energy drinks.

42.    Defendants had actual knowledge that Hansen's Allied products were suffering and that the Allied line was certainly not producing the type of sales that would offset margin pressure in the Monster line.  In addition to the extreme step of abandoning the FJ Cruiser promotion in March or April and offering unprecedented discounts beginning in July, the Company held a national sales meeting in June/July 2007 at a casino near the Company's Corona, California, headquarters, which the Regional Sales Manager attended.  The meeting was attended by top-ranking sales personnel, including Jim Hahn and Richard Hastings as well as Sacks and about 200 Hansen staff members.  During this meeting, defendant Sacks expressed serious concern with the poor sales performance of Lost and the other Allied products.  According to a Regional Sales Manager in attendance, the sales personnel were

1  "shocked" by the sudden stress on Allied sales since they had never been a priority
2  before the meeting. The Sales Manager recalled the Company had increased sales in
3  2006 by $200 million over the previous year and sales personnel expected to be
4  congratulated. Instead, the Company gave a lot of credit to marketing personnel and
5  "beat up" on the sales people.

6      43.    The next day, the meeting attendees attended a drag racing event where a
7  new Monster drag race car was unveiled that the Regional Sales Manager estimated to
8  have cost the Company $5 million to sponsor. When the sales personnel returned to
9  their home bases, they discovered that Hansen had docked 50% of their expected
10 bonuses and that the bonuses for 2007 would depend on Allied sales. A National
11 Account Manager for Hansen corroborated this information by explaining that Hansen
12 started putting pressure on regional managers to sell more Allied products in 2007 and
13 indicated that people could lose their jobs if they did not bring in more distribution
14 agreements for Allied.

15 **Hansen Issues False 2Q07 Financial Results**

16     44.    On August 8, 2007, Hansen announced extraordinary results for 2Q07.
17 Hansen reported sales of $280.6 million (or 54% growth) and $0.46 EPS (excluding
18 one-time charges), which beat estimates by as much as $33 million *and $0.10 EPS*.
19 In the conference call that followed, Sacks attributed the extraordinary second quarter
20 results to various factors, including normal acceleration in summer sales and a "little
21 bit" of buy-in ahead of a price increase. And Sacks dispelled analysts' concerns about
22 Hansen's results reflecting shipments rather than actual sales:

23         Astrachan: . . . I'm just trying to get a sense for general demand here at
24         retail versus what it is in terms of how you're shipping the product.
25         Sacks: . . . I can only assume it follows. Distributors don't keep
26         inventory and they [sic] probably one of our problems is they buy on too
27         short notice. That's probably the biggest problem. But what we sell is
28

1    going through, it's going through to the retail stores and going th[r]ough

2    to consumers.

3        45.    Analysts were excited about the results.  A Goldman Sachs analyst noted

4    that the results should *"stem investors' concern about the beverage firm's slowing*

5    *expansion over the previous four to six quarters."*  Canaccord Adams maintained

6    their "BUY" rating and raised their price target to $52 from $47 and JP Morgan

7    reiterated their "Overweight" rating, noting that the results were "very strong and high

8    quality" and *that operating expenses were lower than expected.*  Analysts were also

9    excited about Hansen's prospects for the next quarter.  Canaccord Adams stated that

10   "Hansen indicated that total sales for the month of July were up 44%, *well above our*

11   *Q3 estimate as strong Monster sales trends continue."*  Hansen shares shot up 13% in

12   response.

13       46.    Hansen's 2Q07 financial results were false and materially misleading.

14   Given the market's reaction to Hansen's results in 2Q06 and 1Q07, when the

15   Company missed analyst expectations, defendants knew that another poor showing

16   would wipe out Hansen's stock and the value of their personal holdings.  They

17   therefore manipulated Hansen's results to exceed expectations.  Indeed, a National

18   Account Manager reported that Vice President of National Accounts, Richard

19   Hastings, instructed the witness to withhold reporting promotional costs associated

20   with the Walmart account in 2Q07 to improve Hansen's results.  Hansen's 2Q07

21   financial results therefore did not include what the witness estimated were hundreds of

22   thousands of dollars of expenses related to the Walmart account.  The National

23   Account Manager also added that 2Q07 promotional costs were significant because

24   the Manager had arranged "rollback" promotions at Walmart, which were in-store,

25   high visibility displays/promotions related to all of Hansen's products.

26       47.    Less than a month after defendants' statements drove Hansen's stock up

27   13%, defendants bailed out of $75 million worth of Hansen stock.  Defendants' sales

28   were extremely suspicious in timing and amount.  Not only did they come days after

1  Hansen reported extraordinary results (this was the first time in five quarters that
2  Hansen had exceeded consensus estimates by a significant amount), defendants sold
3  between 66% and 100% of their holdings only 12 weeks before Hansen announced an
4  equally extraordinary miss in 3Q07. Sacks and Schlosberg each sold more than $18.7
5  million worth of Hansen stock and an additional joint sale of $35 million of their
6  Hansen stock held by Hilrod Holdings, L.P., and Thomas Kelly sold more than $2.7
7  million. Defendants therefore timed their sales to take advantage of material non-
8  public information.

9  **Hansen Reveals the Truth**

10      48.      Then, on November 8, 2007 (only after dumping their stock), defendants
11  shocked the market by announcing that Hansen would miss consensus estimates by as
12  much as $0.03 per share. The reasons for the miss were as shocking as the miss itself.
13  Sacks disclosed that contrary to their prior representations, Hansen had put a "brake
14  on" the AB deal and that AB had its "focus on their own products" to the detriment of
15  Monster and the Allied line, that they were questioning what to do with the AB
16  transition going forward, and that the Allied line showed overwhelmingly poor sales,
17  coming in at $10 million lower than Hansen's estimates and $6 million lower than the
18  previous year:

19              As I've indicated previously, by and large, the transition
20          arrangements to the A-B system is largely complete. *We did put to*
21          *brake on them. We are looking to, you know, as what we should be*
22          *doing going forward.* There will be some selected markets, where I
23          believe we will continue to transition the additional markets to the A-B
24          system, but that will be done on a carefully selected and determined
25          basis.

26                              *        *        *

27

28

We're working through some issues in sort of integrating the sales effort into the A-B sales team. *There are some challenges there because they've got their focus on their own products, as well*.

\*     \*     \*

Some of the decreases that we had were in – Lost as a brand has sort of suffered some reductions in sales and making – taking steps to address that. Joker and Ace and Unbound are all products where – on the Allied product side, we have seen falloff in sales, which have been disappointing, and we're looking at decisions on what we'd do with those lines and how we'd address them going forward.

\*     \*     \*

*The effect of the drop-off in sales of what I would call these Allied products was, in the quarter, about $5.5 million. $5.5 to $6 million with Energy. So about $6 million was the drop-off in the other Energy products right from the previous year. Obviously, we had expected an increase. So, obviously, that has affected the numbers so quite dramatically*.

\*     \*     \*

If we had been projecting a 40% increase, or 50%, on the Allied products, what you've got – it's there in your numbers, *that would have made about a $10 million difference*.

49.   Hansen's stock collapsed 32.5% on the news on volume of 18.4 million shares. Hansen's stock dropped from its close of $56.67 on November 7, 2007, to an intra-day low of $38.25 on the day of the announcement. The following chart depicts the impact of defendants' fraud on Hansen's stock price:



Hansen Natural Corp.

October 2, 2006 to December 31, 2007

Dollars Per Share

**5/7/07:**
1Q07 - Missed Analyst Estimates by $0.01 EPS
Hansen/AB Off-Premise Agreement "Progressing Well"
Distribution of Unbound Contributes to Record Revenues
Very Positive About Relationship and Quality of Distribution

**11/9/06:**
3Q06 - In-Line with Analyst Estimates
Transition to AB will Continue to Help Us

Allied Line
• Lost is Up on Last Year
• Joker and Unbound Good Velocity
• Rumba Has Got a Lot of Legs

Allied Line Will Offset Margin Pressure in Monster Line

**2/27/07:**
4Q06 - In-Line with Analyst Estimates
Hansen/AB Will Jointly Market to On-Premise Channel

• AB Distribution System Improved Quality of Hansen Sales
• AB Holdouts for Monster Resolved

**2/9/07:**
Hansen/AB On-Premise Distribution Deal
• Will Build on Success of Monster and Other Drink Brands
• AB Outstanding Business Partner for Last Eight Months

**May 2007:**
FJ Cruiser Promotion for Lost Abandoned
Sales Do Not Justify Cost

**June/July 2007:**
Sacks Chastises Sales Reps for Poor Allied Sales
Bonuses Cut by 50%
2007 Bonuses Tied to Allied Sales
50% Discount for Allied Drinks

**5/23/07:**
Meeting with JP Morgan
• Benefits from AB Off-Premise Ramping Up
• Initial "Hiccups" By Prior Distributors and Spotty Initial AB Execution Resolved

**8/7/07:**
False 2Q07 Results Exceed Analyst Estimates by $0.10 EPS
National Account Manager Instructed to Hold Back WalMart Promo Costs

Analysts
• Expenses 50 Basis Points Below Expectations
• Results Should "Stem Investors Concerns"

**8/13/07 - 9/14/07:**
Defendants bail out of $75 million of HANS stock.

**11/8/07:**
3Q07 Results Miss Analyst Estimates by $0.03
Hansen Puts Brake on AB Deal
AB Focusing on AB Products
Allied Drinks Miss by $6M

Class Period : 11/9/06 - 11/8/07

$75
$60
$45
$30
$15

10/02/2006
11/01/2006
12/04/2006
01/08/2007
02/08/2007
03/13/2007
04/13/2007
05/15/2007
06/15/2007
07/18/2007
08/17/2007
09/19/2007
10/19/2007
11/20/2007
11/01/2006
12/21/2007

- 24 -

1

**JURISDICTION AND VENUE**

2   50.   The claims asserted herein arise under and pursuant to §§10(b) and 20(a)

3   of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated

4   thereunder by the SEC (17 C.F.R. §240.10b-5).

5   51.   This Court has jurisdiction over the subject matter of this action pursuant

6   to 28 U.S.C. §1331 and §27 of the Exchange Act.

7   52.   Venue is proper in this District pursuant to §27 of the Exchange Act and

8   28 U.S.C. §1391(b).   Many of the acts charged herein, including the preparation and

9   dissemination of materially false and misleading information, occurred in substantial

10   part in this District.

11   53.   In connection with the acts alleged in this Complaint, defendants, directly

12   or indirectly, used the means and instrumentalities of interstate commerce, including,

13   but not limited to, the mails, interstate telephone communications and the facilities of

14   the national securities markets.

15

**THE PARTIES**

16   54.   Plaintiff Structural Ironworkers Local Union #1 Pension Fund (the

17   "Fund") was appointed Lead Plaintiff by order of the Court dated July 13, 2009.   The

18   Fund's Class Period purchases of Hansen common stock are on file as an exhibit with

19   the Court in connection with the Fund's motion for Lead Plaintiff.

20   55.   Defendant Hansen, through its subsidiaries, engages in the development,

21   marketing, sale, and distribution of beverages in the United States and Canada.

22   56.   Defendant Rodney C. Sacks ("Sacks") is, and was at all relevant times,

23   Chairman and Chief Executive Officer ("CEO") of Hansen.

24   57.   Defendant Hilton H. Schlosberg ("Schlosberg") is, and was at all relevant

25   times, Vice Chairman, President, Chief Operating Officer and Chief Financial Officer

26   ("CFO") of Hansen.

27

28

1    58.    Defendant Thomas J. Kelly ("Kelly") is, and was at all relevant times,
2    Vice President of Finance of Hansen Beverage Company, Hansen's operating
3    subsidiary.

4    59.    Defendants Sacks, Schlosberg, and Kelly are collectively referred to
5    herein as the "Individual Defendants."

6    60.    During the Class Period, the Individual Defendants, as senior executive
7    officers and/or directors of Hansen, were privy to confidential and proprietary
8    information concerning Hansen, its operations, finances, financial condition and
9    present and future business prospects. The Individual Defendants also had access to
10   material adverse non-public information concerning Hansen, as discussed in detail
11   below. Because of their positions with Hansen, the Individual Defendants had access
12   to non-public information about its business, finances, products, markets and present
13   and future business prospects via internal corporate documents, conversations and
14   connections with other corporate officers and employees, attendance at management
15   and/or board of directors meetings and committees thereof, and via reports and other
16   information provided to them in connection therewith. Because of their possession of
17   such information, the Individual Defendants knew or recklessly disregarded that the
18   adverse facts specified herein had not been disclosed to, and were being concealed
19   from, the investing public.

20   61.    The Individual Defendants are liable as direct participants in the wrongs
21   complained of herein. In addition, the Individual Defendants, by reason of their status
22   as senior executive officers and/or directors, were "controlling persons" within the
23   meaning of §20(a) of the Exchange Act and had the power and influence to cause the
24   Company to engage in the unlawful conduct complained of herein. Because of their
25   positions of control, the Individual Defendants were able to and did, directly or
26   indirectly, control the conduct of Hansen's business.

27   62.    The Individual Defendants, because of their positions with the Company,
28   controlled and/or possessed the authority to control the contents of its reports, press

1  releases and presentations to securities analysts and through them, to the investing
2  public. The Individual Defendants were provided with copies of the Company's
3  reports and press releases alleged herein to be misleading prior to or shortly after their
4  issuance and had the ability and opportunity to prevent their issuance or cause them to
5  be corrected. Thus, the Individual Defendants had the opportunity to commit the
6  fraudulent acts alleged herein.

7        63.    As senior executive officers and/or directors and as controlling persons of
8  a publicly traded company whose common stock was, and is, registered with the SEC
9  pursuant to the Exchange Act, and was, and is, traded on the NASDAQ National
10  Market ("NASDAQ") and governed by the federal securities laws, the Individual
11  Defendants had a duty to promptly disseminate accurate and truthful information with
12  respect to Hansen's financial condition and performance, growth, operations, financial
13  statements, business, products, markets, management, earnings and present and future
14  business prospects, and to correct any previously issued statements that had become
15  materially misleading or untrue, so that the market price of Hansen's common stock
16  would be based upon truthful and accurate information. The Individual Defendants'
17  misrepresentations and omissions during the Class Period violated these specific
18  requirements and obligations.

19        64.    The Individual Defendants are liable as participants in a fraudulent
20  scheme and course of conduct that operated as a fraud or deceit on purchasers of
21  Hansen's common stock by disseminating materially false and misleading statements
22  and/or concealing material adverse facts. The scheme: (i) deceived the investing
23  public regarding Hansen's business, operations, management and the intrinsic value of
24  Hansen's common stock; (ii) allowed the Individual Defendants and other Company
25  insiders to sell their personally-held Hansen common stock for gross proceeds in
26  excess of $75 million; and (iii) caused plaintiff and members of the Class (defined
27  below) to purchase Hansen's common stock at artificially inflated prices.

28

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

65.    The Class Period starts on November 9, 2006.    That day, Hansen announced financial results for 3Q06.    After having experienced a 35% drop in Hansen's stock after missing analyst expectations in 2Q06, defendants reported results that were in line with analyst expectations.    During the Company's 3Q06 earnings conference call, and to offset the decline in Hansen's stock price, defendant Sacks emphasized the strength of Hansen's relationship with AB and the success of its Allied products.    According to Sacks, Hansen's relationship with AB would "continue to help" the Company and improve the quality and quantity of Hansen's sales.    Sacks also emphasized that Hansen's "Allied" products had "good velocity" and "a lot of legs" and claimed that Hansen's Lost energy drink, which was second only to Monster, was "up on last year" even with a "disruption" that Hansen had experienced transitioning to AB:

We think that the transition to Anheuser-Busch is really going to continue to help us.

\*          \*          \*

We really are very happy with the transition.    The Anheuser-Busch group are really a professional group.    We're getting good information from them.    We really do see that they're very motivated at the distributor level, and we are very confident that will improve both the quality and the quantity of product being sold by them and distributed.

\*          \*          \*

In the energy category, we're still very positive about Lost.    It is still one of the top 10 selling brands in the country, and it is up on last year even with the disruption we've experienced.    It is doing pretty nicely in the California market where the disruption was far less.

1     We do believe that these other brands, if you look at some of the

2     convenience [store] sales velocity, Joker is at a good velocity and so is

3     Unbound. Looking at those products, their velocity is higher than some

4     of the Coke and Pepsi products, and on a per-point basis. We really do

5     believe that those products do have good opportunity.

6                      \*      \*      \*

7     The one we honestly believe – it's difficult to tell because it may

8     be very premature, but we do believe that Rumba has got a lot of legs

9     because as the category matures and becomes more mainstream, Rumba

10     is one of the only maybe not the only but one of the only energy drinks

11     that is non-carbonated and is 100% juice product. We believe that that is

12     ideally placed for the morning consumer which is a big sector of the

13     category.

14     66.    During the question and answer session with analysts, defendants went so

15  far as to suggest that strong sales of Allied would help offset margin pressure in the

16  Monster line:

17     [Q.] You think your gross margins will be affected by the increase of

18     24-ounce cans [of Monster] going forward?

19     [A. Sacks] They might be a little bit, yes. We were hoping that it has

20     been a little slow in getting out – that we would be able to offset that

21     partially by the 8-ounce and *we're hoping that we will also be able to*

22     *offset some of that percentage by the increased sales in Ace, Joker and*

23     *Unbound which are also in 16-ounce sizes which have more traditional*

24     *margins, so we think those will also help improve our – on the other*

25     *side would help improve it.*

26     The margins of Ace into the Cadbury Schweppes group are lower,

27     and the margins of Joker into Cadbury Schweppes and some of the

28     Circle-K group here has a lower margin, but we're not responsible for

1    some of the promotional – most of the promotional costs on those items

2    to those customers.  That also has an effect on their gross profit, but

3    other brands like Unbound are going through the traditional channel and

4    *Joker and Rumba those will help pick up some margins*.

5    67.    Defendants' statements about Hansen's relationship with AB were false

6  or materially misleading when made.  Contrary to their claims, the relationship was

7  encountering significant problems and damaging Hansen's business.  As alleged in

8  ¶¶21-23 above, AB had no interest in distributing Hansen's Allied beverages and

9  largely abandoned the products after signing the original deal.   In fact, AB's

10  disinterest was a significant contributor in the loss of market share for at least

11  Hansen's Lost product line.   To make matters worse, Hansen was facing

12  insurmountable hurdles with AB's status as an alcohol distributor.   Alcohol

13  regulations throughout the country either prohibited or restricted AB's ability to

14  distribute Hansen's products, which led to Hansen having to undertake obligations and

15  costs that should have been borne by the distributor.

16    68.    Defendants' statements about the success of Hansen's Allied products

17  were also false or materially misleading when made.  Contrary to these claims,

18  Hansen's Allied products were experiencing overall disinterest in the marketplace,

19  which was exacerbated by AB's disinterest in distributing the products as well as a

20  lack of marketing for the products. As alleged in ¶¶34-41, countless witnesses have

21  reported that Hansen wholly failed to market these products and, in fact, viewed them

22  more as a product to take up shelf space to inhibit Hansen's competitors than to

23  contribute to Hansen's growth. In fact, one witness reported that the primary purpose

24  of creating the line was to appease distributors that had been replaced by AB. Hansen

25  devoted 90% of its marketing budget to Monster and allotted the remaining 10% to *all*

26  *other Hansen products*, which countless witnesses throughout the country have

27  confirmed damaged the viability of the Allied line.

28

69.    In response to these statements, Hansen's stock began an upward climb from $24.88 to over $38 in January.

70.    On February 9, 2007, defendants announced a new agreement with AB. Despite the fact that their prior agreement included on-premise distribution, Hansen entered into an "On-Premise Sales and Distribution Deal" that was supposed to open a "significant new and incremental sales channel for Monster Energy® that will play an essential role in continuing the development of the image and personality of our Monster Energy® brand . . . ." The release also quoted Sacks as saying that "[w]e look forward to working together to **build on the success** of Monster Energy® **and our other energy drink brands**":

> **Hansen Natural Corporation and Anheuser-Busch Announce On-Premise Sales and Distribution Deal**
>
> **Monster Energy® to be Sold and Distributed Through Anheuser-Busch, Inc. Wholesaler Network; Agreement Significantly Expands On-Premise Channel for Hansen's Monster Energy® Brand**
>
> CORONA, Calif. (Feb. 9, 2007) – Hansen Natural Corporation (Nasdaq: HANS) and Anheuser-Busch, Inc. (NYSE: BUD) today announced they have concluded an agreement under which Anheuser-Busch, Inc. will manage and coordinate the sales, distribution and merchandising of Monster Energy® energy drinks to on-premise retailers including bars, nightclubs and restaurants in territories approved by Hansen. Terms of the agreement were not disclosed. Select Anheuser-Busch wholesalers currently distribute Monster Energy®, Lost® Energy™ and Unbound® energy drinks, as well as Rumba™ energy juice, to off-premise accounts in certain U.S. markets following agreements signed between Anheuser-Busch and Hansen Natural Corporation in May 2006. This new agreement will provide Anheuser-Busch designated wholesalers with an opportunity to sell Monster Energy® to on-premise accounts.

\*    \*    \*

"Anheuser-Busch has been an outstanding business partner for the last eight months, and we are excited to expand our relationship with them to include the on-premise channel – a significant and largely untapped market for our products," said Rodney C. Sacks, chairman and chief executive officer of Hansen Natural Corporation. "This agreement opens a significant new and incremental sales channel for Monster Energy® that will play an essential role in continuing the development of the image and personality of our Monster Energy® brand and provide extremely important sampling opportunities. We look forward to working together to build on the success of Monster Energy® and our other energy drink brands."

71.    On February 27, 2007, Hansen announced results for 4Q06 that were, again, in line with analyst expectations. On the Company's 4Q06 and year-end conference call, defendant Sacks again promoted the new AB on-premise agreement. He told investors that "Anheuser-Busch themselves as a corporation will be coming actively involved in jointly marketing to this channel with us" and claimed that "we believe it is an incremental channel for us, and we're very excited by it":

We're also looking at some alternative packages this year. Principally to cater for the on premise agreement that we have concluded a couple of weeks back with Anheuser-Busch Inc. Under that agreement, Anheuser-Busch Inc. at a corporate level will be responsible for selling and basically joined with us in marketing products to the on-premise channel. . . . *it will enable us to secure quite extensive distribution in the on-premise channel*.

\*    \*    \*

Obviously, the actual sales into the on-premise channel will still be handled by the Anheuser-Busch distributors. But Anheuser-Busch

- 32 -

1     themselves as a corporation will be coming actively involved in jointly

2     marketing to this channel with us. So, we think that's pretty exciting.

3         72.    During the question and answer session, defendants promoted the

4 transition to AB as a "good system" that they were comfortable with. They also

5 emphasized that the relationship "has improved the quality of our distribution in

6 stores" and "point of sale merchandising:"

7     [Q.] [Y]ou had mentioned to me in December that you were taking a

8     second evaluation of your switch to your – your off-premise distribution

9     change over to Bud, and you were evaluating kind of where you stood

10     and whether or not you would execute a second wave of change overs

11     early in the year. Can you just give us an update on what that evaluation

12     yielded and what your decision has been?

13     [A. Sacks]  We are – *we have been comfortable.  We think that the*

14     *quality of our sales to that system, by the system is, has improved the*

15     *quality of our distribution in stores, execution, point of sale*

16     *merchandising has improved. Generally so, we are happy with – with*

17     *that system.* . . . but we have – you know, we're looking at doing it on –

18     on – sort of – not a slower bases, but just maybe – you know, just a more

19     controlled roll out. . . . *But generally, we are continuing to transition*

20     *areas in to the AB system within the US. We think that is a good*

21     *system.*

22         73.    Defendants addressed the slowdown in sales of Lost and attributed it to

23 the AB relationship. But instead of telling investors the truth about AB's lack of

24 interest in the Allied line, they blamed the slowdown on a "hold out" by certain

25 distributors that had not been awarded Monster. They suggested that now that the

26 new agreement gave these distributors access to Monster, the situation had been

27 addressed and would improve:

28

1    [Q.] Can you also talk about what you are seeing in terms of Lost in

2    number – how that transition is actually going there?

3    [A. Sacks] What is happening Lost – Lost is up on sales for the year

4    from last year, but, it did suffer quite a bit of out of stocks and quite a bit

5    of disruption during the transition. *We're still working through some of*

6    *the areas we lost didn't lose distribution in this whole transition, where*

7    *we did get some resistance from those, Budweiser distributors who*

8    *didn't – weren't awarded Monster, who basically held out for Monster*

9    *and didn't take Lost. We think that will be, that situation will be*

10   *improved as we go forward with the on-premise because by [and] large,*

11   *all of the Budweiser distributors will be getting the on-premise*

12   *Monster, . . . and they will – those that sort of haven't taken Lost will*

13   *take Lost, and so, we think we'll be able to improve our distribution*

14   *with Lost as we go forward.* Pretty much that's just one of the, just the

15   side effects of the on-premise going forward. Rumba has started to go to

16   the system and is doing quite nicely.

17   74.    Defendants' statements about Hansen's relationship with AB were false

18   or materially misleading when made. As alleged in ¶¶30-33 above, the quality of

19   Hansen's distribution and point of sale merchandising was not improving in many

20   parts of the country and Hansen's sales were suffering because AB could not or would

21   not distribute Hansen's products in many areas with strict alcohol regulations. Indeed,

22   defendants found themselves performing tasks that should have been performed by

23   Hansen's distributors because AB was either unable or unwilling to perform those

24   tasks. This increased costs and diminished Hansen's distribution overall in many

25   parts of the country.

26   75.    To make matters worse, the significant decline in Lost's market share

27   came not because certain AB distributors held out until they were awarded Lost but

28   instead because AB had no interest in distributing a product that was not well-known

1  or well-received in the marketplace.    Indeed, distributors viewed doing so as
2  potentially damaging their relationships and jeopardizing their market share.
3  Defendants therefore entered into the supplemental agreement with AB to try to
4  incentivize AB to distribute products that it had no interest in distributing.  At no time
5  did defendants disclose these critical facts to investors.

6      76.    On May 7, 2007, Hansen announced its results for 1Q07.  In a press
7  release, defendants attributed "record revenues" to continued strong sales of Monster
8  and the expansion of distribution of Unbound, one of Hansen's "Allied" energy
9  drinks.  They also explained that the implementation of the off-premise distribution
10 agreement was progressing well and that Hansen was planning to implement its on-
11 premise distribution agreement with AB prior to the end of 2Q07:

12         Hansen Natural Corporation (NASDAQ:HANS) today reported
13     record sales for the first quarter ended March 31, 2007.

14                         *         *         *

15         Rodney C. Sacks, chairman and chief executive officer, said the
16     record revenues reflected continued strong sales of Monster Energy®
17     brand energy drinks, as well as the expansion of distribution of
18     Unbound® brand energy drinks.  "The energy category continued to
19     show strong growth over the prior year, and the Monster Energy® brand
20     grew well in excess of the market.  Monster continued to gain increased
21     distribution during the quarter," Sacks said. . . .

22         Sacks also noted that the implementation of the off-premise
23     distribution arrangements with selected Anheuser-Busch wholesalers
24     was progressing well, and effective mid April 2007, the Company
25     commenced distribution arrangements with PepsiCo Canada. Sacks
26     added that the Company is planning to implement its on-premise
27     distribution agreement with Anheuser-Busch Inc. prior to the end of the
28     second quarter.

77.    On the conference call the same day, defendants continued to mislead investors about Hansen's relationship with AB. They claimed that the agreement was "getting into place" and added that they were "still very positive about the relationship":

> Going forward, the Anheuser-Busch relationship is getting into place. It is gearing up.
>
> *        *        *
>
> Some of it is the fact that some of the – we think the AB distributors don't go to as many accounts as we have previously covered, some of the small mom and pops, by basically the non-alcoholic bottler that we had before. We think that will get addressed. We're also making changes to our staffing there to deal with that. So we think that those are markets that will improve and, we will, obviously, address the Northwest.
>
> ***But going forward, overall, we're still very positive about the relationship and about the quality of the distribution and the long-term strength that this distribution system will bring to our Company*** in addition to the existing hard core of our existing distributors who we are happy with.

78.    While defendants announced record revenues on strong sales of Monster and expanded distribution of Unbound, Hansen's results again came in below analyst expectations by a ***single penny*** – at $0.28 instead of the estimated consensus of $0.29. Like before, Hansen stock was pummeled as a result, dropping from its close of $39.32 on May 4, 2007 to an intra-day low of $36.04 on May 7, 2007. Defendants knew that they had to do something to stem the slide in Hansen's stock.

79.    Despite limited public access and a proclamation that they would limit their comments to analysts while a stock option investigation was ongoing, defendants granted an interview to JP Morgan analyst Dara Mohsenian in May 2007. During that interview, defendants Sacks and Schlosberg pushed the strength of its relationship

1  with AB and its energy products as a whole.  They told Ms. Mohsenian that the
2  benefits of transitioning to AB distributors was starting to ramp up after initial
3  "hiccups" in the second half of 2006, attributed the "hiccups" to *prior* distributors
4  losing focus and spotty "initial execution" by AB, which they represented had been
5  resolved, and repeated that Hansen's "on-premise agreement with Anheuser Busch
6  should start to ramp up by the end of Q2":

7  > We are reiterating our Overweight [rating] on Hansen following a
8  > recent positive management meeting with CEO Rodney Sacks and CFO
9  > Hilton Schlosberg.  We continue to believe that the market is
10 > undervaluing Hansen's growth opportunity over the next few years . . . .
11 > ***Near-term catalysts include expanding off-premise distribution, entry***
12 > ***into the on-premise channel***, international expansion, pricing, and new
13 > products.

14 *       *       *

15 **Benefits from A-B Wholesaler Off-Premise Distribution are**
16 **Ramping Up**

17 Hansen's commentary was positive regarding the ongoing
18 transition of Monster distribution to Anheuser-Busch distributors on a
19 selective basis.  There were initial hiccups in a number of transition
20 markets in H2 of 2006 as *prior distributors* lost their focus on Hansen
21 products prior to changes, and A-B distributors' *initial execution* was
22 spotty given the challenges in adjusting to distribute non-alcoholic
23 products for a distribution system previously focused on alcoholic
24 products.

25  80.    At the conclusion of her report, Ms. Mohsenian reiterated her
26 "Overweight [rating] on Hansen after a bullish meeting with Hansen's management
27 team."

28

- 37 -

81.    Defendants' statements about Hansen's relationship with AB were false or materially misleading when made. Contrary to their claims, the relationship encountered significant problems and damaged Hansen's business. As alleged in ¶¶30-33 above, in addition to having no interest in distributing Hansen's Allied products and having largely abandoned the products after signing the original deal, Hansen was facing insurmountable hurdles with AB's status as an alcohol distributor, which was limiting Hansen's off-premise distribution and increasing Hansen's costs. Indeed, countless witnesses have explained that alcohol regulations throughout the country either prohibited or restricted AB's ability to distribute Hansen's products, which led to Hansen having to undertake obligations and costs that should have been borne by the distributor.

82.    Defendants' statements about the success of Hansen's Allied products were also false or materially misleading when made. As alleged in ¶¶34-41 above, Hansen's Allied products were experiencing poor sales in the marketplace not only from AB's disinterest in distributing the products, but also from defendants' decision to effectively abandon any marketing for the product. Countless witnesses reported that Hansen wholly failed to market these products and viewed them as a product to take up shelf space to inhibit Hansen's competitors. In fact, Hansen devoted 90% of its marketing budget to Monster and the remaining 10% *to all other Hansen products*. Witnesses have confirmed that this lack of marketing damaged the viability of the Allied line throughout the entire country.

83.    Defendants took notorious steps between the months of April and July to reverse the slide in Hansen's Allied products. Indeed, defendants abandoned a high profile FJ Cruiser promotion for Lost because sales did not justify the expense of the car, which the Company would have had to pay for outright, and authorized a $12 promotion (50% discount) on cases of Allied products that one witness described as a desperate attempt to increase sales of the brand. Defendants also took the extreme step of berating their sales representatives at a sales meeting in June or July of 2007

1   for failing to push the Allied line and docked their bonuses by 50% to reflect poor

2   sales of Allied beverages. And contrary to its practice of tying bonuses to sales of

3   Monster, defendants changed course and tied bonuses to the sales of Allied products

4   for 2007. These statements belied any claim by defendants that sales of Allied

5   products were strong or contributed to Hansen's record results.

6       84.    On August 8, 2007, defendants stunned the market by announcing

7   financial results that far exceeded analysts' expectations. Hansen announced $280.6

8   million in gross sales (a year-over-year increase of 54.1%), net sales of $244.8 million

9   (a year-over-year increase of 56.9%), and net income of $38.3 million or $0.39 per

10  diluted share (a year-over-year increase of 35.9%). Excluding one-time charges,

11  Hansen's earnings were an extraordinary $45.9 million or $0.47 per diluted share (a

12  year-over-year increase of 62.7%), which exceeded analysts' expectations by an

13  amazing $0.10 per share.

14      85.    Defendants used the opportunity to emphasize the strength of its

15  relationship with AB. They claimed that the relationship "is working for us," that

16  Hansen was "getting good solid distribution," and that they were generally very happy

17  with the arrangement. They also claimed that they were putting a brake on some of

18  the transition arrangements to enable Hansen's sales representatives to focus on

19  selling their products during the summer. However, they conveniently failed to

20  mention the fact that AB continued to neglect Hansen's Allied products or that AB

21  was focusing on its own products to the detriment of Hansen:

22          We sort of put a break on some of the transition arrangements during

23          summer *so we could get our guys focussed [sic] on out in the field,*

24          *focussed [sic] on selling and rather not focus on transition brands and*

25          *dealing with the numbers of the issues that go with that.* We will

26          probably continue to do a little bit of transitions after the summer but by

27          and large we are generally done in our mind at the moment with the

28          transition. *We think it is working for us, we're getting good solid*

1    *distribution, we're working with professional distributors, and so we*
2    *are generally very happy.*

3        86.    During the question and answer session, defendants assured investors that
4    the Company's extraordinary results reflected true demand for Hansen's products and
5    that Hansen's relationship with AB, while taking a little longer than defendants would
6    have liked, was progressing well.  In fact, Sacks claimed that the "proof [was] in the
7    pudding" and the "pudding" was Hansen's extraordinary 2Q07 results:

8        [Q.]  I guess I'm just trying to get a sense for general demand here at
9        retail versus what it is in terms of how you're shipping the product.

10       [A.  Sacks]  I can only assume it follows.  Distributors don't keep
11       inventory and they probably one of our problems is they buy on too short
12       notice.  That's probably the biggest problem.  But what we sell is going
13       through, it's going through to the retail stores and going th[r]ough to
14       consumers.

15                              *      *      *

16       [Q.]  Moving over to on premise, big opportunity for you, can you
17       maybe a little bit more, in terms of how you see that evolving over the
18       next year or two?

19       [A. Sacks]  We really – it's really speculative.  We just don't know.  We
20       know what's out there, we know the accounts, we know the opportunity.
21       But we just really are still in the planning and execution stages.  It is
22       taking time, as I indicated a bit earlier, it's probably a little longer than
23       we would have liked but again we have a very substantial partner in it
24       and they are a large corporation.  Things just don't happen overnight in
25       any large corporation, unfortunately.  But it is going at a good pace and
26       we're very confident that we're going to be able to make real inroads in
27       that section but it is going to take time. . . .

28

1    So this all takes time, and so I know that there has been the

2    analysis on the prebu[d] transition and post bu[d] transition, these do

3    take time. In some markets we have disappointments, *by and large we're*

4    *happy with the improvement, our sales have improved pretty much in*

5    *most of the bu[d] markets*. That we've been into.  And it is going to

6    happen, it's just a long haul, it's building yourselves, single can by can,

7    *but it is happening and we're continuing to increase our market share*

8    *off a big base, as you're aware. I think the proof is in the pudding, it is*

9    *happening for us and it will continue to, we think, improve, as we go*

10   *forward. And the same thing applies to the onpremise. We think it's*

11   *going to take time but it is going to happen and it's going to happen*

12   *well for us. We are seeing some results coming in already but it's*

13   *obviously – we've got much higher expectations than what we're*

14   *seeing at the levels we're seeing now.*

15   87.    But defendants did not stop there.  In the conference call, Sacks stated

16   that sales in July, the first month of 3Q07, were up 43.6% year-over-year.

17   Going forward, sales going into July, sales are up in July 43.6% in

18   the company.  Sales of Monster are up well over 50%.  One of the issues,

19   the sales would have – might appear at first glance to be a little lower

20   than we've achieved as an increase in sales in the third quarter, but there

21   are a number of reasons for that.  It was a short month in deliveries,

22   secondly, we had a buy in obviously in – we took up our processing of

23   our 24-ounce product and there was a buying simply one of the effects of

24   life and was normal, which obviously did boost sales a little bit in June,

25   and then it took away from sales in July, we believe that will normalize

26   as we go forward.

27                          *        *        *

28

1          Hello, just one of the things, I have got some numbers or August
2     and last year, there was quite a substantial increase in August over the
3     July, which had a similar trend.  The June number last year was higher
4     than the July number.  Generally, the sales are both up to June, it then
5     had a drop-off last year in July a little bit and then it was quite a good
6     increase in August, and then continued, there was a slight corroborate
7     back in September and then it started to level off but those are at much
8     higher levels than earlier.  What we are doing is trading off levels now
9     that are very much higher last year than the second quarter.  So there was
10    that very sort of similar trend where June was higher, July dropped off
11    and then August was substantially higher.  So just to give you that color
12    in answer to that earlier question.  Okay.  As I said, thanks very much,
13    we're happy with the results, we're excited to go forward, we think
14    we've got a great new product line, we've got some new products
15    coming and we're very excited about the second half of the year and for
16    the category generally which is continuing to show really really strong
17    and solid results for us.  Thank you once again for your support, and
18    hopefully we will be able to report to you positive results to you guys at
19    the end of the third quarter.  Thank you.

20         88.    Analysts were excited about the July sales numbers Sacks referenced in
21    the conference call. An analyst from Canaccord Adams stated that "Hansen indicated
22    that total sales for the month of July were up 44%, *well above our Q3 estimate* as
23    strong Monster sales trends continue," and an analyst from JP Morgan noted that
24    "SG&A was also 50 basis points lower than expected" as a % of sales.

25         89.    Hansen's 2Q07 results were false.  Given the market's reaction to
26    Hansen's results in 2Q06 and 1Q07, when the Company missed analyst expectations,
27    defendants knew that another poor showing would wipe out Hansen's stock and the
28    value of their personal holdings.  They therefore manipulated Hansen's results to

1    exceed expectations.    Indeed, a National Account Manager reported that Vice
2    President of National Accounts, Richard Hastings, instructed the witness to withhold
3    reporting promotional costs associated with the Walmart account in 2Q07 to improve
4    Hansen's results.  Hansen's 2Q07 financial results therefore did not include what the
5    witness estimated were hundreds of thousands of dollars of expenses related to the
6    Walmart account.  The National Account Manager also added that 2Q07 promotional
7    costs were significant because the Manager had arranged "rollback" promotions at
8    Walmart, which were in-store, high visibility displays/promotions related to all of
9    Hansen's products.

10            90.    Defendants' statements regarding initial 3Q07 results were materially
11    misleading when made.  As alleged in ¶46, defendants knew that the promotional
12    costs which were not reported in 2Q07 would be reported in 3Q07, thereby lowering
13    Hansen's profit that quarter.  Defendants also knew that buy-in prior to the 24-ounce
14    Monster price increase in 2Q07 would have a material adverse effect on 3Q07 results,
15    as retailers bought Monster in the 24-ounce can at the lower price in 2Q07 and would
16    not need as much product in 3Q07 as a result.

17            91.    As alleged in ¶¶17, 21-23 and 33, defendants' statements about Hansen's
18    relationship with AB were again false or materially misleading when made.  Contrary
19    to their claims, the relationship was not "working for" Hansen and their distribution
20    was adversely affected by AB's disinterest in Hansen's Allied brand, as well as AB's
21    distribution limitations because of alcohol regulations.  And contrary to defendants'
22    claim that they were putting the brake on transitioning to AB over the summer to give
23    their employees time to focus on sales, they did so because AB was not focusing on
24    distributing Hansen's products.  Along the same lines, defendants' statements about
25    the on-premise agreement were materially misleading.   The delay occurred not
26    because AB was a "large corporation," but instead because AB did not have the
27    connections necessary to effect the distribution and was being restricted by numerous
28    exclusivity agreements with Red Bull.

1    92.    Beginning on August 13, 2007 and continuing to August 28, 2007,

2  defendants unloaded $75 million worth of their Hansen stock. Sacks and Schlosberg

3  each sold more than $18.7 million worth of Hansen stock and an additional joint sale

4  of $35 million of their Hansen stock held by Hilrod Holdings, L.P., and Thomas Kelly

5  sold more than $2.7 million.

6                    **THE TRUTH BEGINS TO EMERGE**

7    93.    On November 8, 2007, Hansen stunned investors. After an extraordinary

8  second quarter and a wholesale dump of Hansen stock, defendants announced

9  extremely disappointing financial results that were far below analysts' expectations.

10  Unlike 2Q07, where Hansen exceeded analysts' estimates by $33 million and an

11  amazing $0.10 per share, defendants disclosed results that missed analysts'

12  expectations by $11 million and $0.03 per share, far more than the misses that had

13  pummeled Hansen's stock price in the past.

14    94.    Even more astonishing than the miss were the reasons for it. Defendants

15  disclosed for the first time that they had put the brake on the AB transition not because

16  they were trying to free up their sales representatives to sell product during the

17  summer, but because AB was not focusing on Hansen's products. They even

18  questioned what they were going to do with the relationship going forward. And

19  contrary to their previous claims about the strength of Hansen's Allied products, they

20  disclosed that Hansen's Allied products had missed expectations by up to $10 million.

21  Like the AB relationship, they also questioned the viability of the brand going

22  forward:

23              As I've indicated previously, by and large, the transition

24         arrangements to the A-B system is largely complete. *We did put to*

25         *brake on them. We are looking to, you know, as what we should be*

26         *doing going forward.* There will be some selected markets, where I

27         believe we will continue to transition the additional markets to the A-B

28

1  system, but that will be done on a carefully selected and determined

2  basis.

3              *       *       *

4  We're working through some issues in sort of integrating the sales effort

5  into the A-B sales team. *There are some challenges there because*

6  *they've got their focus on their own products, as well.*

7              *       *       *

8          Some of the decreases that we had were in – Lost as a brand has

9  sort of suffered some reductions in sales and making – taking steps to

10  address that. Joker and Ace and Unbound are all products where – on

11  the Allied product side, we have seen falloff in sales, which have been

12  disappointing, and *we're looking at decisions on what we'd do with*

13  *those lines and how we'd address them going forward.*

14              *       *       *

15  The effect of the drop-off in sales of what I would call these Allied

16  products was, in the quarter, *about $5.5 million. $5.5 to $6 million with*

17  *Energy. So about $6 million was the drop-off in the other Energy*

18  *products right from the previous year. Obviously, we had expected an*

19  *increase. So, obviously, that has affected the numbers so quite*

20  *dramatically.*

21              *       *       *

22  If we had been projecting a 40% increase, or 50%, on the Allied

23  products, what you've got – it's there in your numbers, *that would have*

24  *made about a $10 million difference.*

25      95.    Hansen's stock collapsed 32.5% on the news on volume of 18.4 million

26  shares. Hansen's stock dropped from its close of $56.67 on November 7, 2007, to an

27  intra-day low of $38.25 on the day of the announcement.

28

1

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

2    96.    During the Class Period, the defendants had actual knowledge of the

3  misleading nature of the statements they made or acted in reckless disregard of the

4  true information known to them at the time.  In so doing, the defendants participated

5  in a scheme to defraud and committed acts, practices and participated in a course of

6  business that operated as a fraud or deceit on purchasers of Hansen securities during

7  the Class Period.  The fraudulent scheme: (a) deceived the investing public regarding

8  the value of the Company's securities; (b) enabled the defendants to sell more than

9  $75 million worth of their Hansen stock at artificially inflated prices; and (c) caused

10  plaintiff and other Class members to purchase Hansen stock at artificially inflated

11  prices, causing them damage.

12

## SCIENTER ALLEGATIONS

13    97.    As alleged herein, defendants acted with scienter in that defendants either

14  knew or recklessly disregarded that the public documents and statements issued or

15  disseminated in the name of the Company were materially false and misleading, that

16  such statements or documents would be issued or disseminated to the investing public,

17  and substantially participated or acquiesced in the issuance or dissemination of such

18  statements or documents as primary violations of the federal securities laws.  As set

19  forth elsewhere herein in detail, defendants, by virtue of their receipt of information

20  reflecting the true facts regarding Hansen, their control over, and/or receipt and/or

21  modification of Hansen's allegedly materially misleading misstatements and/or their

22  associations with the Company which made them privy to confidential proprietary

23  information concerning Hansen, participated in the fraudulent scheme alleged herein.

24    98.    Defendants knew, or with deliberate recklessness disregarded, that public

25  documents and statements issued in the name of the Company were materially false

26  and misleading; knew, or with deliberate recklessness disregarded, that such

27  documents or statements would be issued or disseminated to the investing public; and

28  substantially participated or acquiesced in the issuance or dissemination of such

1    documents or statements as primary violators of the federal securities laws.
2    Defendants also routinely communicated with analysts and investors during the Class
3    Period and represented that they were informed of and knowledgeable about Hansen's
4    business and finances, specifically including the Company's relationship with AB and
5    the strength of its Allied sales.

6    99.    Defendants are the highest ranking executive officers within Hansen,
7    holding top management positions such as Chairman and CEO, CFO and COO.
8    Accordingly, defendants were intimately aware of, and involved in, all core operations
9    of the Company. Defendants received regular briefing as to sales, growth, margins,
10   distribution agreements, correspondence with the public market, and all other
11   operations central to the management of the Company. Further, defendants, in the
12   name of the Company, attended, participated in, approved, and managed all major
13   conference calls, press releases, and official interaction and communication with the
14   financial press, public markets, and investors.

15   100.    Due to the circumstances described in this Consolidated Complaint,
16   nothing was more important to defendants than sales growth and the success of its
17   products. Defendants knew that there was a direct correlation between sales growth
18   and Hansen's stock price.   Indeed, when Hansen missed sales estimates for a
19   particular quarter, Hansen executives saw the stock plunge time and time again. The
20   ongoing fraudulent scheme described in this Complaint could not have been
21   perpetrated over the substantial time period, as has occurred, without the knowledge
22   and complicity of the insiders and personnel at the highest levels of the Company.

23   101.    Defendants monitored and reviewed specific reports on these material
24   indicators and knew, based on their review of such information, that their alleged
25   Class Period misrepresentations were false and misleading. A Regional Manager
26   indicated that the Company "lived and died" by the Nielson numbers and, if the
27   Company experienced even a half-percent drop in market share related to Monster,
28   Company executives would "freak out." The witness further indicated that Sacks was

1 known to carry two or three binders with him that contained the Nielsen numbers.
2 Another Regional Sales Manager confirmed that the Company measured its
3 performance by the Nielsen numbers. And a former Cost Accountant confirmed that
4 all sales data was kept in a computer system called Mass 500, and was available
5 almost immediately to those with access to the system, which would undoubtedly
6 include each defendant. Therefore, executives within Hansen were intimately aware
7 of the position of Hansen's product in the marketplace and the status of its sales. In
8 fact, defendant Sacks made repeated reference to the position of Hansen's products
9 during the Class Period.

10    102.    Defendants further had actual knowledge that Monster and, particularly,
11 Allied sales were declining. According to an On-Premise Sales Manager for the
12 Monster and Allied lines, each sales manager would provide their sales figures to
13 James Powell, a National On-Premise Sales Manager, who would compile the sales
14 figures into a master spreadsheet. Defendants either knew of this information or
15 recklessly disregarded it as they repeatedly referenced this information during the
16 Class Period. Given the importance of Monster and Allied to Hansen's success and
17 growth, defendants knew that their sales in the Allied line and Monster were
18 declining. Further, the witness described monthly conference calls that were
19 moderated by On-Premise Sales Director, Dan Lamb. During these calls, Lamb and
20 the other On-Premise Managers discussed sales performance and strategy. This
21 information filtered up to the senior executives. In fact, the witness also described a
22 yearly meeting attended by defendant Sacks, along with all sales personnel, where
23 they undoubtedly discussed sales performance and strategy.

24 **Knowledge of Deficiencies Related to the Anheuser-Busch Agreement**

25    103.    Due to Hansen's reliance on outside distributors for the vast majority of
26 its distribution of Monster and Allied, including the convenience store channel vital
27 for Monster sales, successful execution and maintenance of distribution agreements
28 were integral to the Company's operations. Agreements such as those entered into by

1  Hansen with AB in May 2006 and February 2007 drove the market penetration, sales
2  growth, and the overall success of Hansen products.  Consequently, defendants knew
3  that complications with such integral distributors and distribution agreements could
4  greatly impact the Company's sales, margins, and growth prospects.  Because these
5  agreements were of such critical importance to the core operation of Hansen's
6  business, undoubtedly, defendants focused on them.  Moreover, defendants approved
7  Hansen's distribution agreements with AB and, as such, were intimately aware of the
8  terms and limitations of the agreements as well as problems and complications that
9  developed due to the agreements.  In fact, defendants made repeated reference to the
10  status of the relationship throughout the Class Period and even misrepresented the
11  motivation behind the expanded agreement with AB.  Sacks, in a February 27, 2007
12  conference call with analysts, even announced that the second agreement with AB was
13  meant to appease the AB distributors, giving them exclusive on-premise rights to
14  Monster, so that "those that sort of haven't taken Lost will take Lost."  But he
15  downplayed and misrepresented the problem by limiting it to certain AB distributors
16  who were not awarded Monster holding out by not taking Lost.

17       104.  Defendants knew that alcohol distributors such as AB presented serious
18  complications to the distribution of Hansen products.  According to a Senior
19  Marketing Manager, Hansen's executives knew that the agreement with AB posed
20  serious risks.  While AB had connections with bars and restaurants in the on-premise
21  channel Hansen intended to enter, AB had very limited access to retailers and
22  establishments that did not sell alcohol.  Hansen also knew or recklessly disregarded
23  that AB, as an alcohol distributor, would not be able to distribute even non-alcoholic
24  Hansen products in dry counties of certain states.  This meant that a third-party
25  distributor was necessary to service these areas.  Not only did this predictably lead to
26  increased costs, but to foreseeable disagreements between wholesalers over territory
27  due to overlapping distribution rights.  Given the importance of the relationship and
28  the expanded distribution, defendants knew or recklessly disregard this information.

**Knowledge of the Deficient Support and Limited Prospects for the Allied Products**

105.    Defendants were aware that Allied product sales had suffered due to lack of adequate promotion and marketing. A National Account Manager stated that this lack of promotion was in part a result of Hansen spending 90% of the marketing budget promoting the Monster line. Paying anywhere from $10,000 to $3.5 million a year for each of the approximately 180 extreme athletes sponsored in support of Monster left little to promote the Allied line. Also, Hansen was high on Monster and neglected the other energy drinks. A Senior Marketing Manager stated that the Allied line was not designed to succeed. It was designed to take up shelf space. Because Hansen failed to provide adequate promotional support, Allied products could not gain traction and sales were minimal. Defendants knew of or recklessly disregarded the information given their access to marketing budgets where the disparity would have been evident.

106.    Defendants did not begin to focus any serious efforts on Allied until the summer of 2007, when defendants held a national sales meeting at a casino near the Company's headquarters in Corona, California. A Sales Manager who attended recalled defendant Sacks expressing serious unhappiness with the poor sales performance of Lost and other Allied products. Management spent the last hour of the meeting blasting sales staff for the low sales of Allied products. Sales personnel were shocked because the Company had never stressed the importance of Allied product sales before. When the sales staff received their bonuses, they had been docked 50%. Moreover, they learned that their 2007 bonuses would depend on improved Allied sales and that their jobs would be threatened if they could not bring in more Allied distribution agreements. Sacks' direct involvement in these events establishes his actual knowledge.

107.    Other notorious events establish defendants' knowledge of poor Allied sales. Hansen also began offering a 50% price cut on cases of Allied products to

1   distributors and extended the promotion for an unprecedented six months in July
2   2007. Hansen also planned to give away a 2007 Toyota FJ Cruiser in order to
3   generate interest in Lost, but abandoned the promotion in April 2007 because the
4   sluggish sales of Lost did not justify the expense.

5   **Defendants' Knowledge of Facts Rendering Their 2Q07 Results False**

6           108. Defendants knowingly published artificially inflated 2Q07 results. A
7   former National Account Manager reported instructions to withhold promotional costs
8   amounting to hundreds of thousands of dollars in 2Q, effectively rendering Hansen's
9   2Q07 financial results false. This was just one example of accounting tomfoolery that
10  defendants would have been alerted to when they discovered that Hansen's results
11  would exceed estimates by an unusual $0.10 per share with expenses lower than
12  expected. Defendants reported Hansen's financial results to the SEC, and defendant
13  Sacks signed Sarbanes-Oxley certifications certifying the accuracy of the reports,
14  stating that he had "designed such internal control over financial reporting, or caused
15  such internal control over financial reporting to be designed under our supervision, to
16  provide reasonable assurance regarding the reliability of financial reporting and the
17  preparation of financial statements for external purposes in accordance with generally
18  accepted accounting principles." By signing these Sarbanes-Oxley certifications,
19  defendant Sacks had an obligation to assure the accuracy of Hansen's financial results.
20  Defendants therefore knew or recklessly disregarded that such expenses were not
21  reported in the 2Q07 results, and that profits during 2Q07 were artificially inflated as
22  result.

23          109. Defendant Kelly had actual knowledge of the falsity of Hansen's
24  financial reports. A former Cost Accountant indicated that Kelly was "very diligent"
25  about reviewing the financial information at Hansen. Further, the witness described
26  reporting to Kelly about poor internal controls at Hansen. In response, Kelly would
27  "chew people out" but did not correct the problem because he did not have the time or
28  resources available. Further, the individual responsible for Sarbanes-Oxley

1  compliance would tell Kelly once a month about the discrepancies between the

2  Company's purchase orders and invoices, but Kelly apparently did not correct the

3  problem.  A witness has reported that Kelly worked directly with Sacks and brought

4  important accounting issues to his attention.

5  **Defendant Insiders' Stock Sales Were Suspicious in Timing and Amount**

6        110.  Defendants made good use of their inside knowledge of Hansen's

7  artificially inflated 2Q07 results, failing AB deal, and failing Allied line to sell $75

8  million worth of their Hansen stock.  Defendants' insider sales were suspicious in

9  timing and amount, and provide additional inference of scienter.  Defendants' sales

10  occurred just days after Hansen announced extraordinary (but false) financial results

11  for 2Q07 and weeks prior to Hansen disclosing disappointing sales and growth data,

12  as well as disillusioning aspects of the AB relationship and Allied line performance in

13  3Q07.  The following chart identifies defendants' Class Period trades in Hansen stock:

| Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold | Stock + Vested Option Holdings | % Sold |
|------|------|--------|-------|----------|----------------|--------|-------------------------------|--------|
| **Thomas Kelly** | | | | | | | | |
| | 8/13/2007 | 40,000 | $45.83 | $1,833,200 | | | | |
| | 8/13/2007 | 10,000 | $45.16 | $451,600 | | | | |
| | 9/4/2007 | 10,000 | $45.80 | $458,000 | | | | |
| | | 60,000 | | $2,742,800 | 0 | 100% | 59,200 | 50.34% |
| | | | | | | | | |
| **Rodney Sacks** | | | | | | | | |
| | 8/24/2007 | 128,500 | $44.14 | $5,671,990 | | | | |
| | 9/13/2007 | 150,000 | $50.11 | $7,516,500 | | | | |
| | 9/14/2007 | 113,000 | $49.56 | $5,600,280 | | | | |
| | | 391,500 | | $18,788,770 | 211,224 | 64.96% | 2,159,724 | 15.35% |
| | | | | | | | | |
| **Hilton Schlosberg** | | | | | | | | |
| | 8/24/2007 | 128,500 | $44.14 | $5,671,990 | | | | |
| | 9/13/2007 | 150,000 | $50.11 | $7,516,500 | | | | |
| | 9/14/2007 | 113,000 | $49.56 | $5,600,280 | | | | |
| | | 391,500 | | $18,788,770 | 200,000 | 66.19% | 2,148,500 | 15.41% |

- 52 -

| Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold | Stock + Vested Option Holdings | % Sold |
|------|------|--------|-------|----------|----------------|--------|-------------------------------|--------|
| Hilrod Holdings, L.P.[1] (Schlosberg, Sacks) | | | | | | | | |
| | 8/20/2007 | 25,000 | $44.01 | $1,100,250 | | | | |
| | 8/21/2007 | 320,000 | $44.08 | $14,105,600 | | | | |
| | 8/22/2007 | 200,000 | $44.10 | $8,820,000 | | | | |
| | 8/23/2007 | 110,000 | $44.01 | $4,841,100 | | | | |
| | 8/24/2007 | 145,000 | $44.14 | $6,400,300 | | | | |
| | | 800,000 | | $35,267,250 | | | 14,857,808 | 5.11% |
| | Total: | 1,643,000 | | $75,587,590 | | | | |

[1]  Hilrod Holdings is jointly owned by Sacks and Schlosberg.

111.    These sales were highly suspicious in timing and amount. Indeed, on August 24, 2007 and September 13 and 14, 2007, defendants Sacks and Schlosberg sold over 65% of their personal holdings of Hansen and over 15% of their options. Kelly sold 100% of his Hansen stock during the Class Period and over 50% of his options. The timing of these sales was also highly suspicious, as they were timed to take advantage of the artificially inflated valuation caused by defendants' misrepresentations just after Hansen reported extraordinary (and false) results for 2Q07 and just prior to the third quarter 2007 conference call that shocked the market and unveiled defendants' fraud. Defendants' sales could hardly have been better timed. Indeed, they sold just after it appeared that the momentum in Hansen's stock price from defendants' false statements in 2Q07 had subsided.

112.    Defendants' trades were also out of line with their prior trading practices. The following chart identifies defendants' trades in the five years prior to the Class Period:

| Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold | Stock + Vested Option Holdings | % Sold |
|---|---|---|---|---|---|---|---|---|
| **Thomas Kelly** | | | | | | | | |
| | 5/24/2004 | 2,400 | $3.10 | $7,440 | | | | |
| | 5/26/2004 | 9,776 | $2.98 | $29,132 | | | | |
| | 5/26/2004 | 4,744 | $3.00 | $14,232 | | | | |
| | 5/28/2004 | 16,000 | $3.26 | $52,160 | | | | |
| | 6/1/2004 | 30,400 | $3.28 | $99,712 | | | | |
| | 6/1/2004 | 20,800 | $3.28 | $68,224 | | | | |
| | 6/1/2004 | 12,800 | $3.29 | $42,112 | | | | |
| | 9/8/2004 | 32,000 | $3.45 | $110,400 | | | | |
| | | 128,920 | | $423,412 | 0 | 100.00% | 0 | 100.00% |
| | | | | | | | | |
| | 3/16/2005 | 16,000 | $6.88 | $110,080 | | | | |
| | 3/31/2005 | 12,000 | $7.48 | $89,760 | | | | |
| | 9/16/2005 | 4,000 | $11.50 | $46,000 | | | | |
| | 11/11/2005 | 6,000 | $17.00 | $102,000 | | | | |
| | 12/27/2005 | 8,000 | $21.37 | $170,960 | | | | |
| | | 46,000 | | $518,800 | 10,000 | 82.14% | 10,000 | 82.14% |
| | | | | | | | | |
| | 5/11/2006 | 20,044 | $48.20 | $966,121 | | | | |
| | 5/11/2006 | 11,600 | $48.34 | $560,744 | | | | |
| | 5/11/2006 | 8,356 | $48.35 | $404,013 | | | | |
| | 5/11/2006 | 3,180 | $48.36 | $153,785 | | | | |
| | 5/11/2006 | 1,200 | $48.25 | $57,900 | | | | |
| | 5/11/2006 | 464 | $48.42 | $22,467 | | | | |
| | 5/11/2006 | 400 | $48.22 | $19,288 | | | | |
| | 5/11/2006 | 400 | $48.34 | $19,336 | | | | |
| | 5/11/2006 | 260 | $48.25 | $12,545 | | | | |
| | 5/11/2006 | 96 | $48.21 | $4,628 | | | | |
| | | 46,000 | | $2,220,826 | 20,000 | 69.70% | 20,000 | 69.70% |
| | | | | | | | | |
| **Rodney Sacks** | | | | | | | | |
| | 6/1/2006 | 120,000 | $45.86 | $5,503,200 | | | | |
| | 6/2/2006 | 120,000 | $46.33 | $5,559,600 | | | | |
| | | 240,000 | | $11,062,800 | 540,000 | 30.77% | 2,480,000 | 8.82% |

| Name | Date | Shares | Price | Proceeds | Stock Holdings | % Sold | Stock + Vested Option Holdings | % Sold |
|------|------|--------|-------|----------|----------------|--------|-------------------------------|--------|
| **Hilton Schlosberg** | | | | | | | | |
| | 6/1/2006 | 120,000 | $45.86 | $5,503,200 | | | | |
| | 6/2/2006 | 120,000 | $46.33 | $5,559,600 | | | | |
| | | 240,000 | | $11,062,800 | 228,776 | 51.20% | 2,168,776 | 9.96% |
| | | | | | | | | |
| **Hilrod Holdings, L.P. (Schlosberg, Sacks)** | | | | | | | | |
| | 6/2/2004 | 4,000,000 | | $11,480,000 | | | | |
| | 9/13/2004 | 1,256,000 | | $4,678,640 | | | | |
| | 11/11/2004 | 856,000 | | $3,323,427 | | | | |
| | 11/12/2004 | 744,000 | | $2,914,080 | | | | |
| | 3/28/2005 | 13,600 | | $102,000 | | | | |
| | 3/29/2005 | 206,800 | | $1,549,800 | | | | |
| | 3/31/2005 | 855,256 | | $6,406,418 | | | | |
| | 1/6/2006 | 16,384 | | $352,347 | | | | |
| | 1/9/2006 | 347,292 | | $7,804,289 | | | | |
| | 1/10/2006 | 136,288 | | $3,156,068 | | | | |
| | 1/13/2006 | 99,988 | | $2,457,389 | | | | |
| | 6/1/2006 | 560,000 | | $25,681,600 | | | | |
| | 6/2/2006 | 240,000 | | $11,119,200 | | | | |
| | | 9,331,608 | | $81,025,457 | | | | |
| | | | | | | | | |
| | **Total:** | **10,032,528** | | **$106,314,095** | | | | |

113.    As the foregoing chart reveals, the number of shares and the amount that defendants Sacks and Schlosberg sold of their individual holdings in less than a month during the Class Period far exceeded the numbers and amounts that they sold in the prior five years combined.    And for Kelly, the value that he sold in two days during the Class Period almost matches the entire value that he sold in the prior five years. While defendants' percentages are similar, defendants' sales are made even more suspicious given the time of year in which they sold.    Over the five years prior to the Class Period, virtually all of Kelly's sales were made between March and June or near the close of the calendar year.    And Sacks and Schlosberg followed a similar pattern,

- 55 -

1 | including their sales by Hilrod Holdings. Yet, just before Hansen disclosed its
2 | shocking 3Q07 results, defendants broke their patterns and unloaded their holdings in
3 | August and September. In light of the material misrepresentation alleged herein, the
4 | unusual timing of defendants' trades, along with the substantial amounts, raise a
5 | strong inference of scienter.

6 |     114. Defendants' affirmative actions and conduct designed to inflate Hansen
7 | stock, as alleged herein, were based on a deliberate and concerted effort and course of
8 | conduct intended to benefit and enrich themselves to the detriment of plaintiff and the
9 | members of the Class.

10 | **LOSS CAUSATION**

11 |     115. The markets for Hansen stock were open, well-developed, and efficient at
12 | all relevant times. As a result of defendants' materially false and misleading
13 | statements and failure to disclose, Hansen securities traded at artificially inflated
14 | prices during the Class Period. Plaintiff and other members of the Class purchased or
15 | otherwise acquired Hansen common stock relying on the integrity of the market price
16 | of Hansen common stock and market information relating to Hansen, and have been
17 | damaged thereby.

18 |     116. At all relevant times, the material misrepresentations and omissions
19 | particularized in this Complaint directly or proximately caused or were a substantial
20 | contributing cause of the damages sustained by plaintiff and other members of the
21 | Class. As described herein, during the Class Period, defendants made or caused to be
22 | made a series of materially false or misleading statements about Hansen's business,
23 | products, prospects, and operations. These material misstatements and omissions had
24 | the cause and effect of creating in the market an unrealistically positive assessment of
25 | Hansen and its business, products, prospects, and operations, thus causing the
26 | Company's common stock to be overvalued and artificially inflated at all relevant
27 | times. Defendants' materially false and misleading statements and omissions during
28 | the Class Period resulted in plaintiff and other members of the Class purchasing the

1   Company's common stock at artificially inflated prices, thus causing the damages

2   complained of herein, upon defendants' revelations of the truth.

3        117. During the Class Period, as detailed herein, defendants engaged in a

4   scheme to deceive the market and a course of conduct that artificially inflated the

5   price of Hansen common stock and operated as a fraud or deceit on Class Period

6   purchasers of Hansen common stock by failing to disclose to investors the failures of

7   the distribution agreements with AB, and by presenting falsely positive assessments

8   related to the Company's failing and unsupported Allied products. Even in the face of

9   declining sales growth and an increasingly strained relationship with AB, defendants

10   continued to misrepresent the Company's growth prospects, the support behind its

11   Allied line, and the condition of its relationship with AB. When the Company's prior

12   misrepresentations and fraudulent conduct became apparent to the market, the

13   artificially inflated price of Hansen common stock fell precipitously back towards the

14   true valuation of the Company. As a result of their purchases of Hansen common

15   stock during the Class Period, plaintiff and the other Class members suffered

16   economic loss, *i.e.*, damages, under the federal securities laws.

17        118. By failing to disclose to investors the failures of the AB distribution

18   agreements and the limited support and prospects for the Allied lines, defendants

19   presented a misleading picture of Hansen's business, value, and growth prospects.

20   Defendants' false and misleading statements and omissions had the intended effect,

21   causing Hansen common stock to trade at artificially inflated levels throughout the

22   Class Period, reaching as high as $68.37 per share on October 31, 2007.

23        119. Prior to the market opening on November 8, 2007, Hansen issued a press

24   release announcing its financial results for the third quarter of 2007. The press release

25   announced that Hansen had significantly missed analyst estimates for sales and

26   growth. Hansen reported third quarter 2007 EPS of $0.46, significantly below

27   consensus estimates of $0.49. Sales were 4.3% below consensus estimates and gross

28

1  profit missed estimates by 1.2%. Sales growth diminished to 38.4% from 56.9% in

2  the prior quarter, and from 79.84% year-over-year.

3      120.  On the conference call that day, Sacks disclosed that "on the Allied

4  product side we have seen falloff in sales," and thus that the Company was

5  disappointed and would need to reevaluate those lines going forward. Specifically,

6  Sacks announced that "Lost as a brand has sort of suffered some reductions in sales

7  and making." Moreover, Sacks stated, "[t]he effect of the drop-off in sales of what I

8  would call these Allied products was, in the quarter, about $5.5 million. $5.5 to $6

9  million with Energy. So about $6 million was the drop-off in the other Energy

10 products right from the previous year. Obviously, we had expected an increase. So,

11 obviously, that has affected the numbers so quite dramatically. . . . These Allied

12 product sales were lower. If we had been projecting a 40% increase, or 50%, on the

13 Allied products, what you've got – it's there in your numbers, that would have made

14 about a $10 million difference."

15     121.  In reference to the AB distribution agreements, Sacks announced that

16 "[w]e did put to brake on them," that AB was not focusing on Hansen's products, and

17 that any further transition to AB distribution would "be done on a carefully selected

18 and determined basis." He went on to state that for independent convenience stores,

19 "the Budweiser system is not quite as strong" and "is an area that obviously [Hansen

20 has] to address with the A-B system." Sacks elaborated that AB distributors had not

21 adequately "embraced the brand and the potential for the brand." Also, Sacks stated

22 that the development of the on-premise channel was "probably coming along more

23 slowly than we had hoped for."

24     122.  In response to these disillusioning announcements, Hansen's share price

25 dropped to $38.25, over 32% from the previous day's close, and trading volume

26 increased 1,900% from the day prior. This rapid decline removed the artificial

27 inflation from the price of Hansen common stock, causing real economic loss to

28 investors who had purchased Hansen common stock during the Class Period.

123.  The substantial decline in the price of Hansen common stock after these disclosures came to light was a direct result of the true nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the price decline in Hansen common stock negates any inference that the loss suffered by plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of Hansen common stock and the subsequent significant decline in the value of Hansen common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

124.  At all relevant times, the market for Hansen common stock was an efficient market for the following reasons, among others:

(a)  Hansen common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)  as a regulated issuer, Hansen filed periodic public reports with the SEC and the NASDAQ;

(c)  Hansen regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)  Hansen was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

1    125.  As a result of the foregoing, the market for Hansen common stock

2  promptly digested current information regarding Hansen from all publicly available

3  sources and reflected such information in the prices of the stock.  Under these

4  circumstances, all purchasers of Hansen common stock during the Class Period

5  suffered similar injury through their purchase of Hansen common stock at artificially

6  inflated prices and a presumption of reliance applies.

7                 **NO SAFE HARBOR**

8    126.  The statutory safe harbor provided for forward-looking statements under

9  certain circumstances does not apply to any of the allegedly false statements pleaded

10  in this Complaint. Many of the specific statements pleaded herein were not identified

11  as "forward-looking statements" when made.  To the extent there were any forward-

12  looking statements, there were no meaningful cautionary statements identifying

13  important factors that could cause actual results to differ materially from those in the

14  purportedly forward-looking statements. Alternatively, to the extent that the statutory

15  safe harbor does apply to any forward-looking statements pleaded herein, defendants

16  are liable for those false forward-looking statements because at the time each of those

17  forward-looking statements were made, the particular speaker knew that the particular

18  forward-looking statement was false, and/or the forward-looking statement was

19  authorized and/or approved by an executive officer of Hansen who knew that those

20  statements were false when made.

21              **CLASS ACTION ALLEGATIONS**

22    127.  Plaintiff brings this action as a class action pursuant to Federal Rule of

23  Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who

24  purchased the common stock of Hansen between November 9, 2006 and November 8,

25  2007, inclusive, and who were damaged thereby (the "Class").  Excluded from the

26  Class are defendants, the officers and directors of the Company, at all relevant times,

27  members of their immediate families and their legal representatives, heirs, successors

28  or assigns and any entity in which defendants have or had a controlling interest.

1    128.   The members of the Class are so numerous that joinder of all members is
2  impracticable.   Throughout the Class Period, Hansen common stock was actively
3  traded on the NASDAQ.  While the exact number of Class members is unknown to
4  plaintiff at this time and can only be ascertained through appropriate discovery,
5  plaintiff believes that there are hundreds or thousands of members in the proposed
6  Class. Record owners and other members of the Class may be identified from records
7  maintained by Hansen or its transfer agent and may be notified of the pendency of this
8  action by mail, using the form of notice similar to that customarily used in securities
9  class actions.

10    129.   Plaintiff's claims are typical of the claims of the members of the Class as
11  all members of the Class are similarly affected by defendants' wrongful conduct in
12  violation of federal law complained of herein.

13    130.   Plaintiff will fairly and adequately protect the interests of the members of
14  the Class and has retained counsel competent and experienced in class action and
15  securities litigation.

16    131.   Common questions of law and fact exist as to all members of the Class
17  and predominate over any questions solely affecting individual members of the Class.
18  Among the questions of law and fact common to the Class are:

19    (a)    whether the federal securities laws were violated by defendants'
20  acts as alleged herein;

21    (b)    whether statements made by defendants to the investing public
22  during the Class Period misrepresented material facts about the business and
23  operations of Hansen;

24    (c)    whether the price of Hansen common stock was artificially inflated
25  during the Class Period; and

26    (d)    to what extent the members of the Class have sustained damages
27  and the proper measure of damages.

28

132.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against Defendants Sacks and Schlosberg

133.    Plaintiff incorporates ¶¶1-132 by reference.

134.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew, or disregarded with deliberate recklessness, were misleading in that they contained misrepresentation and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

135.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchase of Hansen securities during the Class Period.

136.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hansen securities. Plaintiff and the Class would not have purchased Hansen securities at the prices paid,

1  or at all, had they been aware that the market prices had been artificially and falsely

2  inflated by defendants' misleading statements.

3      137.   As a direct and proximate result of these defendants' wrongful conduct,

4  plaintiff and the other Class members suffered damages in connection with their

5  purchases of Hansen securities during the Class Period.

## COUNT II

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

138.   Plaintiff incorporates ¶¶1-132 by reference.

139.   During the Class Period, defendants occupied positions within Hansen that allowed access to confidential information concerning the Company, its operations, finances, financial condition, and future business prospects. Defendants' public representations on these subjects set forth herein were materially false or misleading.

140.   Notwithstanding their duty to refrain from trading in Hansen securities unless they disclosed the material adverse facts alleged herein, and in violation of their fiduciary duties to plaintiff and other members of the Class, defendants each sold millions of dollars worth of Hansen securities during the Class Period.

141.   Defendants sold their shares of Hansen common stock, as alleged herein, at market prices artificially inflated by the nondisclosure and misrepresentations of material adverse facts in the public statements released during the Class Period.

142.   Defendants knew that they were in possession of material adverse information that was not known to the investing public, including plaintiff and other members of the Class. Before selling their stock to the public, they were obliged to disclose such information to plaintiff and other Class members.

143.   By reason of the foregoing, defendants directly and indirectly, by use of the means and instrumentalities of interstate commerce, the mails, and the facilities of the national securities exchanges, employed devices, schemes, and artifices to defraud,

1  and engaged in acts and transactions and a course of business, which operated as a

2  fraud or deceit upon members of the investing public who purchased Hansen common

3  stock.

4        144.   Plaintiff and other members of the Class who purchased shares of Hansen

5  common stock: (1) have suffered substantial damages because they relied upon the

6  integrity of the market and paid artificially inflated prices for Hansen common stock

7  as a result of the violations of §10b and Rule 10b-5 alleged herein; and (2) would not

8  have purchased Hansen common stock at the prices they paid, or at all, had they been

9  aware that the market prices had been artificially and falsely inflated by defendants'

10 misleading statements and concealment.  At the time of the purchases by plaintiff and

11 members of the Class, the fair and true value of Hansen common stock was

12 substantially less than the prices paid by members of the Class.

13       145.   As a direct and proximate result of defendants' wrongful conduct,

14 plaintiff and the other members of the Class suffered damages in connection with their

15 purchases of Hansen common securities during the Class Period.

16                                    **COUNT III**

17        **For Violation of §20(a) of the Exchange Act Against All Defendants**

18       146.   Plaintiff incorporates ¶¶1-132 by reference.

19       147.   The defendants acted as controlling persons of Hansen within the

20 meaning of §20(a) of the Exchange Act.  By virtue of their position and their power to

21 control public statements about Hansen, the defendants had the power and ability to

22 control the actions of Hansen and its employees.  Hansen controlled the defendants

23 and its other employees.  By reason of such conduct, defendants are liable pursuant to

24 §20(a) of the Exchange Act.

25                                **PRAYER FOR RELIEF**

26       A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ.

27 P. 23;

28       B.     Awarding plaintiff and the members of the Class damages and interest;

1      C.    Awarding plaintiff's reasonable costs, including attorneys' fees; and

2      D.    Awarding such equitable/injunctive or other relief as the Court may deem

3   just and proper.

4                              **JURY DEMAND**

5      Plaintiff hereby demands a trial by jury.

6   DATED:  August 28, 2009               COUGHLIN STOIA GELLER
7                                           RUDMAN & ROBBINS LLP
                                          DARREN J. ROBBINS
8                                         DOUGLAS R. BRITTON

9

10                                               DOUGLAS R. BRITTON

11                                        655 West Broadway, Suite 1900
                                          San Diego, CA 92101
12                                        Telephone:  619/231-1058
                                          619/231-7423 (fax)
13
                                          Lead Counsel for Plaintiffs
14
                                          DYER & BERENS LLP
15                                        JEFFREY A. BERENS
                                          682 Grant Street
16                                        Denver, CO  80203
                                          Telephone:  303/861-1764
17                                        303/395-0393 (fax)

18                                        HOLZER, HOLZER & FISTEL, LLC
                                          COREY D. HOLZER
19                                        MICHAEL I. FISTEL, JR.
                                          1117 Perimeter Center West, Suite E-107
20                                        Atlanta, GA  30338
                                          Telephone:  770/392-0090
21                                        770/392-0029 (fax)

22                                        Additional Counsel for Plaintiff

23

24   S:\CasesSD\Hansen Natural Secs\CPT00061322_Consol.doc

25

26

27

28

                                  - 65 -

## DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.    That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of San Diego, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 655 West Broadway, Suite 1900, San Diego, California 92101.

2.    That on August 28, 2009, declarant served the CONSOLIDATED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at San Diego, California in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.    That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 28th day of August, 2009, at San Diego, California.

KATHLEEN R. JONES

HANSEN NATURAL SECS
Service List - 8/28/2009    (08-0180)
Page 1 of 1

### Counsel For Defendant(s)

Thomas V. Reichert
Bird Marella Boxer Wolpert Nessim Drooks &
Lincenberg P.C.  *
1875 Century Park East, 23rd Floor
Los Angeles, CA  90067-2561
   310/201-2100
   310/201-2110 (Fax)

### Counsel For Plaintiff(s)

Douglas R. Britton
Coughlin Stoia Geller Rudman & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101
   619/231-1058
   619/231-7423 (Fax)

Jeffrey A. Berens
Dyer & Berens LLP
682 Grant Street
Denver, CO  80203-1764
   303/861-1764
   303/395-0393 (Fax)

Corey D. Holzer
Michael I. Fistel, Jr.
Holzer Holzer & Fistel, LLC
200 Ashford Center North, Suite 300
Atlanta, GA  30338
   770/392-0090
   770/392-0029 (Fax)

   * Denotes service via overnight mail.