Mark T. Drooks - State Bar No. 123561
  mtd@birdmarella.com
Thomas V. Reichert - State Bar No. 171299
  tvr@birdmarella.com
BIRD, MARELLA, BOXER, WOLPERT,
  NESSIM, DROOKS & LINCENBERG, P.C.
1875 Century Park East, 23rd Floor
Los Angeles, California  90067-2561
Telephone: (310) 201-2100
Facsimile: (310) 201-2110

Martin L. Perschetz (admitted *pro hac vice*)
  martin.perschetz@srz.com
Gary Stein (admitted *pro hac vice*)
  gary.stein@srz.com
William M. Uptegrove (admitted *pro hac vice*)
  william.uptegrove@srz.com
SCHULTE ROTH & ZABEL LLP
919 Third Avenue
New York, New York 10022-3902
Telephone: (212) 756-2000
Facsimile: (212) 593-5955

Attorneys for Defendants Hansen Natural
Corporation, Rodney C. Sacks, Hilton H.
Schlosberg, and Thomas J. Kelly

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION

| | |
|---|---|
| MARCELO CUNHA, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>vs.<br><br>HANSEN NATURAL CORPORATION, RODNEY C. SACKS, HILTON H. SCHLOSBERG, and THOMAS J. KELLY,<br><br>        Defendants. | CASE NO. EDCV08-1249 SGL (JCx) [Consolidated with EDCV08-1278 SGL (JCx)]<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**[Request for Judicial Notice Filed Concurrently Herewith]**<br><br>Date: March 15, 2010<br>Time: 10:00 a.m.<br>Crtrm.: Hon. Stephen G. Larson |

275496.1

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................1

II.   STATEMENT OF FACTS ....................................................................3

    A.    Hansen's Business.........................................................................3

    B.    Hansen's Performance ..................................................................5

    C.    The Allegations of the Complaint ................................................7

          1.    The Purported Misrepresentations and Omissions ...........7

          2.    The November 8, 2007 Conference Call ..........................9

          3.    The Insider Trading Allegations ....................................10

III.  ARGUMENT ......................................................................................11

    A.    The Complaint Fails to State a Claim Under Section 10(b) or Rule 10b-5 for Alleged False or Misleading Statements ...............................11

          1.    The Complaint Fails to Plead that Defendants Made Any Material Misrepresentations or Omissions About the AB Transition or the Allied Brands ...................................13

              a.    General Statements of Corporate Optimism Are Not Actionable as a Matter of Law .........................................14

              b.    Forward-Looking Statements Are Protected by the Bespeaks Caution Doctrine and the PSLRA ....................16

              c.    Allegations of Business Problems Do Not Render Hansen's Statements False .............................................19

              d.    The Challenges Relating to the AB Transition and the Allied Products Were Expressly Disclosed by Hansen....22

              e.    Plaintiff's Allegations of Corporate Mismanagement Do Not State a Claim for Securities Fraud.......................24

          2.    The Complaint Fails to Plead that Hansen's Quarterly Results Were Materially False........................................25

          3.    The Complaint Fails to Plead Facts Giving Rise to a Strong Inference of Scienter ...................................................27

              a.    Plaintiff's Boilerplate Allegations of Corporate Positions, Access to Information, and Sarbanes-Oxley Certifications Do Not Support an Inference of Scienter ..................................................................29

              b.    Plaintiff's Confidential Witnesses Do Not Support an Inference of Scienter.......................................30

275496.1

- i -

(i)  Plaintiff Fails to Establish the Reliability and Personal Knowledge of the Confidential Witnesses.................................................30

(ii)  The Confidential Witness Statements Are Not Indicative of Scienter ................................33

c.  Plaintiff's "Insider Trading" Allegations Do Not Support an Inference of Scienter ......................35

(i)  There Is Nothing Suspicious About the Percentages of Shares Sold by Defendants............36

(ii)  There Is Nothing Suspicious About the Timing of Defendants' Sales ................................38

(iii)  Defendants' Sales During the Class Period Were Consistent with their Trading Histories .......40

4.  The Complaint Fails to Plead Loss Causation............................42

a.  The Stock Drop Preceded the November 8, 2007 Earnings Call ....................................................43

b.  The November 8, 2007 Earnings Call Was Not a Corrective Disclosure ........................................43

B.  The Complaint Fails to State a Claim Under Section 10(b) and Rule 10b-5 for Alleged Insider Trading.................................46

C.  The Complaint Fails to State a Claim Under Section 20(a) for Control Person Liability .......................................................48

IV.  CONCLUSION ........................................................................50

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page(s)**

*In re Apple Computer Sec. Litig.*,
  886 F.2d 1109 (9th Cir. 1989) ........................................................................37

*Asher v. Baxter Int'l, Inc.*,
  377 F.3d 727 (7th Cir. 2004) ..........................................................................17

*In re Audodesk, Inc. Sec. Litig.*,
  132 F. Supp. 2d 833 (N.D. Cal. 2000) .............................................................29

*Belodoff v. Netlist, Inc.*, No. SA CV 07-00677,
  2008 WL 2356699 (S.D. Cal. May 30, 2008) ..................................................22

*In re Blue Rhino Corp. Sec. Litig.*, No. CV 03-3495,
  2004 WL 5681763 (C.D. Cal. Oct. 7, 2004) ...................................................30

*Brodsky v. Yahoo! Inc.*,
  630 F. Supp. 2d 1104 (N.D. Cal. 2009) .....................................................20, 26

*Brody v. Transitional Hosps. Corp.*,
  280 F.3d 997 (9th Cir. 2002) ..........................................................................48

*In re Bus. Objects S.A. Sec. Litig.*, No. C 04-2401,
  2005 WL 1787860 (N.D. Cal. July 27, 2005) ........................................26-27, 32

*Cal. Pub. Employees Ret. Sys. v. Chubb Corp.*,
  394 F.3d 126 (3d Cir. 2004) ...........................................................................32

*In re Copper Mountain Sec. Litig.*,
  311 F. Supp. 2d 857 (N.D. Cal. 2004) .............................................................15

*In re Daou Sys., Inc., Sec. Litig.*,
  411 F.3d 1006 (9th Cir. 2005) ..............................................................26, 42, 43

*In re Dothill Sys. Corp. Sec. Litig.*, No. 06-CV-228,
  2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ...............................................43-44

*In re Downey Sec. Litig.*, No. CV 08-3261,
  2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ..................................................49

*Dura Pharm. Inc. v. Broudo*,
  544 U.S. 336 (2005) ......................................................................................42

*In re Dura Pharm. Sec. Litig.*,
  452 F. Supp. 2d 1005 (S.D. Cal. 2006) ............................................................19

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
  595 F. Supp. 2d 1253 (M.D. Fla. 2009) ...........................................................47

*Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox
Co.*, 353 F.3d 1125 (9th Cir. 2004).................................................................16

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

*In re eSpeed, Inc. Sec. Litig.,*
   457 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................... 17

*In re Gap Sec. Litig.*, No. C-87-4895,
   1988 WL 168341 (N.D. Cal. Sept. 28, 1988)............................... 47

*In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510 (CPS),
   2005 WL 2277476, at *13 (E.D.N.Y. Sept. 19, 2005) .................. 17

*Glazer Capital Mgmt., LP v. Magistri,*
   549 F.3d 736 (9th Cir. 2008) ...................................................... 30

*In re GlenFed, Inc. Sec. Litig.,*
   42 F.3d 1541 (9th Cir. 1994) ...................................................... 11

*Gompper v. VISX, Inc.,*
   298 F.3d 893 (9th Cir. 2002) ...................................................... 12

*Grossman v. Novell, Inc.,*
   120 F.3d 1112 (10th Cir. 1997) .............................................. 15-16

*In re Gupta Corp. Sec. Litig.,*
   900 F. Supp. 1217 (N.D. Cal. 1994)............................................ 14

*In re Hansen Natural Corp. Sec. Litig.,*
   527 F. Supp. 2d 1142 (C.D. Cal. 2007)................................. 13, 29

*Head v. NetManage Inc.*, No. C 97-4385,
   1998 WL 917794 ........................................................................ 39

*In re Hienergy Tech., Inc.*, No. SACV04-1226,
   2005 WL 3071250 (N.D. Cal. Dec. 30, 1998) ............................. 37

*Higginbotham v. Baxter Int'l Inc.,*
   495 F.3d 753 (7th Cir. 2007) ...................................................... 33

*Hollinger v. Titan Capital Corp.,*
   914 F.2d 1564 (9th Cir. 1990) .................................................... 49

*Howard v. Everex Sys., Inc.,*
   228 F.3d 1057 (9th Cir. 2000) .................................................... 48

*In re Hypercom Corp. Sec. Litig.*, No. CV-05-0455,
   2006 WL 1836181 (D. Ariz. July 5, 2006)................................... 35

*In re Impac Mortgage Holdings, Inc. Sec. Litig.,*
   554 F. Supp. 2d 1083 (C.D. Cal. 2008)................................. *Passim*

*Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,*
   537 F.3d 527 (5th Cir. 2008) ...................................................... 33

*In re Leapfrog Enters., Inc. Sec. Litig.,*
   527 F. Supp. 2d 1033 (N.D. Cal. 2007)...................... 14, 15, 17, 19

- iv -

*Limantour v. Cray Inc.*,
   432 F. Supp. 2d 1129 (W.D. Wash. 2006) .......................................................... 31

*Lipton v. Pathogenesis Corp.*,
   284 F.3d 1027 (9th Cir. 2002) ....................................................................... 40

*In re Lockheed Martin Corp. Sec. Litig.*,
   272 F. Supp. 2d 944 (C.D. Cal. 2003) ................................................................ 29

*Metzler Investment GmbH v. Corinthian Colls., Inc.*,
   540 F.3d 1049 (9th Cir. 2008) .................................................................. *Passim*

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................... 38

*Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863,
   2008 WL 7084629, at *14 (C.D. Cal. July, 10, 2008). ...................................... 48

*In re Netflix, Inc. Sec. Litig.*, No. C04-2978,
   2005 WL 1562858 (N.D. Cal. June 28, 2005) ...................................................... 20

*Neubronner v. Milken*,
   6 F.3d 666 (9th Cir. 1993) ........................................................................ 47, 48

*In re Northpoint Comm'ns. Group, Inc. Sec. Litig.*,
   184 F. Supp. 2d 991 (N.D. Cal. 2001) ............................................................ 31-32

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ....................................................................... 28

*Pa. Ave. Funds v. Borey*, No. C06-1737,
   2009 WL 902070 (W.D. Wash. Mar. 30, 2009) ................................................. 47

*Panter v. Marshall Field & Co.*,
   646 F.2d 271 (7th Cir. 1981) ......................................................................... 25

*In re Party City Sec. Litig.*,
   147 F. Supp. 2d 282 (D.N.J. 2001) .................................................................. 40

*In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823,
   2005 WL 5957816 (S.D. Cal. Aug. 1, 2005) .................................... 20, 21, 25, 47

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ................................................................... *Passim*

*Rubke v. Capitol Bancorp Ltd.*,
   551 F.3d 1156 (9th Cir. 2009) ....................................................................... 12

*Santa Fe Indus., Inc. v. Green*,
   430 U.S. 462 (1977) .................................................................................. 25

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ............................................................. 19

*In re Silicon Graphics Sec. Litig.*,
  183 F.3d 970 (9th Cir 1999) ................................................................ *Passim*

*In re Splash Tech. Holdings, Inc. Sec. Litig. ("Splash Tech. I")*, No. C 99-00109, 2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) ..................................... 17-18

*In re Splash Tech. Holdings, Inc. Sec. Litig. ("Splash Tech. II")*,
  160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................ 15, 16, 39

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996) .................................................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ............................................................................. 12

*In re Tibco Software, Inc.*, No. C 05-2146,
  2006 WL 1469654 (N.D. Cal. May 25, 2006) ......................................... 32

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002) ................................................. 29

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002) .......................................................... *Passim*

*Vess v. Ciba-Geigy Corp. USA*,
  317 F.3d 1097 (9th Cir. 2003) ........................................................... 11-12

*Weiss v. Amkor Tech., Inc.*,
  527 F. Supp. 2d 938 (D. Ariz. 2007) .................................................... 34

*Wenger v. Lumisys, Inc.*,
  2 F. Supp. 2d 1231 (N.D. Cal. 1998) ................................................... 20-21

*In re Westinghouse Sec. Litigation*,
  90 F.3d 696 (3d Cir. 1995) ................................................................... 27

*In re Worlds of Wonder Sec. Litig.*,
  35 F.3d 1407 (9th Cir. 1994) ........................................................... 16, 17, 47

*Yourish v. Cal. Amplifier*,
  191 F.3d 983 (9th Cir. 1999) ................................................................ 28

*Zucco Partners, LLC v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ............................................................ *Passim*

*In re Zumiez Inc. Sec. Litig.*, No. C07-1980,
  2009 WL 901934 (W.D. Wash. Mar. 30, 2009) .................................... 32-33

**Statutes**                                                            **Page(s)**

15 U.S.C. § 78u-4 ....................................................................... 12-13, 42

15 U.S.C. § 78u-5 ............................................................................ 16

**Legislative Materials**                                                    **Page**

H.R. Rep. No. 104-369, at 31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ........... 1

# I.    INTRODUCTION

This is a lawsuit in search of a theory – a prime example of the type of abusive and meritless class action litigation that the Private Securities Litigation Reform Act ("PSLRA") was designed to cut off at the pleading stage.

In November 2007, Defendant Hansen Natural Corporation ("Hansen" or "the Company") announced its third-quarter results.  Although Hansen reported record sales and profits, the results fell short of what most market analysts had been expecting, and Hansen's stock price fell.  Some ten months later, this purported class action suit was filed, even though there had been no disclosure of fraud or other wrongdoing at the Company; even though Hansen itself had not issued any projections or estimates for its third-quarter results upon which investors could have relied; and even though Hansen – and its shareholders – enjoyed spectacular success during the relevant period.  In fact, for 2007 as a whole, Hansen's sales and profits *exceeded* analysts' estimates, and even after the November 2007 drop, Hansen's stock price was *75% above* where it stood at the beginning of the alleged Class Period.[1]

It is axiomatic that a securities class action must be predicated on something more than a drop in the issuer's stock price.[2]  Yet it is plain from Plaintiff's shifting theories that there is nothing else behind this suit.  The original complaint filed in September 2008 alleged that Hansen and its top officers had committed securities fraud by failing to disclose, *inter alia*, that Hansen's second quarter results were favorably impacted by purchases made by customers in advance of a price increase to take effect the following quarter.  Those allegations were frivolous; as the complaint

---

[1]  Plaintiff purports to bring this action on behalf of all purchasers of Hansen stock between November 9, 2006 and November 8, 2007 (the "Class Period").

[2]  *See, e.g.,* H.R. Rep. No. 104-369, at *31 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 (PSLRA was intended to stop the "routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action").

1  itself showed, Hansen actually disclosed the facts alleged to have been concealed.[3]

2      The Consolidated Complaint ("Complaint"), filed nearly a year later, abandons

3  these allegations.  Plaintiff has now come up with a new theory nowhere mentioned

4  in the original complaint.  The Complaint alleges that Hansen made material misrep-

5  resentations relating to a distribution arrangement with Anheuser-Busch, Inc. ("AB")

6  and its impact on sales of Hansen's "Allied" energy drink lines, which represent a

7  tiny fraction – a mere 5% – of Hansen's overall sales.  But these allegations are just

8  as frivolous as those in the original complaint.

9      The Complaint does not and cannot allege that Hansen materially misstated

10  *any* financial results or misrepresented *any* material *facts* regarding the AB distribu-

11  tion arrangement or the Allied brands.  Rather, the Complaint relies chiefly on allega-

12  tions that Hansen made general optimistic statements to the effect that it was "happy"

13  with the AB relationship and allegations that Hansen could have done a better job in

14  handling the AB transition and in marketing the Allied products.  None of these alle-

15  gations are even actionable under the federal securities laws, let alone sufficient to

16  satisfy the PSLRA's stringent pleading requirements.

17      In substance, Plaintiff's claim amounts to this: Hansen's business had some

18  "problems," and therefore when Hansen executives spoke in positive terms about the

19  Company and its prospects, they were committing fraud.  As the courts have repeat-

20  edly recognized, such a claim is illogical and insufficient under the PSLRA.  That is

21  particularly true in this case, given Hansen's performance during the relevant period

22  and the run-of-the-mill nature of the "problems" cited by Plaintiff, which, even as al-

23  leged, were extremely minor in the context of the business as a whole.

24      The Complaint should be dismissed, without leave to replead.

25

26  [3]  *Compare* Complaint dated Sept. 11, 2008, ¶¶ 29, 39 (alleging that impact of price
      increase was not disclosed) *with id.* ¶ 26 (quoting August 2007 earnings call in which
27  Hansen CEO disclosed that price increase "obviously did boost sales a little bit in
      June [the second quarter], and then it took away from sales in July").
28

1  **II.    STATEMENT OF FACTS**

2      **A.    Hansen's Business**

3          Hansen, based in Corona, California, is a publicly traded company listed on the

4  NASDAQ stock exchange.  (Compl. ¶ 63; Request for Judicial Notice Exhibit ("Ex.")

5  L at 190, 216).    Defendant Rodney C. Sacks is Hansen's CEO and Chairman.

6  (Compl. ¶ 56).  Defendant Hilton H. Schlosberg is Hansen's Vice Chairman, Presi-

7  dent, COO and CFO.  (Compl. ¶ 57).  Defendant Thomas J. Kelly is Vice President of

8  Finance for Hansen Beverage Company ("HBC"), Hansen's chief operating subsidi-

9  ary.  (Compl. ¶ 58).  Through HBC and its other subsidiaries, Hansen develops, mar-

10  kets, and sells energy drinks, sodas, juices and other beverages.  (Compl. ¶¶ 8, 55).

11          In 2002, Hansen launched a carbonated energy drink under the Monster Energy

12  brand name ("Monster"), which, as the Complaint notes, was "wildly successful" and

13  by 2006 had become the second most popular energy drink in the country.  (Compl.

14  ¶ 12; Ex. C at 10).[4]  Monster is part of Hansen's Direct Store Delivery ("DSD") seg-

15  ment.  (Compl. ¶ 9; Ex. L at 190).  The DSD segment accounts for the vast majority

16  of Hansen's sales and profits: approximately 85-90% of net sales and 97-99% of con-

17  tribution to operating income during the Class Period.  (*See* Exs. L at 229-31, 308; S

18  at 446-48, 491-92).  In addition to Monster, the DSD segment includes several other

19  energy drinks, referred to in the Complaint as the "Allied" lines.  (Ex. L at 190).  The

20  _____

21  [4] Plaintiff asserts that prior to Monster's introduction, Hansen was "a mediocre
beverage company that struggled to survive" and "even filed for bankruptcy in 1998

22  because it was apparently unable to pay its payroll taxes." (Compl. ¶ 10). These
assertions are not only irrelevant, but completely false and emblematic of the

23  Complaint's pervasive disregard for the facts. From 1996 to 2001, Hansen reported

24  profits each year and its sales nearly tripled. (Exs. A at 3; B at 5). Moreover, Hansen
has never filed for bankruptcy. Plaintiff apparently is referring to the bankruptcy

25  filing made in *1988* by another company, Hansen Foods, Inc. (Ex. A at 2), which long

26  preceded Defendants Sacks and Schlosberg's involvement with the Company and
Defendant Hansen's ownership of the business, which it acquired in 1992 (Compl.

27  ¶ 11).

28

275496.1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1  Allied brands include Lost Energy Drinks ("Lost"), Rumba Energy Juice ("Rumba"),
2  Unbound Energy Drinks ("Unbound"), Joker Mad Energy Drinks ("Joker") and Ace
3  Energy Drinks ("Ace").  (Compl. ¶ 13; Ex. S at 415).

4      Although the Complaint repeatedly chastises Hansen for devoting more atten-
5  tion and resources to Monster than to the Allied brands (*see, e.g.*, Compl. ¶¶ 5, 21,
6  34-38, 105-06), this criticism is perplexing given the relative importance of the dif-
7  ferent lines to Hansen's business.  During the Class Period, Monster was by far Han-
8  sen's most important brand, representing approximately 94% of DSD sales (Ex. X at
9  587) and, therefore, roughly 80-85% of Hansen's overall sales.  By contrast, the Al-
10  lied energy drinks combined represented only 6% of DSD sales and therefore ac-
11  counted for only about 5% of Hansen's overall sales during the Class Period.  In
12  2006, Monster's share of the market was more than twenty times greater than that of
13  Lost, the largest of the Allied brands.  (Ex. W at 560).[5]

14      As its Monster business grew, Hansen looked for a way to enhance its distribu-
15  tion system, which depended on an amalgam of local, independent beer and liquor
16  distributors and soft-drink bottlers.  (Ex. C at 10).  In May 2006, Hansen announced
17  that it had reached an agreement with AB, the maker of Budweiser beer, to tap into
18  AB's extensive nationwide network of more than 600 independent distributors (the
19  "AB Distributors").  (Compl. ¶ 15; Exs. C at 10; J at 177, 178).  Hansen's subsidiary
20  HBC entered into two long-term "Off-Premise" Distribution Coordination Agree-
21  ments (the "Off-Premise Agreements") with AB: one for Monster, and one for three
22  of the Allied product lines (Lost, Rumba and Unbound).[6]  (Compl. ¶ 15; Ex. L at 223;

23

24  [5] The relative importance of these product lines is further demonstrated by the
25  conference call transcripts and analyst reports cited in the Complaint, which reflect
   minimal discussion of the Allied products and an overwhelming focus on Monster.
26
27  [6] "Off-Premise" refers to points of sale where a consumer purchases the beverage and
   then consumes it off the premises.  This category represents the vast majority of the
28  beverage market and includes convenience chains, grocery stores, drug stores, and

Ex. E at 84 (§ 11), 105 (§ 11)).  Hansen anticipated that it would transfer about 50% of its distribution to the AB system.  (Exs. U at 519; W at 577; X at 599).

Although the Complaint fails to distinguish between AB and the AB Distributors, the agreements assigned different duties to them.  Specifically, the Off-Premise Agreements contemplated that the distribution of Hansen products to off-premise channels would be done by the AB Distributors, not by AB.  (Ex. E at 76 (Rec. 3), 96 (Rec. 3)).  AB's obligations were limited to facilitating and supporting the relationship between Hansen and the AB Distributors.  (Ex. E at 76, 78 (§§ 1, 4.1-4.4), 96, 98 (§§ 1, 4.1-4.4)).  Although the Off-Premise Agreements gave Hansen access to the hundreds of AB Distributors that comprised AB's distribution network, Hansen had to negotiate and enter into separate distribution agreements with each AB Distributor. (*See* Exs. E at 76-78 (Rec. 3, §§ 1, 2.4, 3), 96-98 (Rec. 3, §§ 1, 2.2, 3); V at 543).

In February 2007, HBC and AB also entered into a separate "On-Premise" Distribution Coordination Agreement (the "On-Premise Agreement") for the Monster brand.  (Ex. H at 137).  The On-Premise Agreement created a joint venture, whose purpose was to help Hansen get a foothold in bars, nightclubs and other places licensed to sell alcohol for on-premise consumption, which represented a largely untapped but small niche market for the Company.  (*Id.* at 137-38).  The On-Premise Agreement required AB to assume "primary responsibility for the marketing, promotion, merchandising and sales of [Monster brand products] to On-Premise Accounts only . . . ."  (*Id.* at 137, 140 (Rec. 5)).

**B.    Hansen's Performance**

Driven by the phenomenal success of Monster, Hansen has consistently reported record sales and profits over the last several years, including throughout the Class Period.  From 2003 to 2007, Hansen's net sales rose from $110 million to more than $904 million.  (Ex. S at 438).  Net income during that five-year period increased

---

mass merchandisers.  (Compl. ¶ 15; *see also* Ex. L at 202).

1  from $6 million to $149 million.  (*Id.*).  As a consequence, Hansen's stock price has

2  also grown dramatically, generating enormous benefits for its stockholders.  From

3  2003 to 2007, Hansen's stock price climbed from $0.53 per share to $44.29 on a split-

4  adjusted basis (or from $4.25 per share to $354.32 on a pre-split basis), an increase of

5  more than 8,000%.  (Exs. S at 438; JJ at 747, 733).[7]

6          Hansen's explosive growth continued after it began implementing the AB dis-

7  tribution arrangement in the second half of 2006.  Notwithstanding the Complaint's

8  rhetoric about Hansen's "declining," "deteriorat[ing]" or "collaps[ing]" sales (Compl.

9  ¶¶ 18, 26, 102), Hansen posted *record* sales in *each* quarter during the Class Period.

10 Compared to the prior year, Hansen's net sales increased by 38.1% in the first quarter

11 of 2007, by 56.9% in the second quarter, by 38.4% in the third quarter, and by 63.0%

12 in the fourth quarter.  (Exs. K at 182; N at 352; Q at 399; R at 407).  For the year as a

13 whole, Hansen's net sales grew by nearly $300 million – the largest increase in the

14 Company's history.  (Ex. S at 438).  As demonstrated by the following chart,[8] the AB

15 relationship was followed not by a decline, but by a huge increase in Hansen's annual

16 net sales:



17

18

19

20

21

22

23

---

24 [7] In fact, Hansen was *the single best* performing stock in the United States during

25 both the 5-year period and the 10-year period ending in 2007.  (Ex. II 731-32 (noting

26 that "[a]n investment of $1,000 in Hansen stock at the end of 1997 would have been

27 worth a whopping $195,489 a decade later, compared with $1,776 for a similar

   investment in the Standard & Poor's 500-stock index")).

   [8] (*See* Exs. T at 508; V at 543).

28

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1   Not only did sales increase under the AB relationship, but so too did Hansen's
2   share of the overall energy drink market.  When the AB deal was announced in May
3   2006, Monster had a 19.4% share of the energy drink market.  (Ex. C at 10).  At the
4   end of the Class Period – after operating under the AB distribution system – Mon-
5   ster's market share had risen to 24.9%, outperforming its competitors.  (Ex. BB at
6   652).  Hansen's profitability also improved.  Hansen's net income decreased by 4.2%
7   in the first quarter of 2007, and then rose by 62.7% in the second quarter, by 73.1% in
8   the third quarter, and by 103.1% in the fourth quarter.  (Exs. M at 337; N at 352; Q at
9   399; R at 407).  On a year over year basis, net income grew from $98 million in 2006
10  to $149 million in 2007, an increase of 52.5%.  (Ex. S at 445).

11  Hansen's stock price also continued to climb as the transition to the AB net-
12  work progressed.  When the Class Period began on November 9, 2006, Hansen's
13  shares were trading at $24.88.  (Ex. JJ at 746).  At the end of the Class Period on No-
14  vember 8, 2007 – *after* the decline following release of the third-quarter 2007 results
15  – Hansen's shares were trading at $43.50.  (*Id.* at 734).  This represents an apprecia-
16  tion of 74.8% in one year's time and the creation of nearly $1.7 billion in shareholder
17  value.[9]

18  **C.    The Allegations of the Complaint**

19  **1.    The Purported Misrepresentations and Omissions**

20  The Complaint alleges that, from November 2006 to August 2007, Hansen
21  made a series of "false and misleading statements."  (Compl. ¶¶ 64-92).  Virtually all
22  the purported misrepresentations are alleged to have taken place in quarterly earnings
23  conference calls led by Hansen's CEO, Rodney Sacks.

24  Notwithstanding the huge improvement in Hansen's sales, profits, and stock
25  price that followed the implementation of the AB agreements, the Complaint's central
26  allegation is that Hansen's top officers committed securities fraud when its CEO

27
28
[9] Hansen had roughly 90 million shares outstanding in 2007.  (Ex. L at 188).

1    stated that the transition to the AB distribution system was "progressing well" and

2    that they were "generally very happy" with the AB relationship and viewed it as a

3    "positive" relationship for Hansen.  (*See, e.g.,* Compl. ¶¶ 2, 4, 72, 77, 85).  Accord-

4    ing to the Complaint, these statements were false and fraudulent because "the [AB]

5    relationship encountered significant problems," including that some AB Distributors

6    allegedly had no interest in distributing Hansen's Allied products and that some AB

7    Distributors were restricted from selling Hansen products because of alcohol regula-

8    tions.  (Compl. ¶¶ 3-4, 81).

9        Nowhere, however, does the Complaint explain why the existence of isolated

10   problems with the AB transition – which would be expected in any significant busi-

11   ness transition – meant that the AB relationship as a whole was not progressing well

12   or having a positive impact on Hansen's distribution and sales.  Moreover, as detailed

13   below, the Complaint itself and the conference call transcripts on which it relies show

14   that Hansen specifically and repeatedly disclosed the issues relating to the AB transi-

15   tion throughout the Class Period.

16       The Complaint also alleges that Hansen made false statements concerning sales

17   of the Allied brands.  There is no allegation, however, that Hansen *ever* misrepre-

18   sented actual sales for the Allied products, and as detailed below, Hansen's CEO

19   candidly disclosed throughout the Class Period that Hansen faced challenges with the

20   Allied products.  The purported "false statements" consist of Hansen's CEO express-

21   ing, in highly general terms, the hope that sales of Allied products would improve.

22   (Compl. ¶¶ 66, 73).  The Complaint is devoid of any facts adequately alleging that

23   these statements were false, much less knowingly false, when made.

24       Although the Complaint proclaims that Hansen's second-quarter 2007 results

25   were "false," the *sole* basis for this inflammatory charge turns out to be a single

26   vague allegation that a former Hansen employee was instructed to "withhold" some

27   "promotional expenses" estimated to be in the "hundreds of thousands of dollars."

28   (Compl. ¶¶ 6, 89).  The Complaint pleads no particularized facts indicating that there

1    was any violation of accounting rules, let alone fraud; that any of the Defendants had

2    any knowledge whatsoever of any impropriety; or that the amount involved was ma-

3    terial to Hansen's financial statements.

4          The 65-page Complaint cites *not a single* documentary source in support of its

5    sweeping fraud allegations, but instead is replete with conclusory statements that

6    have been purportedly "confirmed" or "reported" by various unnamed former Hansen

7    employees and by one or at most two of the hundreds of AB Distributors. None of

8    these alleged confidential witnesses, however, suggests that any of the Defendants

9    were involved in fraudulent activity.

10        **2.**      **The November 8, 2007 Conference Call**

11          The Complaint further alleges that the "truth" about the AB relationship and

12    sales of Hansen's Allied brands was "reveal[ed]" in Hansen's earnings call for the

13    third quarter of 2007 held on November 8, 2007. (Compl. ¶ 48). In that call, the

14    Complaint alleges, Hansen "admitted that [it] had put the brake on the AB transition."

15    (Compl. ¶ 7). But as the very conference call transcripts cited in the Complaint

16    clearly demonstrate, there was no "admission" at all. In prior conference calls in May

17    and August 2007, Hansen had already announced that the AB transition was "largely

18    done" (Ex. Z at 627) and "largely complete" (Ex. AA at 635). Thus when Sacks re-

19    ported in the November 2007 call that, "[a]s I've indicated previously, by and large,

20    the transition arrangements to the A-B system is largely complete" (Ex. BB at 653),

21    he was saying nothing different from what he had been saying for months.

22          Nor was there any "admission" whatsoever in the November 2007 call that the

23    AB system had hurt Hansen's business or that Hansen was no longer happy with it.

24    On the contrary, Sacks expressly noted that "you [can] see from the distribution num-

25    bers overall . . . we have increased [our distribution] pretty significantly" as a result

26    of the AB transition, and he reaffirmed that "by and large we are certainly happy. If

27    somebody asked me, looking back, would we have done the A-B transition again?

28    Yes, we would've. Absolutely. We think that was the right [decision] for the com-

1   pany. . . ." (*Id.*).

2      The Complaint further alleges that Hansen stated in the November 8 earnings

3   call that its "Allied products had missed internal expectations by $10 million."

4   (Compl. ¶ 7).  But this was no acknowledgement of a prior misstatement either, for

5   the Complaint does not and cannot allege that Hansen had made any prior public

6   statement projecting what sales of Allied products would be in the third quarter.  In-

7   deed, there is no allegation in the Complaint that Hansen has ever issued financial

8   projections of any kind or given earnings estimates to securities analysts.  To the con-

9   trary, the Complaint speaks only of estimates or guidance made by *third-party ana-*

10  *lysts*. (*See, e.g.,* Compl. ¶¶  6-7, 18, 26, 47-48, 93).

11     Overall, Hansen again reported record sales and profits for the third quarter of

12  2007: a 38.4% increase in net sales over the prior year and a 73.1% increase in earn-

13  ings.  (Ex. Q at 399).  While this may have fallen short of some analysts' third quarter

14  estimates, Sacks stated that sales in October (the first month of the fourth quarter) had

15  grown by 48%.  (Ex. BB at 652).  (Ex. BB at 652).  When the full-year 2007 results

16  came in a few months later, Hansen's sales and earnings per share had in fact *ex-*

17  *ceeded* these same analysts' estimates.[10]

18                **3.    The Insider Trading Allegations**

19     The Complaint also makes unsubstantiated allegations of "insider trading"

20  against the Individual Defendants, claiming that they "unloaded" Hansen shares be-

21  tween August 13 and September 14, 2007 "to take advantage of material non-public

22  information" prior to the November 2007 price drop.  (Compl. ¶¶ 6, 47, 92, 110-14).

23  Far from suggesting fraud, however, these allegations bolster the opposite inference,

24

25  [10] *Compare* Exs. FF at 705; GG at 714; HH at 724 (analyst reports issued in August

26  2007 estimating Hansen 2007 net sales between $863.0 million and $888.1 million
    and earnings per share (diluted) between $1.46 and $1.48) *with* Ex. S at 445

27  (reporting Hansen 2007 net sales of $904.5 million and earnings per share (diluted) of
    $1.51).

28

1  *i.e.*, that the Individual Defendants did *not* sell their shares based on inside informa-

2  tion.

3      As the price chart set forth in the Complaint itself shows, the Individual Defen-

4  dants' sales took place prior to the substantial run-up in Hansen's stock price that

5  preceded the November drop, and at prices that were in the *same range* at which the

6  stock traded *following* the November drop.  (Compl. ¶ 110).  In fact, most of the Indi-

7  vidual Defendants' stock sales were at prices (between $44.01 and $44.14) that were

8  *below* the average price at which Hansen's stock traded from November 8 – when

9  Plaintiff alleges that the "truth" was revealed – through the end of the year ($44.77).

10  (Compl. ¶ 110; Ex. JJ at 733-34).

11  **III.  ARGUMENT**

12      **A.  The Complaint Fails to State a Claim Under Section 10(b) or Rule**
13          **10b-5 for Alleged False or Misleading Statements**

14      Plaintiffs in private securities fraud class actions "face formidable pleading re-

15  quirements to properly state a claim and avoid dismissal under Fed. R. Civ. P.

16  12(b)(6)."  *Metzler Inv. GmbH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1054-55

17  (9th Cir. 2008).  The elements of a claim for securities fraud under Section 10(b) and

18  Rule 10b-5 are: (1) a material misrepresentation or omission of fact, (2) scienter, (3) a

19  connection with the purchase or sale of a security, (4) transaction and loss causation,

20  and (5) economic loss.  *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990

21  (9th Cir. 2009).

22      To withstand a motion to dismiss, the complaint "must satisfy the dual plead-

23  ing requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA."  *Id.*  Rule

24  9(b) provides that "a party must state with particularity the circumstances constituting

25  fraud or mistake."  Under Rule 9(b), "[t]he plaintiff must set forth what is false or

26  misleading about a statement" and provide "an explanation as to why the disputed

27  statement was untrue or misleading *when made*."  *In re GlenFed, Inc. Sec. Litig.*, 42

28  F.3d 1541, 1548-49 (9th Cir. 1994) (emphasis in original); *see also Vess v. Ciba-*

1  *Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (Rule 9(b) requires averments

2  of "the who, what, when, where, and how of the misconduct charged").

3      The PSLRA imposes even "more exacting pleading requirements," *Zucco*

4  *Partners*, 552 F.3d at 990, which serve as a "check against abusive litigation by pri-

5  vate parties" in securities fraud cases.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,

6  551 U.S. 308, 313 (2007).  The PSLRA requires plaintiffs to "specify each statement

7  alleged to have been misleading, the reason or reasons why the statement is mislead-

8  ing, and, if an allegation regarding the statement or omission is made on information

9  and belief, the complaint shall state with particularity all facts on which that belief is

10  formed."  15 U.S.C. § 78u-4(b)(1)(B).

11      "[T]he PSLRA also requires a plaintiff to plead scienter with particularity."

12  *Rubke v. Capitol Bancorp Ltd.*, 551 F.3d 1156, 1164 (9th Cir. 2009).  Plaintiffs must

13  "state with particularity facts giving rise to a *strong* inference that the defendant acted

14  with the required state of mind."  15 U.S.C. § 78u-4(b)(2) (emphasis added).  A plain-

15  tiff must show that the false statement was made intentionally or with a "degree of

16  recklessness that strongly suggests actual intent."  *In re Silicon Graphics Sec. Litig.*,

17  183 F.3d 970, 977-79 (9th Cir 1999); *see also Zucco Partners*, 552 F.3d at 991 (de-

18  liberate recklessness standard is "a form of intentional or knowing misconduct").  It is

19  not enough for a complaint "to allege facts from which an inference of scienter ra-

20  tionally *could* be drawn."  *Tellabs*, 551 U.S. at 323 (emphasis in original).  Rather,

21  the facts alleged, "taken collectively," must give rise to an inference of scienter that is

22  "cogent and at least as compelling as any opposing inference one could draw . . . ."

23  *Id.* at 323-24.

24      Thus, the PSLRA requires that a securities fraud complaint "plead with particu-

25  larity both falsity and scienter."  *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir.

26  2002).  Because the Complaint here fails to plead either falsity or scienter in confor-

27  mity with the heightened requirements of the PSLRA and Rule 9(b), it must be dis-

28  missed.  *See* 15 U.S.C. § 78u-4(b)(3)(A) (mandating that "the court *shall*, on the mo-

1  tion of any defendant, dismiss the complaint if" these two requirements are not met

2  (emphasis added)).

### 1.  The Complaint Fails to Plead that Defendants Made Any Material Misrepresentations or Omissions About the AB Transition or the Allied Brands

5  Except for the patently deficient allegations concerning Hansen's purported

6  failure to account for certain "promotional expenses" in the second quarter of 2007,

7  which are addressed below in Point III.A.2., nowhere does Plaintiff allege that any of

8  Hansen's publicly-reported financial information was misstated.  Instead, Plaintiff

9  claims that Hansen's CEO Sacks made false or misleading statements about Hansen's

10  transition to the AB distribution system and about the success of the Allied brands

11  during analyst calls and in a single press release.[11]

12  As discussed below, Plaintiff has failed adequately to plead that any of the

13  statements made by Sacks were false or misleading for the following five independ-

14  ent reasons: (a) the statements at issue are general statements of corporate optimism,

15  which are not actionable as a matter of law; (b) most of the statements constitute for-

16  ward-looking statements, which are protected by the bespeaks cautions doctrine and

17  the PSLRA; (c) the problems that Plaintiff alleges existed at Hansen do not render

18  any of the statements made by Sacks false or misleading; (d) the issues that Plaintiff

19  claims Sacks concealed were in fact repeatedly disclosed; and (e) allegations of cor-

20  porate mismanagement do not give rise to a securities fraud claim.

21

22

23

24  [11] Although Plaintiff names both Sacks and Schlosberg in the first cause of action, the Complaint does not allege that Schlosberg made *any* of the allegedly false or

25  misleading statements.  Nor does the Complaint plead particularized facts showing Schlosberg's involvement in preparing, drafting or disseminating *any* of the allegedly

26  false or misleading statements.  For this reason alone, the Complaint fails to state a Section 10(b) misrepresentation claim against Schlosberg.  *See In re Hansen Natural*

27  *Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1153 (C.D. Cal. 2007).

28

### a.     General Statements of Corporate Optimism Are Not Actionable as a Matter of Law

"[V]ague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws." *In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).  Such statements "are considered immaterial and discounted by the market" because "reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions."  *In re Leapfrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1049 (N.D. Cal. 2007) (citation omitted); *see also In re Gupta Corp. Sec. Litig.*, 900 F. Supp. 1217, 1235 (N.D. Cal. 1994) ("Numerous courts have held . . . that general statements of optimism about the future and 'puffing' about a company or product are not actionable.").

The statements quoted in the Complaint are precisely the kind of indeterminate statements of opinion and optimism that courts routinely conclude are not actionable. For example, with respect to the AB transition, the Complaint alleges that the following statements by Sacks were "false":

- "We *think* that the transition to [AB] is really *going to continue to help us*. . . . We really are very *happy* with the transition."  (Compl. ¶ 65).

- "We *look forward* to working together [with AB] to build on the *success* of Monster Energy® and our other energy drink brands."  (*Id.* ¶ 70).

- The AB on-premise agreement "*will enable us* to secure quite extensive distribution in the on-premise channel."  (*Id.* ¶ 71).

- The AB system "has *improved* the *quality* of our distribution in stores, execution, [and] point of sale merchandising . . . .  Generally so, we are *happy* with – with [the AB] system . . . ."  (*Id.* ¶ 72).

- "But *going forward*, overall, we're still very *positive* about the relationship and about the *quality* of the distribution and the *long-term strength* that this distribution system will bring to our Company . . . ."  (*Id.* ¶ 77).

- "We *think* it is working for us, we're getting good *solid* distribution, we're working with professional distributors, and so we are generally very *happy*."  (*Id.* ¶ 85).

- "I *think* the *proof is in the pudding*, it is happening for us and it *will continue to, we think, improve, as we go forward.*" (*Id.* ¶ 86) (emphasis added or modified throughout)).

The alleged misrepresentations regarding the Allied brands are of the same kind:

- "[W]e're still very *positive* about Lost. . . . Joker is at a *good velocity* and so is Unbound. . . . We really do *believe* that those products do have *good opportunity.* . . . [W]e do believe Rumba has got *a lot of legs* . . . ." (*Id.* ¶ 65).

- "[W]e're *hoping* that we *will* also be able to offset [any potential decrease in gross margins due to the buy in for 24-ounce Monster cans] by the increased sales in Ace, Joker and Unbound . . . , so we *think* those will also help *improve* our [margins]." (*Id.* ¶ 66).

- "[W]e *think* we'll be able to *improve* our distribution with Lost *as we go forward*." (*Id.* ¶ 73) (emphasis added or modified throughout).

All of these allegations fail as a matter of law. *See, e.g., Impac*, 554 F. Supp. 2d at 1096 (CEO's statements that "[w]e continue to expect solid loan acquisitions and originations" and "[w]e remain optimistic for continued solid loan production" were not actionable); *Leapfrog*, 527 F. Supp. 2d at 1050 ("we feel very positive," "we continue to make strong growth in supply chain" and "[w]e are pleased with our progress" were "soft statements or loose predictions that do not give rise to a securities fraud claim"); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868-69 (N.D. Cal. 2004) (statements that business remained "strong," that demand "will continue to grow" and that consolidation in the DSL market would be "very positive" for the company "constitute run-of-the-mill corporate optimism on which no reasonable investor would rely"); *In re Splash Tech. Holdings, Inc. Sec. Litig. ("Splash Tech. II")*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001) (holding that phrases such as "strong," "solid," "improved," and "unfolding as planned" when used to describe demand, results, and growth strategy were not actionable as material misrepresentations); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1121-22 (10th Cir. 1997) (statements attributing "substantial success" to the integration of sales forces after a merger were

1   the sort of soft statements that courts routinely dismiss as vague).

2          **b.     Forward-Looking Statements Are Protected by the Be-**
3                 **speaks Caution Doctrine and the PSLRA**

4          "'The bespeaks caution doctrine provides a mechanism by which a court can

5   rule as a matter of law . . . that defendants' forward-looking representations contained

6   enough cautionary language or risk disclosure to protect the defendant against claims

7   of securities fraud.'" *Employers Teamsters Local Nos. 175 and 505 Pension Trust*

8   *Fund v. Clorox Co.*, 353 F.3d 1125, 1132 (9th Cir. 2004) (quoting *In re Worlds of*

9   *Wonder Sec. Litig.*, 35 F.3d 1407, 1413 (9th Cir. 1994)).  The PSLRA's safe harbor is

10  a statutory version of this doctrine.  *Id.*  It independently protects defendants from li-

11  ability for a forward-looking statement, provided that the statement is "identified as a

12  forward-looking statement, and is accompanied by meaningful cautionary statements

13  identifying important factors that could cause actual results to differ materially from

14  those in the forward looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).[12]

15         As is clear from the quotations above, the vast majority of the statements by

16  Sacks about Hansen's distribution relationship with AB and the Allied brands were

17  forward-looking statements.  The PSLRA defines "forward-looking statement[s]" to

18  include statements regarding "a projection of revenues [or] income," "the plans and

19  objectives of management for future operations," and "future economic perform-

20  ance." 15 U.S.C. § 78u-5(i)(1).  In addition, a present-tense statement may qualify as

21  forward-looking if "the truth or falsity of the statement cannot be discerned until

22

23  [12] Alternatively, even if a forward-looking statement fails to meet these requirements,

24  it still is protected unless the plaintiff can meet its heavy burden to plead facts to
    show that the alleged misstatement was made with "actual knowledge" of its falsity.

25  15 U.S.C. § 78u-5(c)(1)(B); *see also Splash Tech II.*, 160 F. Supp. 2d at 1069

26  ("Where a plaintiff alleges false forward-looking statements, the 'required state of
    mind' is 'actual knowledge' that the statement was false at the time it was made."

27  (citation omitted)).  As set forth below in Point III.A.3., Plaintiff has failed to plead a

28  strong inference of actual knowledge.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1  some point in time after the statement is made." *In re Splash Tech. Holdings, Inc.*

2  *Sec. Litig.* *("Splash Tech. I")*, No. C 99-00109, 2000 WL 1727377, at *6 (N.D. Cal.

3  Sept. 29, 2000).  Statements that Hansen looks *forward* to working with AB, *expects*

4  distribution to *continue* to improve, and *hopes* that sales of Allied products will im-

5  prove are forward-looking.  *See, e.g.*, *Impac*, 554 F. Supp. 2d at 1098-99 (holding that

6  statements of expected "continued solid loan production" are forward-looking state-

7  ments); *Leapfrog*, 527 F. Supp. 2d at 1046-47 (holding that statements of "expecta-

8  tions of further improvements in gross margins" are forward-looking statements).[13]

9      Nor can it be disputed that these statements were identified as forward-looking

10  and accompanied by meaningful cautionary language.  Cautionary language is

11  "meaningful" if it "'relate[s] directly to that which plaintiffs claim to have been mis-

12  led.'"  *Leapfrog*, 527 F. Supp. 2d at 1047 (quoting *Worlds of Wonder*, 35 F.3d at

13  1415).[14]  Sacks began each analyst call that is referred to in the Complaint by caution-

14  _____

15  [13] Indeed, Hansen's SEC reports specifically advised investors that "[a]ll statements

16  which address operating performance, events or developments that management
    expects or anticipates will or may occur in the future including . . . statements

17  expressing general optimism about future operating results and non historical
    information, are forward looking statements" and that "the words 'believes,' 'thinks,'

18  'anticipates,' 'plans,' 'expects,' and similar expressions are intended to identify

19  forward-looking statements."  (Exs. D at 60; L at 240).

20  [14] Where, as here (Compl. ¶¶ 124-25), the Complaint relies on the "fraud-on-the-
    market" presumption, which posits that the market is efficient and promptly digests

21  *all* publicly available information regarding an issuer, "the defendants' cautionary

22  statements must be treated as if attached to every one of its oral and written
    statements,'" and "the Court must consider whether any cautionary language

23  provided by the defendants *at any time* sufficiently warned of the risk of which

24  plaintiffs complain."  *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 280
    (S.D.N.Y. 2006) (citation omitted) (emphasis added); *In re Gilat Satellite Networks,*

25  *Ltd.*, No. CV-02-1510 (CPS), 2005 WL 2277476, at *13 (E.D.N.Y. Sept. 19, 2005);

26  *accord Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 731-32 (7th Cir. 2004) (oral
    statements need not include or reference risks where plaintiff relies on fraud-on-the-

27  market theory); *see also Splash Tech. I*, 2000 WL 1727377, at *10 (under bespeaks

28  caution doctrine, oral forward-looking statements must be considered in light of

1   ing that "certain statements made in [the call] may constitute forward-looking state-

2   ments" and that "these statements are qualified by their terms or important factors,

3   many of which are outside the control of the Company that could cause actual results

4   and events to differ materially from the statements made [in the call]."  (Exs. W at

5   557-58; *see also* X at 584; Y at 603; AA at 632; BB at 648).  The analyst calls were

6   each preceded by a press release cautioning that the Company's forward-looking

7   statements were qualified by the risk factors set forth in the release itself and in Han-

8   sen's financial statements.  (Exs. G at 130; I at 174; K at 183; N at 353; Q at 401).

9       Hansen's SEC reports, in turn, detailed a variety of "risks, uncertainties and

10  other factors, that could cause actual results and events to differ materially" from

11  Hansen's statements, and expressly cautioned investors that "[g]iven these uncertain-

12  ties, you should not rely on forward-looking statements."  (*E.g.* Exs. D at 60-61; L at

13  240, 242; P at 386-88).  These included risk factors specifically related to the matters

14  that are the subject of the forward-looking statements challenged in the Complaint.

15  For example, Hansen specifically identified as one risk factor "[t]he marketing efforts

16  of distributors of the Company's products, most of which distribute products that are

17  competitive with the products of the Company."  (Exs. D at 61; L at 241; I at 174; K

18  at 183; P at 387).  Similarly, Hansen specifically identified risk factors that related to

19  product distribution, including the AB distribution agreements:

20          Disruption in distribution or sales and/or decline in sales
            due to the termination of the distribution agreements with
21          certain of the Company's existing distributors or distribu-
            tion networks and the appointment of selected AB whole-
22          salers as distributors in their place for the territories of such
            terminated distributors.
23

24  (Exs. D at 61; L at 241; P at 387).  Accordingly, Plaintiff cannot state a securities

25  fraud claim based on any of the forward-looking statements set forth in the Com-

26

27  ─────────────────

28  cautionary language in company's SEC filings).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

plaint.[15]

### c. Allegations of Business Problems Do Not Render Hansen's Statements False

Even if any of the challenged statements were not simply inactionable statements of optimism or forward-looking statements, the Complaint would still be fatally defective because it fails to allege sufficiently that any such statement was false.

Plaintiff alleges that Hansen's positive statements were false and misleading because of various "problems" (*see, e.g.*, Compl. ¶¶ 23, 67, 81) that allegedly plagued its transition to the AB distribution system and sales of the Allied products.  These alleged problems included that (i) AB Distributors wanted only Monster and lacked interest in the Allied brands because the brands were not well-known or well-received in the marketplace (Compl. ¶¶ 3, 4, 22, 68, 75); (ii) AB Distributors were restricted from distributing Hansen's products in many areas because of alcohol regulations, in-

---

[15] Plaintiff also alleges that statements in a May 2007 JP Morgan analyst report were false.  (Compl. ¶¶ 79-80).  Because Defendants never adopted or endorsed the report, they can be held liable only for their own statements to the analyst.  *See In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 934 (9th Cir. 1996); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1170-71 (C.D. Cal. 2003).  It is not enough to assert that the report was based on information provided by Sacks and Schlosberg; Plaintiff must identify the specific statements that they made to the analyst and the reasons why the statements were false or misleading when made.  *See In re Dura Pharm. Sec. Litig.*, 452 F. Supp. 2d 1005, 1035 (S.D. Cal. 2006); *SeeBeyond*, 266 F. Supp. 2d at 1170.  Plaintiff has not done so.

First, neither the Complaint nor the JP Morgan report identifies Sacks' or Schlosberg's specific statements to the analyst.  The report merely references "Hansen's commentary" during "a recent positive management meeting with CEO Rodney Sacks and CFO Hilton Schlosberg." (Compl. ¶ 79).  Given that the report, at best, paraphrases statements made at the meeting, neither Sacks nor Schlosberg can be held liable for federal securities fraud for the report's statements.  *See Leapfrog*, 527 F. Supp. 2d at 1051-52 (rejecting allegations where "analyst 'repackaged' defendants' statements in 'vague and impressionistic terms' rather than the mere reporting of defendants' actual statements").  Second, even if the report's statements could be attributed to Sacks and Schlosberg (which they cannot), the statements still would not be actionable for the reasons discussed herein.

1  creasing Hansen's costs (*e.g.*, Compl. ¶¶ 4, 30-32, 67); (iii) Hansen was not devoting

2  enough marketing resources to the Allied brands and instead was spending 90% of its

3  marketing budget on Monster (Compl. ¶¶ 5, 34-35, 68, 82, 105); and (iv) certain on-

4  premise markets were difficult to break into due to Red Bull's exclusivity agreements

5  in those markets (Compl. ¶¶ 33, 91).  To support these allegations, Plaintiff relies ex-

6  clusively on the reports of confidential witnesses.  However, as explained below in

7  Point III.A.3.b., the Complaint fails to describe its confidential witnesses with suffi-

8  cient particularity to establish their reliability and personal knowledge, as required by

9  the PSLRA.  *See, e.g., Zucco Partners,* 552 F.3d 981 at 995.

10  But even assuming, *arguendo*, that these various "problems" existed, they in no

11  way establish the falsity of any of the challenged statements.  Claims that AB Dis-

12  tributors were most interested in Monster, that some AB Distributors were hindered

13  by alcohol regulations, or that Hansen could have spent more marketing dollars on

14  Allied products simply do not render false Sacks' general positive statements about

15  the AB transition or the prospects for the Allied products.  The Courts of this Circuit

16  have recognized time and again that such allegations fail to state a claim for violation

17  of the federal securities laws.  As recently stated by one court in words equally appli-

18  cable to this case:

19  > Plaintiffs' complaint merely juxtaposes public statements expressing en-
20  > thusiasm for Yahoo! with paragraphs referring to myriad internal prob-
   > lems at Yahoo!.  Alleging a litany of problems is not enough to refute
21  > specifically general statements that project optimism and Yahoo!'s
   > growth.  As the Court previously noted, in a business as large and com-
22  > plex as Yahoo!, "problems and difficulties are the daily work of business
   > people.  That they exist does not make a lie out of any alleged false
23  > statement."

24  *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009) (quoting *Ron-*

25  *coni v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001); *accord, e.g., In re Petco Animal*

26  *Supplies Inc. Sec. Litig.*, No. 05-CV-0823, 2005 WL 5957816, at *20-26 (S.D. Cal.

27  Aug. 1, 2005); *In re Netflix, Inc. Sec. Litig.*, No. C04-2978, 2005 WL 1562858, at *7

28  (N.D. Cal. June 28, 2005); *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1247 (N.D.

1    Cal. 1998) ("All businesses from time to time suffer management problems and

2    product delays, but many manage to 'do very well' despite those commonplace busi-

3    ness wobbles.").

4          This is especially true here.  It is undisputed that Hansen reported substantial

5    *increases* in sales and profits throughout the Class Period (and beyond), following

6    implementation of the AB agreements.  Hansen's transition to the AB network was a

7    nationwide effort involving hundreds of AB Distributors and primarily directed at

8    improving distribution levels and sales of Monster, Hansen's flagship brand.  In this

9    light, the Complaint's allegations of peripheral problems predominately affecting a

10   few AB Distributors and the Allied brands – which comprised only 5% of Hansen's

11   overall sales – are patently insufficient to establish that Hansen's positive statements

12   about the AB system were false.[16]  *See Petco*, 2005 WL 5957816, at *23 (alleged op-

13   erational problems did not render false company's statements given that it had a suc-

14   cessful business strategy given, *inter alia*, its sales growth and earnings record during

15   the class period).

16          Similarly, the Complaint fails to explain how the alleged problems rendered

17   false Sacks' hopeful statements regarding the Allied brands.  There is no allegation in

18   the Complaint that Hansen's internal projections for Allied products were inconsis-

19   tent with Sacks' statements.  On the contrary, the Complaint affirmatively alleges that

20   Hansen's internal projections assumed an *increase* in Allied sales.  (*See* Compl. ¶ 7).

21   Alleged problems with the marketing of Allied products in no way establish that

22   Sacks' statements were false.  *See Ronconi*, 253 F.3d at 434 ("A company could ex-

23   perience 'serious operational problems,' 'substantial difficult[ies],' and 'difficult

24   problems' and still have increasing revenue.").

25   _____

26   [16] Notably, the Complaint's confidential witnesses do not attempt to describe what

27   impact the supposed issues with the AB transition and the Allied brands had on
     Hansen's overall business or assert (let alone show) that the impact was material.

28

**d.    The Challenges Relating to the AB Transition and the Allied Products Were Expressly Disclosed by Hansen**

To state the obvious, where the information alleged by the Complaint to have been omitted was actually disclosed, there can be no basis for a claim of misrepresentation under the federal securities laws. *See, e.g.*, *Belodoff v. Netlist, Inc.*, No. SA CV 07-00677, 2008 WL 2356699, at *9 (S.D. Cal. May 30, 2008). Yet the conference call transcripts cited in the Complaint itself show that Sacks repeatedly disclosed the challenges that Hansen faced with the AB transition and Allied sales, including the very issues the Complaint alleges were concealed from investors.

Plaintiff attempts to avoid acknowledging these disclosures by quoting the transcripts selectively. The full transcripts confirm that, throughout the Class Period, Sacks discussed the issues arising from the transition to the AB distribution system:

- "Rome wasn't built in a day. It takes time. In some of these cases . . . a lot of the distributors haven't [gone through][17] distributing non-alcoholic products. There is a learning curve." (Ex. W at 561).

- "It's taking time in many cases to, you know, change the mind set of the distributors and of their salespeople as to how to sell and how to merchandise energy drinks . . . ." (Ex. X at 592).

- "There are markets where we were weak . . . . [In s]ome of the markets in the Northwest . . . we're not seeing the growth we would have liked to have seen." (Ex. Y at 608).

- "[T]hese [things] do take time. In some markets we have disappointments . . . ." (Ex. AA at 640).

Sacks specifically discussed that some AB Distributors were interested in distributing Monster, and not the Allied brands:

---

[17] For the Court's convenience, we have made minor modifications based on the audio record to some of the quotations from the investor call transcripts to correct obvious transcription errors. The modifications appear in brackets and have been added solely to make the text more comprehensible; none of the bracketed language materially alters the overall meaning of the quoted language.

- "There were longer negotiations with some of the [AB] distributors who weren't getting Monster, who . . . indicated . . . that [they don't] want to take the other brands, unless they got Monster . . . [and that] [t]here have been some markets that have not agreed to take the brands unless they get Monster . . . ." (Ex. W at 563-64).

- "[W]e did get some resistance" from the AB distributors who "weren't awarded Monster" and who "held out for Monster. . . ." (Ex. X at 594).

- "[A]ll of the Budweiser distributors will be getting the on-premise Monster, and we think that by getting them with the on-premise Monster, . . . those that sort of haven't taken Lost will take Lost, and so, we think we'll be able to im-prove our distribution with Lost as we go forward. . . ." (*Id.*).

Sacks also specifically discussed that some AB Distributors did not sell in markets due to alcohol regulations, and that AB's on-premise distribution would be adversely affected by competitors' existing agreements:

- "[T]here are some states that . . . whether it is for dry areas or just different channels where they don't permit alcoholic drinks to be sold, and the result is that AB doesn't ordinarily go into it. . . . [T]here may be a little bit of fall off that we'll get. We won't be able to reach as many accounts . . . ." (Ex. W at 577).

- "Until now, as you know, we obviously, attacked that [on-premise] channel, but it has been very difficult. That channel is dominated by Red Bull. They have dominated that channel for over 10 years, and really no one-- none of the competitors have managed to make any inroads into their channel." (Ex. X at 589).

- On-premise establishments have "many existing agreements with competing brands and competing beverages that encompass energy drinks even though they might not be selling them" and that Hansen would have to "wait for the contract[s] to expire . . . ." (Ex. AA at 635).

Likewise, Hansen specifically and repeatedly disclosed that the AB transition had adversely affected sales of Allied products, particularly Lost:

- "So [certainly] Lost-- we think has got hurt this period. We also weren't really able to get started with Rumba. We think the other sort of-- just because of how much work and focus we have got in dealing with A-B and Monster . . . ." (Ex. V at 554).

- "Lost is down from 1.3 to 1.1 [percent] largely [due] to the effects of the transition [that] has been a little bit disruptive to the Lost brand, but it is getting back on stream"; the transition of Lost has been "a struggle." (Ex. W at 560, 563).

- "By and large [the transition] has worked out, but it did take some time and there was disruption. We need to get through it on the Lost brand." (*Id.* at 564).

- "Lost energy lost some ground due to the transition. We are still trying to get the brand back on track and that is taking some effort." (Ex. Y at 606).

- Lost "has sort of struggled a little more. . . . [W]e had lost distribution because of the change-over hadn't gone as smoothly as planned with Lost, and it has been more of a challenge. . . . [I]t has been disappointing that [Lost] has sort of dropped off as it has in the period. . . . [It] is probably about 2 million in sales during the period, less than last year." (*Id.* at 615).

The above disclosures refute any claim that Sacks concealed the alleged problems arising from the transition to the AB distribution system and sales of the Allied brands.[18]

### e. Plaintiff's Allegations of Corporate Mismanagement Do Not State a Claim for Securities Fraud

At its core, the Complaint does not rest on any colorable claim of fraudulent conduct, but rather attacks the wisdom of Hansen's sales and marketing strategy. According to Plaintiff, it was a poor business decision for Hansen to enter into the distribution agreements with AB and to allocate more resources to its flagship brand, Monster, than to the Allied products. The Complaint is chock full of such criticisms. (*See, e.g.,* Compl. ¶¶ 33-34, 37, 39, 105).

Plaintiff's questioning of Hansen's business acumen is seriously misguided (especially given Hansen's performance during the Class Period). For example, while the Complaint repeatedly faults Hansen for devoting 90% of its marketing

---

[18] In addition to Hansen's own disclosures, the securities analysts who tracked Hansen's stock, relying on monthly AC Nielsen sales data, provided investors with their own independent assessments of the impact of the AB transition, noting negatives as well as positives. (*See* Exs. CC at 671; DD at 687, 690; EE at 696, 699).

1   budget to Monster and only 10% to the Allied brands and other products, this alloca-

2   tion hardly seems unreasonable given that Monster was by far the Company's leading

3   product and accounted for more than 80-85% of its revenues during the Class Period

4   (compared to only 5% for the Allied brands).

5          But more fundamentally, such allegations simply are not the stuff of a claim for

6   federal securities fraud.  The Supreme Court long ago held that allegations of corpo-

7   rate mismanagement do not constitute "manipulative or deceptive" conduct and are

8   not actionable under Section 10(b).  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462,

9   471, 479 (1977).  It is equally well-settled that such a claim may not be bootstrapped

10  into a cause of action under Section 10(b) by alleging that the mismanagement was

11  not properly disclosed.  *See, e.g., Panter v. Marshall Field & Co.*, 646 F.2d 271, 288

12  (7th Cir. 1981).  Courts in this Circuit therefore have repeatedly dismissed such mis-

13  management claims as not actionable.  *See, e.g., Impac*, 554 F. Supp. 2d at 1094-96

14  (allegations by confidential witnesses of poor judgment and even incompetence "do

15  not show any deceit on the part of Defendants" and therefore "cannot support a fraud

16  claim"); *Petco*, 2005 WL 5957816, at *22 ("Generic allegations of mismanagement

17  could be made against any business, and do not support a federal securities fraud law-

18  suit.").  The same conclusion is compelled here.

19          **2.     The Complaint Fails to Plead that Hansen's Quarterly Results**
20                 **Were Materially False**

21         Plaintiff's lone allegation of accounting fraud – relating to Hansen's financial

22  statements for the second quarter of 2007 – also fails to establish the existence of any

23  material misrepresentation.  Based on the account of a single confidential witness, "a

24  National Account Manager," Plaintiff alleges that Hansen's "results" for its second

25  quarter of 2007 were false because one of Hansen's vice presidents, who is not a de-

26  fendant in this action, instructed the witness to "withhold promotional expenses" for

27  one particular account.  (Compl. ¶¶ 46, 89).  Consequently, "Hansen's 2Q07 financial

28  results . . . did not include what the witness estimated were hundreds of thousands of

1  dollars of expenses . . . ." (Compl. ¶ 89). These vague and conclusory allegations of

2  accounting fraud do not remotely satisfy the particularity requirements of the PSLRA

3  and Rule 9(b).

4       "To properly state a claim for accounting fraud, plaintiffs must 'plead facts'

5  sufficient to support a conclusion that [d]efendant [ ] prepared fraudulent financial

6  statements and that the alleged financial fraud was material." *In re Daou Sys., Inc.,*

7  *Sec. Litig.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (citation omitted) (alterations in

8  original). "[T]he complaint *must describe the violations with sufficient particularity*;

9  a general allegation that the practices at issue resulted in a false report of company

10  earnings is not a sufficiently particular claim of misrepresentation." *Id.* (internal quo-

11  tation marks and citations omitted) (emphasis added). No such particularized facts

12  are pled here.

13       For starters, Plaintiff fails to describe the confidential witness with sufficient

14  particularity to establish the witness's reliability and personal knowledge, as required

15  by the PSLRA. *See Zucco Partners*, 552 F.3d at 995. There are no particularized

16  facts showing that Plaintiff's confidential witness had any role in Hansen's account-

17  ing process or financial reporting. *Brodsky*, 630 F. Supp. 2d at 1114 (for accounting

18  fraud allegation to survive pleading stage, plaintiff "must describe with particularity

19  these CWs' roles in [the company's] revenue recognition process and that they had

20  personal knowledge of Defendants' accounting decisions").

21       Moreover, the Complaint pleads no facts indicating that any misstatement re-

22  sulted from the alleged "withholding" of promotional expenses. Plaintiff provides no

23  specifics whatsoever regarding what promotions were involved, when they took

24  place, how the expenses associated with them were "withheld," from whom they

25  were "withheld" or even what is meant by that cryptic word. *See In re Bus. Objects*

26  *S.A. Sec. Litig.*, No. C 04-2401, 2005 WL 1787860, at *7 (N.D. Cal. July 27, 2005)

27  (rejecting "vague and conclusory" allegation based on confidential witness statement

28  that "some sales were not recorded in the quarter in which they were made;" "[t]he

1  Court is left to speculate as to the date, sales[,] quantity, and other relevant details re-

2  garding the transaction"). Indeed, the Complaint does *not* specifically allege that the

3  promotional expenses were actually incurred in, or required under applicable ac-

4  counting rules to be accounted for in, the second quarter of 2007, or that they were

5  not actually accounted for in the second quarter.[19]

6       Finally, the Complaint provides no particulars regarding the impact of the al-

7  leged conduct on Hansen's financial statements, *i.e.*, the approximate amount by

8  which a specific line item was overstated. The witness' vague "estimate" that the

9  promotional expenses at issue were in the "hundreds of thousands of dollars" is

10  plainly insufficient. *See In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1090-91 (9th

11  Cir. 2002) (allegations of improper revenue recognition of "millions of dollars" insuf-

12  ficient to plead the amount of the overstatement). Tellingly, the Complaint does not

13  even allege that the purported omission of these promotional expenses had a *material*

14  impact on Hansen's financials – nor could it, given that Hansen reported total net

15  sales of $244.8 million in the second quarter and operating income of $61.4 million.

16  (Ex. P at 379). A few hundred thousand dollars of promotional costs could not have

17  made any conceivable difference to a reasonable investor. *See, e.g., In re Westing-*

18  *house Sec. Litig.*, 90 F.3d 696, 714-15 (3d Cir. 1995).

19
20       **3.    The Complaint Fails to Plead Facts Giving Rise to a Strong Inference of Scienter**

21       Even if the Complaint did sufficiently allege a material misrepresentation or

22  omission by any of the Defendants – and it does not – the Complaint would still have

23  to be dismissed because it fails to plead the requisite "strong inference" of scienter.

24
25  [19] More specifically, there are no allegations as to what accounting rules applied to
the promotional expenses, in what period the expenses were supposed to be recorded,
26  whether the expenses were required to be accrued for in advance, or whether and how
Hansen failed properly to accrue for them or to adhere to generally accepted
27  accounting principles in any respect.
28

1  The Complaint's scienter allegations, whether examined individually or collectively,

2  fail to give rise to a cogent and compelling inference that Defendants intended to de-

3  ceive investors, as required by *Tellabs*. *See Zucco Partners*, 552 F.3d at 992 (com-

4  plaint's scienter allegations should first be examined individually and then holisti-

5  cally to determine if *Tellabs* standard is satisfied).

6        The most direct way to show that "the party making the statement knew that it

7  was false is via contemporaneous reports of data, available to the party, which con-

8  tradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380

9  F.3d 1226, 1230 (9th Cir. 2004); *see also Yourish v. Cal. Amplifier*, 191 F.3d 983,

10  993 (9th Cir. 1999) (plaintiff must point "to inconsistent contemporaneous statements

11  or information (such as internal reports) which were made by or available to the de-

12  fendants"). Here, the Complaint cites *no* contemporaneous documents or data sug-

13  gesting that *any* of the Defendants knew that *any* of the alleged misstatements were

14  false when made.

15        Instead, the Complaint tries several other tacks, none of which support any in-

16  ference of scienter – much less a "strong inference" or the "cogent and compelling"

17  inference required by *Tellabs*. First, Plaintiff makes boilerplate allegations about the

18  Individual Defendants' positions as Hansen officers, their access to or receipt of uni-

19  dentified "information," "specific reports," and "regular briefing[s]," and their signa-

20  tures on Sarbanes-Oxley certifications. (Compl. ¶¶ 99, 101). Second, Plaintiff relies

21  on amorphous observations of unnamed confidential witnesses, who themselves

22  never suggest that any fraud was afoot. Third, Plaintiff points to the Individual De-

23  fendants' stock trades during the class period in an attempt to support its other, factu-

24  ally devoid allegations of scienter. As discussed in more detail below, whether

25  viewed in isolation or holistically, none of these allegations are sufficient to satisfy

26  the pleading standards articulated in *Tellabs* and *Zucco Partners*.

27

28

1

a.    **Plaintiff's Boilerplate Allegations of Corporate Posi-tions, Access to Information, and Sarbanes-Oxley Certi-fications Do Not Support an Inference of Scienter**

Under the heading "Scienter Allegations," Plaintiff sets forth various boiler-plate allegations, including that the "defendants," by virtue of their corporate posi-tions, were aware of the allegedly undisclosed information.  (*See* Compl. ¶¶ 97-101). Fraud, however, is not a status offense, and courts have routinely rejected attempts to plead scienter on this basis.  *See, e.g.*, *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002); *Hansen*, 527 F. Supp. 2d at 1158-59.  A ruling to the contrary "would eliminate the necessity for specially pleading scienter, as any corporate officer could be said to possess the requisite knowledge by virtue of his or her position."  *In re Audodesk, Inc. Sec. Litig.*, 132 F. Supp. 2d 833, 844 (N.D. Cal. 2000).

Similarly, Plaintiff alleges that the "defendants" should have been aware of the alleged issues by virtue of their access to general company information, attendance at unspecified meetings, participation on equally vague "monthly conference calls," and review of unidentified reports and other data.  (Compl. ¶¶ 97, 102).  Boilerplate alle-gations, such as these, are repeatedly and roundly rejected by courts.  *See Vantive*, 283 F.3d at 1087 (general allegations of defendants' "hands-on" management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient); *Impac*, 554 F. Supp. 2d at 1100 ("Vague references to 'packages' and 'reports' are the type of boi-lerplate allegations that courts generally reject as evidence of scienter."); *In re Lock-heed Martin Corp. Sec. Litig.*, 272 F. Supp. 2d 944, 956 (C.D. Cal. 2003) (allegations that defendant "received regular updates regarding the status of the Company's major projects" insufficient to allege scienter).

Equally unavailing are Plaintiff's allegations about "binders" of publicly-available "Nielson numbers," and access to sales data in "a computer system called Mass 500" and in "a master spreadsheet."  (Compl. ¶¶ 101-102).  Under controlling

1  law in this Circuit, Plaintiff must allege more than the existence of internal reports

2  and data that might have contradicted the information provided to the public; Plaintiff

3  must allege specific facts about the contents of those reports, which officers reviewed

4  them and when, and why the reports were reliable. *In re Blue Rhino Corp. Sec. Litig.*,

5  No. CV 03-3495, 2004 WL 5681763, at *6 (C.D. Cal. Oct. 7, 2004) ("[C]omplaint

6  must 'state facts relating to internal reports, including their contents, who prepared

7  them, which officers reviewed them and from whom [plaintiff] obtained the informa-

8  tion.'" (quoting *Silicon Graphics*, 183 F.3d at 984)); *see Metzler*, 540 F.3d at 1066

9  (mere existence of "sophisticated information management system" insufficient to

10  establish scienter).  Here, Plaintiff has pled no such facts.

11      Nor does the fact that Sacks signed Sarbanes-Oxley certifications support an

12  inference of scienter, as Plaintiff argues. (Compl. ¶ 108).  "[R]equired certifications

13  under Sarbanes-Oxley section 302(a) . . . add nothing substantial to the scienter calcu-

14  lus." *Zucco Partners*, 552 F.3d at 1003-04; *see also Glazer Capital Mgmt., LP v.*

15  *Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) ("Sarbanes-Oxley certifications are not

16  sufficient, without more, to raise a strong inference of scienter").

### b.  Plaintiff's Confidential Witnesses Do Not Support an Inference of Scienter

17
18      Statements from confidential witnesses must pass two "hurdles" to satisfy the

19  PSLRA's pleading requirements. *Zucco Partners*, 552 F.3d at 995.  First, the wit-

20  nesses "must be described with sufficient particularity to establish their reliability and

21  personal knowledge. . . .  Second, those statements which are reported by confidential

22  witnesses . . . must themselves be indicative of scienter." *Id.* (citations omitted).  The

23  Complaint does not satisfy either requirement.

24
### (i)  Plaintiff Fails to Establish the Reliability and Personal Knowledge of the Confidential Witnesses

25
26      Where, as here, a complaint lacks documentary evidence, "confidential witness

27  statements may only be relied upon where the confidential witnesses are described

28  'with sufficient particularity to support the probability that a person in the position

1   occupied by the source would possess the information alleged.'" *Id.* (citation omit-

2   ted); *see also Limantour v. Cray Inc.*, 432 F. Supp. 2d 1129, 1142 (W.D. Wash. 2006)

3   (courts should examine, among other things, whether each witness is provided with a

4   number, job title, time period of employment, work location, and a brief job descrip-

5   tion).  The Complaint fails to provide these particulars.

6       To begin with, none of the witnesses are numbered, making it impossible even

7   to know how many confidential witnesses the Complaint relies on.  While the Com-

8   plaint provides job titles and locations for some witnesses (but not for others), it is

9   clear that in some instances the Complaint refers to multiple witnesses in the same

10  location and with the same title.  (*E.g.*, Compl. ¶¶ 32, 35).  On a number of occasions

11  the Complaint does not even do that much, resorting instead to reports supposedly

12  from "many AB distributors and Hansen former employees," "numerous former em-

13  ployees," and "countless witnesses."  (*E.g.*, Compl. ¶¶ 22, 34, 68, 81).  Without a

14  name, number or some other identifying information, there is no way to ascertain

15  which of the Complaint's innumerable witnesses is speaking, and thus no way to

16  measure the credibility and reliability of the speaker.

17      In addition, the Complaint does not explain the responsibilities or duties of the

18  confidential witnesses.  Absent this information, it cannot be determined whether the

19  witnesses would have possessed any of the information ascribed to them.[20]  *See, e.g.*,

20  _____

21  [20] For example, the Complaint leaves unexplained how a low or mid-level "Regional

22  Sales Manager in Texas" would know about "the most significant disagreement

    between Hansen and AB," how the same or similarly situated sales person in Texas

23  became aware that the entire "Company began shifting a significant amount of its

24  marketing budget to the Monster line," or how a sales person in Arizona learned

    about the purchasing patterns of consumers in "Kansas, Iowa and elsewhere."

25  (Compl. ¶¶ 17, 34, 39).  It is similarly unclear as to what aspects of a "Senior

26  Marketing Manager['s]" undefined duties would have made him or her familiar with

    "AB's hope of breaking into the on-premise market," its business relationships with

27  restaurants and stores, and the increasing segmentation by bars and restaurants of

28  their distributors.  (Compl. ¶ 33).  The PSLRA demands more than speculation about

1   *In re Northpoint Comm'ns. Group, Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1000 (N.D.

2   Cal. 2001) (finding confidential witness statements insufficient where witness de-

3   scriptions did not provide their job duties or describe how the witness learned of the

4   information alleged); *In re Tibco Software, Inc.*, No. C 05-2146, 2006 WL 1469654,

5   at *22 (N.D. Cal. May 25, 2006) (finding inadequate job descriptions that did not in-

6   dicate specific knowledge of the acquisition and forecasting process at issue).

7        The Complaint likewise fails to allege when any of the witnesses worked for

8   Hansen or AB.  Confidential witnesses who were not employed during the events to

9   which their observations and statements relate cannot be given any weight.  *See, e.g.,*

10  *Zucco Partners*, 552 F.3d at 996 (complaint failed to plead facts showing the wit-

11  nesses had personal knowledge of the information alleged, in part because two of the

12  witnesses were not employed when the relevant facts occurred).

13       Finally, the Complaint improperly attempts to establish the existence of *com-*

14  *panywide* problems relating to the AB transition and Allied sales by relying on in-

15  formation allegedly received from confidential witnesses servicing parts of a handful

16  of states (at most six).  Allegations that attempt to extrapolate a confidential witness'

17  knowledge of Hansen's business in discrete regional areas to the Company as a whole

18  are insufficiently particular to survive a motion to dismiss.  *See Cal. Pub. Employees*

19  *Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 148-49 (3d Cir. 2004) (PSLRA not satisfied

20  where plaintiff "heavily rel[ies] on former [local branch office] employees . . . for in-

21  formation concerning the [defendant's] business on a national scale," and does not

22  allege "how or why such [low level, locally sited former employees] would have

23  knowledge that expanded beyond" their area of employment); *In re Zumiez Inc. Sec.*

24  *Litig.*, No. C07-1980, 2009 WL 901934, at *7 (W.D. Wash. Mar. 30, 2009) (rejecting

25  scienter allegations where confidential witnesses "were in no position to have infor-

26

27  ―――――――――――――

    what a witness might have known based on his or her title alone.  *See Bus. Objects*,

28  2005 WL 1787860, at *6.

mation concerning company-wide performance").

**(ii)    The Confidential Witness Statements Are Not In-
dicative of Scienter**

Even if the Complaint had sufficiently alleged the reliability and personal knowledge of its confidential witnesses (which it has not), the statements that the Complaint attributes to those witnesses are not "indicative of scienter." *Zucco Partners*, 552 F.3d at 995.[21]

Here, no confidential witness provides *any* particularized facts showing that any defendant intentionally or with deliberate recklessness made a false statement or engaged in any other fraud. Indeed, for the most part, Plaintiff simply offers the nebulous opinions of confidential witnesses conveying run-of-the-mill business problems or their disagreement with management's decisions.[22] Not one of the Com-

---

[21]  As the Fifth and Seventh Circuits have explained, allegations based on unnamed witnesses should be steeply discounted in light of the Supreme Court's decision in *Tellabs*. *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756-57 (7th Cir. 2007); *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 535 (5th Cir. 2008); *see also Zucco Partners*, 552 F.3d at 995 n.2. This is because "anonymity conceals information that is essential to the sort of comparative evaluation required by *Tellabs*." *Higginbotham*, 493 F.3d at 757. "It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying. Perhaps they don't even exist." *Id.*

[22]  By way of example, witnesses purportedly "confirmed" or "reported" that Hansen's "marketing plans . . . were *not working*," that "it was *hard* for AB/Hansen to 'get its foot in the door'" with on-premise retailers, that Hansen "began shifting a *significant amount* of its marketing budget to the Monster line," that "Hansen *effectively sacrificed* Allied for Monster success," that "based on interactions with Hansen personnel, the emphasis on Monster produced an *obvious negative effect* on the sales of non-Monster products," that the "Rumba line *suffered* the *same fate* [as Lost] as the Company *struggled* to determine whether to market it as an energy drink," that "the Allied beverages could not *gain traction* because Hansen did not provide *adequate* promotional support when they were launched," and that sales declined "*because Hansen sold [Lost] in states with no relation to surfing. . . . Lost*

1  plaint's confidential witnesses is reported to have said that any of the Defendants en-

2  gaged in fraudulent conduct, nor does any witness even assert that any of the state-

3  ments allegedly made by the Defendants were false.  *See Weiss v. Amkor Tech., Inc.*,

4  527 F. Supp. 2d 938, 955-56 (D. Ariz. 2007) (dismissing complaint with prejudice

5  and noting that "there is no allegation by any [confidential witness] directly asserting

6  that the statements at issue were false").

7        The statements that are attributed to the confidential witnesses do not support

8  any inference, let alone a strong inference, that any of the Defendants made an inten-

9  tionally false statement.  Thus, for example, confidential witness statements that some

10  AB Distributors were interested only in Monster, that alcohol regulations restricted

11  AB Distributors in certain areas, and that certain on-premise markets had exclusivity

12  agreements with Red Bull (*see, e.g.*, Compl. ¶¶ 21-22, 30-31, 33) do not show that

13  Sacks, contrary to what he stated on analyst calls, in fact was not generally happy

14  with the AB transition or did not think the AB system would improve Hansen's dis-

15  tribution.  Not a single confidential witness states that Sacks thought or felt differ-

16  ently about the AB relationship from what he stated on the analyst calls, nor does the

17  Complaint allege that any witness even was in a position to know such information.

18        Similarly, confidential witness statements that the Company's primary focus

19  was on marketing Monster, that some AB Distributors were not interested in distrib-

20  uting the Allied brands, and that, in the summer of 2007, Sacks emphasized Allied

21  brand sales at a national meeting, made bonuses of sales personnel dependent

22  thereon, and offered promotions on Allied brands (*see, e.g.*, Compl. ¶¶ 34-43) do not

23  show that Sacks – contrary to his statements – was not hopeful about the Allied

24  brands or did not think the AB distribution system would help improve Allied brand

25  distribution.  Again, not a single confidential witness states that Sacks thought or felt

26

27  *only did well* in coastal locations . . . ."  (Compl. ¶¶ 33-37, 39) (emphasis added).

28  These are opinions and conclusions, not facts.

1    differently about the Allied brands from what he stated on the analyst calls, nor does

2    the Complaint allege that any witness was in a position to know such information.

3         Likewise, no confidential witness states that any Defendant had any awareness

4    that an account manager was purportedly instructed by her supervisor to "withhold

5    reporting promotional costs" in the second quarter of 2007 (Compl. ¶ 89).  Rather, a

6    former "Cost Accountant" states only that Kelly was "very diligent" about reviewing

7    Hansen's financial information and that Kelly received reports about Hansen's "poor

8    internal controls."  (*Id.* ¶ 109).  An allegation that an employee thought Kelly to be

9    very diligent about reviewing financial information and received reports about the

10   Company's controls does not show that Kelly had any knowledge about the alleged

11   withholding of promotional expenses.[23]  *See In re Hypercom Corp. Sec. Litig.*, No.

12   CV-05-0455, 2006 WL 1836181, at *6 (D. Ariz. July 5, 2006) (rejecting allegations

13   that defendants must have known about the accounting issues given how "detail-

14   oriented they were").

### c.    Plaintiff's "Insider Trading" Allegations Do Not Support an Inference of Scienter

15

16

17        Finally, Plaintiff argues that the Individual Defendants' stock sales during the

18   Class Period support an inference of scienter.  (Compl. ¶¶ 110-14).  For stock sales by

19   corporate insiders to evidence scienter, a plaintiff must plead particularized facts

20   showing that the sales were "unusual" or "suspicious."  *See Ronconi*, 253 F.3d at 435.

21   "[I]nsider trading is suspicious only when it is 'dramatically out of line with prior

22   [23] Similarly unavailing is the Complaint's allegation that "the individual responsible

23   for Sarbanes-Oxley compliance," who is not otherwise identified and is not alleged to

24   be one of the Complaint's witnesses, "would tell Kelly once a month about the

     discrepancies between the Company's purchase orders and invoices, but Kelly

25   *apparently* did not correct the problem."  (Compl. ¶ 109) (emphasis added).  This

26   allegation has nothing to do with the alleged false statements in the Complaint, and

     appears to be based on nothing more than conjecture and impermissible hearsay.  *See,*

27   *e.g., Zucco Partners*, 552 F.3d at 998 n.4 (cautioning against reliance on hearsay

28   statements by confidential witnesses).

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS

1  trading practices *at times calculated to maximize the personal benefit from undis-*

2  *closed inside information.*'" *Id.* (quoting *Silicon Graphics*, 183 F.3d at 986) (empha-

3  sis added in *Ronconi*).  Three factors are used in making this determination:  (1) the

4  amount and percentage of shares sold by insiders; (2) the timing of the sales; and

5  (3) whether the sales were consistent with the insider's prior trading history.  *Id.*  All

6  three factors demonstrate that there was nothing unusual or suspicious about the Indi-

7  vidual Defendants' stock sales during the Class Period.

8                **(i)    There Is Nothing Suspicious About the Percent-**

9                            **ages of Shares Sold by Defendants**

10     In computing percentages for insider stock holdings and sales, courts include

11  "'[a]ctual stock shares plus exercisable stock options.'"  *Vantive*, 283 F.3d at 1092

12  n.12 (quoting *Silicon Graphics*, 183 F.3d at 986-87).  Accordingly, only the last two

13  columns of the Complaint's stock charts, which represent the Individual Defendants'

14  stock plus vested stock options, are relevant.  (Compl. ¶¶ 110, 112).  Plaintiff's alle-

15  gation that Sacks and Schlosberg each sold about 65% of their "Stock Holdings" (*Id.*

16  ¶ 110) is misleading because it excludes their vested options, which represent the vast

17  majority of their holdings.  Similarly misleading is the fact that Plaintiff segregates

18  the shares that Sacks and Schlosberg held individually from those they held jointly

19  through various of their entities such as Hilrod Holdings L.P. ("Hilrod I").[24]  (*See id.*).

20     Taking into account the vested options and the shares held through their enti-

21  ties during the Class Period, Sacks sold 13.15% of his total holdings and Schlosberg

22  sold 13.86% of his total holdings.[25]  These percentages are not unusual or suspicious.

23 ─────────────────

24  [24] In addition to Hilrod I, other entities through which Sacks and Schlosberg held shares during the Class Period include Hilrod Holdings II L.P. ("Hilrod II"), HRS

25  Holdings L.P. ("HRS") (which actually made the sale on August 22, 2007 attributed to Hilrod I in the Complaint), and the Rodney C. Sacks 2007 Grantor Retained

26  Annuity Trust ("RCS 2007 GRAT").  (Exs. KK at 752-64; LL at 768-80).

27  [25] As alleged in the Complaint, Sacks and Schlosberg each sold 791,500 shares during

28  the Class Period (attributing to each of them 50% of the shares sold by their jointly

1   *See Vantive*, 283 F.3d at 1094 (sales by insider of 13% were not suspicious); *Metzler*,

2   540 F.3d at 1067 (sales of 37% of stock holdings did not support an inference of sci-

3   enter because the Ninth Circuit "typically require[s] larger sales amounts"); *In re*

4   *Hienergy Tech., Inc.*, No. SACV04-1226, 2005 WL 3071250, at *7 (C.D. Cal. Oct.

5   25, 2005) (sales of 20% of insider's holdings were not suspicious enough to support

6   finding of scienter).   Indeed, the fact that Sacks and Schlosberg retained over 85% of

7   their holdings actually *negates* any inference of scienter.   *Vantive*, 283 F.3d at 1094;

8   *see also In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117-18 (9th Cir. 1989)

9   (holding that, despite sales of $84 million in shares, the defendants retained a large

10  percentage of their holdings such that an inference of scienter was negated).[26]

11          The Complaint alleges that Kelly sold 50.34% of his holding during the Class

12  Period.   (Compl. ¶ 110).   In fact, Kelly sold 77.32% of his holdings during the Class

13  Period.[27]   This circumstance, however, does not support an inference of scienter given

14  that there was nothing suspicious about the sales' timing and the sales were consistent

15  with Kelly's trading history, as explained below.   *See Vantive*, 283 F.3d at 1093-94

16  (insider's sales of 74% of holdings did not raise suspicion to support finding of sci-

17  enter where sales were not suspicious in their timing and not inconsistent with trading

18  ───────────────
    held entities).   (Compl. ¶ 110; Exs. KK at 752-64; LL at 768-80).   Following the last
19  of these sales on September 14, 2007, Sacks had remaining a total of 5,228,500
    shares (including 2,159,724 shares and vested options held directly and 3,068,776
20  shares held through Hilrod I, Hilrod II, HRS and the RCS 2007 GRAT) (Ex. KK at
    762-64), and Schlosberg had remaining a total of 4,917,276 shares (including
21  2,148,500 shares and vested options held directly and 2,768,776 shares held through
    Hilrod I, Hilrod II and HRS) (Ex. LL at 778-80).
22
23  [26] Even if the Complaint's percentages of stock and vested options are used, there is
24  still nothing suspicious.   The Complaint alleges that, during the Class Period, Sacks
    and Schlosberg sold 15.35% and 15.41% of their holdings (including vested options),
25  respectively, and that Hilrod I sold 5.11% of its holdings.   (Compl. ¶ 110).

26  [27] The Complaint alleges that Kelly held 59,200 shares (including vested options)
27  after his last trade during the Class Period.   (Compl. ¶ 110).   In fact, Kelly had 17,600
    shares remaining.   (Ex. MM at 793-95).
28

history).  Further undermining any inference of scienter are the facts that Kelly is not alleged to have made any false or misleading statement and that Kelly's shares represent a tiny percentage (less than 4%) of the total insider sales alleged in the Complaint.  *See Vantive*, 283 F.3d at 1094; *Silicon Graphics*, 183 F.3d at 987-88 (no inference of scienter despite insiders' sales of 43.6% and 75.3% of holdings where one insider's sales amounted to only 5% of total sales alleged and other defendant did not make any of the alleged false statements).

### (ii)    There Is Nothing Suspicious About the Timing of Defendants' Sales

Not a single fact alleged in the Complaint demonstrates that the timing of the Individual Defendants' sales was suspicious or that Defendants timed their sales to "*maximize the personal benefit from undisclosed inside information*."  *See Ronconi*, 253 F.3d at 435 (emphasis in original).  To the contrary, the facts alleged in the Complaint support the opposite inference.

First, the Individual Defendants cannot even plausibly be said to have sold their shares at an artificially inflated price.  (*See* Compl. ¶ 110).  The rationale behind the insider trading analysis is that well-timed sales of stock immediately preceding a negative announcement, which results in an insider obtaining a substantial premium over the stock's value following the announcement, raises some inference that the insider may have traded on non-public information.  *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1185 (C.D. Cal. 2007).

That is demonstrably not the case here.  Most of the Individual Defendants' sales – nearly 1.1 million of the roughly 1.6 million shares alleged in the Complaint – were made at prices *below* the average price at which Hansen stock traded between November 9 and the end of the year ($44.80), after the purported "truth" was disclosed.  (*See* Compl. ¶ 110; Ex. JJ at 733-34).  Moreover, the average closing price ($45.36) during the period in which the Individual Defendants sold (between August 13 and September 14) was essentially the same as the average closing price ($44.80)

between November 9 and the end of the year. (Ex. JJ at 733-37). Where an insider sells stock "at about what the stock was worth after the bad news [became] public, [and] not when they might have gained market advantage from as yet undisclosed bad news," there can be no inference of scienter. *Ronconi*, 253 F.3d at 435.

Second, not only did the Individual Defendants sell stock at roughly the same price that it traded at after the truth allegedly was revealed, but their sales took place *before* the substantial increase in Hansen's stock price that occurred prior to November 8. After the last sale in September the stock price rose. The stock reached a peak close of $68.11 on October 18, 2007, roughly 50% higher than the prices at which the Individual Defendants sold their shares. (Ex. JJ at 734). When, as here, the "insiders miss the boat this dramatically, their sales do not support an inference that they are preying on ribbon clerks who do not know what the insiders know." *Ronconi*, 253 F.3d at 435; *see also Vantive*, 283 F.3d at 1093-94 (fact that stock price continued to increase for several months following the insiders' sales undermines any inference of scienter).

Third, the significant time lapse between the sales at issue and the disclosure that purportedly revealed the "truth" undermines any inference of scienter, because the greater the time lag the less plausible an inference that an inside trade was for the purpose of trying to maximize the personal benefit from undisclosed information. *See Splash Tech. II*, 160 F. Supp. 2d at 1083-84. The first sale on August 13 and the last sale on September 14 were, respectively, nearly three months and two months before the November 8 disclosure that purportedly revealed the truth. *See id.* (trades made four months prior to onset of stock's decline were not "calculated to maximize the personal benefit from undisclosed information" (quoting *Silicon Graphics*, 183 F.3d at 986)); *Head v. NetManage Inc.*, No. C 97-4385, 1998 WL 917794, at *4 (N.D. Cal. Dec. 30, 1998) (sales two months before announcement not suspicious).

Finally, restrictions on the Individual Defendants' ability to trade explain the timing of the Class Period sales. *See, e.g., Ronconi*, 253 F.3d at 436 (noting that "re-

1   strictions on an insider's ability to trade are important in determining whether the

2   trading pattern is suspicious").  For ten months prior to the first sale, Hansen had

3   been the subject of an informal SEC inquiry that was announced in October 2006.

4   (Ex. F at 122).  Hansen announced on August 7, 2007, less than one week before the

5   first sale, that the SEC's investigation had ended without any enforcement action.

6   (Ex. O at 357).  Two days later, on Thursday, August 9, 2007, Hansen disclosed its

7   results for the prior quarter.  The Individual Defendants' first sale during the Class

8   Period occurred on the following Monday, August 13, 2007.  "Trading following

9   public announcements . . . evidences compliance with the securities laws.  Indeed, in-

10  siders are only permitted to trade in a 'window' after a public announcement is

11  made." *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 312 (D.N.J. 2001) (citations

12  omitted); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1037 (9th Cir. 2002)

13  (finding "timing of . . . stock transactions was not suspicious" because "[o]fficers of

14  publicly traded companies commonly make stock transactions following the public

15  release of quarterly earnings and related financial disclosures").

16              **(iii)   Defendants' Sales During the Class Period Were**

17                      **Consistent with their Trading Histories**

18          Again, "[i]nsider trading is suspicious only when it is '*dramatically out of line*

19  *with prior trading practices*.'"  *Ronconi*, 253 F.3d at 435 (quoting *Silicon Graphics*,

20  183 F.3d at 986) (emphasis added).  None of the Individual Defendants' sales during

21  the Class Period were out of line with their trading histories, let alone dramatically

22  out of line.  Taking into account their stock, vested options, and shares held through

23  entities, Sacks and Schlosberg sold, respectively, 15.56% and 16.41% of their total

24  holdings in the first five months of 2006.[28]  Thus, not only were their respective sales

25  _____

26  [28] Sacks and Schlosberg are alleged to have sold approximately 940,000 shares each

27  during 2006 (again attributing to each of them 50% of the shares sold by their jointly
    held entities).  (*See* Compl. ¶ 112).  Following the last sales on June 2, 2006, Sacks

28  and Schlosberg had remaining a total of 5,100,000 shares and 4,788,776 shares,

1  of 13.15% and 13.86% during the Class Period consistent with their trading histories,

2  their Class Period sales actually constituted a smaller percentage of their holdings.[29]

3      Nor are Kelly's sales during the Class Period out of line with his prior sales.

4  Kelly sold 100% of his holdings in 2004, 82.14% of his holdings in 2005, and 92% of

5  his holdings in 2006.[30]  (Compl. ¶ 112; Ex. MM at 787-89).  Thus, the 77.32% of his

6  holdings that Kelly sold during the Class Period is not only consistent with the per-

7  centages of his prior years' trades, but actually lower.  In fact, what Kelly's trading

8  history shows is a pattern of his exercising his options and selling the vast majority of

9  the resulting shares in the same year that the options vested, a pattern echoed in his

10  sales during the Class Period.  (Compl. ¶¶ 110, 112; Ex. MM at 781-89, 793-95).

11      Furthermore, the Complaint's allegation that the Individual Defendants' sales

12  during the Class Period were unusually large in comparison to their sales activity dur-

13  ing prior years (Compl. ¶ 113) is refuted by the Complaint itself.  Sacks, Schlosberg

14  and their entities are collectively alleged to have sold approximately 6.9 million

15  shares in 2004, 1.1 million shares in 2005, 1.9 million shares in 2006 and 1.6 million

16  _____

17  respectively (including shares and vested options held directly and shares held
    indirectly through Hilrod I and HRS).  (Exs. KK at 749-51; LL at 765-67).  Notably,

18  and contrary to Plaintiff's allegation that they "unloaded" their Hansen stock during

19  the Class Period (*see* Compl. ¶ 92), Sacks and Schlosberg actually held *more* shares
    following their 2007 sales than they held following their sales in 2006. *See* note 25,

20  *supra.*

21  [29] The Complaint's allegation that Sacks and Schlosberg individually sold 8.82% and

22  9.96%, respectively, of their holdings in 2006 (Compl. ¶ 112) is meaningless because,
    as noted above, these calculations exclude shares sold and held through Hilrod I and

23  HRS.

24  The Complaint also sets forth stock sales allegedly made by Hilrod I in 2004 and

25  2005, but does not even attempt to allege what percentage of Sacks and Schlosberg's
    overall holdings these sales constituted.  (*See* Compl. ¶ 112).

26  [30] The Complaint's allegation that Kelly sold 69.70% of his holdings in 2006 is

27  incorrect.  (Compl. ¶ 112).  Kelly retained 4,000 shares (and not 20,000 shares as
    alleged in the Complaint) after his sales on May 5, 2006.  (Ex. MM at 787-89).

28

shares in 2007. (*See* Compl. ¶¶ 110, 112). Similarly, Kelly is alleged to have sold 128,920 shares in 2004, 46,000 shares in 2005, 46,000 shares in 2006 and 60,000 shares in 2007. (*See id.*). Nothing about this suggests that the Individual Defendants' trading activity in 2007 was in the least suspicious or out of line with their activity in prior years.

### 4. The Complaint Fails to Plead Loss Causation

The Complaint's allegations of loss causation are also legally insufficient. The PSLRA requires that a plaintiff demonstrate loss causation by showing that "the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). A plaintiff must "demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered." *Daou*, 411 F.3d at 1025. To demonstrate such a causal connection, a plaintiff must identify the alleged fraudulent statement that artificially inflated the stock price, as well as the corrective disclosure (*i.e.*, revelation of the truth) that subsequently drove the price down. *Id.* at 1025-27. Stated differently, a plaintiff must sufficiently allege that the market reacted to the disclosure of new facts that revealed a previous representation to have been fraudulent, and not merely to reports of a company's poor financial health generally. *See Metzler*, 540 F.3d at 1063. An allegation that stock was purchased at an inflated price does not establish loss causation. *Dura Pharm. Inc. v. Broudo*, 544 U.S. 336, 347 (2005).

The Complaint alleges that Sacks' statements during a November 8, 2007 earnings call "revealed" the "prior misrepresentations and other fraudulent conduct," and that it was these purported revelations that caused Hansen's stock price to drop. (Compl. ¶¶ 120-23). These allegations fail to plead loss causation because (1) the stock price declined prior to the earnings call and (2) Sacks' statements during the call did not constitute corrective disclosures.

### a. The Stock Drop Preceded the November 8, 2007 Earnings Call

On November 7, 2007, Hansen's stock closed at $56.67. (Ex. JJ at 734). The next day, on November 8, 2007, the stock price closed at $43.50, a decline of approximately 23%. (*Id.*). However, the stock price *opened* on the morning of November 8 at an even lower price – $42.86. (*Id.*) The drop between the November 7 close and the November 8 open followed the issuance of a press release announcing Hansen's third-quarter results. (*See* Compl. ¶ 119 (noting that press release was issued prior to market opening on November 8)). The conference call on November 8 had nothing to do with this drop; the call did not start until 2:30 p.m. EST – some five hours after the opening of the market. (Ex. Q at 400-01).

Hansen's stock price, therefore, did not fall after the "truth" was allegedly revealed in the conference call. Indeed, the price rebounded after the conference call. The November 8 closing price of $43.50 was $0.64 cents above the open price of $42.86. (Ex. JJ at 734). A complaint fails to demonstrate loss causation where the stock price declines before the alleged fraud is revealed to the market. *See Daou*, 411 F.3d at 1026-27 (holding that any loss occurring before the alleged disclosure of a prior fraud cannot be considered causally related to that fraud); *Metzler*, 540 F.3d at 1063 (instructing courts to make a "careful delineation between losses caused after the company's [improper] conduct was revealed, and losses suffered before the revelation"). Thus, because Hansen's stock price declined before the earnings call that purportedly revealed the "truth," the Complaint fails to plead a facially plausible theory of loss causation.

### b. The November 8, 2007 Earnings Call Was Not a Corrective Disclosure

In any event, none of Sacks' statements during the November 8, 2007 earnings call constituted a disclosure of a prior misrepresentation. The Complaint distorts Sacks' statements and ignores his prior disclosures in a failed attempt to demonstrate loss causation. (Compl. ¶¶ 94, 120-21). *See, e.g., In re Dothill Sys. Corp. Sec. Litig.*,

1  No. 06-CV-228, 2009 WL 734296, at *14 (S.D. Cal. Mar. 18, 2009) ("[a] disclosing

2  event which does not actually disclose the falsity of the alleged misrepresentations is

3  inadequate" to plead loss causation).

4         The Complaint alleges that, during the November 8 call, "Defendants disclosed

5  for the first time that they had put the brake on the AB transition . . . because AB was

6  not focusing on Hansen's products." (Compl. ¶¶ 94, 121). But that quote mislead-

7  ingly splices and combines two innocuous statements. Sacks' comment about putting

8  the brake on the AB transition related solely to the Off-Premise Agreements, and

9  simply reiterated what he had said in prior earnings calls. Regarding the Off-Premise

10 Agreements, Sacks had previously disclosed in a May 14, 2007 call that the transition

11 was "largely done," but that there would still be some markets that would be transi-

12 tioned at the end of the summer. (Ex. Z at 627). On August 8, 2007, Sacks similarly

13 stated that the off-premise transition was "largely complete" and that Hansen "sort of

14 put a [brake] on some of the transition arrangements during summer," but would

15 "probably continue to do a little bit of transitions after the summer . . . ." (Ex. AA at

16 635). Thus, Sacks was saying nothing new, let alone revealing a prior fraud, when he

17 again said during the November 8 call that, with respect to the Off-Premise Agree-

18 ments, "the transition arrangements to the A-B system is largely complete" and "[w]e

19 did put a brake on them," although "[t]here will be some selected markets, where I

20 believe we will continue to transition the additional markets to the A-B system . . . on

21 a carefully selected and determined basis." (Ex. BB at 653).

22        Nor did Sacks state during the November 8 call that the reason why Hansen put

23 a brake on the AB off-premise transition was that "AB was not focusing on Hansen's

24 products." (Compl. ¶ 94). In fact, Sacks' "focus" comment related solely to the On-

25 Premise Agreement and had nothing to do with the AB Distributors selling in the off-

26 premise markets. (*See* Ex. BB at 654). Further, Sacks did not say (even in relation to

27 the On-Premise Agreement) that AB "was not focusing on distributing Hansen's

28 products." (Compl. ¶ 91). Rather, he stated only that the AB sales team "[have] got

1    their focus on their own products *as well*" as Hansen's products, and that this posed

2    "some challenges." (Ex. BB at 654) (emphasis added). This statement does not con-

3    tradict, let alone reveal to be false, anything that Sacks had said previously. Plaintiff

4    does not and cannot allege that Sacks ever represented that AB's sales team was sell-

5    ing Hansen products exclusively (or that the market would ever believe such a repre-

6    sentation). Moreover, since announcing the On-Premise Agreement in February

7    2007, Sacks repeatedly noted the difficulties involved with that agreement, describing

8    it as a "crap shoot" and a "speculative" opportunity that would "take time" to yield

9    results. (Exs. Y at 616-17; AA at 639).

10        The Complaint also alleges that, during the November 8 call, "Sacks elaborated

11   that AB distributors had not adequately 'embraced the brand and the potential for the

12   brand.'" (Compl. ¶ 121). What Sacks actually said was that "[certain] AB distribu-

13   tors have embraced the brand and potential for the brand in these sort of non-

14   alcoholic accounts more readily with more resources than others" and that, while this

15   has been a challenge, "by and large, we are certainly happy" with the AB transition.

16   (Ex. BB at 653). Moreover, Sacks had previously told the market that there was a

17   "learning curve" for the AB distributors because they were not familiar with distribut-

18   ing nonalcoholic beverages. (Ex. W at 561 ("It takes time. In some of these cases

19   [because] a lot of the distributors haven't [gone through] distributing non-alcoholic

20   products. There is a learning curve.")).

21        The Complaint also avers that Sacks "disclosed" in the November 8 call that

22   "for independent convenience stores, 'the Budweiser system is not quite as strong'

23   and 'is an area that obviously [Hansen has] to address with the A-B system.'"

24   (Compl. ¶ 121). But this was no corrective disclosure either. What Sacks actually

25   said – in the context of reaffirming that "overall . . . we have increased [our distribu-

26   tion] pretty significantly" through AB – was that "the independents . . . is probably

27   the one area where the Budweiser system is not quite as strong as perhaps, the inde-

28   pendent beverage systems like Coke and Pepsi because that's part of their everyday

1  businesses, going to all these non-alcoholic, small moms and pops, and stores, which

2  are traditionally not on the radar of the beer distributors."  (Ex. BB at 653).  More-

3  over, Sacks had told the market back in November 2006 that there were channels

4  "that AB doesn't ordinarily go into" and therefore Hansen would not be able to reach

5  as many accounts.  (Ex. W at 577).

6          Finally, the Complaint highlights that, during the November 8 call, Sacks re-

7  ported that Allied brands sales had declined in the third quarter of 2007 and had

8  missed internal expectations.  (Compl. ¶¶ 94, 120).  Sacks' report cannot be deemed a

9  corrective disclosure because it did not contradict (or "correct") a prior report.  In-

10  deed, Hansen had not previously announced either actual Allied brand sales data for

11  the quarter or its internal expectations for Allied sales for the quarter.  Moreover, as

12  detailed above, Sacks had told the market throughout the Class Period that the Allied

13  brands, particularly Lost, had struggled during the transition to the AB distribution

14  system.

15          Given that Hansen's stock price dropped before the November 8 earnings call

16  (*i.e.*, the alleged corrective disclosure) and that the November 8 call, in any event, did

17  not reveal any prior fraud, it is clear that the market reacted to Hansen's third quarter

18  2007 financial results, and not to any alleged revelation of a prior fraud.  Accord-

19  ingly, the Complaint fails to demonstrate loss causation and should be dismissed for

20  this independent reason.

21      **B.    The Complaint Fails to State a Claim Under Section 10(b) and Rule
            10b-5 for Alleged Insider Trading**

22

23          The Complaint's second cause of action asserts insider trading claims under

24  section 10(b) and Rule 10b-5 against the Individual Defendants and Hansen.[31]

25  (Compl. ¶¶ 138-45).  But this claim adds nothing to the Complaint's first cause of ac-

26  tion and should likewise be dismissed.

27  _____

[31] The insider trading claim against Hansen fails not only for the reasons set forth in
28  the text, but also because Plaintiff does not allege that the Company sold any shares.

1    A plaintiff asserting an insider trading claim must plead with particularity, as

2 required by the PSLRA and Rule 9(b), that the defendant knowingly traded on the ba-

3 sis of material, non-public information and that the plaintiff traded contemporane-

4 ously with the defendant. *See Neubronner v. Milken*, 6 F.3d 666, 669-72 (9th Cir.

5 1993); *Petco*, 2005 WL 5957816, at *36-37; *Pa. Ave. Funds v. Borey*, No. C06-1737,

6 2009 WL 902070, at *12-14 (W.D. Wash. Mar. 30, 2009); *Edward J. Goodman Life*

7 *Income Trust v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1287-90 (M.D. Fla. 2009).

8 Thus, Plaintiff must plead particularized facts giving rise to a strong inference of sci-

9 enter, *i.e.*, that the Defendants intentionally or with deliberate recklessness traded on

10 the basis of material, non-public information. *See Worlds of Wonder*, 35 F.3d at 1427

11 ("To establish section 10(b) liability . . . the plaintiffs must prove that the insider

12 traders acted with scienter . . . .").

13    Plaintiff's section 10(b) insider trading claim is based on the exact same defi-

14 cient allegations that fail to state a section 10(b) misrepresentation claim.  The only

15 putatively material, non-public information alleged in the Complaint relates to Sacks'

16 statements about the AB system, the Allied brands, and Hansen's second quarter

17 2007 financial results.  As explained above, the Complaint fails to plead particular-

18 ized facts showing that any of these statements were false or that the Individual De-

19 fendants knew they were false.  Indeed, the problems that Plaintiff alleges rendered

20 the AB system and Allied brand statements false were publicly disclosed throughout

21 the Class Period.  Because Plaintiff fails to plead with particularity that material, non-

22 public information even existed, much less that the Individual Defendants knowingly

23 traded based on such information, Plaintiff's insider trading claim should be dis-

24 missed. *See In re Gap Sec. Litig.*, No. C-87-4895, 1988 WL 168341, at *8 (N.D. Cal.

25 Sept. 28, 1988) (dismissing insider trading claim that was based on same factual alle-

26 gations underlying plaintiffs' deficient misrepresentation claim).

27    There is an additional reason why Plaintiff's insider trading claim fails.  "[T]he

28 scope of liability for insider trading claims under section 10(b) and Rule 10b-5 is con-

1   fined to persons who traded contemporaneously with the insider." *Neubronner*, 6

2   F.3d at 670.  "[P]laintiff must have traded in a company's stock at about the same

3   time as the alleged insider." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1001

4   (9th Cir. 2002).  "Generally this has meant that the trades must occur within a few

5   days of each other." *Middlesex Ret. Sys. v. Quest Software, Inc.*, No. CV 06-6863,

6   2008 WL 7084629, at *14 (C.D. Cal. July, 10, 2008).  Here, Plaintiff alleges that it

7   purchased its Hansen stock on October 25, 2007 – 73 days after the first of the Indi-

8   vidual Defendants' sales on August 13, and 41 days after the last sale on September

9   14. (*See* Ex. B to Decl. of Ramzi Abadou in Support of Structural Ironworkers Local

10  Union #1 Pension Fund's Motion for Consolidation, Appointment as Lead Plaintiff

11  and Approval of Its Selection of Lead Counsel). Therefore, Plaintiff lacks standing to

12  assert an insider trading claim because it did not trade contemporaneously with any of

13  the Individual Defendants, and accordingly the insider trading claims should be dis-

14  missed.[32]

### C.   The Complaint Fails to State a Claim Under Section 20(a) for Control Person Liability

15

16

17      Plaintiff also brings claims against the Defendants under Section 20(a) of the

18  Exchange Act for control person liability.  A *prima facie* case under Section 20(a) re-

19  quires (1) "a primary violation of federal securities law" and (2) the exercise of "ac-

20  tual power or control [by the defendant] over the primary violator." *Zucco Partners,*

21  552 F.3d at 990; *Howard v. Everex Sys., Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

22  As explained above, Plaintiff has failed to allege a viable claim under Section 10(b)

23  against the Company or any of the Defendants.  Accordingly, Plaintiff's Section 20(a)

24  claim fails at the threshold.  *See Zucco Partners,* 552 F.3d at 990.

25  Even if Plaintiff had adequately pled a primary violation under Section 10(b), which

26  ───────────────

27  [32]   In addition, Plaintiff's claim fails because the Complaint is devoid of any
    allegations sufficient to establish a causal connection between the Individual
28  Defendants' sales and any losses allegedly sustained by Plaintiff.

1    it has not, its Section 20(a) claim still would fail because of Plaintiff's failure to al-

2    lege facts concerning the critical element of control. Plaintiff must establish "con-

3    trol" by demonstrating that the defendants exercised actual control in an effort to in-

4    duce violations of securities laws. *In re Downey Sec. Litig.*, No. CV 08-3261, 2009

5    WL 2767670, at *15 (C.D. Cal. Aug. 21, 2009). The Complaint generally alleges

6    that, "[b]y virtue of their position and their power to control public statements about

7    Hansen, the defendants had the power and ability to control the actions of Hansen and

8    its employees." (Compl. ¶ 147). Such boilerplate assertions are insufficient to state a

9    claim for control person liability. *See Downey*, 2009 WL 2767670, at *15 (dismiss-

10   ing plaintiff's Section 20(a) claims because plaintiff did not make "particularized al-

11   legations that the Individual Defendants exercised control . . . in an effort to induce

12   [primary violators] to engage in acts that violated the securities laws" nor state "the

13   times, dates, and places that such control allegedly occurred"). It cannot be automati-

14   cally assumed that Defendants are controlling persons under Section 20(a). *See id*.

15   Yet Plaintiff does not set forth any facts to establish the Defendants' "control." Thus,

16   the Section 20(a) claim should be dismissed.[33]

17   / / /

18   / / /

19   / / /

20   / / /

21   / / /

22   / / /

23   / / /

24   —————————————

25   [33]  The Complaint asserts a Section 20(a) claim against Hansen, but Hansen is outside
     the scope of that section. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1577

26   (9th Cir. 1990) (noting that § 20(a) "was intended to impose liability on . . .

27   controlling shareholders and corporate officers, who would not be liable under

28   respondeat superior because they were not actual employers").

1 **IV.    CONCLUSION**

2          For the foregoing reasons, the Consolidated Complaint should be dismissed in

3 its entirety, with prejudice, and without leave to replead.

4

5 DATED: November 16, 2009          Respectfully submitted,

6                                                          Mark T. Drooks

7                                                          Thomas V. Reichert
                                                            BIRD, MARELLA, BOXER, WOLPERT,
8                                                                    NESSIM, DROOKS & LINCENBERG, P.C.

9
                                                            Martin L. Perschetz
10                                                         Gary Stein

11                                                         William M. Uptegrove
                                                            SCHULTE ROTH & ZABEL LLP
12

13

14                                                         By: /s/ Thomas V. Reichert
                                                                       Thomas V. Reichert
15

16                                                         Attorneys for Defendants Hansen Natural Cor-
                                                            poration, Rodney C. Sacks, Hilton H. Schlos-
17                                                         berg, and Thomas J. Kelly

18

19

20

21

22

23

24

25

26

27

28