1  COUGHLIN STOIA GELLER
     RUDMAN & ROBBINS LLP
2  DOUGLAS R. BRITTON (188769)
   SHANNON M. MATERA (249440)
3  CHRISTINA A. ROYCE (254551)
   655 West Broadway, Suite 1900
4  San Diego, CA  92101
   Telephone:  619/231-1058
5  619/231-7423 (fax)
   dougb@csgrr.com
6  smatera@csgrr.com
   croyce@csgrr.com
7
   Lead Counsel for Plaintiffs
8
   [Additional counsel appear on signature page.]
9
                    UNITED STATES DISTRICT COURT
10
                   CENTRAL DISTRICT OF CALIFORNIA
11
                          EASTERN DIVISION
12
   MARCELO CUNHA, Individually and    ) No. ED-CV-08-01249-DGT(JCx)
13 on Behalf of All Others Similarly   )
   Situated,                          ) CLASS ACTION
14                                     )
                         Plaintiff,    ) PLAINTIFF'S OPPOSITION TO
15                                     ) DEFENDANTS' MOTION TO
        vs.                            ) DISMISS THE CONSOLIDATED
16                                     ) CLASS ACTION COMPLAINT
   HANSEN NATURAL CORPORATION,)
17 et al.,                             ) DATE:      March 15, 2010
                                       ) TIME:      10:00 a.m.
18                       Defendants.   ) CTRM:      Hon. David G. Trager
                                       )
19
20
21
22
23
24
25
26
27
28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................ 1

II.     STATEMENT OF THE CASE ........................................................... 3

    A.     Background ............................................................................... 3

    B.     Hansen Signs a Distribution Agreement with AB to Reverse
        Monster's Slowing Growth Trend .............................................. 4

    C.     Defendants Attempt to Reverse the Slide in Hansen's Stock .............. 5

    D.     Defendants Sign Another AB Agreement to Incentivize AB to
        Distribute Hansen's Allied Products ........................................... 6

    E.     Defendants Sell $75 Million of Their Stock Days After Hansen
        Reports False 2Q07 Financial Results ......................................... 8

    F.     Defendants Disclose the Truth Less than Eight Weeks After
        Completing Their Insider Trading Spree ...................................... 10

III.    ARGUMENT .................................................................................... 11

    A.     The Complaint Adequately Pleads Materially False and
        Misleading Statements and Omissions ........................................ 11

        1.     Defendants' Statements About Hansen's Relationship
            with AB Were False ...................................................... 12

        2.     Defendants' Statements Emphasizing the Success of
            Hansen's Allied Products Were False and Misleading ........... 17

        3.     Defendants' Statements Were Far from "Puffery" ................. 20

        4.     Defendants' Claim of Mismanagement and Poor
            Business Judgment Do Not Support Dismissal ...................... 21

        5.     Hansen's 2Q07 Financial Results Were Materially False
            and Misleading ............................................................. 22

    B.     Defendants' Misrepresentations About the AB Relationship and
        the Success of the Allied Line Were Material ................................ 26

    C.     Defendants' False Statements Are Not Protected by the Safe
        Harbor ..................................................................................... 27

        1.     Defendants' Statements of Present Fact Do Not Invoke
            the Safe Harbor ........................................................... 28

        2.     Defendants' Vague and Boilerplate Warnings Do Not
            Qualify as "Meaningful" Under the Safe Harbor .................. 30

Page

3.   The Safe Harbor Does Not Protect Defendants Since They Had Actual Knowledge of Facts Tending to Seriously Undermine Those Statements ................................... 32

D.   The Complaint Alleges a Strong Inference of Scienter ...................... 33

1.   The Importance of the AB Relationship and the Allied Line, as Reflected by Defendants' Repeated Emphasis on Those Subjects, Raises a Strong Inference of Scienter ........... 33

a.   Defendants Knew About the Problems in the AB Relationship and the Allied Line ................................... 34

b.   Defendants Knew or Recklessly Disregarded that Hansen's 2Q07 Financial Results Were False .............. 36

2.   Insider Sales Provide Strong Evidence of Scienter ................. 39

a.   Defendants Sold Suspicious Amounts of Hansen Stock During the Class Period ....................................... 39

b.   Defendants' Class Period Sales Occurred at Suspicious Times ...................................................... 40

c.   Defendants' Trades Were Dramatically Out of Line with Past Trading Practices ................................... 42

d.   Defendants Traded Stock While in Possession of Material Non-Public Information in Violation of Exchange Act §10(b) and SEC Rule 10b-5 ................... 43

E.   The Complaint Adequately Alleges Its Confidential Sources of Information ................................................................................... 45

F.   Plaintiff Adequately Alleges that Defendants' False Statements and Material Omissions Are the Proximate Cause of Its Losses ........ 48

G.   The Complaint Adequately Alleges Control Person Liability ........... 53

IV.   CONCLUSION .......................................................................... 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Asher v. Baxter Int'l, Inc.*,
   No. 02 CV 5608, 2006 WL 299068
   (N.D. Ill. Feb. 7, 2006) ................................................................. 51

*Backe v. Novatel Wireless, Inc.*,
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ................................... *passim*

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................... *passim*

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009) ................................. 13, 24

*Brody v. Transitional Hosps. Corp.*,
   280 F.3d 997 (9th Cir. 2002) ........................................................ 44

*Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine
      Biosciences, Inc.*,
   No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899
   (S.D. Cal. May 13, 2008) ............................................................. 28

*Copperstone v. TCSI Corp.*,
   No. C 97-3495 SBA, 1999 U.S. Dist. LEXIS 20978
   (N.D. Cal. Jan. 19, 1999) ............................................................. 12

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336, 161 L. Ed. 2d 577, 125 S. Ct. 1627 (2005) ..................... 48, 49

*Fecht v. Price Co.*,
   70 F.3d 1078 (9th Cir. 1995) ................................................. 11, 14

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
   270 F.3d 645 (8th Cir. 2001) ........................................................ 33

*Glazer Capital Mgmt., LP v. Magistri*,
   549 F.3d 736 (9th Cir. 2008) ........................................................ 37

*Greebel v. FTP Software, Inc.*,
   194 F.3d 185 (1st Cir. 1999) ........................................................ 23

1

2                                                                          **Page**

3   *Head v. NetManage, Inc.*,
4           No. C97-4385-CRB, 1998 U.S. Dist. LEXIS 20433
            (N.D. Cal. Dec. 30, 1998) ........................................................................41
5
    *Hollinger v. Titan Capital Corp.*,
6           914 F.2d 1564 (9th Cir. 1990).................................................................54
7
    *Howard v. Everex Sys.*,
8           228 F.3d 1057 (9th Cir. 2000)..................................................................54
9
    *In re Amgen Inc. Sec. Litig.*,
10          544 F. Supp. 2d 1009 (C.D. Cal. 2008)........................................................49
11  *In re Business Objects S.A. Sec. Litig.*,
12          No. C 04-2401 MJJ, 2005 U.S. Dist. LEXIS 20215
            (N.D. Cal. July 27, 2005) ........................................................................23
13
    *In re Connetics Corp. Sec. Litig.*,
14          No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515
15          (N.D. Cal. Aug. 14, 2008) ........................................................................23
16  *In re Countrywide Fin. Corp. Derivative Litig.*,
17          554 F. Supp. 2d 1044 (C.D. Cal. 2008)................................................35, 48
18  *In re Countrywide Fin. Corp. Sec. Litig.*,
19          588 F. Supp. 2d 1132 (C.D. Cal. 2008)................................................19, 20
20  *In re Daou Sys.*,
            411 F.3d 1006 (9th Cir. 2005).............................................................*passim*
21
    *In re DDi Corp. Sec. Litig.*,
22          No. CV03-7063-NM, 2005 U.S. Dist. LEXIS 28216
23          (C.D. Cal. July 20, 2005) ........................................................................25, 26
24  *In re Donald J. Trump Casino Sec. Litig.*,
25          7 F.3d 357 (3d Cir. 1993)........................................................................31
26  *In re Dothill Sys. Corp. Sec. Litig.*,
            No. 06-CV-228-JLS (WMc), 2009 WL 734296
27          (S.D. Cal. Mar. 18, 2009) ........................................................................52
28

1

2                                                                                                    **Page**

3    *In re Downey Sec. Litig.*,
4        No. CV 08-3261-JFW(RZx), 2009 WL 2767670
         (C.D. Cal. Aug. 21, 2009) ......................................................................... 54
5

6    *In re Dura Pharms., Inc. Sec. Litig.*,
         452 F. Supp. 2d 1005 (S.D. Cal. 2006) .......................................................... 21

7    *In re Dura Pharms., Inc. Sec. Litig.*,
8        548 F. Supp. 2d 1126 (S.D. Cal. 2008) .......................................................... 32

9    *In re Gap Sec. Litig.*,
10       No. C-87-4895 JPV, 1988 U.S. Dist. LEXIS 17124
         (N.D. Cal. Sept. 28, 1988), *aff'd*,
11       925 F.2d 1470 (9th Cir. 1991) ....................................................................... 44

12   *In re Gilead Scis. Sec. Litig.*,
13       536 F.3d 1049 (9th Cir. 2008), *cert. denied*,
         __U.S.__, 173 L. Ed. 2d 1085, 129 S. Ct. 1993 (2009) .............. 11, 13, 15, 48
14

15   *In re Immune Response Sec. Litig.*,
         375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................ 31
16

17   *In re Impac Mortgage Holdings, Inc.*,
         554 F. Supp. 2d 1083 (C.D. Cal. 2008) ................................................ 22, 30, 36
18

19   *In re Impax Labs., Inc. Sec. Litig.*,
         No. C04-04802 JW, 2008 U.S. Dist. LEXIS 104485
20       (N.D. Cal. Apr. 17, 2008) ............................................................................. 45

21   *In re Juniper Networks, Inc. Sec. Litig.*,
22       542 F. Supp. 2d 1037 (N.D. Cal. 2008) ...................................................... 48, 51

23   *In re Lattice Semiconductor Corp. Sec. Litig.*,
         No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262
24       (D. Or. Jan. 3, 2006) ........................................................................ 13, 17, 37

25   *In re LeapFrog Enters., Inc. Sec. Litig.*,
26       527 F. Supp. 2d 1033 (N.D. Cal. 2007) ................................................ 12, 20, 21, 30

27   *In re Lucent Techs., Inc. Sec. Litig.*,
28       217 F. Supp. 2d 529 (D.N.J. 2002) ................................................................ 30

1

2                                                                                    **Page**

3  *In re Motorola Sec. Litig.*,
4       505 F. Supp. 2d 501 (N.D. Ill. 2007) ........................................................ 51

5  *In re Nat'l Golf Props. Sec. Litig.*,
         No. CV 02-1383-GHK(RZx), 2003 U.S. Dist. LEXIS 4321
6        (C.D. Cal. March 18, 2003) ...................................................................... 46

7  *In re New Century*,
8        588 F. Supp. 2d 1206 (C.D. Cal. 2008) ...................................................... 48

9  *In re Party City Sec. Litig.*,
10       147 F. Supp. 2d 282 (D.N.J. 2001) ............................................................ 41

11 *In re Petco Animal Supplies Inc. Sec. Litig.*,
         No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927
12       (S.D. Cal. Aug. 1, 2006) ............................................................... 22, 25, 44

13
*In re Secure Computing Corp. Sec. Litig.*,
14       120 F. Supp. 2d 810 (N.D. Cal. 2000) ........................................................ 28

15
*In re SeeBeyond Techs. Corp. Sec. Litig.*,
16       266 F. Supp. 2d 1150 (C.D. Cal. 2003) ........................................... 40, 43, 46

17
*In re Silicon Graphics Sec. Litig.*,
18       183 F.3d 970 (9th Cir. 1999) ....................................................... 11, 24, 36, 40

19 *In re Splash Tech Holdings Sec. Litig.*,
20       160 F. Supp. 2d 1059 (N.D. Cal. 2001) ...................................................... 41

21 *In re Splash Tech. Holdings Sec. Litig.*,
         No. C 99-00109 SBA, 2000 U.S. Dist. LEXIS 15369
22       (N.D. Cal. Sept. 29, 2000) ................................................................... 28, 30

23
*In re Syncor Int'l Corp. Sec. Litig.*,
24       239 Fed. Appx. 318 (9th Cir. 2007) ............................................................ 49

25
*In re UTStarcom, Inc. Sec. Litig.*,
26       617 F. Supp. 2d 964 (N.D. Cal. 2009) ............................................. 27, 28, 30

27 *In re Vantive Corp. Sec. Litig.*,
28       283 F.3d 1079 (9th Cir. 2002) ............................................................ *passim*

1

2                                                                                     **Page**

3    *In re Veritas Software Corp. Sec. Litig.*,
          No. 04-831-SLR, 2006 U.S. Dist. LEXIS 32619
4         (D. Del. May 23, 2006) ................................................................. 32

5
     *In re Wash. Mut., Inc. Sec.*,
6         No. 2:08-md-1919 MJP, 2009 U.S. Dist. LEXIS 99727
7         (W.D. Wash. Oct. 27, 2009) ........................................................ 35

8    *In re Wells Fargo Sec. Litig.*,
9         12 F.3d 922 (9th Cir. 1993) ......................................................... 21

10   *In re Westinghouse Sec. Litig.*,
          832 F. Supp. 948 (W.D. Pa. 1993) .............................................. 26
11

12   *In re Westinghouse Sec. Litig.*,
          90 F.3d 696 (3d Cir. 1996) .................................................... 25, 26
13

14   *In re Williams Sec. Litig.*,
          558 F.3d 1130 (10th Cir. 2009) ................................................... 51
15

16   *In re WorldCom, Inc. Sec. Litig.*,
          294 F. Supp. 2d 392 (S.D.N.Y. 2003) ......................................... 32
17

18   *Institutional Investors Group v. Avaya, Inc.*,
          564 F.3d 242 (3d Cir. 2009) ........................................................ 14

19
     *Johnson v. Aljian*,
20        257 F.R.D. 587 (C.D. Cal. 2009) ................................................. 44

21   *Johnson v. Aljian*,
          394 F. Supp. 2d 1184 (C.D. Cal. 2004), *aff'd*,
22        490 F.3d 778 (9th Cir. 2007) ................................................. 43, 44

23
     *Lipton v. PathoGenesis Corp.*,
24        284 F.3d 1027 (9th Cir. 2002) ..................................................... 41

25   *Madden v. Cowen & Co.*,
26        576 F.3d 957 (9th Cir. 2009) ....................................................... 25

27

28

Page

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
    437 F.3d 588 (7th Cir. 2006), *vacated on other grounds*,
    *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308, 168 L. Ed. 2d 179, 127 S. Ct. 2499 (2007).....................*passim*

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008)....................................................39, 50

*Middlesex Ret. Sys. v. Quest Software Inc.*,
    527 F. Supp. 2d 1164 (C.D. Cal. 2007).......................................44

*Miller v. Thane Int'l, Inc.*,
    508 F.3d 910 (9th Cir. 2007)...............................................17

*Miss. Pub. Employees Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d  75 (1st Cir. 2008) .................................................11, 12

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008).............................................45

*Morgan v. AXT, Inc.*,
    No. C 04-4362 MJJ, 2005 U.S. Dist. LEXIS 42346
    (N.D. Cal. Sept. 23, 2005)...................................................20

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*
    *West Holding Corp.*,
    320 F.3d 920 (9th Cir. 2003)................................................*passim*

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004)...............................................40

*Panter v. Marshall Field & Co.*,
    646 F.2d 271 (7th Cir. 1981).................................................22

*Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*,
    411 F. Supp. 2d 1172 (N.D. Cal. 2005) .......................................50

*Pozzi v. Smith*,
    CIV. A. No. 95-1454, 1995 WL 723191
    (E.D. Pa. Dec. 5, 1995) ......................................................30

**Page**

*Provenz v. Miller*,
 102 F.3d 1478 (9th Cir. 1996)..........................................................39, 40, 41

*Rogers v. Mo. Pac. R.R. Co.*,
 352 U.S. 500, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957)....................................36

*Ronconi v. Larkin*,
 253 F.3d 423 (9th Cir. 2001).......................................................19, 41, 42

*Rosenbaum Capital, LLC v. McNulty*,
 549 F. Supp. 2d 1185 (N.D. Cal. 2008) ........................................................32

*S. Ferry LP #2 v. Killinger*,
 399 F. Supp. 2d 1121 (W.D. Wash. 2005)....................................................20

*S. Ferry LP #2 v. Killinger*,
 No. C04-1599-JCC, 2009 WL 3153067
 (W.D. Wash. Oct. 1, 2009)......................................................................34, 35

*S. Ferry LP v. Killinger*,
 542 F.3d 776 (9th Cir. 2008)...................................................33, 34, 36, 38

*Sanchez v. Stancliff*,
 No. 1:07-CV-00128-LJO-SMS PC,
 2009 U.S. Dist. LEXIS 71732 (E.D. Cal. Aug. 14, 2009) ............................36

*Santa Fe Indus., Inc. v. Green*,
 430 U.S. 462 (1977) ......................................................................................22

*SEC v. Adler*,
 137 F.3d 1325 (11th Cir. 1998)....................................................................44

*SEC v. Phan*,
 500 F.3d 895 (9th Cir. 2007).........................................................................26

*SEC v. Sandifur*,
 No. C05-1631C, 2006 U.S. Dist. LEXIS 12243
 (W.D. Wash. Mar. 2, 2006)............................................................................23

*Siracusano v. Matrixx Initiatives, Inc.*,
 585 F.3d 1167 (9th Cir. 2009)..................................................................26, 27

1
2

**Page**

3   *United States v. Hernandez-Escarsega,*
4        886 F.2d 1560 (9th Cir. 1989)......................................................46

5   *United States v. O'Hagan,*
6        521 U.S. 642 (1997) ...................................................................44

7   *Weiss v. Amkor Tech., Inc.,*
        527 F. Supp. 2d 938 (D. Ariz. 2007).........................................36
8
9   *Yourish v. Cal. Amplifier,*
        191 F.3d 983 (9th Cir. 1999).......................................................11
10
11  *Zucco Partners, LLC v. Digimarc Corp.,*
        552 F.3d 981 (9th Cir. 2009)...............................24, 37, 45, 54

12  **STATUTES, RULES AND REGULATIONS**

13  15 U.S.C.
14        §78j(b) ..................................................................................*passim*
        §78t(a)........................................................................................54
15        §78u-4(b)(2) ..............................................................................33
16        §78u-5(c)(1)...............................................................................27
        §78u-5(c)(1)(A)..........................................................................32
17        §78u-5(c)(1)(B) ..........................................................................28

18
19  Federal Rules of Civil Procedure
        Rule 12(b)(6) .............................................................................48
20
21  17 C.F.R.
        §240.10b-5............................................................................43, 44
22        §240.10b5-1(b) ...........................................................................44

23  SEC Release No. SAB 99, 1999 SEC LEXIS 1599 ..............................25

24
25
26
27
28

## I.    INTRODUCTION

This is a straightforward case of securities fraud.  Defendants repeatedly promoted Hansen Natural Corporation's ("Hansen" or the "Company") relationship with Anheuser Busch ("AB") throughout the Class Period (November 9, 2006- November 8, 2007) as one that was progressing well and benefitting the distribution of Hansen products, emphasized the strength and success of its "Allied" line of energy drinks, and blatantly manipulated Hansen's 2Q07 financial results to beat expectations by an extraordinary $0.10 per share *before unloading $75 million worth of their Hansen holdings*.  Then, only seven weeks after their last sale, Hansen announced devastating news that caused its stock price to collapse by 32.5%.  Defendants disclosed that Hansen would miss expectations in 3Q07 by $0.03, that the Allied line fell short by $10 million because of a "drop-off in sales," and that Hansen was struggling with AB because they "had their focus on their own products" and had not "embraced the brand or the potential for the brand" – *the exact opposite of what defendants were saying about the AB relationship throughout the Class Period*. They even disclosed that they were questioning what to do with both the AB transition and the Allied line going forward.

Defendants' motion to dismiss is peculiar.  Their statement of facts boasts about how successful Hansen has been for investors before and after the Class Period (despite the fact that Hansen's supposed success is irrelevant to whether they misled investors), but say nothing about the severe harm that investors suffered when their disclosures of missed expectations pummeled the Company's stock price.  Indeed, for all of their fawning over the increase in Hansen's sales and earnings, they do not dispute plaintiff's allegations that year-over-year growth in the energy drink division, which had fueled the extraordinary stock performance that defendants boast about, was slowing heading into the Class Period.  And while they emphasize that Hansen's stock closed at a higher price at the end of the Class Period than at the beginning, they do not mention the fact that investors purchasing in the interim, especially at the

- 1 -

1   height, were damaged by the artificial inflation caused by defendants'
2   misrepresentations.

3        For those issues that are actually relevant, defendants' motion is similarly
4   peculiar. Defendants claim that the Consolidated Complaint for Violations of Federal
5   Securities Laws ("Complaint") lacks particularity despite the **uniform** testimonials
6   from numerous former Hansen employees from **throughout the country** describing a
7   state of disinterest by AB in Hansen's Allied line, a wholesale abandonment by
8   Hansen of marketing dollars for the Allied line, and debilitating problems arising from
9   the AB relationship and the limitations that alcohol regulations placed on AB as a
10  distributor. And they do so despite the fact that their own admissions corroborate
11  what the former employees had to say. They also seek to invoke the Private Securities
12  Litigation Reform Act of 1995's ("PSLRA") safe harbor for **all of their statements**
13  despite the fact that virtually every statement is a statement of present fact specifically
14  exempted from the statute. And they deny knowledge of any problems cited in the
15  Complaint despite the fact that they spoke repeatedly about the AB relationship, knew
16  that what they falsely described as problems with "prior distributors" and spotty
17  "initial" execution had damaged Hansen's top product in the Allied line, and were
18  intensely focused on Hansen's sales and financial results. Defendants' cries of
19  ignorance ring hollow given these facts and the fact that Hansen's relationship with
20  AB was viewed by analysts and the Company as the single most important
21  relationship for the Company's distribution. It would truly be absurd to suggest that
22  the Company's top officers were not aware of these problems. *Berson v. Applied*
23  *Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008).

24       Defendants' claims of ignorance also ring hollow given the specific facts
25  alleged in the Complaint and the suspicious nature of their insider sales. Defendants
26  unloaded a massive amount of their Hansen stock only days after the Company
27  announced extraordinarily positive results for 2Q07, **which were a complete surprise**
28  **given that Hansen had struggled to meet and often missed analysts' expectations**

1    *throughout the prior year*.  These extraordinary results came only weeks after an

2    annual sales conference where defendant Rodney Sacks ("Sacks"), Hansen's

3    Chairman and Chief Executive Officer, berated sales representatives for poor Allied

4    sales, cut bonuses by 50%, and tied future compensation to increased Allied sales

5    despite a cited history of ignoring the line.  And they came in the same quarter where

6    a Hansen National Account Manager was ordered to withhold reporting promotional

7    expenses for a significant promotion at WalMart to manipulate the Company's results.

8    Then, in a moment of incredible luck, defendants decided to unload their stock *in a*

9    *quarter where historically they have sold very little* and only weeks before Hansen

10    announced a spectacular miss – *larger than any in the previous year*.

11        The suspicious nature of defendants' sales, combined with particular allegations

12    from former Hansen employees, as corroborated by defendants' own admissions,

13    satisfy the PSLRA.  Defendants' motion should be denied.

14    **II.    STATEMENT OF THE CASE**

15        **A.    Background**

16        Defendant Hansen, through its operating subsidiaries, develops, markets, sells,

17    and distributes beverages in the United States and Canada.  ¶8.[1]  Hansen's principal

18    line of business is its energy drinks.  That line of business, sold through the Direct

19    Store Delivery ("DSD") division, includes Hansen's "Allied" energy drinks (Lost

20    Energy, Joker Mad Energy, Unbound Energy and Ace) and its popular Monster

21    energy drink line.  ¶¶8-9.

22        Monster is Hansen's flagship product and was single-handedly responsible for

23    driving Hansen's extraordinary stock price growth in the years before the Class

24    Period.  ¶¶10-12.  Unfortunately for Hansen's investors, Monster's tremendous

25    growth streak started to slow in 2006.  ¶14.  Monster's descent compelled the need to

26    _____

27    [1]    Unless otherwise noted, all paragraph references ("¶__" or "¶¶__") are to the
Complaint.

28

- 3 -

take action to continue the Company's historic growth. *Id*.

**B.    Hansen Signs a Distribution Agreement with AB to Reverse Monster's Slowing Growth Trend**

To reverse Monster's slowing growth trend, Hansen entered into a distribution agreement with Anheuser-Busch ("AB Agreement #1"). ¶15. AB Agreement #1 gave AB the right to distribute Hansen's Allied and Monster energy drinks to "on-premise" (*i.e.*, bars and restaurants) and "off-premise" (*i.e.*, retailers) accounts. *Id*.[2] But the agreement was implemented in a sporadic manner and limited AB's access to Hansen's flagship Monster energy drink. ¶¶16-17. Employees across the country during the Class Period reported that AB coveted Monster and was not interested in distributing Hansen's Allied brands. *Id*. In fact, August A. Busch IV was quoted as saying that AB would "initially" be able to distribute Monster in half of the country – a clear signal that he expected AB's access to Monster to expand. ¶16.

Problems with the AB relationship began immediately after Hansen signed AB Agreement #1 and directly affected Hansen's business. DSD growth dropped from 139.8% in 1Q06 to just 79.84% by 3Q06 – a serious problem given Monster's status as the largest component of DSD revenue. ¶18. Hansen's top Allied beverage, Lost, dropped from number eight to number ten on the list of most popular energy drinks in the United States. ¶21. And by 2Q06, Hansen's stock collapsed for the first time since Hansen introduced Monster when the Company missed analyst's estimates by

---

[2]    Defendants' claim that AB Agreement #1 did not include on-premise distribution is inconsistent with Sacks' contemporaneous description of the agreement. Memorandum of Points and Authorities in Support of Defendants' Motion to Dismiss the Complaint ("Defs.' Mem.") at 4-5. In fact, the page of the press release that defendants do not cite quotes Sacks as stating that AB's distribution system "will enable Hansen to expand availability and improve the presence of our products ***across all channels***." ¶15. Defendants' "evidence" to the contrary is not only improper (*see* Lead Plaintiff's Opposition to Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss the Consolidated Class Action Complaint ("RJN Opp.") at 7-9) but also does not prove otherwise. *See* Defs.' Ex. E (*see* n.3) (Amended and Restated Agreements dated three months after original agreement). Reports from witnesses also described the application of the agreement as including on-premise distribution. ¶¶16-17.

1  $0.01.  ¶18.  Hansen's stock, which had skyrocketed 5,000% in the five years before

2  the Class Period, collapsed 35% in response.  *Id*.

3  **C.     Defendants Attempt to Reverse the Slide in Hansen's Stock**

4  The Class Period starts on November 9, 2006, when Hansen reported its

5  financial results for 3Q06.  ¶¶18-19, 65-66.  Hansen reported results that were in-line

6  with expectations and made positive statements about the AB relationship and

7  Hansen's Allied energy drinks.  ¶¶19-20, 65-66.  Defendants told investors that "[w]e

8  think that the transition to Anheuser-Busch is really going to continue to help us," that

9  "[w]e really are very happy with the transition," and that "[w]e really do see that

10  they're very motivated at the distributor level, and we are very confident that will

11  improve both the quality and the quantity of product being sold by them and

12  distributed."  ¶¶19, 65.  For Allied, they told investors that "[t]he key is to build up

13  our ***other [Allied] supporting products*** so that hopefully we end up with a shelf plus

14  or shelf and a half of Monster ***and probably a shelf for our other brands***," that "we're

15  hoping that we will also be able to offset some of that percentage [of lost margin in

16  Monster] by the increased sales in Ace, Joker and Unbound," and that "Joker and

17  Rumba . . . will help pick up some margins."  ¶¶20, 66.

18  Defendants' statements about the AB relationship and Hansen's Allied brand

19  were false.  Contrary to their claims, Hansen's relationship with AB was actually

20  harming the Company.  ¶¶21, 67.  According to a Senior Marketing Manager, the

21  relationship was much different than the one publicly described.  ¶21.  When the

22  Company entered into the agreement with AB, it required AB to take on distribution

23  of Lost and other Allied energy drinks.  *Id*.  AB agreed because it wanted Monster.

24  *Id*.  But after the deal was in place, AB did nothing with Lost and it cost the Company

25  considerable market share.  *Id*.  Numerous witnesses throughout the country described

26  a similarly troubled relationship because AB had no interest in distributing Hansen's

27  Allied products and focused only on Monster.  ¶¶22-23, 67.  Indeed, witnesses from

28  Louisiana and North Carolina said that AB either never tried to (or chose not to) sell

even Hansen's top Allied brand, Lost, in those territories because it was not a well known brand and they were loathe to jeopardize their market share by pushing an unpopular and unproven product.  ¶22.

These problems were exacerbated by defendants' decision to shift practically all of Hansen's marketing budget to Monster.  ¶¶24, 68.  Again, employees throughout the country during the relevant time share a consistent experience – Hansen abandoned the marketing for Allied in order to emphasize Hansen's Monster energy drink.  ¶35.  Witnesses explained that Hansen started shifting marketing dollars toward Monster and away from its other products beginning in 2006 and 2007, and that Hansen devoted 90% of its marketing budget to Monster and the remaining 10% to all other Hansen products.  ¶¶3-34, 68.  As many employees have reported, Hansen sacrificed Allied for the sake of Monster.  ¶¶35, 68.

### D.    Defendants Sign Another AB Agreement to Incentivize AB to Distribute Hansen's Allied Products

Despite AB Agreement #1, defendants announced a new on-premise agreement with AB on February 9, 2007 ("AB Agreement #2") that they claimed "'opens a significant new and incremental sales channel for Monster Energy® that will play an essential role in continuing the development of the image and personality of our Monster Energy® brand.'"  ¶¶24, 70.  They also told investors that AB "'***has been an outstanding business partner for the last eight months***'" and that "'we are excited to expand our relationship with [AB] to include the on-premise channel.'"  *Id*.  They also claimed that the new agreement would bring in certain AB "holdouts" who were "sort of" not taking Lost because they were not awarded Monster.  *Id*.

A few weeks later, defendants again praised the AB relationship, claiming "[w]e think that the quality of our sales to that system . . . has improved the quality of our distribution in stores, execution, point of sale merchandising has improved."  ¶72.  They reiterated that Lost's decline came from "some resistance from those, Budweiser distributors who didn't – weren't awarded Monster, who basically held out for

1   Monster and didn't take Lost," and claimed that the issue with Lost had been resolved

2   – "those that sort of haven't taken Lost will take Lost, and so, we think we'll be able

3   to improve our distribution with Lost as we go forward." ¶73.

4       Defendants' statements about the AB relationship were again false or materially

5   misleading.  Contrary to their claims, AB had not been an outstanding business

6   partner for Hansen.  Partnering with AB had directly contributed to loss of market

7   share for Lost and AB was limiting the distribution of Hansen's Allied line throughout

8   the country.  Even worse, AB was encountering severe difficulties distributing even

9   Monster because of varying state alcohol regulations, which either restricted entirely

10  or severely limited AB's ability to distribute Hansen's products. ¶¶21-23, 30-31, 39,

11  74-75.  Hansen was therefore not "expand[ing]" on the AB relationship as defendants

12  claimed.  ¶75.  Instead, Hansen entered AB Agreement #2 to incentivize AB to

13  distribute Allied brands.  *Id*.

14      Not surprisingly, Hansen continued to struggle after signing AB Agreement #2.

15  Its 4Q06 results were barely in-line with analyst expectations and its 1Q07 results

16  again missed expectations by $0.01, causing Hansen's stock to drop by 17%. ¶¶26,

17  76-78.  Thus, a Company that had been used to dramatic increases in its stock price

18  suddenly found its stock languishing as analysts downgraded the stock.  ¶26.

19      In mid-2007, defendants decided to reinvigorate Hansen's stock price.  On or

20  shortly before May 23, 2007, defendants departed from their practice of limiting their

21  public comments and granted an interview to JP Morgan analyst Dara Mohsenian.

22  ¶¶27, 79. *Id*.  According to Ms. Mohsenian's report, defendants Sacks and Hilrod H.

23  Schlosberg ("Schlosberg"), Hansen's Vice Chairman and President, pushed the

24  strength of Hansen's relationship with AB and its energy products as a whole.  *Id*.

25  They told her that the "on-premise agreement with Anheuser-Busch should start to

26  ramp up by the end of Q2" and described the problems with AB as "initial hiccups"

27  caused by "prior distributors" and spotty "initial" execution by AB, which they

28  claimed had been resolved.  ¶¶27-28, 79.

1    Contrary to these claims, the relationship was damaging the Company and its

2 off-premise distribution. ¶81. Numerous employees during the time confirmed that

3 AB continued to limit the distribution of Allied throughout the country, continued to

4 be restricted by alcohol regulations, and did not have connections to break into the on-

5 premise market, which had largely segmented suppliers. ¶¶30-33, 81. In fact, the

6 "hiccups" that defendants referenced did not occur because of "prior" distributors or

7 spotty "initial" execution, but instead because AB had no interest in distributing

8 Hansen's Allied line. *Id.* And far from experiencing "challenges" in adjusting to

9 distributing non-alcohol products, alcohol regulations prevented AB from ever doing

10 so in many territories, resulting in fewer sales and increased costs to Hansen. *Id.*

11    By the summer of 2007, the strength of Hansen's Allied line had fallen to

12 desperate levels. Defendants abandoned an FJ Cruiser promotion by May 2007

13 because it would have to pay for the Cruiser outright and Allied sales did not justify

14 the expense. ¶¶40, 83. They began extending extraordinary promotions by July 2007

15 that were historically short-term. ¶¶41, 83. And defendant Sacks berated sales

16 personnel for poor Allied sales at a national sales meeting in June or July 2007 at a

17 casino near the Company's headquarters. ¶¶42, 83. As a witness at the meeting

18 explained, sales personnel were "shocked" by the sudden stress on Allied sales since

19 they had never been a priority before the meeting. *Id.* They were even more shocked

20 to learn that the Company had docked their bonuses by 50% and tied future bonuses to

21 Allied sales. ¶¶43, 83.

### E.    Defendants Sell $75 Million of Their Stock Days After Hansen Reports False 2Q07 Financial Results

22

23    Only a month later, and in the midst of these problems, defendants caused

24 Hansen to announce extraordinary financial results for 2Q07. ¶¶44, 84. The

25 Company stunned the market by beating expectations by a whopping $0.10 per share,

26 including SG&A that was 50 basis points lower than analysts expected. ¶¶44-45, 84,

27 88. Defendants also told investors that the AB relationship "is working for us," that

28

1   Hansen was "getting good solid distribution," and that they were "generally very
2   happy" with the arrangement. ¶85.  They said that AB Agreement #2 "is going at a
3   good pace and we're very confident that we're going to be able to make real inroads in
4   that section but it is going to take time" because "[t]hings just don't happen overnight
5   in any large corporation."   ¶86.   And they added that the Company was "sort of"
6   putting a break on the transition "so we could get our guys focussed [sic] on out in the
7   field, focussed [sic] on selling and rather not focus on transition brands and dealing
8   with the numbers of the issues that go with that."  ¶85.  Hansen's stock jumped 20%
9   in response, closing at $41.58 on August 7 and reaching a high of $49.98 on August 8.
10  Defs.' Ex. JJ.[3]

11       Hansen's 2Q07 financials were false.  A National Account Manager reported
12  that Vice President of National Accounts, Richard Hastings, instructed the witness to
13  withhold reporting "rollback" promotional costs associated with the WalMart account
14  in 2Q07 to improve Hansen's results.    ¶89.   These in-store, high visibility
15  displays/promotions related to all of Hansen's products and were estimated to be
16  hundred of thousands of dollars in expenses.  *Id*.

17       Defendants' statements about AB were also false.  Contrary to their claims, the
18  relationship was not "working for" Hansen and their distribution was adversely
19  affected by AB's disinterest in Hansen's Allied brand, as well as AB's distribution
20  limitations because of alcohol regulations.  ¶91.  And contrary to defendants' claim
21  that they were putting the brake on the transition to give their employees time to focus
22  on sales, they did so because AB was not focusing on distributing Hansen's products
23  and had not embraced the brand or the potential for the brand.  *Id*.  And AB's delay in
24  making "inroads in that [on-premise] section" was occurring not because AB was a

25  _____

26  [3]      Unless otherwise noted, all defendants' exhibit references ("Defs.' Ex. __") are
27  to the exhibits attached to their Request for Judicial Notice in Support of Defendants'
    Motion to Dismiss the Complaint.

28

"large corporation," but instead because AB did not have the connections necessary to effect the distribution, was restricted by numerous exclusivity agreements with Red Bull, and was facing a segmented market, which undermined the publicly stated purpose of selecting AB as an on-premise distributor. ¶¶33, 86, 91.

By August 13, just three trading days after Hansen announced its tremendous 2Q07 results and when Hansen stock had pulled back to $45.16 after reaching a high of $49.98, defendants sold the first of many shares in a massive insider trading spree. ¶¶47, 92. Between August 13, 2007, and continuing to September 14, 2007, Sacks and Schlosberg each sold more than $18.7 million and an additional joint sale of $35 million of their Hansen stock held by Hilrod Holdings, L.P., and Thomas J. Kelly ("Kelly"), Hansen's Vice President of Finance, sold more than $2.7 million in two separate days of trading. ¶¶47, 110.

## F.    Defendants Disclose the Truth Less than Eight Weeks After Completing Their Insider Trading Spree

Less than eight weeks later, on November 8, 2007, Hansen stunned investors again, this time with bad news. ¶¶48, 93. After an extraordinary second quarter and a wholesale dump of Hansen stock, defendants announced extremely disappointing financial results that were far below analysts' expectations. *Id*. Hansen missed analysts' expectations by $11 million and $0.03 per share, far more than the misses that had pummeled Hansen's stock price in the previous several quarters. *Id*.

Even more astonishing than the miss were the reasons for it. ¶¶48, 94. Defendants disclosed for the first time that they had put the brake on the AB transition, not because they were trying to free up their sales representatives to sell product during the summer, but because AB was not focusing on Hansen's products or embracing the potential for the brand. *Id*. They even questioned what they were going to do with the relationship going forward. *Id*. And contrary to their previous claims about the strength of Hansen's Allied products, they disclosed that Hansen's Allied products had missed expectations by up to $10 million because of a drop-off in

1  sales. *Id*. Like the AB relationship, they also questioned the viability of the brand
2  going forward. *Id*.

3       Hansen's stock collapsed 32.5% on the news on a volume of 18.4 million
4  shares. ¶¶49, 95.

5  **III.  ARGUMENT**

6       To state a claim under §10(b) of the Securities Exchange Act of 1934
7  ("Exchange Act"), a plaintiff must allege: "'(1) a material misrepresentation or
8  omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security,
9  (4) transaction and loss causation, and (5) economic loss.'" *In re Gilead Scis. Sec.*
10 *Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), *cert. denied*, __U.S.__, 173 L. Ed. 2d
11 1085, 129 S. Ct. 1993 (2009).[4] On a motion to dismiss, "[a]ll allegations of material
12 fact made in the complaint are taken as true and construed in the light most favorable
13 to the plaintiff." *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am.*
14 *West Holding Corp.*, 320 F.3d 920, 931 (9th Cir. 2003).

15       **A.   The Complaint Adequately Pleads Materially False and**
            **Misleading Statements and Omissions**
16
17       A plaintiff may demonstrate the false or misleading character of a statement by
18 identifying inconsistent contemporaneous statements made by the defendants or
19 inconsistent contemporaneous information that was available to the defendants.
   *Yourish v. Cal. Amplifier*, 191 F.3d 983, 993 (9th Cir. 1999). "Allegations of specific
20 problems undermining a defendant's optimistic claims suffice to explain ***how*** the
21 claims are false." *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (emphasis in
22 original). Under the PSLRA, some corroborating details concerning the problems
23 must be set forth. *See In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985, 988 (9th
24 Cir. 1999). But the complaint need not plead in evidentiary detail. *See Miss. Pub.*
25 *Employees Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008) ("'[I]n
26 

_____

27 [4]      Unless otherwise noted, all citations are omitted and all emphasis is added.
28

determining the adequacy of a complaint [a court] cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence.'").

### 1.   Defendants' Statements About Hansen's Relationship with AB Were False

Defendants were unequivocally positive throughout the Class Period about the AB relationship and its ability to drive Hansen's growth.  They told investors that "[w]e think that the transition to Anheuser-Busch is really going to continue to help us" and that "[w]e really are very happy with the transition."  ¶¶19, 65.  They said that AB was "motivated at the distributor level, and we are very confident that will improve both the quality and the quantity of product being sold by them and distributed."  *Id.*  And they emphasized that "[s]elect Anheuser-Busch wholesalers currently distribute Monster [and Allied drinks] to off-premise accounts in certain U.S. markets" and added that "Anheuser-Busch has been an outstanding business partner for the last eight months." ¶¶24, 70.  The message that defendants intended to deliver was clear – AB was "improv[ing] the quality of [Hansen's] distribution." ¶72.

Defendants also downplayed the problems that Hansen was having with AB as minimal.  In fact, they described them as "***initial hiccups***," and problems with "***initial execution***," which had been resolved, and added that AB's struggles with alcohol regulations were limited to "some of the small mom and pops" that "[w]e think . . . will get addressed." ¶¶27, 77, 79.[5]  At the same time, defendants were telling

---

[5]    Defendants argue that they "never adopted or endorsed the report" where they downplayed Hansen's problems with AB.  Defs.' Mem. at 19 n.15.  But defendants' adoption is unnecessary where, like here, plaintiffs have alleged that they made the statements referenced in the report.  *See Copperstone v. TCSI Corp.*, No. C 97-3495 SBA, 1999 U.S. Dist. LEXIS 20978, at *23-*24 (N.D. Cal. Jan. 19, 1999).  Unlike *LeapFrog*, on which defendants rely, the analyst did not repackage defendants' statements in "'vague and impressionistic terms.'"  *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051-52 (N.D. Cal. 2007).  She simply repeated what they said, which even *LeapFrog* recognizes is sufficient to hold defendants liable for the statements.  *Id.* at 1051.  And since the report attributes the statements to both Sacks and Schlosberg, defendants are wrong that Schlosberg is not alleged to have made a false statement.  Defs.' Mem. at 19 n.15.

1    investors that "the off-premise distribution arrangements . . . was progressing well"

2    and that the AB relationship "is getting into place.  It is gearing up."  ¶¶76-77.  Even

3    near the end of the Class Period, defendants characterized themselves as "generally

4    very happy" with the relationship and misled investors into believing that Hansen was

5    putting a temporary brake on the transition to AB "so we could get our guys focussed

6    [sic] on out in the field, focussed [sic] on selling and rather not focus on transition

7    brands and dealing with the numbers of the issues that go with that."  ¶85.

8          Defendants misrepresented the AB relationship throughout the entire Class

9    Period.  Hansen's problems with AB dated as far back as AB Agreement #1.  The

10   agreement required AB to distribute Hansen's Allied brands, but witnesses throughout

11   the country have all stated that AB did not do so, not because they were not getting

12   Monster, but instead because AB had no interest in the new brand because it lacked

13   name recognition.  Defendants' omission of this material fact made their positive

14   claims about the relationship misleading.  *Gilead*, 536 F.3d at 1052 ("Omitting the

15   role of off-label marketing in a press release highlighting the drug's success made a

16   true statement (that demand was strong) also a misleading one.").  Indeed, defendants'

17   own admission that Lost fell from number eight in popularity to number ten confirms

18   the falsity of defendants' statements about the relationship.  *In re Lattice*

19   *Semiconductor Corp. Sec. Litig.*, No. CV04-1255-AA, 2006 U.S. Dist. LEXIS 262, at

20   *43 (D. Or. Jan. 3, 2006) ("falsity and later statements . . . directly contradict earlier

21   statements").[6]

22         Defendants' explanation for Lost's drop in demand – "prior" distributors losing

23   focus and spotty "initial" execution by AB – could not have been more misleading.

24   _____

25   [6]      Defendants' authority does not support dismissal.  Defs.' Mem. at 20-21.  For
26   example, in *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009),
     plaintiffs failed to establish falsity because the undisclosed internal problems at the
27   company were "not particular to the public statements." *Id.* at 1113; Defs.' Mem. at
     20-21.  The same is not true here.

28

1    Indeed, witnesses have reported that AB chose not to distribute Lost at all in
2    Louisiana, distributors were choosing not to distribute Lost in North Carolina, and that
3    the same problems were also occurring in at least Michigan, Texas, and California.
4    Hansen was even taking distribution rights back from AB in Texas because sales of
5    Lost were languishing.  ¶23.  These facts directly undermine defendants' optimistic
6    claims about the relationship.  *Fecht*, 70 F.3d at 1083 ("allegations of specific
7    problems undermining a defendant's optimistic claims suffice to explain ***how*** the
8    claims are false") (emphasis in original).

9        Defendants' statements in connection with AB Agreement #2 were also false
10   and misleading.  At the outset, Hansen's reported reasons for entering the agreement
11   were misleading.  Contrary to their claims about opening a new sales channel for
12   Monster, defendants signed the agreement to incentivize AB (and not just certain
13   holdouts) to distribute Hansen's Allied brands.  Coincidentally, defendants claimed
14   earlier that AB Agreement #1 would improve the presence of Hansen's products
15   "across all channels," which corroborates witnesses' accounts that AB Agreement #2
16   was intended to incentivize AB concerning Allied.  *See Institutional Investors Group*
17   *v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009) (stating that courts look to
18   corroborating details, among other things, to determine the adequacy of the
19   confidential witness' account).[7]

20       The assertion that "[s]elect Anheuser-Busch wholesalers currently distribute
21

---

22   [7]    Defendants argue that since their disclosures that "certain" AB distributors
23   "'held out for Monster'" and "'[don't] want to take the other brands, unless they got
     Monster,'" immunizes them from liability.  Defs.' Mem. at 23.  Not true.  These
24   supposed disclosures did not reveal that AB was not interested in distributing the
     Allied line and that the problem was occurring throughout the country.  The position
25   of AB with respect to the Allied line rendered defendants' statements about
     disappointment in "some of the markets" and having to "'change the mindset of the
26   distributors . . . as to how to sell and how to merchandise energy drinks'" false and
     misleading.  *Id*. at 22.  Far from disclosing the problem, defendants' "disclosures"
27   misled investors by minimizing problems and suggesting that those problems had
     been resolved.  ¶¶3-4, 22-23, 38, 67, 75, 82.
28

1    Monster [**and Allied drinks**] to off-premise accounts in certain U.S. markets" was just

2    plain misleading given AB's position on the Allied line and its effect on, at least, Lost.

3    So too were defendants' claims about AB improving the quality of Hansen's

4    distribution and AB being an outstanding partner.  Not only did AB Agreement #2 not

5    cure Hansen's distribution problems with AB and Allied, but also the AB relationship

6    was fraught with serious problems that were costing Hansen money.  *In re Daou Sys.*,

7    411 F.3d 1006, 1020 (9th Cir. 2005) (falsity established by "[s]uch discrepancy

8    between what . . . executives reported and the allegedly true state of affairs").  Far

9    from "'challenges in adjusting to distribut[ing] non-alcoholic products'" and not

10   distributing to "'some of the small mom and pops,'" AB's position as an alcohol

11   distributor had created insurmountable hurdles in many areas of the country.  ¶¶27, 77.

12   From restricting delivery entirely (at gas stations and major grocery stores) and

13   resulting increased costs to Hansen (*e.g.*, paying for rental trucks and non-alcoholic

14   distributors) to restrictions on the method of conducting business (*e.g.*, AB's inability

15   to pay for shelf space) that benefitted the competition, these limitations severely

16   restricted Hansen's distribution.  ¶¶30-33; *see Gilead*, 536 F.3d at 1052 ("Omitting the

17   role of off-label marketing in a press release highlighting the drug's success made a

18   true statement (that demand was strong) also a misleading one.").

19        Defendants' claims about the on-premise agreement "getting into place,"

20   "gearing up," and "going at a good pace" were also materially misleading.  Not only

21   was AB locked out of the channel because of exclusivity agreements with Red Bull,

22   but also AB did not have connections with establishments that did not sell alcohol and

23   **were often restricted from doing so because of alcohol regulations**.  And for those

24   on-premise accounts where AB distributed its own alcohol products, it could not

25   automatically distribute Monster because those establishments had a practice of

26   segmenting distributors.  Given these hurdles, numerous witnesses have explained that

27   AB could not get its foot in the door to the on-premise channel.  These problems made

28   defendants' claims about the implementation "taking time" because "[t]hings just

1   don't happen overnight in any large corporation" materially misleading.  ¶86.[8]

2   Defendants argue that their disclosure that the on-premise channel is

3   "dominated" by Red Bull and that, in some cases, Hansen would have to "'wait for the

4   contract[s] to expire'" immunizes them from liability.  Defs.' Mem. at 23.  Not so.

5   Defendants' disclosures were themselves misleading.  Far from a meaningful

6   disclosure, defendants greatly minimized the impact of Red Bull on their on-premise

7   agreement with AB by stating that "*[w]e believe that we will be able to [make inroads*

8   *into their channel]* . . . . *we think that's pretty exciting*" (Defs.' Ex. X at 589), and

9   that Hansen "*ha[d] an opportunity to supply despite the contract[s]* or wait for the

10  contract[s] to expire, and these happen, *they renew all the time*."  Defs.' Ex. AA at

11  635.  These disclosures did not inform investors that AB was locked out of the on-

12  premise channel not only because of Red Bull's exclusivity agreements, but also

13  because of alcohol regulations and the channel's practice of segmenting distributors.

14  ¶¶17, 33, 91.[9]

15  Defendants argue that since Hansen reported increases in sales and profits

16  following the implementation of the AB distribution relationship, their Class Period

17  statements touting the relationship with AB as "outstanding" and "progressing well"

---

19  [8]   Defendants argue that since they disclosed that "'AB doesn't ordinarily go
20  into'" dry areas that "'don't permit alcoholic drinks'" and faced a "learning curve,"
    which led to "disappointments" in "some markets," they could not have misled
21  investors.  Defs.' Mem. at 22-23.  But defendants' material omissions concerned
    insurmountable hurdles with AB's status as an alcohol distributor in many areas of the
22  country and for which no amount of "learning" would cure.  *See* ¶¶30-33, 67.

23  [9]   Defendants mischaracterize the problems with AB as isolated instances of
    ordinary business problems.  *See* Defs.' Mem. at 19.  Not true.  Numerous witnesses
24  throughout the country – in Arizona, California, Louisiana, Michigan, North Carolina
    and Texas – have all independently reported one consistent story of pervasive,
25  undisclosed problems plaguing Hansen's Allied products and its relationship with AB.
    *See* ¶¶5, 22-23, 32, 34, 39.  Together, these reports establish the systemic scope of
26  defendants' material misrepresentations and omissions rendering false their Class
    Period statements.  *See Am. West*, 320 F.3d at 938 ("Beyond each individual
27  allegation, we also consider 'whether the total of plaintiffs' allegations, even though
    individually lacking, are sufficient . . . .'").

1   are true. Defs.' Mem. at 21. Not so. Defendants' statements would still be actionable

2   as misleading even if they were literally true. As the Ninth Circuit recognized in

3   *Miller*, "'[s]ome statements, although literally accurate, can become, through their

4   context and manner of presentation, devices which mislead investors. [T]he

5   disclosure required by the securities laws is measured not by literal truth, but by the

6   ability of the material to accurately inform rather than mislead prospective buyers.'"

7   *Miller v. Thane Int'l, Inc.*, 508 F.3d 910, 916 (9th Cir. 2007). Defendants misled

8   investors by failing to disclose critical problems facing the Company.

9       Defendants' argument concerning Hansen's sales and profits also ignores

10  plaintiff's allegations. During the AB relationship, Hansen faced insurmountable

11  hurdles that limited distribution and increased costs. In fact, the relationship failed to

12  stem declining sales growth in Monster and damaged the Allied line. ¶¶2, 12, 14, 26,

13  48, 78, 89-90. The damage that the AB relationship caused to the Lost product, alone,

14  defeats defendants' argument. *See Lattice*, 2006 U.S. Dist. LEXIS 262, at *43

15  ("falsity and ***later statements . . . directly contradict earlier statements***"); *Backe v.*

16  *Novatel Wireless, Inc.*, 642 F. Supp. 2d 1169, 1181-82 (S.D. Cal. 2009) (falsity

17  established where admission "undercut" previously made statements).

18              **2.    Defendants' Statements Emphasizing the Success of**
                        **Hansen's Allied Products Were False and Misleading**

19

20      From the beginning of the Class Period, defendants emphasized the strength of

21  Hansen's Allied product. Even though Allied was a far smaller segment of Hansen's

22  business than Monster, they told investors that "[t]he key is to build up our other

23  [Allied] supporting products so that hopefully we end up with a shelf plus or shelf and

24  a half of Monster ***and probably a shelf for our other brands***." ¶¶20, 66. They added

25  that they were very positive about Lost "even with the disruption we've experienced"

26  with the AB transition and suggested that sales of Hansen's Allied line was so strong

27  that they would offset margin pressures in areas of the Monster line. ¶¶20, 65-66.

28  They even emphasized the "velocity" that the Allied brands had in the market and

- 17 -

1   claimed that it was "higher than some of the Coke and Pepsi products, and on a per-
2   point basis."  ¶65.

3        When defendants announced AB Agreement #2, they continued to emphasize
4   the strength of Hansen's Allied line.  ¶¶24, 70.  They told investors the same day that
5   "'[w]e look forward to working together to **build on the success of** Monster Energy®
6   and **our other energy drink brands**'" and they even blamed the drop off in Lost not to
7   any problems with demand but instead to "**some** resistance from those, Budweiser
8   distributors who didn't – weren't awarded Monster, who basically held out for
9   Monster and didn't take Lost."  ¶¶70, 73.  As late as May 2007, after Hansen had
10  abandoned the FJ Cruiser promotion and was extending extraordinary Allied
11  discounts, defendants told investors that "the expansion of distribution of Unbound,"
12  an Allied energy drink, contributed to "record revenues" in 1Q07.  ¶76.

13       Defendants' statements about the success of the Allied line were false and
14  misleading.  Contrary to their positive claims, Allied sales were suffering not only
15  from AB's disinterest in the line but also disinterest in the marketplace that was borne
16  by their decision to focus virtually all of Hansen's marketing dollars on Monster.
17  Numerous employees at the time have all repeated the same thing – Hansen sacrificed
18  Allied for Monster.  Defendants devoted roughly 90% of the marketing dollars to
19  Monster compared to only 10% to all other products.  They had seven marketing
20  employees for Monster compared to two to three for everything else.  And they
21  practically abandoned any high-profile marketing initiatives for Allied at the same
22  time that they were sponsoring extreme athletes to the tune of up to $3.5 million.

23       As a result of defendants' marketing position, witnesses have explained that
24  Allied products were difficult to place on shelves.  And they describe in detail how
25  Hansen's lack of marketing damaged the Allied line.  WalMart refused additional Lost
26  product.  Rumba struggled despite extending the duration of deep buy 3-get-1-free
27  discounts.  And Hansen's Allied products had limited shelf space at major grocery
28  stores like Safeway.  Similar stories were reported throughout the country.  Given

1    these circumstances, defendants could have no reasonable belief in the Allied line

2    occupying an entire shelf at retailers or offsetting margin pressure in the Monster line.

3    Defendants' statements about the success "of our other energy drink brands" were

4    simply false and misleading.  *See Daou*, 411 F.3d at 1020 (falsity established by

5    "[s]uch discrepancy between what . . . executives reported and the allegedly true state

6    of affairs"); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1144

7    (C.D. Cal. 2008) ("the CAC adequately alleges that Countrywide's practices so

8    departed from its public statements that even 'high quality' became materially false or

9    misleading").[10]

10   　　　Defendants argue that investors could not have been misled because they

11   disclosed that Lost was being hurt by the transition.  Defs.' Mem. at 23-24.  But these

12   supposed disclosures did not reveal that: (1) AB had no interest at any time in

13   distributing or otherwise promoting any sales growth of Allied products and largely

14   abandoned the products after signing the original deal (¶¶3-4, 23, 38, 67, 75, 82); or

15   (2) defendants had abandoned marketing the product line (¶¶5, 22, 35, 40, 42, 68, 82-

16   83, 105).  In fact, the Complaint alleges that defendants misrepresented the reason for

17   the drop in Lost – "certain" distributors holding out until they were awarded Monster.

18   Defendants described the problem as an "initial" problem that had been resolved,

19   which was simply not true.  Defendants' misleading disclosures do not immunize

20   them from liability.[11]

21   ────────────────────

22   [10]    "Hansen's business acumen" in devoting 90% of its marketing budget to
23   Monster is not at issue.  Defs.' Mem. at 24-26.  Rather, defendants' decision to shift
     practically all of Hansen's marketing budget to Monster is highly relevant to the
     element of falsity because it was inconsistent with defendants' contemporaneous
24   statements about the strength and growth of the Allied line.

25   [11]    Defendants contend that the Complaint does not allege that the Company's
     internal projections were inconsistent with Sacks' statements.  Defs.' Mem. at 21.
26   The Complaint alleges specifically that Allied sales were far below expectations and
     even details how Sacks berated employees and cut their bonuses because of poor
27   Allied sales.  These facts directly undermined defendants' positive claims about the
     success of the Allied brand.  *Ronconi* does not help defendants.

28

1          **3.    Defendants' Statements Were Far from "Puffery"**

2          Defendants mischaracterize many of their statements about strong demand as

3    "puffery."  *See* Defs.' Mem. at 14.  "[T]he exception for puffery is narrowly drawn"

4    and only "statements on the extreme edge of generality and vagueness may be

5    insufficient as a basis for a securities fraud claim."  *S. Ferry LP #2 v. Killinger*, 399

6    F. Supp. 2d 1121, 1129 (W.D. Wash. 2005).  Even "vague and amorphous" statements

7    are actionable when "either immediately preceded or followed by very specific

8    statements of fact that supposedly justify or supply a foundation for the optimism.'"

9    *LeapFrog*, 527 F. Supp. 2d at 1051.

10         Statements discussing the continued strong performance of a particular

11    relationship or product, like those made by defendants here, have long been held to be

12    actionable.  *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 598 (7th Cir.

13    2006) (holding "[i]nterest in and demand for the 6500 continues to grow. . . .  We

14    continue to ship the . . . 6500 through the first quarter.  We are satisfying very strong

15    demand and growing customer demand" to be actionable and not puffery), *vacated on*

16    *other grounds*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 168 L. Ed.

17    2d 179, 127 S. Ct. 2499 (2007).    In fact, many statements that defendants

18    mischaracterize as "puffery" created an extremely positive, consistent, and misleading

19    picture of the relationship – one that was improving Hansen's distribution and

20    contributing to its growth.  They cannot be dismissed as mere puffery.  *Countrywide*,

21    588 F. Supp. 2d at 1144 ("the CAC adequately alleges that Countrywide's practices so

22    departed from its public statements that even 'high quality' became materially false or

23    misleading; and that to apply the puffery rule to such allegations would deny that

24    'high quality' has any meaning"); *Morgan v. AXT, Inc.*, No. C 04-4362 MJJ, 2005

25    U.S. Dist. LEXIS 42346, at *30-*31 (N.D. Cal. Sept. 23, 2005) ("statements touting

26    the superiority of AXT's specific products . . . are far less generalized than the

27    statements the *Foundry Networks* court determined were inactionable").

28         At the same time, defendants surrounded certain statements that could be

characterized as "puffery" with very specific statements of present fact that supposedly supplied the foundation for defendants' optimism. ¶66 (Joker, Ace, and Unbound "'*will also help improve our [margins]*'"); ¶73 ("'*those [distributors] that sort of haven't taken Lost will take Lost*, and so, we think we'll be able to improve our distribution with Lost as we go forward'"); ¶85 ("'[w]e think it is working for us, *we're getting good solid distribution*, we're working with professional distributors, and so we are generally very happy'"); ¶86 ("'by and large we're happy with the improvement, *our sales have improved pretty much in most of the bu[d] markets*'"). Statements like these that are enveloped in specific statements of present fact are clearly actionable. *In re Dura Pharms., Inc. Sec. Litig.*, 452 F. Supp. 2d 1005, 1033 (S.D. Cal. 2006) ("[A]lthough statements that sales and demand for Ceclor CD were 'strong,' that the Company was 'pleased' with Dura's performance and financial results, and that Ceclor CD was 'well received' by physicians are generalized, the facts alleged in the TAC lead to a strong inference there was no reasonable basis for believing such statements to be true because the sales were achieved by overloading wholesalers with the product.   Accordingly, the puffery rule does not insulate Defendants from liability."); *LeapFrog*, 527 F. Supp. 2d at 1051 (even "vague and amorphous" statements are actionable when "'either immediately preceded or followed by very specific statements of fact that supposedly justify or supply a foundation for the optimism'").[12]

### 4.    Defendants' Claim of Mismanagement and Poor Business Judgment Do Not Support Dismissal

The Ninth Circuit long ago rejected attempts by defendants to avoid liability through claims of mismanagement. *In re Wells Fargo Sec. Litig.*, 12 F.3d 922, 927

---

[12]    Defendants' authority is inapposite. *See* Defs.' Mem. at 15 (citing cases).  Far from the generalized and vague statements of optimism in those cases, the statements made by defendants here were far more specific and were surrounded by specific statements of concrete fact.

1    (9th Cir. 1993) ("'[A] complaint does allege an actionable misrepresentation if it

2    alleges that a defendant was aware that mismanagement had occurred and made a

3    material public statement about the state of corporate affairs inconsistent with the

4    existence of the mismanagement.'").    Defendants' claims of "poor business

5    decision[s]" ring hollow given the simple fact that they chose to speak about the AB

6    relationship and Hansen's Allied line. *See* Defs.' Mem. at 24-25.  When they did so,

7    they were duty bound to make those statements not misleading.  *Berson v. Applied*

8    *Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("once defendants chose to tout

9    the company's backlog, they were bound to do so in a manner that wouldn't mislead

10    investors as to what that backlog consisted of").[13]

11    **5.    Hansen's 2Q07 Financial Results Were Materially**
        **False and Misleading**
12

13    Intentionally manipulating a company's financial results adequately states a

14    fraud claim.  In *Daou*, the Ninth Circuit expressly stated that "[i]f plaintiffs can in fact

15    prove such ***intentional manipulation of the accounting principles***, they will have

16    shown that Daou's public statements regarding recognized revenue were materially

17    misleading." *Daou*, 411 F.3d at 1018.  Numerous cases say the same thing. *See, e.g.*,

18    _____

19    [13]    Defendants' authority does not hold otherwise. Defs.' Mem. at 24. In fact, the
        *Panter* case that they cite actually supports plaintiff stating that "once a company
20    undertakes partial disclosure of such information there is a duty to make the full
        disclosure of known facts necessary to avoid making such statements misleading."
21    *Panter v. Marshall Field & Co.*, 646 F.2d 271, 292 (7th Cir. 1981). Defendants' other
        cases, *Santa Fe*, *Impac*, and *Petco*, similarly do not support defendants' contentions
22    since none of them address the issue at hand, *i.e.*, that defendants chose to speak about
        the Allied brand and the AB relationship. *See Santa Fe Indus., Inc. v. Green*, 430 U.S.
23    462, 474 (1977) ("The finding of the District Court, undisturbed by the Court of
        Appeals, was that there was no 'omission' or 'misstatement' in the information
24    statement accompanying the notice of merger."); *In re Petco Animal Supplies Inc. Sec.*
        *Litig.*, No. 05-CV-0823-H (RBB), 2006 U.S. Dist. LEXIS 97927, at *64-*65 (S.D.
25    Cal. Aug. 1, 2006) ("To be actionable under the securities laws, an omission must be
        misleading; in other words it must affirmatively create an impression of a state of
26    affairs in a material way from the one that actually exists."); *In re Impac*
        *Mortgage Holdings, Inc.*, 554 F. Supp. 2d 1083, 1094 (C.D. Cal. 2008) ("However,
27    because these allegations do not show any deceit on the part of Defendants . . . , they
        cannot support a fraud claim.").

28

1    *Backe*, 642 F. Supp. 2d at 1174, 1176-77 (upholding complaint where plaintiff alleged

2    company improperly recognized revenue to meet or exceed Wall Street expectations);

3    *In re Connetics Corp. Sec. Litig.*, No. C 07-02940 SI, 2008 U.S. Dist. LEXIS 62515,

4    at *32-*33 (N.D. Cal. Aug. 14, 2008) (upholding allegations concerning the

5    intentional manipulation of financial results, "despite the lack of specific allegations

6    regarding the nuts and bolts of defendants' alleged channel stuffing").

7    　　　　Here, the Complaint alleges blatant manipulation. A senior executive at Hansen

8    directly required a Company employee in charge of the WalMart account to withhold

9    hundreds of thousands of dollars of expenses from 2Q07 to improve the Company's

10   financial results. The Complaint details the name of the executive giving the order,

11   the account at which it occurred, the promotional expenses at issue, and the dollar

12   volume involved. ¶46. These details more than adequately satisfy the PSLRA and

13   demonstrate that Hansen's 2Q07 financial results were false. *SEC v. Sandifur*, No.

14   C05-1631C, 2006 U.S. Dist. LEXIS 12243, at *10-*11 (W.D. Wash. Mar. 2, 2006)

15   (holding "material misstatements" in 10-Q and 10-K sufficiently alleged where

16   defendants "improperly recognized gains on four real estate transactions . . . allowing

17   Metropolitan to report pre-tax net income . . . rather than a loss").[14]

18   　　　　Contrary to defendants' assertion, no amount of accounting knowledge is

19   necessary to understand plaintiff's claim. Defs.' Mem. at 27. It does not take an

20   accountant to understand that withholding promotional expenses from financial

---

22   [14]　　Defendants cite *In re Business Objects S.A. Sec. Litig.*, No. C 04-2401 MJJ,
      2005 U.S. Dist. LEXIS 20215, at *19-*20 (N.D. Cal. July 27, 2005), and *In re Vantive*
23   *Corp. Sec. Litig.*, 283 F.3d 1079, 1090-91 (9th Cir. 2002), to challenge plaintiff's
      allegations concerning defendants' false 2Q07 financial results. Defs.' Mem. at 26-
24   27. These cases are inapposite because they address whether the plaintiffs sufficiently
      alleged that management failed to choose one of GAAP's legitimate accounting
25   methods when recording revenues. Here, no legitimate accounting method is at issue
      as the Complaint demonstrates defendants' blatant erasure of specific expenses – akin
26   to directly altering company documents. *See Greebel v. FTP Software, Inc.*, 194 F.3d
      185, 203-05 (1st Cir. 1999) ("***Unlike altering company documents***, there may be any
27   number of legitimate reasons for attempting to achieve sales earlier.") (cited with
      approval in *Daou*, 411 F.3d at 1016).

1  statements renders them false.  And Hansen's own SEC filing for 2007 demonstrates

2  that promotional expenses directly affected the bottom line – "[n]et sales have been

3  determined after deduction of promotional and other allowances."  Defs.' Ex. P at

4  366.  In fact, that filing directly attributed a "year-over-year increase [in net sales] of

5  56.9%" to "a decrease in promotional and other allowances."  *Id*. at 366, 378-79; ¶84.

6  Plaintiff has adequately alleged that Hansen's financial results were false.[15]

7       Defendants question whether the National Account Manager, who withheld the

8  aforementioned WalMart account promotional costs, "had any role in Hansen's

9  accounting process or financial reporting."  Defs.' Mem. at 26.  This argument is

10  absurd.  The National Account Manager's ***direct role*** in Hansen's accounting

11  machinations establishes that the witness was in a position to know the information.

12  *Daou*, 411 F.3d at 1015 (sources need only be described "with sufficient particularity

13  to support the probability that a person in the position occupied by the source would

14  possess the information alleged").  For this reason, *Brodsky*, and other cases cited by

15  defendants are inapposite.  Defs.' Mem. at 26-27.  In fact, in *Brodsky*, the confidential

16  witnesses were either not employees during the Class Period or not otherwise in a

17  position to know whether certain improper practices actually boosted revenues.  630

18  F. Supp. 2d at 1114.  And unlike the cases cited by defendants, complicated

19  accounting concepts are not at issue here.  *See, e.g.*, *Zucco Partners, LLC v. Digimarc*

20  *Corp.*, 552 F.3d 981, 987 (9th Cir. 2009) ("Accounting for the costs of internal

21

---

22  [15]    Defendants argue that plaintiff must allege the specific accounting rules that
defendants violated to establish falsity. Defs.' Mem. at 27 n.19. But they cite to no
23  authority supporting the argument.  *Id.*  Nor can they.  Plaintiff need only allege
enough facts to support the claim that Hansen's financial statements were false, which
24  it has done. *See Silicon Graphics*, 183 F.3d at 998 n.23. Nevertheless, the facts
alleged in the Complaint reveal a violation of fundamental GAAP provisions. FASB
25  Statement of Concepts No. 2, ¶79 (principle of completeness which means that
"nothing material is left out of the information that may be necessary to insure that it
26  validly represents the underlying events and conditions" was violated); FASB
Statement of Concepts No. 5, ¶¶85, 87 ("An expense or loss is recognized if it
27  becomes evident . . . that a liability has been incurred or increased, without associated
economic benefits.").

28

1    software development is not a simple task.").[16]

2          Contrary to defendants' contention, their manipulation is material. Defs.' Mem.

3    at 27. They complain that plaintiff has not quantified the effect of the manipulation,

4    but ignore the quantification that plaintiff has alleged – several hundred thousands of

5    dollars in promotional expenses withheld from Hansen's results. Defendants'

6    argument boils down to a claim that what plaintiff's investigation uncovered of their

7    manipulation was not big enough. But their intent to manipulate Hansen's results

8    supplies the necessary materiality. SEC Release No. SAB 99 ("SAB 99"), 1999 SEC

9    LEXIS 1599, at *15 ("The evidence [of materiality] may be particularly compelling

10    where management has intentionally misstated items in the financial statements to

11    'manage' reported earnings."). Defendants would not have intentionally manipulated

12    Hansen's financial results to inflate its earnings if the manipulation was not material.

13    *Petco*, 2006 U.S. Dist. LEXIS 97927, at *42 ("[A] company holding back invoices to

14    affect the bottom line 'would have been viewed by the reasonable investor as having

15    significantly altered the "total mix" of information made available.'"). Certainly,

16    these facts would have been viewed by a reasonable investor as significantly altering

17    the total mix of information. *See In re DDi Corp. Sec. Litig.*, No. CV03-7063-NM,

18    2005 U.S. Dist. LEXIS 28216, at *40 (C.D. Cal. July 20, 2005); ¶¶26, 76, 79.[17]

19    _____

20    [16]     Defendants assert that the term "withhold" is confusingly "cryptic." Defs.'
21    Mem. at 26. Their struggle is easily remedied by referring to the term's plain
    meaning. *Madden v. Cowen & Co.*, 576 F.3d 957, 967 (9th Cir. 2009) (where a word
22    is not defined in a document, readers should "look to the word's plain meaning"). The
    dictionary defines "withhold" to mean, among other things, "to hold back from
23    action," "to keep in custody," or "to refrain from granting, giving, or allowing."
    www.Merriam-Webster.com (2009). And if the dictionary does not resolve the
24    difficulty, plaintiff's Complaint does by alleging that "Hansen's 2Q07 financial results
    therefore ***did not include*** what the witness estimated were hundreds of thousands of
25    dollars of expenses related to the Walmart account." ¶46. The Complaint cannot be
    more clear. Hansen's 2Q07 financial results were intentionally manipulated.

26    [17]     Defendants, citing *Vantive*, 283 F.3d at 1090-91 and *In re Westinghouse Sec.*
27    *Litig.*, 90 F.3d 696, 714-15 (3d Cir. 1996), argue that the absence of at least hundreds
    of thousands of dollars of expenses from Hansen's 2Q07 financial is not material.
28    However, the *Vantive* court did not deem the quantification of the fraud to be

### B. Defendants' Misrepresentations About the AB Relationship and the Success of the Allied Line Were Material

Materiality is an issue usually reserved for the trier of fact. *SEC v. Phan*, 500 F.3d 895, 908 (9th Cir. 2007) ("Determining materiality in securities fraud cases 'should ordinarily be left to the trier of fact.'"). "'[T]he ultimate issue of materiality [is] appropriately resolved "as a matter of law"' only where the omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality.'" *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1178 (9th Cir. 2009).

Defendants cannot meet this burden. Hansen's problems with the AB relationship, the true reason for signing AB Agreement #2, weak Allied sales and the reasons for it, and defendants' accounting manipulations are certainly facts that a reasonable investor would consider important, especially given defendants' positive Class Period representations. In fact, the 32.5% drop in Hansen's stock price when defendants disclosed the truth confirms that investors considered the information material. *Am. West*, 320 F.3d at 948 ("At a minimum, the static or dynamic nature of a stock price after the disclosure of previously withheld information is strong evidence of how reasonable investors view the significance of the information."). Under these facts, defendants cannot prove that the alleged omissions were "so obviously unimportant that reasonable minds could not differ" on the question of materiality. *DDi*, 2005 U.S. Dist. LEXIS 28216, at *40-*41, *44.

---

inadequate. *See* 283 F.3d at 1090-91 (finding that the "major problem" with the plaintiffs' accounting fraud allegation was that it "rests upon" the company's "description of its revenue recognition policy . . . [which] did not necessarily represent a change in policy . . . [and did not necessarily make] the challenged revenue-recognition practice fraudulent or misleading"). And, in *Westinghouse*, the circuit court upheld the district court's finding of quantitative immateriality in part because plaintiffs "had the benefit of conducting discovery" on the size of the accounting fraud alleged. *See In re Westinghouse Sec. Litig.*, 832 F. Supp. 948, 973 (W.D. Pa. 1993) (detailing plaintiffs' discovery); *Westinghouse*, 90 F.3d at 714 n.14 ("the question of materiality must be considered on a case-by-case basis").

Contrary to defendants' contention, the fact that the Allied line comprised 5% of Hansen's overall sales and Hansen reported $244.8 million in net sales for 2Q07 is irrelevant to the Court's evaluation of materiality. *See* Defs.' Mem. at 21-27; *Siracusano*, 585 F.3d at 1178 ("[t]he Supreme Court has rejected the adoption of a bright-line rule to determine materiality"). "Magnitude by itself, without regard to the nature of the item and the circumstances in which the judgment has to be made, will not generally be a sufficient basis for a materiality judgment." SAB 99, 1999 SEC LEXIS 1599, at *11. And since defendants themselves found the Allied line sufficiently material to discuss with investors, they cannot now credibly claim that the line was immaterial. ¶¶2, 20, 29. To claim now, after a $10 million miss in Allied sales contributed to a $0.03 earnings miss, that the information is immaterial is simply not credible.

## C. Defendants' False Statements Are Not Protected by the Safe Harbor

The PSLRA's safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement [if] (A) The forward-looking statement is – (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement; or (ii) immaterial; or (B) the plaintiff fails to prove that the forward-looking statement – (i) if made by a natural person, was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. §78u-5(c)(1).

The PSLRA defines a forward-looking statement as "'a statement containing a projection of revenues, income (including income loss), earnings . . . or other financial items' or a 'statement of future economic performance' or 'any statement of the assumptions underlying or relating to any statement described [above].'" *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 972 n.12 (N.D. Cal. 2009). A person may be held liable if the "forward-looking statement" is made with "actual

knowledge . . . that the statement was false or misleading." *Id.*; 15 U.S.C. §78u-5(c)(1)(B). *See Am. West*, 320 F.3d at 936.

### 1. Defendants' Statements of Present Fact Do Not Invoke the Safe Harbor

Defendants argue that the "vast majority" of their misleading statements during the Class Period were forward-looking. Defs.' Mem. at 16. Not true. Most, if not all, of their misstatements concerned past plans or present facts that fall outside of the safe harbor. *See In re Splash Tech. Holdings Sec. Litig.*, No. C 99-00109 SBA, 2000 U.S. Dist. LEXIS 15369, at *18-*20 (N.D. Cal. Sept. 29, 2000) ("*Splash I*") (finding defendants' statement that they were "pleased with these financial results. . . [t]hey're reflective of increased awareness of the Splash advantage, strong product demand, and planned investments in our sales and marketing areas" and that the market was "healthy" to refer to past plans and results rather than to future success). *See Constr. Laborers Pension Trust of Greater St. Louis v. Neurocrine Biosciences, Inc.*, No. 07CV1111-IEG-RBB, 2008 U.S. Dist. LEXIS 38899, at *37-*38 (S.D. Cal. May 13, 2008) ("Defendants' statements in this case relating to the comprehensiveness of the data could have been false when made. . . . Although these statements 'relate' to the forward-looking statements predicting FDA approval, they are not 'assumptions' and thus they are not covered by the safe harbor."); *In re Secure Computing Corp. Sec. Litig.*, 120 F. Supp. 2d 810, 818 (N.D. Cal. 2000) (finding that a statement that the company was "on track to meet expectations" was not forward-looking because, by doing so, "Defendants represented that a reasonable person who knew what Defendants knew at the time the statements were made could reasonably conclude that Secure was likely to meet analysts' expectations").

Defendants' statements during the Class Period concerned past or present events that do not qualify for safe harbor protection. *See, e.g.*, ¶28 ("'by and large *we're happy* with the improvement, our sales *have improved* pretty much in most of the bu[d] markets'"); ¶65 (Allied products *are* at a "'good velocity,'" *have* "'a lot of

legs'" and "'[w]e really *do believe* that those products do have good opportunity'";
"'[w]e really *are* very happy with the transition [to AB] . . . that will improve both the
quality and the quantity of the product being sold by them and distributed'"); ¶70
("'Anheuser-Busch *has been* an outstanding business partner for the *last eight
months*'"); ¶76 ("'the implementation of the off-premise distribution arrangements
with selected Anheuser-Busch wholesalers *was progressing well*'"); ¶85 ("'[w]e think
it *is* working for us, *we're getting* good solid distribution, *we're working* with
professional distributors, and so *we are* generally very happy'"); ¶86 ("'I think the
proof is in the pudding, *it is happening for us* and it will continue to, we think,
improve, as we go forward.  And the same thing applies to the onpremise'").  By
definition, the safe harbor does not apply to these statements of present facts alleged
in the Complaint.

Surprisingly, defendants do not analyze or even cite a *single statement* that they
consider to be forward-looking.  Defs.' Mem. at 16.  Instead, they say "[a]s is clear
from the quotations above, the vast majority of the statements . . . about Hansen's
distribution relationship with AB and the Allied brands were forward-looking
statements."  *Id.*  To construct a forward-looking statement where none exist,
defendants cite individual words from unrelated statements that, on their face, could
be construed as speaking of the future.  Defs.' Mem. at 17.  But when those words are
analyzed in their respective statements, it is clear that they fall outside of the safe
harbor:

- "'We think that the transition to [AB] is really going to *continue to* help us. . . .  We really *are very happy* with the transition.'"

- "'We look forward to working together [with AB] to build on *the success* of Monster Energy® and our other energy drink brands.'"

- The AB system "'*has improved* the *quality* of our distribution in stores, execution, [and] point of sale merchandising. . . .  Generally so, *we are* happy with – with [the AB system].'"

- "'[W]e're hoping that we will also be able to offset [any potential decrease in gross margins due to the buy in for 24-ounce Monster cans] **by the increased sales in Ace, Joker and Unbound** . . . , so we think those will help improve our [margins].'"

*Compare* Defs.' Mem. at 17 *with* Defs.' Mem. at 14-15.  Defendants cannot invoke the safe harbor with this type of sleight of hand.  In fact, their own authority supports plaintiff since the truth or falsity of every statement can be discerned at the time the statement was made.  *See Splash I*, 2000 U.S. Dist. LEXIS 15369, at \*17.[18]

## 2.    Defendants' Vague and Boilerplate Warnings Do Not Qualify as "Meaningful" Under the Safe Harbor

Cautionary statements can only be meaningful if they "'discredit the [alleged misrepresentations] so obviously that the risk of real deception drop[ped] to nil.'" *Pozzi v. Smith*, CIV. A. No. 95-1454, 1995 WL 723191, at \*2 (E.D. Pa. Dec. 5, 1995). Defendants' purported "cautions" clearly do not meet this standard.[19]

Defendants claim that the boilerplate "cautions" in Hansen's press releases and SEC filings were "meaningful."  Defs.' Mem. at 17-18.  Not so.  Defendants' purported "cautions" that warned of "a variety of 'risks, uncertainties and other factors'" were clearly insufficient to invoke the safe harbor.  Defs.' Mem. at 18.  Only the following two were apparently relevant enough to even warrant discussion in their memorandum:

---

[18]    Defendants' reliance on *Impac* and *LeapFrog* to argue otherwise is misplaced. Defs.' Mem. at 17.  Unlike here, the statements in *Impac* and *LeapFrog* dealt solely with **future events**.  *See Impac*, 554 F. Supp. 2d at 1096; *LeapFrog*, 527 F. Supp. 2d at 1046.  Moreover, defendants' reference to Hansen's definition of a forward-looking statement in its SEC filings is meaningless.  Defs.' Mem. at 17 n.13.  Defendants cannot convert a statement of present fact into a forward-looking one by telling investors in a boilerplate paragraph what they intend certain words to mean.

[19]    "The question whether any cautionary language is sufficiently 'meaningful' raises fact issues that are improperly resolved on [a] motion to dismiss."  *In re Lucent Techs., Inc. Sec. Litig.*, 217 F. Supp. 2d 529, 557 (D.N.J. 2002); *see also UTStarcom*, 617 F. Supp. 2d at 972.

- • ""The marketing efforts of distributors of the Company's products, most of which distribute products that are competitive with the products of the Company.'"

- • "Disruption in distribution or sales and/or decline in sales due to the termination of the distribution agreements with certain of the Company's existing distributors or distribution networks and the appointment of selected AB wholesalers as distributors in their place for the territories of such terminated distributors."

*Id*.  These purported cautions were so far removed for the true risks attendant to the AB relationship and the success of the Allied line that they are hardly worth discussing.  It was not AB's marketing efforts that sabotaged the Allied line.  It was AB's disinterest in the product and ***Hansen's*** failure to assign any marketing dollars to the product that undermined the line.  And disruption in distribution may have occurred when Hansen terminated some of the distribution agreements with existing distributors, but that is not what plaintiff alleges Hansen concealed from investors.  *See* §III.A.1., *supra*.  They were therefore not "meaningful" cautions sufficient to drop the real risk of deception to nil.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005).  Even if defendants' statements could be characterized as forward-looking, these "cautions" and otherwise boilerplate cautions in Hansen's SEC filings are insufficient to invoke the safe harbor.  *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371-72 (3d Cir. 1993) ("[v] ague or boilerplate disclaimers are insufficient to invoke safe harbor protection").[20]

---

[20]    Defendants argue that the safe harbor rule is treated differently than provided in the statute when a plaintiff relies on the fraud-on-the-market presumption. Defs.' Mem. at 17 n.14.  Defendants are misguided.  The only statements this argument could possibly apply to are the statements that Sacks and Schlosberg made in their May 23, 2007 meeting with JP Morgan analyst Dara Mohsenian.  But the statements made in that meeting clearly concerned present fact and were not forward-looking.

1
2

**3.    The Safe Harbor Does Not Protect Defendants Since They Had Actual Knowledge of Facts Tending to Seriously Undermine Those Statements**

3    For any statement about the AB relationship or Hansen's Allied products that

4  were forward-looking, defendants still cannot claim safe harbor protection since they

5  had actual knowledge of facts tending to seriously undermine those statements. *Daou*,

6  411 F.3d at 1021.  No amount of cautionary language insulates such conduct from

7  liability. *See Rosenbaum Capital, LLC v. McNulty*, 549 F. Supp. 2d 1185, 1191 (N.D.

8  Cal. 2008) ("Defendants' warning statements lose much, if not all, of their value if, as

9  Plaintiff has alleged, at the time Defendants publicly stated that they 'exited [the first

10  quarter] functioning as a well integrated single Company in all departments,' . . .

11  Defendants in fact knew that the integration was highly problematic."). *See In re

12  WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 427 (S.D.N.Y. 2003) (stating that the

13  "doctrine of bespeaks caution provides no protection to someone who warns his

14  hiking companion to walk slowly because there might be a ditch ahead when he

15  knows with near certainty that the Grand Canyon lies one foot away").

16    Here, defendants' cautions were not meaningful because they knew those

17  cautions were false when made and knew of facts that seriously undermined their

18  public statements.  As discussed in detail in §III.D., defendants had actual knowledge

19  of facts that seriously undermined their positive claims about the AB relationship and

20  the success of the Allied line.  For this reason alone, defendants are not entitled to the

21  safe harbor protection. 15 U.S.C. §78u-5(c)(1)(A)); *see also In re Dura Pharms., Inc.

22  Sec. Litig.*, 548 F. Supp. 2d 1126, 1143 (S.D. Cal. 2008) ("even when a forward-

23  looking statement is accompanied by the requisite cautionary language, the speaker

24  may still be liable if the statement is made with actual knowledge" of its falsity); *In re

25  Veritas Software Corp. Sec. Litig.*, No. 04-831-SLR, 2006 U.S. Dist. LEXIS 32619, at

26  *20 (D. Del. May 23, 2006) ("In other words, the safe harbor provision does not

27  afford corporations a free pass to lie to investors.").

28

1       **D.      The Complaint Alleges a Strong Inference of Scienter**

2            A complaint alleging securities fraud under §10(b) must "state with particularity

3   facts giving rise to a strong inference that the defendant acted with the required state

4   of mind."  15 U.S.C. §78u-4(b)(2).  In the Ninth Circuit, recklessness can meet the

5   necessary scienter state of mind if it reflects "some degree of intentional or conscious

6   misconduct."  *S. Ferry LP v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008).  At this

7   stage, the inquiry for the Court is "whether *all* of the facts alleged, taken collectively,

8   give rise to a strong inference of scienter, not whether any individual allegation,

9   scrutinized in isolation, meets that standard."  *Tellabs*, 551 U.S. at 312 (emphasis in

10  original).[21]  "[T]he inference that the defendant acted with scienter need not be

11  irrefutable, i.e. of the 'smoking-gun' genre, or even the 'most plausible of competing

12  inferences."  *Id.* at 324.

13              **1.      The Importance of the AB Relationship and the Allied
                        Line, as Reflected by Defendants' Repeated Emphasis
14                      on Those Subjects, Raises a Strong Inference of
                        Scienter**

15           "One of the classic fact patterns giving rise to a strong inference of scienter is

16  that defendants published statements when they knew facts or had access to

17  information suggesting that their public statements were materially inaccurate."  *Fla.*

18  *State Bd. of Admin. v. Green Tree Fin. Corp.* , 270 F.3d 645, 665 (8th Cir. 2001); *S.*

19  *Ferry*, 542 F.3d at 785.  Officers are also deemed to know facts reasonably available

20  to them, especially when those facts relate to the company's "core business"

21  operations.  *See, e.g.*, *Berson*, 527 F.3d at 987-89.  In *South Ferry*, the Ninth Circuit

22  explained that the core operations theory can support an inference of scienter when

23  accompanied by particularized allegations that are sufficiently detailed to establish

24

25  _____

26  [21]      Defendants' contention that scienter allegations should first be examined
    individually and then holistically (Defs.' Mem. at 28) is directly at odds with the
27  Supreme Court's mandate in *Tellabs*.  551 U.S. at 312 (the inquiry is "not whether any
    individual allegation, scrutinized in isolation, meets that standard").

28

actual knowledge of the disputed information or when the nature of the relevant fact is of such prominence that it would be absurd to suggest that management was without knowledge of the matter. 542 F.3d at 785-86. Core business operations allegations may also be used as a plus factor to add weight to other allegations and circumstances as part of a holistic analysis under *Tellabs*. *Id*. at 785; *see also S. Ferry LP #2 v. Killinger*, No. C04-1599-JCC, 2009 WL 3153067, *6 (W.D. Wash. Oct. 1, 2009).

### a.    Defendants Knew About the Problems in the AB Relationship and the Allied Line

The individual defendants in this case knew of the problems with the AB relationship and their impact on Hansen. Not only were the defendants Hansen's top officers, but their actions throughout the Class Period reveal that they were intimately familiar with the issues surrounding that relationship. They repeatedly spoke to investors about the relationship and provided specific (albeit misleading) details about the purpose of the relationship, the supposed benefits of the relationship, the history of the relationship, and the then-current status of the relationship. *Backe*, 642 F. Supp. 2d at 1186 (finding that individual defendants' top positions with the company and importance of the relationship with a key customer contributed to a finding of scienter). In fact, they even knew that Hansen's most popular Allied product, Lost, dropped from number eight to number ten in popularity but attributed the drop to "transition" issues. Like *South Ferry*, it would be absurd to suggest that Hansen's top officers did not know about the problems in the relationship, especially since that relationship was represented to be the most important relationship for the Company, the key to Hansen's distribution, and problems in the relationship were being experienced throughout the country. *Berson*, 527 F.3d at 987 (top executives deemed to have known about "stop-work orders" from the company's largest customers that had a devastating affect on the corporation's revenue).

The same is true with respect to the Allied line. Not only did defendants speak directly to the demand for the line, but they also told investors how much of that

1   product would be distributed to the market, how the product was "disrupted" because

2   of "hiccups" in the AB relationship, and that even with those "hiccups," the Allied

3   line would offset margin pressures in the Monster line.  In fact, they even discussed

4   building on the success of the line in connection with AB Agreement #2.  These facts,

5   combined with Sacks' conduct at the casino meeting where he berated the sales force

6   for poor Allied sales, docked bonuses 50% immediately thereafter, and tied future

7   sales to Allied distribution agreements provide the necessary details to demonstrate

8   that defendants actually knew that their statements about Allied were false.  *In re*

9   *Wash. Mut., Inc. Sec.*, No. 2:08-md-1919 MJP, 2009 U.S. Dist. LEXIS 99727, at *28

10  (W.D. Wash. Oct. 27, 2009) (finding a strong inference of scienter where plaintiffs'

11  allegations showed defendant's knowledge of and access to information contradicting

12  his statements).

13      The dramatic marketing expenses that Hansen devoted to the Monster line, the

14  widespread knowledge that Hansen sacrificed Allied for Monster, and AB's disregard

15  of the Allied line, as reported by witnesses across the country, contribute to the

16  conclusion that it would be absurd to suggest that defendants did not know that Allied

17  sales were far below expectations.  *In re Countrywide Fin. Corp. Derivative Litig.*,

18  554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008) (finding a strong-inference of

19  scienter based on accounts that (1) emanated from several geographic areas, (2)

20  spanned different levels of the company hierarchy, and (3) remained consistent across

21  different time periods).  Under a holistic analysis, the Court "need not close [its] eyes

22  to management's inevitable exposure to core operations," and should take allegations

23  regarding top management's positions into account in its scienter determination.  *S.*

24  *Ferry*, 2009 WL 3153067, at *6.[22]

---

26  [22]   Defendants' attack on supposed "boilerplate" allegations of "corporate

27  positions" ignores direct Ninth Circuit authority and minimizes the critical importance
    of the AB relationship.  Defs.' Mem. at 29-30.  Indeed, virtually every case that

28  defendants cite rejecting the reality that the highest level executives know what is

- 35 -

1    Defendants' argument that the confidential sources must accuse defendants of

2  fraud is simply absurd.  Defs.' Mem. at 34-35.  As an initial matter, defendants'

3  attempt to attack the credibility of plaintiff's sources is wholly improper on a motion

4  to dismiss.  *Sanchez v. Stancliff*, No. 1:07-CV-00128-LJO-SMS PC, 2009 U.S. Dist.

5  LEXIS 71732, at *14-*15 (E.D. Cal. Aug. 14, 2009) (a court cannot make

6  determinations of witness credibility on a motion to dismiss).  Nevertheless, it is

7  sufficient that those witnesses supply information that contradicts what the defendants

8  were saying publicly and put the executives in a position to know the information,

9  which they have done.  This type of circumstantial evidence is even more compelling

10  than the direct evidence that defendants demand.  *Rogers v. Mo. Pac. R.R. Co.*, 352

11  U.S. 500, 508 n.17, 1 L. Ed. 2d 493, 77 S. Ct. 443 (1957) (noting that "circumstantial

12  evidence is not only sufficient, but may also be more certain, satisfying and persuasive

13  than direct evidence").[23]

14                  **b.    Defendants Knew or Recklessly Disregarded**
                          **that Hansen's 2Q07 Financial Results Were**
15                        **False**

16    Defendants also knew or recklessly disregarded that Hansen's 2Q07 financial

17  ─────────────────────────────────────────────

18  happening with critical aspects of their company's operations was issued prior to the
    Ninth Circuit's opinions in *South Ferry* and *Berson*.  *U.S. Aggregates*, *Hansen*, and
19  *Autodesk* all found that the individual defendants' top positions alone did not support
    a strong inference of scienter (Defs.' Mem. at 29), while plaintiff here argues that in
20  accordance with *Tellabs*, such allegations should be considered as part of the totality
    of the circumstances.  *Tellabs*, 551 U.S. at 325.  Moreover, *Vantive*, *Impac*, and
21  *Lockheed* all explicitly rely on the Ninth Circuit's now limited standard from *Silicon
    Graphics*.  Defs.' Mem. at 29.  In *South Ferry*, the court clearly questioned the *Silicon
22  Graphics* standard when attempting to reconcile *Tellabs* and Ninth Circuit
    jurisprudence, noting that "perhaps *Silicon Graphics*, *Vantive*, and *Read-Rite* are too
23  demanding and focused too narrowly in dismissing vague, ambiguous or general
    allegations outright" and requiring that courts instead consider such allegations as part
24  of the totality of circumstances.  *S. Ferry*, 542 F.3d at 784.

25  [23]    *Weiss v. Amkor Tech., Inc.*, 527 F. Supp. 2d 938 (D. Ariz. 2007), does not
    support defendants' argument that witnesses must assert that defendants' statements
26  were false.  Defs.' Mem. at 34.  The court in *Weiss* found that defendants lacked
    scienter because the confidential witnesses were described with insufficient detail to
27  establish personal knowledge and their allegations were too vague.  527 F. Supp. 2d at
    954.  The same is not true here.

28

1   results were false.  The fact that Hansen's financial results that quarter exceeded

2   analyst expectations by an extraordinary ***$0.10 per share*** with expenses noted by

3   analysts to be 50 basis points below expectations raises a strong inference of

4   defendants' recklessness, especially since the Company had struggled to meet

5   expectations in the previous year, had missed expectations in two quarters of the

6   previous four, was struggling with the AB relationship, and had experienced a

7   significant drop in demand for Hansen's Allied products.  Sacks, who had a reputation

8   of being singularly focused on Hansen's financial results and, in particular, its AC

9   Nielsen sales data, and who received important accounting updates from defendant

10  Kelly, would have undoubtedly recognized such a significant departure from

11  expectations.  And since the departure occurred shortly after he had berated sales

12  representatives for poor Allied sales and cut their bonuses by 50%, he would

13  undoubtedly have questioned the validity of Hansen's 2Q07 results.  *See* ¶¶42-43.  If

14  he did not, his failure would amount to deliberate recklessness, especially in the face

15  of his Sarbanes-Oxley ("SOX") certification attesting to the validity of the Company's

16  2Q07 financial results.  *Lattice*, 2006 U.S. Dist. LEXIS 262, at *50-*51 (SOX

17  certifications may be probative of scienter where the people signing the certifications

18  knew or "had reason to know, or should have suspected" that the financial statements

19  contained material misstatements); *see Backe*, 642 F. Supp. 2d at 1187 (recognizing

20  that SOX certifications can support an inference of scienter when combined with other

21  allegations).[24]

22          Reports from witnesses support a finding that defendants knew or recklessly

23

24  [24]     *Zucco*, 552 F.3d 981, and *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736,
25  747 (9th Cir. 2008), do not hold otherwise.  Defs.' Mem. at 30.  *Zucco* simply held
    that plaintiffs may not rely solely on SOX certifications to raise a strong inference of
26  scienter in a case involving complicated accounting principles.  552 F.3d at 1004,
    1007.  *Glazer* similarly held that SOX certifications are not sufficient without more to
27  raise a strong inference of scienter.  549 F.3d at 747.  Plaintiff here has alleged much
    more.

28

1    disregarded the veracity of Hansen's 2Q07 financial results.  According to those

2    witnesses, defendant Sacks "lived and died" by the Nielsen numbers and, if the

3    Company experienced even a half-percent drop in market share related to Monster,

4    Company executives would "freak out." ¶101.  Sacks himself was known to carry two

5    or three binders with him that contained the Nielsen numbers and received important

6    accounting updates from defendant Kelly, who had been informed repeatedly of poor

7    internal controls at Hansen. ¶¶101, 109.  Defendant Kelley was also reported to have

8    been very diligent in reviewing Hansen's financial information.  ¶109.  Thus, a

9    significant departure from expectations would undoubtedly have risen to the highest

10   levels.  *See S. Ferry*, 542 F.3d at 785 (noting defendants' roles in managing the

11   company, including allegations that defendants monitored the data that was the subject

12   of the allegedly false statements).[25]

13        Defendants argue that no confidential witness states that any defendant had any

14   awareness that an account manager was instructed to withhold expenses. Defs.' Mem.

15   at 35.  But those witnesses do not have to make a direct link for plaintiff to allege

16   defendants' scienter.  Indeed, *Tellabs* instructs that all of the allegations are to be

17   considered holistically.  When the appropriate standard is used, a far different picture

18   arises than the one that defendants seek to create. *See* §III.D.1.b., *supra*. Defendants'

19

20

---

21   [25]    Defendants' argument that no confidential witness states that any witness had
22   any awareness of the 2Q07 accounting manipulations also ignores at least Sacks'
      obligations under Sarbanes-Oxley. Defs.' Mem. at 35.  In his certification, Sacks
23   claimed to have designed or supervised "the implementation of internal controls over
      financial reporting . . . to provide reasonable assurance regarding the reliability of
24   financial reporting and the preparation of financial statements for external purposes in
      accordance with generally accepted accounting principles." Sacks' SOX certification
25   and the obligations that the certification imposed on Sacks supports a strong inference
      of scienter, especially when Hansen beat expectations by $0.10 per share shortly after
26   he took draconian measures to reverse horrific Allied sales. Unlike *Hypercom*, where
      the court found that merely alleging that the defendant was detail-oriented was not
27   sufficient to establish an inference of scienter (Defs.' Mem. at 35), plaintiff alleges
      more than just opinion.  ¶109.

28

1    attempt to view plaintiff's allegations in isolation is contrary to the law.[26]

2    **2.    Insider Sales Provide Strong Evidence of Scienter**

3    To determine if insider sales support an inference of scienter, courts consider:

4    "(1) the amount and percentage of shares sold by insiders; (2) the timing of the sales;

5    and (3) whether the sales were consistent with the insider's prior trading history." *Am.*

6    *West*, 320 F.3d at 938. Defendants' insider trading met each one of these factors.

7    **a.    Defendants Sold Suspicious Amounts of Hansen**
     **Stock During the Class Period**

8
9    Class period stock sales that generate a dramatic increase in the proceeds for

10   company insiders can provide evidence of scienter. *Am. West*, 320 F.3d at 939 (noting

11   that $12 million worth of insider stock sales was probative of scienter); *Provenz v.*

12   *Miller*, 102 F.3d 1478, 1491 (9th Cir. 1996) (finding defendant's sale of just

13   $1,340,000 of company stock was suspicious). That is precisely the case here.

14   Defendants unloaded 1,643,000 shares of Hansen stock for over $75 million in just a

15   four-week period of the Class Period. ¶110. Defendants Sacks and Schlosberg each

16   sold more than $18 million of their personal holdings in just three weeks compared to

17   only $11 million in the previous five years (¶¶110, 112) and added another 800,000 of

18   their jointly held stock for combined proceeds of $35,267,250. ¶110. When added to

19   the sale of their personal holdings, defendants Sacks and Schlosberg ***each*** sold ***more***

20   [26]    Defendants' arguments dismissing plaintiff's allegations about the existence of
21   internal reports are the exact type of arguments that the Supreme Court condemned in
     *Tellabs*. Defs.' Mem. at 29-30. Indeed, the Supreme Court rejected this type of
22   isolated analysis, requiring courts to not view allegations "holistically." *Tellabs*, 551
     U.S. at 326. No more can a court disregard allegations about internal reports, or other
23   information that can support an inference of scienter. Instead, the court must view
     those allegations in combination with plaintiff's other allegations. The courts in both
24   *Blue Rhino* and *Metzler* evaluated plaintiffs' allegations regarding internal reports to
     determine if alone they provided a strong inference of scienter. Defs.' Mem. at 30. In
25   contrast, plaintiff here contends that its internal reports allegations should be
     considered in combination with allegations regarding Sacks' behavior at the summer
26   casino meeting, his actions cutting bonuses by 50%, and tying future bonuses to
     Allied sales, and his actions of selling stock in a suspicious manner. ¶¶5, 42-43, 106.
27   These additional allegations give credence to the allegations that Sacks and the other
     executives received detailed information about Hansen's sales results.

28

1  ***than $35 million*** worth of Hansen stock over just three weeks. *Id*. For his part,

2  defendant Kelly sold $2.7 million worth of his Hansen stock between August 13 and

3  September 4, 2007, after selling $3.1 million worth in the preceding three years.

4  ¶¶110, 112. Such sales constitute highly suspicious trading activity. *In re SeeBeyond*

5  *Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1169 (C.D. Cal. 2003) (finding $18

6  million in insider sales suspicious even though defendant "may not have sold a large

7  percentage of his shares").[27]

8              **b.    Defendants' Class Period Sales Occurred at**
                       **Suspicious Times**
9
10         Defendants' sales are also suspicious given their proximity to Hansen's

11  manipulated 2Q07 results and their disclosure of the truth in 3Q07. Defendants did

12  not sell any stock following the Company's earnings announcements in 3Q06, 4Q06,

13  and 1Q07, each of which were in line with or slightly below analysts' expectations.

14  ¶¶65-78, 110, 112. And, of course, defendants did not sell a single share of stock after

15  Hansen announced that it missed expectations for 3Q07.[28] ¶¶93-95, 110. These facts

16  ────────────────────

17  [27]    Defendants' suggestion that plaintiffs are "misleading" the Court by
     "segregat[ing]" the individually held shares from those jointly held is wrong. Defs.'
18  Mem. at 36. The Complaint makes clear that defendants Sacks and Schlosberg have
     personal holdings and joint holdings, and each sale is treated accordingly. ¶¶110-112.
19  While the percentage sold by defendants is reduced if joint holdings are combined,
     those percentages do not negate the suspicious nature of defendants' trading. Indeed,
20  the massive amount alone supports an inference of scienter. *Nursing Home Pension
     Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (finding sale of
21  just 2.1% of stock holdings suspicious because of, among other things, enormous
     proceeds generated from sale). The percentage of sales in this case (15% for Sacks
22  and Schlosberg) is far greater than the 2.1% at issue in *Oracle*. The percentage sold
     by Kelly (77% as clarified by defendants) is suspicious under any standard (Defs.'
23  Mem. at 37), especially when combined with the suspicious timing of his sales and his
     diversion from his prior trading practices. Given the dramatic difference in the
24  number of shares held between the defendants, their relative contribution to total sales
     is meaningless. Defs.' Mem. at 38. *Silicon Graphics*, 183 F.3d at 987 (insider selling
25  43.6% of holdings (5% of total sales) "somewhat suspicious" but did not give rise to
     strong inference of scienter because "no significant trading history" available for
26  purposes of comparison).

27  [28]    Defendants suggest that an ongoing SEC inquiry into the Company's "stock
     option grant practices" limited their ability to sell Company stock after these quarterly
28  announcements. Defs.' Mem. at 40; Defs.' Ex. F at 122. This argument is wholly

1   distinguish this case from *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282 (D.N.J.

2   2001), and *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002).  The court in

3   *Party City* found stock sales following a public announcement not suspicious where

4   the sales appeared consistent with an historical practice of trading after

5   "announcements of monthly sales and the filing of Form 10-Qs with the SEC."  147

6   F. Supp. 2d at 312-13; Defs.' Mem. at 40.  *Lipton* found a one-time sale of 10,000

7   shares following the announcement of year-end earnings not suspicious because an

8   absence of prior sales made comparison to trading history impossible and no other

9   defendants made any class period sales.  284 F.3d at 1037.  The same is not true in

10  this case.[29]

11  _____

12  improper on a motion to dismiss.  RJN Opp. at 9-10.  Without discovery, plaintiff is
    unable to confirm the existence of this restriction or its parameters.  Indeed, other
13  corporate insiders each exercised and sold vested options in June 2007 during the very
    period of time defendants claim they were restricted, which suggests that restrictions
14  did not exist.  Declaration of Douglas R. Britton in Support of Plaintiff's Request for
    Judicial Notice in Support of Plaintiff's Opposition to Defendants' Motion to Dismiss
15  the Consolidated Class Action Complaint, Exs. 1-5.  *See also Am. West*, 320 F.3d at
    940 (noting contractual agreement limited defendants' ability to sell their stock, but
16  finding that since defendants were not "legally forbidden" from selling, the restriction
    did "not meaningfully detract from the strong inference of scienter that arises from the
17  massive stock sales").  These sales distinguish this case from *Ronconi* where the
    "officers could not have traded" under SEC regulations because of private merger
18  discussions.  *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001).

19  [29]    Defendants' contention that their sales were not suspicious because they
    occurred "only" two to three months before they stunned investors with the truth is
20  baseless.  Defs.' Mem. at 39.  Courts routinely hold that stock sales made only months
    before a negative disclosure is probative of scienter.  *Provenz*, 102 F.3d at 1491
21  (finding sales 96 days before disclosure raised strong inference of scienter).  *In re
    Splash Tech Holdings Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001)
22  ("*Splash II*"), does not hold otherwise.  In *Splash II*, the court noted that stock sales
    made **three months** before the disclosure of "negative news" **were suspicious** in
23  timing and amount but failed to raise a strong inference of scienter because the
    allegations regarding the "individual defendants' internal knowledge" were
24  insufficient.  160 F. Supp. 2d at 1085-86.  The same is not true here.  Likewise,
    plaintiff's allegations also provide far more context with regard to the suspicious
25  nature of defendants' sales than the plaintiffs in *Head v. NetManage, Inc.*, No. C97-
    4385-CRB, 1998 U.S. Dist. LEXIS 20433, at *4 (N.D. Cal. Dec. 30, 1998), where the
26  court dismissed the complaint based upon numerous pleading defects, including the
    alleged masterminds of the scheme selling 3% and 0% of their holdings.  Again,
27  plaintiff here does not suffer from similar defects.

28

1    Defendants also argue that their failure to perfectly time their sales at the peak

2    of Hansen's Class Period stock price and the fact that they sold their stock "'at about

3    what the price was worth after the bad news [became] public'" negates scienter.

4    Defs.' Mem. at 38-39.  Not true.  Defendants started selling immediately when it

5    appeared that the inflation caused by Hansen's extraordinary 2Q07 results had ended.

6    In fact, Hansen's stock jumped 20% after the announcement of its 2Q07 results,

7    reaching a temporary high of $49.98 on August 8, before dropping back to $41.05

8    only days later.  ¶¶6, 45, 49; Defs.' Ex. JJ.  It was at this point that defendants began

9    their massive insider-selling spree.  At the same time, defendants' sales were made at

10   or near Hansen's 52-week high as of the day the sales occurred.  *Daou*, 411 F.3d at

11   1022 (finding insider sales probative of scienter even though the stock was sold for

12   $22.86 per share while the class period high reached $34.375 per share).  Defendants'

13   argument is not credible since they were not capable of predicting the future and did

14   not make any other public statements to fuel Hansen's stock price.[30]

15              **c.    Defendants' Trades Were Dramatically Out of
                        Line with Past Trading Practices**

16

17          Defendants also deviated dramatically from their prior trading practices.  After

18   more than fourteen months of inactivity, defendants sold enormous amounts of stock

19   following the announcement of Hansen's false 2Q07 results during two months ***in***

     ***which they historically refrained from trading***.  ¶¶110, 112; *Backe*, 642 F. Supp. 2d

20   at 1184 (considering "whether the sales were consistent with the insider's prior trading

21   history" as one of three factors relevant to determining if insider sales are suspicious).

22

23   Historically, defendants sold most of their Hansen stock during the months of January,

24

25   [30]    These facts differentiate this case from *Ronconi*, 253 F.3d 423, where the court
     noted the statements that drove the stock to its class period high occurred after

26   defendants sold their stock.  *Id*. at 431-32; *see also Vantive*, 283 F.3d at 1086-90
     (finding stock sales in November 1997 and February 1998 not suspicious, in part,

27   because insiders continued to make public statements that drove the company's stock
     to a class period high in July 1998).

28

March, May, June and November.[31] ¶112. In the years before 2007, defendants made just two stock sales during the month of September, with Hilrod Holdings adding one more. *Id.* But in August and September of 2007, defendants engaged in **14** separate sales of Hansen stock. ¶110. These facts raise a strong inference of scienter. *SeeBeyond*, 266 F. Supp. 2d at 1169 (finding stock sales that were "atypical" of previous sales raised a strong inference of scienter); *Am. West*, 320 F.3d at 940 ("sudden flurry of massive insider trading" during class period "after extended period of inactivity, appears unusual"). While defendants focus on percentages, they ignore this extremely suspicious deviation. Defs.' Mem. at 40-41.

Defendants Sacks and Schlosberg not only generated enormous proceeds from their Class Period sales, but also sold significantly more shares from their personal holdings than they had over the previous five years. ¶111. Both sold a total of 391,500 shares between August 24, 2007, and September 14, 2007, compared to only 240,000 shares between 2002 and the start of the Class Period. ¶¶110-112. Defendants Sacks and Schlosberg thus sold 63% more of their personally held stock over a 21-day period than they did in the previous five years. Their sales were therefore out of line with prior trading habits. *Backe*, 642 F. Supp. 2d at 1184 (sale of 1,258,466 stock by insiders during nine-month class period suspicious when compared to only 938,316 shares sold by insiders in previous five years).

> **d.    Defendants Traded Stock While in Possession of Material Non-Public Information in Violation of Exchange Act §10(b) and SEC Rule 10b-5**

For an insider trading violation, a plaintiff need only allege that defendants possessed (and failed to disclose) material inside information before trading. *Johnson v. Aljian*, 394 F. Supp. 2d 1184, 1198-99 (C.D. Cal. 2004), *aff'd*, 490 F.3d 778 (9th

---

[31]    Between 2004 and the start of the Class Period, defendants combined to make 25 trades during the months of January, March, May, June, November, and December, and made no trades in February, April, July, August or October of any year. ¶112.

1    Cir. 2007); *SEC v. Adler*, 137 F.3d 1325, 1337-39 (11th Cir. 1998). "[A] purchase or

2    sale of a security of an issuer is 'on the basis of' material nonpublic information about

3    that security or issuer if the person making the purchase or sale was aware of the

4    material nonpublic information when the person made the purchase or sale." 17

5    C.F.R. §240.10b5-1(b).

6         Defendants are liable for insider trading. They sold $75 million of their Hansen

7    stock with the knowledge that the Company's relationship with AB was suffering

8    from critical problems that were hindering distribution and increasing Hansen's costs,

9    that Allied sales were far below expectations, and that the Company's 2Q07 financial

10   results were false. This is a classic violation of Exchange Act §10(b) and SEC Rule

11   10b-5. *United States v. O'Hagan*, 521 U.S. 642, 651-52 (1997); *Petco*, 2006 U.S.

12   Dist. LEXIS 97927, at *105. The suspicious nature of defendants' stock sales,

13   combined with plaintiff's allegations establishing that defendants knew about these

14   problems, supplies the necessary scienter. *Johnson*, 394 F. Supp. 2d at 1198-99.[32]

15        Whether an outsider's purchase of company stock is contemporaneous with

16   insiders' sales depends on the particular facts of the case. *Brody v. Transitional*

17   *Hosps. Corp.*, 280 F.3d 997, 1002 (9th Cir. 2002). Courts have held that the

18   contemporaneous purchase requirement is satisfied so long as the plaintiff's purchases

19   occurred before defendants' fraud was disclosed to the public or as long as plaintiff's

20   purchases occurred during the period that defendants were selling stock on the basis of

21   insider information. *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164,

22   1196 (C.D. Cal. 2007); *Johnson v. Aljian*, 257 F.R.D. 587, 593-95 (C.D. Cal. 2009).

23   Since plaintiff purchased before defendants disclosed the truth and shortly after

24   defendants stopped trading, the Court should find that the purchases were sufficiently

25

26   [32]    Defendants' reliance on *In re Gap Sec. Litig.*, No. C-87-4895 JPV, 1988 U.S.
     Dist. LEXIS 17124, at *3-*7 (N.D. Cal. Sept. 28, 1988), *aff'd*, 925 F.2d 1470 (9th Cir.
27   1991), is misplaced. There, the court held that plaintiffs did not state a claim because
     they failed to plead the theory upon which they subsequently relied in briefing.

28

1  contemporaneous.  If the Court finds that 41 days is insufficiently contemporaneous,

2  however, plaintiff respectfully requests leave to join a representative who purchased

3  closer to when defendants sold.  *In re Impax Labs., Inc. Sec. Litig.*, No. C04-04802

4  JW, 2008 U.S. Dist. LEXIS 104485 (N.D. Cal. Apr. 17, 2008) (granting request to

5  add/substitute plaintiff after determining lead plaintiff lacked standing to pursue

6  §10(b) claims because it sold its shares before the alleged disclosure of fraud).

7      **E.**    **The Complaint Adequately Alleges Its Confidential Sources of Information**

8
9          The test for alleging confidential sources was addressed by the Ninth Circuit in

10 *Daou*.  There, the Ninth Circuit specifically rejected imposing an obligation on

11 plaintiffs to name their sources and held only that the complaint must allege enough

12 information for the court to assess whether the source was in a position to know of the

13 facts alleged.  *Daou*, 411 F.3d at 1015.  Naming sources is unnecessary so long as the

14 sources are described "with sufficient particularity to support the probability that a

15 person in the position occupied by the source would possess the information alleged"

16 and the complaint contains "adequate corroborating details.  *Id.*[33]

17         The Complaint clearly satisfies this standard.  Each of plaintiff's confidential

18 witnesses is identified by job title and provides information regarding issues that one

19 would expect a person in their position to possess.  *See id*.  The Complaint identifies

---

20 [33]    Defendants' attempt to create multiple "hurdles" for alleging confidential

21 witnesses is based on a misreading of *Zucco*.  Defs.' Mem. at 30.  There, the Ninth
Circuit acknowledged the standard outlined by *Daou* and held that when plaintiffs rely

22 on confidential witnesses to allege scienter, they must be indicative of scienter.  *Id.*
*Zucco*, 552 F.3d at 995.  The *Zucco* court did not purport to change the standard for

23 alleging confidential sources.  It simply stated the obvious – that facts offered by
confidential sources to plead scienter must be indicative of scienter.  *Id.*  The

24 witnesses do exactly that.  *See* §III.D.1., *supra*.  The Ninth Circuit has also not
adopted the view that witnesses' testimony should be discounted on the basis that they

25 are confidential.  Defs.' Mem. at 33 n.21.  Instead it credits a plaintiffs' confidential
source as long as the allegations are sufficiently particular to satisfy the PSLRA.

26 *Daou*, 411 F.3d at 1015; *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir.
2008) (recognizing that witnesses' "[c]onfidentiality, however, should not eviscerate

27 the weight given" if plaintiffs otherwise describe and provide a foundation for their
knowledge).

28

1   the positions they held, their areas of responsibility, and exactly how they were in a

2   position to know the information.[34]  *See, e.g.*, ¶¶21-23, 30-43.  Nothing more is

3   required.  *See Beyond*, 266 F. Supp. 2d at 1159 (finding PSLRA pleading requirements

4   met where plaintiff provided details regarding the confidential sources' positions and

5   information attributed to each source did not appear unreliable or clearly beyond the

6   type of knowledge that each source might have).  The fact that numerous witnesses in

7   different regions of the country all corroborated each other with similar stories adds to

8   the reliability of the information alleged.  *See United States v. Hernandez-Escarsega*,

9   886 F.2d 1560, 1566 (9th Cir. 1989) (based on the interlocking nature of their stories,

10  witness information should be treated as credible and reliable).[35]

11       Defendants argue that plaintiff's descriptions of confidential witnesses are

12  inadequate because they lack employment dates and fail to explain the responsibilities

13  and duties of each witness.  Defs.' Mem. at 32.  Defendants are mistaken.  Plaintiff is

14  not required to provide precise employment dates for each witness, but only to

15  establish their personal knowledge of the information reported.  *See SeeBeyond*, 266

16  F. Supp. 2d at 1159 (requiring information such as exact dates of the confidential

---

18  [34]     Contrary to defendants' contention, the witnesses' testimonies are facts based on their experience, not opinions.  *See* Defs.' Mem. at 33 n.22.

19  [35]     Defendants quibble about the manner in which the Complaint describes the
20  witnesses and demand additional identifying information.  Defs.' Mem. at 31.
    Defendants' demand has nothing to do with reliability.  Instead, it is a transparent
21  attempt to figure out who the witnesses are.  Defendants cite two district court cases,
    including one non-reported case, where the court found that plaintiffs had not
22  provided sufficient information to allow the court to determine how the witnesses
    would know the information ascribed to them.  *See* Defs.' Mem. at 32 (citing
23  *Northpoint Commc'ns* and *Tibco Software*).  In contrast, plaintiff here identifies each
    witness by job position and adds further description providing sufficient insight into
24  how they obtained the knowledge they provide.  Plaintiff is not required to plead
    anything more.  *See SeeBeyond*, 266 F. Supp. 2d at 1158 (plaintiffs are only required
25  to plead "sufficient facts" to support their allegations, not every single fact upon
    which their beliefs are based); *In re Nat'l Golf Props. Sec. Litig.*, No. CV 02-1383-
26  GHK(RZx), 2003 U.S. Dist. LEXIS 4321, at *20 (C.D. Cal. March 18, 2003)
    ("Requiring greater disclosure on a motion to dismiss 'serves no legitimate pleading
27  purpose' but could have the effect of deterring informants from providing
    information.").

28

- 46 -

1  witnesses' employment would significantly erode the confidentiality of those sources

2  and is not required under the PSLRA).[36]  Viewing the Complaint's allegations, it is

3  evident that the confidential witnesses were both employed during the relevant time

4  and had contemporaneous knowledge of the various events for which they provided

5  information.  *See, e.g.*, ¶46 (National Account Manager was personally instructed to

6  withhold costs from Company reports to improve 2Q07 results); ¶42 (National Sales

7  Manager attended the 2007 summer sales meeting where top-ranked sales personnel

8  were berated for poor sales performance of Allied products); ¶41 (National Account

9  Manager received internal memo in 2007 from Vice President of Lost regarding

10  discounts for non-Monster energy drinks). [37]

11       Defendants dismiss plaintiff's witnesses as mere low-level employees that

12  cannot establish company-wide problems, citing *Chubb* and *Zumiez*, which involved

13  confidential witnesses that worked at local branch offices in departments having

14  nothing to do with the alleged fraud and individual store managers.  Defs.' Mem. at

15

16  [36]    The *Limantour* case on which defendants rely for the argument that plaintiffs
17  must supply hyper-technical information about their confidential sources is directly at
    odds with Ninth Circuit precedent.  Defs.' Mem. at 31.  The detail outlined in
18  *Limantour* would effectively require plaintiff to name its sources, which the Ninth
    Circuit has specifically rejected.  *Daou*, 411 F.3d at 1015.

19  [37]    Plaintiffs are only required to describe their sources with sufficient particularity
20  to support "the probability" that a person in their position would possess the
    information alleged.  *Daou*, 411 F.3d at 1015.  Defendants attempt to discredit the
21  witnesses' knowledge by asking, for example, how a Regional Sales Manager in
    Arizona "learned about the purchasing patterns of consumers in 'Kansas, Iowa and
22  elsewhere.'"  Defs.' Mem. at 31 n.20.  It is hardly a stretch to envision that Regional
    Sales Managers would be familiar with sales averages for different regions in a
23  national company, especially given Hansen's emphasis on sales in regular sales
    meetings, conference calls, and other discussions with sales teams on sales
24  performance and strategy.  *See, e.g.*, ¶102.  Defendants also take issue with how a
    Senior Marketing Manger would be familiar with Hansen's motivations for entering
25  into the AB agreement.  Defs.' Mem. at 31 n.20.  But defendants offer no legitimate
    reason why a Senior Marketing Manager at the Company's headquarters would not be
26  familiar with the Company's strategies to market Monster, its most popular product.
    *See* ¶33.  These, as well as the other witness descriptions throughout the Complaint,
27  have sufficient detail to make it probable that the witnesses possess the information
    alleged.

28

1  32.  On the contrary, plaintiff's confidential witnesses here are not limited to low-level

2  positions, but instead include national, regional, and senior managers from various

3  regions, including Company headquarters.  Individuals in these positions, unlike the

4  employees referenced in *Chubb* and *Zumiez*, are highly likely to have relevant

5  company and regional information.  Moreover, the goal at the pleading stage is not to

6  conduct a census of current and former employees, but rather that confidential

7  witnesses may be used as important sources of scienter.  *See Countrywide*, 554 F.

8  Supp. 2d at 1059 n.10 (rejecting defendants' argument that plaintiffs' witnesses were

9  14  mostly low-level employees out of 50,000 in 600 offices and therefore lacked

10  particularized knowledge).

11       **F.    Plaintiff Adequately Alleges that Defendants' False
   Statements and Material Omissions Are the Proximate**

12             **Cause of Its Losses**

13         Loss causation is "a causal connection between the material misrepresentation

14  and the loss."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341, 161 L. Ed. 2d 577,

15  125 S. Ct. 1627 (2005).  So long as the complaint alleges facts that, if taken as true,

16  plausibly establish loss causation, a Rule 12(b)(6) dismissal is inappropriate.  *Gilead*,

17  536 F.3d at 1057.  "This is not 'a probability requirement . . . .  It simply calls for

18  enough fact to raise a reasonable expectation that discovery will reveal evidence of'

19  loss causation."  *Id*.  A plaintiff need only allege that a defendant's misstatement or

20  omission "concealed something from the market that, when disclosed, negatively

21  affected the value of the security."  *In re Juniper Networks, Inc. Sec. Litig.*, 542 F.

22  Supp. 2d 1037, 1048-49 (N.D. Cal. 2008).  Significantly, a plaintiff is ***not*** required to

23  show that a misrepresentation was "the ***sole*** reason for the investment's decline in

24  value," as long as it is a "substantial cause."  *Daou*, 411 F.3d at 1025; *Gilead*, 536

25  F.3d at 1055.  Nor is there a requirement that the corrective information come in a

26  single disclosure, take a particular form, or be a "mirror-image" of the misstatement.

27  *In re New Century*, 588 F. Supp. 2d 1206, 1236 (C.D. Cal. 2008); *see also Daou*, 411

28  F.3d at 1025-26.

1     Here, the Complaint far exceeds the requirement that it provide an "indication"

2   of the causal connection that plaintiff "has in mind." *Dura*, 544 U.S. at 347. It alleges

3   that defendants misrepresented the strength of the AB relationship, the success of the

4   Allied line, and Hansen's 2Q07 financial results, and that these misstatements

5   artificially inflated Hansen's stock price throughout the Class Period. *See* §III.A.,

6   *supra*; ¶¶69, 118. It also alleges that Hansen's disclosures on November 8, 2007,

7   disclosed the Company's true, yet previously undisclosed, financial condition and the

8   truth about Hansen's Allied line and its relationship with AB. ¶¶48, 93, 119. Hansen

9   reported significantly less sales and earnings growth than expected (which reflected

10  the expenses that Hansen improperly omitted and deferred from the purportedly stellar

11  2Q07 results), that the Allied line had missed internal expectations by $10 million

12  because of a "drop-off in sales," and that Hansen "put the brake" on the AB transition

13  at the same time that the relationship was facing "some challenges there because

14  they've got their focus on their own products, as well" and had not "embraced the

15  brand and the potential for the brand." ¶¶94, 121. These disclosures were directly at

16  odds with the extremely positive statements that defendants were making on these

17  issues throughout the Class Period and supplied the explanation for Hansen's 3Q07

18  miss. *See In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1028 (C.D. Cal. 2008)

19  ("Because these statements 'affirmatively create[d] an impression of a state of affairs

20  which differ[ed] in a material way from the one that actually exist[ed],' the Court

21  finds that Plaintiffs have sufficiently pled loss-causation.") (quoting *In re Syncor Int'l*

22  *Corp. Sec. Litig.*, 239 Fed. Appx. 318, 320 (9th Cir. 2007)).[38]

23  _____

24  [38]    Defendants mistakenly argue that Hansen's disclosures about Allied brand sales
    cannot be deemed a corrective disclosure because Hansen had not previously
25  announced Allied brand sales data or its internal expectations. Defs.' Mem. at 46.
    Their argument is belied by their positive claims about the product and plaintiffs'
26  allegations that Hansen's struggles with AB and defendants' abandonment of the
    product contributed to the $10 million miss and the 3Q07 miss. The Ninth Circuit
27  upheld allegations similar to these in *Daou*. 411 F.3d at 1026 (loss causation
    adequately pled where defendants disclosed Daou's "true financial health," which
28

1    In response to these shocking announcements, the artificial inflation previously

2    caused by defendants' false statements dissipated, and the price of Hansen's stock

3    plummeted.  ¶¶69, 93, 95, 108, 122.  On November 7, 2007, Hansen's stock price

4    closed at $56.67 per share.  ¶49.  After Hansen issued its November 8, 2007 press

5    release, Hansen's stock price opened down at $42.86 per share and reached an intra-

6    day low of $38.25 per share, on a trading volume 1,900% greater than the prior day's

7    volume.  ¶¶49, 95, 122; Defs.' Ex. JJ.  No more is required to plead loss causation in

8    the Ninth Circuit. *Daou*, 411 F.3d at 1026.[39]

9    Defendants' argument that plaintiff is required to allege that the disclosure

10   "reveal[ed] a prior fraud" demonstrates a fundamental misunderstanding of loss

11   causation.  Defs.' Mem. at 44.  Plaintiff is not required, as defendants suggest, to

12   allege that the disclosing event mirror the misstatements themselves.  In fact, courts in

13   the Ninth Circuit have universally rejected this proposition. *Daou*, 411 F.3d at 1026;

14   *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Sys.*, 411 F. Supp. 2d 1172,

15   1176-77 (N.D. Cal. 2005) (rejecting contention that "corrective disclosure" must

16   "directly relate to the putative misstatement").  Rather, the disclosure need only make

17   the truth generally known. *Daou*, 411 F.3d at 1026 (loss causation adequately pled

18

19   plaintiffs alleged was a "***direct result of prematurely recognizing revenue***").  Sacks'
     previous disclosure about Lost struggling during the transition does not change the
20   result since he attributed the "struggle" to prior distributors, spotty initial execution,
     and "certain" holdouts ***that were resolved*** by the on-premise agreement, which
21   plaintiff alleges are false.

22   [39]   Defendants' argue that the stock "did not fall after the 'truth' was allegedly
     revealed in the conference call" because the stock closed higher on November 8,
23   2007, than it opened. Defs.' Mem. at 43. The argument is absurd. The very problems
     disclosed during the conference call supplied the reasons for the miss.  It makes no
24   economic sense to separate the two.  Since defendants' disclosures during the
     conference call tied the miss to the fraud, loss causation is satisfied. *Daou*, 411 F.3d
25   at 1026 (loss causation adequately pled where defendants disclosed Daou's "true
     financial health," which plaintiffs alleged was a "***direct result of prematurely***
26   ***recognizing revenue***"). *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d
     1049 (9th Cir. 2008), is distinguishable because there was no revelation of truth: the
27   purported disclosure was insufficient because it revealed only a ***potential risk*** of
     fraud. *Id*. at 1063-64.

28

1    where there was a steep drop in stock price once defendants began to disclose the

2    "truth" about the company's financial condition); *see also Juniper*, 542 F. Supp. 2d at

3    1048-49 (plaintiff need only allege that a defendant's "'misstatement or omission

4    concealed something from the market that, when disclosed, negatively affected the

5    value of the security'"); *In re Motorola Sec. Litig.*, 505 F. Supp. 2d 501, 536, 546

6    (N.D. Ill. 2007) (the disclosure need not "specifically identify or explicitly correct a

7    previous representation, or expressly disclose the particular fraudulent scheme the

8    plaintiff alleges").[40]

9        Defendants actually argue that "Sacks was saying nothing new" on

10   November 8, 2007, and then cite snippets to revise history.  Defs.' Mem. at 44-46.

11   Not only is this type of factual argument inappropriate on a motion to dismiss, but it is

12   also misleading and just flat wrong.  Sacks indeed disclosed facts that were directly at

13   odds with his Class Period representations.  The problems that he disclosed on

14   November 8, 2007, were previously minimized as "initial hiccups" that had been

15   resolved by the on-premise agreement.  And Sacks did not describe any part of the

16   relationship as a "crap shoot" or a "'speculative' opportunity that would 'take time' to

17   yield results."  Defs.' Mem. at 45.  He actually said that providing ***an exact***

18   ***percentage of market share*** would be a "crap shoot" and that the implementation

19   ***speed*** was "speculative" because AB was such a large corporation.  Defs' Ex. Y at

20   616-17; Defs.' Ex. AA at 639.  It was the size of AB to which Sacks attributed the on-

21   premise distribution "taking time," not AB failing to focus on Hansen's products. *See*

22   Defs.' Ex. Y at 616-17.  That fact and the fact that AB had not "embraced the brand

23   and the potential for the brand" (¶121) was entirely new information that defendants

24   _____

25   [40]    Other courts have done the same.  *In re Williams Sec. Litig.*, 558 F.3d 1130,
     1140 (10th Cir. 2009) (refusing to impose mirror image corrective disclosure
26   requirement); *Asher v. Baxter Int'l, Inc.*, No. 02 CV 5608, 2006 WL 299068, at *7
     (N.D. Ill. Feb. 7, 2006) (poor financial results revealed "rosy projections" as
27   unattainable, causing actionable losses).

28

1    had previously concealed from the market.

2        Despite defendants' insistence, Sacks admitted that AB was not focusing on

3    Hansen's products with regard to both the off-premise and on-premise agreements.

4    Defs.' Mem. at 44-46.  With regard to off-premise, Sacks conceded that AB

5    distributors had not "embraced the brand and the potential for the brand." ¶121.  In

6    fact, defendants' claim that "Sacks actually said . . . that '[certain] AB distributors

7    have embraced the brand and potential for the brand in these sort of nonalcoholic

8    accounts more readily with more resources than others'" is demonstrably wrong.

9    Defs.' Mem. at 45.  What Sacks was quoted as saying was "*[s]houldn't* AB

10    distributors have embraced the brand and the potential for the brand in these sort of

11    nonalcoholic accounts more readily with more resources than others?"  He then

12    answered the question by stating, "*[a]nd that is just an ongoing challenge that we've*

13    *had in the transition to A-B*."  Defs.' Ex. BB at 653.  In the very next paragraph,

14    Sacks explicitly transitioned to addressing the on-premise agreement, where he

15    attributed difficulties in "integrating the sales effort into the A-B sales team" to AB's

16    "focus on their own products."  *Id*. at 654.  These disclosures revealed a much bleaker

17    picture for Hansen's relationship with AB than Hansen represented during the Class

18    Period.[41]

19        Sacks' disclosures directly contradict his May 2007 statements that Hansen was

20

21    _____

    [41]    While defendants dispute whether Hansen had previously represented that the
22    transition to the AB system had stopped (*see* Defs.' Mem. at 44-45), the Complaint
    makes it clear that defendants misrepresented the *reason* for putting a halt to the
23    transition.  ¶94 ("Defendants disclosed . . . that they had put the brake on the AB
    transition not because they were trying to free up their sales representatives to sell
24    product during the summer, but because AB was not focusing on Hansen's
    products.").  Sacks' statements, in context, admitted that Hansen was suffering
25    because AB was not focusing on Hansen's products and because AB had not
    embraced the brand or the potential for the brand.  This case is therefore
26    distinguishable from *In re Dothill Sys. Corp. Sec. Litig.*, No. 06-CV-228-JLS (WMc),
    2009 WL 734296, at *14 (S.D. Cal. Mar. 18, 2009), where the court found that there
27    were no misrepresentations and, in any event, the plaintiffs failed to identify a
    "disclosing event."

28

1    "largely done with the transition" because "we have an ideal balance" and his August

2    2007 statement that Hansen was putting the brake on the transition "so we could get

3    our guys focussed [sic] on out in the field, focussed [sic] on selling and rather not

4    focus on transition brands."   Defs.' Ex. Z at 627; Defs.' Ex. AA at 635.   Sacks'

5    statements, then, regarding putting the "brake" on the AB transition, except with

6    respect to "selected" markets, reflected the reality that AB was not benefitting Hansen

7    to the extent the market was previously led to believe.   And no amount of positive

8    spin, such as "by and large, we are certainly happy," can nullify the devastating facts

9    that caused Hansen's stock price to collapse 32.5%.

10         Defendants' contention that Sacks' revelation about independent convenience

11   stores being an area that Hansen had to address with the AB system was not a

12   "corrective disclosure" is baseless. Defs.' Mem. at 45-46.   In fact, their claim that

13   Sacks had told the market that there were channels "'that AB doesn't ordinarily go

14   into' and therefore Hansen *would not be able to reach as many accounts*" is

15   misleading. *Id*. at 46. Defendants never told the market that AB's status as an alcohol

16   distributor would limit its distribution.   To the contrary, they claimed that it would

17   enhance it and that AB's status as an alcohol distributor was a problem that "'we think

18   . . . will get addressed.'" ¶77. Defendants' disclosures and Sacks' admission that this

19   also hurt the distribution at independent and convenience stores was new information

20   that contradicted their previous representations.  This is sufficient for loss causation.[42]

21      **G.    The Complaint Adequately Alleges Control Person Liability**

22         Section 20(a) of the Exchange Act provides that "[e]very person who, directly

23   _____

24   [42]      Defendants argue that Sacks' disclosure about Allied sales cannot be deemed a
         corrective disclosure because Hansen had not previously announced Allied brand
25      sales data for the quarter or its internal expectations for the brand.  Defs.' Mem. at 46.
         They are mistaken.  The dramatic $10 million miss for the Allied line and their claims
26      about questioning what to do with the brand going forward directly contradicted their
         previous claims about the line and contributed to the 3Q07 miss, which ties
27      defendants' fraud to the stock decline.  Nothing more is required.

28

1    or indirectly, controls any person liable under any provision of [the Exchange Act] or

2    of any rule or regulation thereunder shall also be liable jointly and severally with and

3    to the same extent as such controlled person."  15 U.S.C. §78t(a).  Scienter is not an

4    element of §20(a).  *Howard v. Everex Sys.*, 228 F.3d 1057, 1066 & n.11 (9th Cir.

5    2000) (noting that any court holding that "the absence of scienter precludes a finding

6    of §20(a) liability . . . would contradict the wording of the statute and [the Ninth

7    Circuit's] subsequent holding in *Nordstrom*").[43]  "This [§20(a)] inquiry is normally an

8    'intensely factual question'" that is inappropriate for a motion to dismiss.  *Zucco*, 552

9    F.3d at 990.

10        The allegations that each of the individual defendants held the highest offices in

11   the Company, sat on its board of directors, maintained substantial Hansen stock

12   holdings, participated in conference calls or interviews where many of the

13   misstatements originated and others were repeated, and oversaw and/or signed off on

14   Hansen's financial, internal control and Sarbanes-Oxley compliance reports are

15   sufficient to hold them liable as "control persons" under §20(a).  *See, e.g.*, ¶¶1, 5, 27-

16   28, 42, 44, 56-58, 60-63, 65-66, 70-73, 76, 79, 86-87, 99, 108-112.  These examples

17   clearly show that defendants directly or indirectly did control Hansen and its false

18   disclosures and omissions.  And since the individual defendants worked in the name

19   of Hansen, Hansen is also liable as a control person.[44]  The Complaint therefore

20   adequately states a claim for control person liability.

---

22   [43]    Defendants rely on *In re Downey Sec. Litig.*, No. CV 08-3261-JFW(RZx), 2009
23   WL 2767670 (C.D. Cal. Aug. 21, 2009), for the proposition that plaintiff must show
     control "in an effort to induce violations of securities laws."  Defs.' Mem. at 49.  This
24   is a gross misstatement of the law.  Section 20(a) does not contain an element of intent
     and the Ninth Circuit has not read that requirement into the claim.

25   [44]    Defendants argue that Hansen is outside the scope of §20(a).  Defs.' Mem. at 49
26   n.33.  Not true.  The Ninth Circuit case that they cite, *Hollinger v. Titan Capital
     Corp.*, 914 F.2d 1564, 1573 (9th Cir. 1990), holds otherwise – "**the district court
27   erred in holding that Titan [a corporation] could not be held vicariously liable as a
     'controlling person' under §20(a)**."

28

## IV.    CONCLUSION

For all of the foregoing reasons, defendants' motion should be denied.  If the Court is inclined to grant any portion of defendants' motion, plaintiff respectfully requests leave to amend the Complaint.

DATED:  January 8, 2010                     Respectfully submitted,

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
DOUGLAS R. BRITTON
SHANNON M. MATERA
CHRISTINA A. ROYCE


                    s/ DOUGLAS R. BRITTON
                     DOUGLAS R. BRITTON

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

DYER & BERENS LLP
JEFFREY A. BERENS
303 East 17th Avenue, Suite 300
Denver, CO  80203
Telephone:  303/861-1764
303/395-0393 (fax)

HOLZER HOLZER & FISTEL, LLC
COREY D. HOLZER
MICHAEL I. FISTEL, JR.
200 Ashford Center North, Suite 300
Atlanta, GA  30338
Telephone:  770/392-0090
770/392-0029 (fax)

Additional Counsel for Plaintiffs

I:\KathyJ\Hansen\BRF00063798_OPP MTD.doc

1

<u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on January 8, 2010, I electronically filed the foregoing with

3  the Clerk of the Court using the CM/ECF system which will send notification of such

4  filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and

5  I hereby certify that I have mailed the foregoing document or paper via the United

6  States Postal Service to the non-CM/ECF participants indicated on the attached

7  Manual Notice List.

8      I certify under penalty of perjury under the laws of the United States of America

9  that the foregoing is true and correct.  Executed on January 8, 2010.

10
              s/ DOUGLAS R. BRITTON
11            DOUGLAS R. BRITTON

12            COUGHLIN STOIA GELLER
                  RUDMAN & ROBBINS LLP
13            655 West Broadway, Suite 1900
14            San Diego, CA  92101-3301
              Telephone:  619/231-1058
15            619/231-7423 (fax)

16
              E-mail:      dougb@csgrr.com
17

18

19

20

21

22

23

24

25

26

27

28

# Mailing Information for a Case 5:08-cv-01249-DGT-JC

**Electronic Mail Notice List**

The following are those who are currently on the list to receive e-mail notices for this case.

- **Douglas R Britton**
  dougb@csgrr.com,stremblay@csgrr.com
- **Hal D Cunningham**
  hcunningham@scott-scott.com
- **Marshall Dees**
  mdees@holzerlaw.com
- **Mark T Drooks**
  mtd@birdmarella.com,lak@birdmarella.com
- **Michael Ira Fistel , Jr**
  mfistel@holzerlaw.com
- **Sabrina S Kim**
  skim@milberg.com,mbowman@milberg.com,cchaffins@milberg.com
- **Brian Oliver O'Mara**
  bomara@csgrr.com
- **Martin Perschetz**
  martin.perschetz@srz.com
- **Andrei V Rado**
  arado@milberg.com
- **Thomas V Reichert**
  tvr@birdmarella.com,krw@birdmarella.com
- **Darren J Robbins**
  e_file_sd@csgrr.com
- **Samuel H Rudman**
  srudman@lerachlaw.com
- **Arthur L Shingler , III**
  ashingler@scott-scott.com,efile@scott-scott.com
- **Gary Stein**
  gary.stein@srz.com,courtfilings@srz.com,evan.melluzzo@srz.com
- **William Uptegrove**
  william.uptegrove@srz.com
- **David C Walton**
  davew@csgrr.com,e_file_sd@csgrr.com

- **Jeff S Westerman**
  jwesterman@milberg.com,mbowman@milberg.com,cchaffins@milberg.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Mario Alba                                    , Jr
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road, Suite 200
Melville, NY 11747

David A Rosenfeld
Coughlin Stoia Geller Rudman & Robbins LLP
58 South Service Road  Suite 200
Melville, NY 11747
```