1   Mark T. Drooks - State Bar No. 123561
      mtd@birdmarella.com
2   Thomas V. Reichert - State Bar No. 171299
      tvr@birdmarella.com
3   BIRD, MARELLA, BOXER, WOLPERT,
      NESSIM, DROOKS & LINCENBERG, P.C.
4   1875 Century Park East, 23rd Floor
    Los Angeles, California  90067-2561
5   Telephone: (310) 201-2100
    Facsimile: (310) 201-2110

6
    Martin L. Perschetz (admitted *pro hac vice*)
7       martin.perschetz@srz.com
    Gary Stein (admitted *pro hac vice*)
8       gary.stein@srz.com
    William M. Uptegrove (admitted *pro hac vice*)
9       william.uptegrove@srz.com
    SCHULTE ROTH & ZABEL LLP
10  919 Third Avenue
    New York, New York 10022-3902
11  Telephone: (212) 756-2000
    Facsimile: (212) 593-5955

12
    Attorneys for Defendants Hansen Natural
13  Corporation, Rodney C. Sacks, Hilton H.
    Schlosberg, and Thomas J. Kelly

14

15              **UNITED STATES DISTRICT COURT**

16      **CENTRAL DISTRICT OF CALIFORNIA, EASTERN DIVISION**

17

| | |
|---|---|
| 18  MARCELO CUNHA, Individually 19  and on Behalf of All Others Similarly  Situated, 20 21              Plaintiff, 22  vs. 23  HANSEN NATURAL 24  CORPORATION, RODNEY C. 25  SACKS, HILTON H.  SCHLOSBERG, and THOMAS J. 26  KELLY, 27              Defendants. 28 | CASE NO. EDCV08-1249 (DGT) (JCx) [Consolidated with EDCV08-1278 SGL (JCx)]  **REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN FURTHER SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**  Date:  TBD Time: TBD Crtrm.: Hon. David G. Trager |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................. 1

II.   ARGUMENT ................................................................................... 3

    A.   The Statements Concerning the AB Transition and the Allied
        Brands Are Not Actionable as a Matter of Law .................................... 3

        1.   General Statements of Corporate Optimism................................ 3

        2.   Forward-Looking Statements ..................................................... 5

    B.   The Complaint Fails to Plead that the Statements Concerning the
        AB Transition and the Allied Products Were Materially False ............. 8

        1.   The AB Transition ........................................................................ 9

        2.   The Allied Brands........................................................................ 14

    C.   The Complaint Fails to Plead that the Statements Concerning the
        AB Transition and the Allied Brands Were Made with Scienter ......... 16

        1.   The "Core Operations" Exception Does Not Apply.................... 16

        2.   Plaintiff's Confidential Witnesses Do Not Support an
            Inference of Scienter ................................................................. 18

    D.   Plaintiff's "Insider Trading" Allegations Do Not Support an
        Inference of Scienter ........................................................................... 20

    E.   The Complaint Fails to Plead that Hansen's 2Q07 Quarterly
        Results Were Materially False ............................................................. 23

    F.   The Complaint Fails to Plead a Section 10(b) Claim Against
        Schlosberg and Kelly .......................................................................... 26

    G.   Plaintiff Fails to Plead Loss Causation ............................................... 27

    H.   Plaintiff's Other Claims Should Be Dismissed.................................... 29

III.  CONCLUSION ............................................................................... 30

1

## TABLE OF AUTHORITIES

2

**Cases**                                                                                          **Page(s)**

3

*In re 2007 Novastar Fin. Inc.*,
   579 F.3d 878 (8th Cir. 2009) .................................................................... 3

4

*Backe v. Novatel Wireless*,

5
   642 F. Supp. 2d 1169 (S.D. Cal. 2009) ...................................................... 25

6

*Berson v. Applied Signal Tech., Inc.*,
   527 F.3d 982 (9th Cir. 2008) ..................................................................... 17

7

*In re Broadcom Corp. Sec. Litig.*, No. 01275,

8
   2004 WL 3390052 (C.D. Cal. Nov. 23, 2004) ............................................ 8

9

*Brodsky v. Yahoo! Inc.*,
   630 F. Supp. 2d 1104 (N.D. Cal. 2009)....................................................... 9

10

*Brody v. Transitional Hosps. Corp.*,

11
   280 F.3d 997 (9th Cir. 2002) ..................................................................... 11

12

*In re Bus. Objects S.A. Sec. Litig.*, No. C-04-2401,
   2005 WL 1787860 (N.D. Cal. July 27, 2005) ........................................ 3, 19

13

*In re CBT Group PLC Sec. Litig.*, No. C-98-21014,

14
   1999 WL 1249287 (N.D. Cal. July 21, 1999) ............................................ 14

15

*In re Cadence Design Sys. Sec. Litig.*,
   654 F. Supp. 2d 1037 (N.D. Cal. 2009)...................................................... 26

16

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,

17
   394 F.3d 126 (3d Cir. 2004) .................................................................. 19, 20

18

*In re Calpine Corp. Sec. Litig.*,
   288 F. Supp. 2d 1054 (N.D. Cal. 2003)....................................................... 5

19

*City of Brockton Ret. Sys. v. Shaw Group Inc.*,

20
   540 F. Supp. 2d 464 (S.D.N.Y. 2008) ....................................................... 26

21

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004)........................................................ 11

22

*In re Countrywide Fin. Corp. Deriv. Litig.*,

23
   554 F. Supp. 2d 1044 (C.D. Cal. 2008)...................................................... 20

24

*In re Countrywide Fin. Corp. Sec. Litig.*,
   588 F. Supp. 2d 1132 (C.D. Cal. 2008)............................................... 4, 29-30

25

*In re Craftmatic Sec. Litig.*,

26
   890 F.2d 628 (3d Cir. 1989) ...................................................................... 16

27

*In re Daou Sys., Inc.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................................... 24

28

*In re Dothill Sys. Corp. Sec. Litig.*, No. 06-CV-228,
    2009 WL 734296 (S.D. Cal. Mar. 18, 2009) ............................................5, 7

*In re Downey Sec. Litig.*, No. CV 08-3261,
    2009 WL 2767670 (C.D. Cal. Aug. 21, 2009) ............................................11, 30

*In re Downey Sec. Litig.*, No. CV 08-3261,
    2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ............................................5

*In re Dura Pharms., Inc. Sec Litig.*,
    452 F. Supp. 2d 1005 (S.D. Cal. 2006) ............................................5

*In re Dura Pharms., Inc. Sec. Litig.*,
    548 F. Supp. 2d 1126 (S.D. Cal. 2008) ............................................8

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ............................................10

*Fisher v. Acuson Corp.*, No. C93-20477,
    1995 WL 261439 (N.D. Cal. Apr. 26, 1995) ............................................28

*Garfield v. NDC Health Corp.*,
    466 F.3d 1255 (11th Cir. 2006) ............................................25

*In re Gilat Satellite Networks, Ltd.*, No. CV-02-1510,
    2005 WL 2277476 (E.D.N.Y Sept. 19, 2005) ............................................8

*Glazer Capital Mgmt., LP v. Magistri*,
    549 F.3d 736 (9th Cir. 2008) ............................................25

*Graff v. Prime Retail, Inc.*,
    172 F. Supp. 2d 721 (D. Md. 2001) ............................................14

*Grossman v. Novell, Inc.*,
    120 F.3d 1112 (10th Cir. 1997) ............................................3, 4

*Harris v. Ivax Corp.*,
    182 F.3d 799 (11th Cir. 1999) ............................................7

*Head v. NetManage, Inc.*, No. C97-4385,
    1998 WL 917794 (N.D. Cal. Dec. 30, 2008) ............................................20-21

*Hockey v. Medhekar*,
    30 F. Supp. 2d 1209 (N.D. Cal. 1998) ............................................4

*Howard v. Everex Sys.*,
    228 F.3d 1057 (9th Cir. 2000) ............................................30

*In re IPO Sec. Litig.*,
    399 F. Supp. 2d 261 (S.D.N.Y. 2005) ............................................29

*In re Impac Mortgage Holdings, Inc. Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ............................................6, 8

REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS

*In re Invision Techs., Inc. Sec. Litig.*, No. C-04-3181,
   2006 U.S. Dist. LEXIS 76458 (N.D. Cal. Aug. 31, 2006) ............................ 26

*Johnson v. Aljian*,
   257 F.R.D. 587 (C.D. Cal. 2009) .................................................................... 29

*Konkol v. Diebold, Inc.*,
   590 F.3d 390 (6th Cir. 2009) ......................................................................... 18

*Landmen Partners Inc. v. Blackstone Group, L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009) ........................................................... 24

*In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255,
   2006 WL 538756 (D. Or. Jan. 3, 2006) .......................................................... 25

*In re LeapFrog Enters., Inc. Sec. Litig.*,
   527 F. Supp. 2d 1033 (N.D. Cal. 2007) .......................................................... 3, 9

*In re Lexar Media, Inc. Sec. Litig.*, No. C-04-2013,
   2005 WL 1566534 (N.D. Cal. July 5, 2005) ................................................... 19

*Ley v. Visteon Corp.*,
   543 F.3d 801 (6th Cir. 2008) ......................................................................... 11

*In re Lockheed Martin Corp. Sec. Litig.*,
   272 F. Supp. 2d 944 (C.D. Cal. 2003) ........................................................... 6, 25-26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006),
   *vacated on other grounds*, 551 U.S. 308 (2007) ........................................... 4

*May v. Borick*, No. CV 95-8407,
   1997 WL 314166 (C.D. Cal. Mar. 3, 1997) ................................................... 28

*In re Metricom Sec. Litig.*, No. C 01-4085,
   2004 WL 966291 (N.D. Cal. Apr. 29, 2004) ................................................. 4

*Middlesex Ret. Sys. v. Quest Software, Inc.*,
   527 F. Supp. 2d 1164 (C.D. Cal. 2007) .......................................................... 20, 29

*Miller v. Champion Enters., Inc.*,
   346 F.3d 660 (6th Cir. 2003) ......................................................................... 7

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ......................................................................... 8, 20

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) ....................................................................... 21

*Panter v. Marshall Field & Co.*,
   646 F.2d 271 (7th Cir. 1981) ......................................................................... 16

*In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823,
   2005 WL 5957816 (S.D. Cal. Aug. 1, 2005) ................................................. 10, 12

*Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings Inc.*, No. 08-cv-1041,
2009 WL 4282940 (S.D. Ind. Dec. 1, 2009) ...................................................... 18

*In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222,
2010 WL 199703 (N.D. Cal. Jan. 13, 2010) ......................................................... 4, 29

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ........................................................................... 4, 11

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...................................................................... 9-10, 22

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977) ...................................................................................... 15-16

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................ 8

*In re Silicon Graphics Sec. Litig.*,
183 F.3d 970 (9th Cir. 1999) ........................................................................ 25-26

*In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C-05-0295,
2007 WL 760535 (N.D. Cal. Mar. 9, 2007) ........................................................... 3

*Skubella v. Checkfree Corp.*, No. 07-796,
2008 WL 1902118 (N.D. Ga. April 25, 2008) ....................................................... 7

*South Ferry LP #2 v. Killinger*,
399 F. Supp. 2d 1121 (W.D. Wash. 2005) ............................................................ 3

*South Ferry LP, #2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008) ...................................................................... 16, 17

*In re Splash Tech. Holdings, Inc. Sec. Litig.*,
160 F. Supp. 2d 1059 (N.D. Cal. 2001) ................................................................ 3

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................................................................................... 22

*In re Vantive Corp. Sec. Litig.*,
283 F.3d 1079 (9th Cir. 2002) ......................................................................... 27

*In re Wells Fargo Sec. Litig.*,
12 F.3d 922 (9th Cir. 1993) ............................................................................ 16

*In re Wet Seal, Inc. Sec. Litig.*,
518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................................................................ 8

*In re Wyse Tech. Sec. Litig.*, No. 89-1818,
1990 WL 169149 (N.D. Cal. Sept. 13, 1990) ....................................................... 15

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ................................................................ 17, 18, 19

*In re Zumiez Inc. Sec. Litig.*, No. 07-1980,
  2009 WL 901934 (W.D. Wash. Mar. 30, 2009) ........................................... 19, 20

**Statutes**                                                                    **Page(s)**

15 U.S.C. § 78u-5(c)(1) (2009) ...................................................................... 8

15 U.S.C. § 78u-5(e) (2009) .......................................................................... 8

H.R. Rep. No. 104-369 (1995) (Conf. Rep.) ............................................... 8

**Miscellaneous**                                                                  **Page**

*SEC Staff Accounting Bulletin 99,*
  1999 WL 1123073 (Aug. 12, 1999) ...................................................... 24

REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS

## I.     INTRODUCTION

There could be no better demonstration of the Complaint's failings under the PSLRA – and of the need for the PSLRA – than Plaintiff's opposition brief ("Opposition" or "Opp.").  In lieu of particularized allegations of fact that give rise to a compelling inference that Hansen's management intentionally deceived investors, Plaintiff offers a litany of hyperbole, conjecture, conclusory characterizations and outright misrepresentation.

The very first paragraph of the Opposition perfectly encapsulates these attributes. It purports to tell a story of a "straightforward case of securities fraud."  But when examined in the light that the PSLRA requires, Plaintiff's story is revealed to be just that: a story, an exercise in creative writing that is wholly unsupported by the Complaint's factual allegations and squarely contradicted by the very documents on which it relies.  This is true of each and every one of Plaintiff's bedrock fraud allegations.

The Complaint pleads no facts to support Plaintiff's contention that Defendants fraudulently represented that the AB relationship was benefiting Hansen when it was actually "harming" Hansen.  The Complaint alleges only that the AB relationship was affected by various problems, most of which concerned Hansen's Allied brands, which represented only 5% of its sales, and the substance of which were disclosed by Defendants during the Class Period.  Sales of Hansen's flagship product, Monster, continued to increase after the AB relationship began and Hansen posted record sales and profits. Nothing is alleged in the Complaint – not a single document, not a single witness statement – to suggest that the AB relationship on balance was "harming" Hansen or, more importantly, that Defendants believed that to be the case when the statements were made.

The Complaint pleads no facts to support Plaintiff's contention that Defendants "blatantly manipulated" Hansen's 2Q07 financial results "to beat expectations by an extraordinary $0.10 per share."  The Complaint's sole accounting-related claim is a thinly-pled allegation about a relatively tiny amount of promotional expenses that Plaintiff now concedes was quantitatively immaterial to Hansen's 2Q07 financial statements.  More-

over, there is no allegation in the Complaint that Defendants Sacks, Schlosberg or Kelly had any knowledge of, or involvement with, these promotional expenses whatsoever. Nothing is alleged in the Complaint – not a single document, not a single witness statement – to suggest that Hansen's 2Q07 performance was the result of any manipulation by Defendants.

The Complaint pleads no facts to support Plaintiff's contention that Defendants "unloaded" their stock holdings just before Hansen's stock price "collapse[d] by 32.5%." Despite Plaintiff's grossly misleading juxtaposition, the undisputed facts are that Defendants did *not* sell their shares at prices 32.5% higher than what the stock price dropped to in November 2007. To the contrary, Defendants sold their stock at essentially the *same* prices that Hansen's stock traded at *after* the November 2007 conference call where Plaintiff claims that the "truth" was disclosed. There is simply no basis for Plaintiff's claim that Defendants sold their shares at "artificially inflated" prices or benefited from any supposed inside information.

The Complaint pleads no facts to support Plaintiff's contention that the November 2007 call disclosed facts that were "the exact opposite of what defendants were saying about the AB relationship during the Class Period." The very conference call transcript on which Plaintiff relies disproves its allegation. It shows that Sacks said the exact *same* things about the AB relationship during the call as he had been saying for months.

As demonstrated in Defendants' Motion to Dismiss ("Motion" or "MTD"), this case is not about securities fraud at all, but is the very kind of lawsuit that the PSLRA is designed to cut off at the pleading stage. Plaintiff cannot bulldoze its way past the PSLRA's heightened pleading requirements with misleading rhetoric and conclusory assertions. Because Plaintiff's arguments fail to demonstrate any of the prerequisites for a valid claim of securities fraud – an actionable misrepresentation or omission, a materially false representation or omission, scienter on the part of any Defendant, or loss causation – the Complaint should be dismissed.

## II.   ARGUMENT

### A.   The Statements Concerning the AB Transition and the Allied Brands Are Not Actionable as a Matter of Law

#### 1.   General Statements of Corporate Optimism

Plaintiff does not dispute that its claims of false and misleading statements[1] are predicated on Sacks' vague and general expressions of corporate optimism, such as that Hansen was generally "happy" with the AB transition and that Hansen hoped to "improve" sales of Allied brands.  Nor does Plaintiff make any real effort to dispute that these statements are in substance identical to those repeatedly held to be inactionable as general statements of optimism.  (*Compare* Opp. at 21 n.12 *with* MTD at 14-15).  Rather than address the authorities cited in the Motion, Plaintiff suggests that they are outliers and that the doctrine is narrowly applied only to "statements on the extreme edge of generality and vagueness." (Opp. at 20).  But this is simply untrue.  *See*, *e.g.*, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1122 (10th Cir. 1997) (courts "routinely" dismiss claims based on vague statements of corporate optimism); *In re Silicon Storage Tech., Inc. Sec. Litig.*, No. C-05-0295, 2007 WL 760535, at *21 (N.D. Cal. Mar. 9, 2007) (same).[2]

Plaintiff next argues that "[s]tatements discussing the continued strong perform-

---

[1]  Littered throughout the Opposition are statements excerpted from portions of the Complaint other than the "False and Misleading" section or from unbolded portions of block quotes that are not specifically discussed in the surrounding text, which Plaintiff now claims were false or misleading.  As numerous courts have recognized, this type of "puzzle-pleading" is impermissible.  *See, e.g.*, *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1074 (N.D. Cal. 2001).  Accordingly, statements which are not specifically identified in the Complaint as false or misleading should be disregarded. *See In re 2007 Novastar Fin. Inc.*, 579 F.3d 878, 882-83 (8th Cir. 2009) (refusing to consider allegedly misleading statement identified in plaintiff's papers but not in the complaint); *In re Bus. Objects S.A. Sec. Litig.*, No. C-04-2401, 2005 WL 1787860, at *4 (N.D. Cal. July 27, 2005) (focusing on statements in bold and italics).

[2]  *South Ferry LP #2 v. Killinger*, 399 F. Supp. 2d 1121, 1129 (W.D. Wash. 2005), does not support Plaintiff's proposed standard.  *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1051 (N.D. Cal. 2007) (rejecting identical argument and noting that *South Ferry* "did not purport to set a minimum threshold for such statements").

1   ance of a particular relationship or product" are actionable.  (Opp. at 20).  That is also

2   untrue.  Numerous courts have dismissed claims based on optimistic statements that re-

3   lated to the performance of a particular business relationship (such as the Hansen-AB re-

4   lationship) or product line (such as the Allied brands).  *See*, *e.g.*, *Grossman*, 120 F.3d at

5   1121-22 ("substantial success" in integrating sales forces after merger with another com-

6   pany); *In re Rackable Sys., Inc. Sec. Litig.*, No. C 09-0222, 2010 WL 199703, at *6

7   (N.D. Cal. Jan. 13, 2010) (relationship with top three customers remained "pretty strong"

8   and "solid"); *In re Metricom Sec. Litig.*, No. C 01-4085, 2004 WL 966291, at *30 (N.D.

9   Cal. Apr. 29, 2004) ("tremendous pace" of specific product launch); *Hockey v. Med-*

10  *hekar*, 30 F. Supp. 2d 1209, 1220-21 (N.D. Cal. 1998) ("promising" relationship as sup-

11  plier to Intel).  As the Second Circuit has noted, "companies must be permitted to operate

12  with a hopeful outlook: 'People in charge of an enterprise are not required to take a

13  gloomy, fearful or defeatist view of the future . . . .'" *Rombach v. Chang*, 355 F.3d 164,

14  174 (2d Cir. 2004) (citation omitted).  Plaintiff's cases are not to the contrary.[3]

15          Finally, Plaintiff argues that the vague and amorphous statements on which it

16  stakes its claim are actionable because they were "either immediately preceded or fol-

17  lowed by very specific statements of fact that supposedly justify or supply a foundation

18  for the optimism."  (Opp. at 20) (citation omitted).  But Plaintiff fails to identify any such

19  _____

20  [3] In fact, those cases serve only to highlight the insufficiency of Plaintiff's allegations.
    In *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596-98 (7th Cir. 2006),
21  *vacated on other grounds*, 551 U.S. 308 (2007), the court found numerous statements –
    including statements relating to demand for a particular product – to be inactionable
22  puffery, but held that other statements about the growth and shipments of a product (the
    "6500") could be found materially false because the product was not even available to be
23  shipped until *after* the statements were made.  Similarly, in *In re Countrywide Fin. Corp.
    Sec. Litig.*, 588 F. Supp. 2d 1132 (C.D. Cal. 2008), the court specifically emphasized
24  that, "in the vast majority of cases," Countrywide's statements regarding the "high
25  quality" of its loan portfolio "would be nonactionable puffery," *id.* at 1144, 1153, but
    found the statements actionable in that "extraordinary case" because the complaint pled
26  specific facts showing that Countrywide had virtually abandoned its quality standards, *id.*
27  at 1144-54.  Plaintiff has alleged nothing remotely comparable.

28

statement surrounding Sacks' general expressions of optimism.

The first two supposedly "very specific statements of present fact" cited by Plaintiff (Opp. at 21) are nothing of the sort; rather, they involve Sacks expressing his "hop[e]" that Hansen could offset a potential decrease in margin by *future* increased sales of Ace, Joker and Unbound (Ex. W at 569; *see* Compl. ¶ 66) and his opinion ("we think") that distribution of Lost *will* improve "*as we go forward*" (Ex. X at 594; *see* Compl. ¶ 73). *See*, *e.g.*, *In re Downey Sec. Litig.*, No. CV 08-3261, 2009 WL 736802, at *6 (C.D. Cal. Mar. 18, 2009) (statements "of hope, opinion, or belief" about "future performance or general market conditions" are not actionable) (citation omitted). Similarly, the third statement cited by Plaintiff – that Hansen was "getting good solid distribution" (Ex. AA at 635; *see* Compl. ¶ 85) – is precisely the type of *non*-specific statement held to be nonactionable. *See*, *e.g.*, *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003) ("solid" not actionable); cases cited in MTD at 15.

The final statement cited by Plaintiff – that "our sales have improved pretty much in most of the bu[d] markets" (Ex. AA at 640; *see* Compl. ¶ 86) – could be construed as a statement of present fact. But the Complaint does not allege that this statement was untrue. To the contrary, the Complaint and the documents on which it relies show that Hansen's sales did increase after the transition to the AB distribution system. (*See* Compl. ¶¶ 76, 84; Exs. K at 182; N at 352). *See In re Dothill Sys. Corp. Sec. Litig.*, No. 06-CV-228, 2009 WL 734296, at *8 (S.D. Cal. Mar. 18, 2009) (rejecting plaintiffs' argument that context of puffing statements rendered them actionable where plaintiffs "do not allege that the surrounding statements are untrue").[4]

### 2.    Forward-Looking Statements

Plaintiff argues that "[m]ost, if not all, of [the alleged] misstatements concerned

---

[4] Thus, Plaintiff's reliance on *In re Dura Pharms., Inc. Sec Litig.*, 452 F. Supp. 2d 1005 (S.D. Cal. 2006), is misplaced. *Dura* found actionable statements to the effect that sales and demand were "strong" because the complaint sufficiently alleged that defendants had orchestrated a scheme to inflate sales using "fire sales" and "load-ins." *Id.* at 1028-30.

1   past plans or present facts that fall outside of the [PSLRA] safe harbor."  (Opp. at 28).

2   But that is plainly not the case.  Indeed, Plaintiff does not dispute that several of the ten

3   alleged misstatements as set forth in Defendants' Motion are forward-looking statements.

4   (*Compare* MTD at 14-15, *citing* Compl. ¶¶ 71, 73, 77, *with* Opp. at 28-30).

5       Plaintiff wrongly attempts to characterize as statements of "past or present events"

6   the following forward-looking statements by Sacks about the prospects for the AB rela-

7   tionship:  "[w]e *look forward* to working together [with AB] *to build* on the success" of

8   Monster and other energy drink brands (¶ 70); "[w]e think that the transition to [AB] is

9   really *going to continue to help us*" (¶ 65); "it *will continue to, we think, improve, as we*

10  *go forward*" (¶ 86).  (Opp. at 29).  Such statements are clearly forward-looking and do

11  not become actionable simply because they are in close proximity to immaterial state-

12  ments couched in the present tense (*e.g.*, "[w]e really are very happy"; "the proof is in

13  the pudding").  *See In re Impac Mortgage Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d

14  1083, 1096 (C.D. Cal. 2008) (statement that defendant "continue[d] to expect solid loan

15  acquisitions and originations" was forward-looking); *In re Lockheed Martin Corp. Sec.*

16  *Litig.*, 272 F. Supp. 2d 944, 949 (C.D. Cal. 2003)  ("predictions of future events [do not]

17  become actionable merely because they happen to have some basis in present facts").

18      Plaintiff also mischaracterizes Sacks' forward-looking statements regarding the

19  Allied brands.  (*See* Opp. at 29-30).  Sacks' statements – in response to an analyst's

20  question about which secondary brands had the greatest potential – that he was "very

21  positive" about Lost, that he believed Joker and Unbound "have good opportunity," and

22  that "Rumba has got a lot of legs" are clearly forward-looking.  (¶ 65; Ex. W at 564-65).

23  So too is Sacks' expression of "hop[e]" that future increased sales of the Allied brands

24  would offset margin pressure.  (¶ 66; Ex. W at 569).

25      Plaintiff also argues that the cautionary language contained in Hansen's SEC fil-

26  ings and press releases is insufficiently meaningful because it is "so far removed from

27  the true risks . . . ." (Opp. at 31). This argument is utterly without merit.  The crux of the

28  Complaint is that Defendants allegedly concealed various issues arising out of the transi-

1   tion from existing distributors to the AB distributors.  The disclosures during the Class

2   Period clearly alerted investors to the potential risk of a decline in sales due to issues

3   stemming from the transition.  (MTD at 18).

4       Indeed, investors were specifically warned that the appointment of AB distributors

5   could cause a disruption or decline in sales.  (*Id.*).  That the disclosure did not list in de-

6   tail every conceivable permutation of the issues that could arise from the transition is of

7   no moment.  The PSLRA does not require companies "to detail every facet or extent of

8   [a] risk to have adequately disclosed the nature of the risk." *Miller v. Champion Enters.,*

9   *Inc.*, 346 F.3d 660, 678 (6th Cir. 2003); *see also Dothill*, 2009 WL 734296, at *12 (not

10  required to list all factors); *Skubella v. Checkfree Corp.*, No. 07-796, 2008 WL 1902118,

11  at *8 (N.D. Ga. April 25, 2008) (cautionary language "does not require a Nostradamus-

12  like warning of the exact event that occurred").  As long as an "investor has been warned

13  of risks of a significance similar to that actually realized, [it] is sufficiently on notice of

14  the danger . . . ." *Harris v. Ivax Corp.*, 182 F.3d 799, 807 (11th Cir. 1999).

15      Equally unavailing is Plaintiff's argument concerning the risk disclosure about

16  "[t]he marketing efforts of distributors of the Company's products, most of which dis-

17  tribute products that are competitive with the products of the Company."  (Opp. at 31).

18  According to Plaintiff, this disclosure is irrelevant because "[i]t was not AB's marketing

19  efforts that sabotaged the Allied lines."  (*Id.*).  Yet all the Complaint itself alleges is that

20  Sacks failed to disclose that AB distributors "had their focus on their own products,"

21  lacked interest in the Allied brands, and did not provide adequate "promotional support"

22  to those brands.  (Opp. at 1; Compl. ¶¶ 7, 38).  That a distributor might negatively impact

23  Hansen as a result of focusing on its own products rather than Hansen's is precisely the

24  risk addressed by this disclosure.  Further, even if sales of Allied declined due to insuffi-

25  cient marketing by Hansen, that risk was disclosed as well.  (Ex. L at 241 ("[t]he effec-

26  tiveness of the Company's advertising, marketing and promotional programs" was

27  among the risks disclosed)).  In short, Hansen's forward-looking statements clearly were

28  accompanied by meaningful cautionary language, which was far from mere "boilerplate"

1    (Opp. at 30-31; s*ee*, *e.g.*, Ex. D at 60-62).[5]

2        Plaintiff also argues that the safe harbor is inapplicable under the second prong

3    because Defendants had "actual knowledge" that the forward-looking statements were

4    false.  (Opp. at 32).  But this argument is directly contradicted by the PSLRA itself,

5    which unambiguously phrases the two prongs in the disjunctive.  *See* 15 U.S.C. § 78u-

6    5(c)(1); *see also* H.R. Rep. No. 104-369, at 15 (1995) (Conf. Rep.).  Thus, a forward-

7    looking statement is not actionable if it qualifies under *either* prong of the safe harbor.

8    *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1164 (C.D. Cal. 2003);

9    *Impac*, 554 F. Supp. 2d at 1098; *In re Broadcom Corp. Sec. Litig.*, No. 01275, 2004 WL

10   3390052, at *3-4 (C.D. Cal. 2004).[6]  And even if that were not the case, as demonstrated

11   below and in the Motion, the Complaint does not come close to meeting the PSLRA's

12   heightened standard of "actual knowledge" for forward-looking statements.

13       **B.     The Complaint Fails to Plead that the Statements Concerning the
            AB Transition and the Allied Products Were Materially False**

14       Plaintiff's falsity arguments all proceed on the assumption that it is sufficient un-

15   der the PSLRA and Rule 9(b) to point to an allegedly positive statement made by Sacks

16   in a conference call or press release, contrast it with allegedly undisclosed or insuffi-

17   ciently disclosed "problems," and then pronounce the two "inconsistent."[7]  (*See* Opp. at

18

19   _____

20   [5] Contrary to Plaintiff's argument (Opp. at 30 n.19), "[w]hether a statement qualifies for
     safe harbor protection is a proper inquiry on a motion to dismiss."  *In re Wet Seal, Inc.*

21   *Sec. Litig.*, 518 F. Supp. 2d 1148, 1169 (C.D. Cal. 2007); *see also* 15 U.S.C. § 78u-5(e)
     (directing courts to consider cautionary statements on a motion to dismiss).

22   [6] *In re Dura Pharms., Inc. Sec. Litig.*, 548 F. Supp. 2d 1126, 1143 (S.D. Cal. 2008) (Opp.

23   at 32), relied entirely on vague dicta in *No. 84 Employer-Teamster Joint Council Pension
     Trust Fund v. Am. West Holding Corp.*, 320 F.3d 920, 937 n.15 (9th Cir. 2003), which

24   itself recognized that the proposition Plaintiff now advances was merely "arguable."  *See*
     *SeeBeyond*, 266 F. Supp. 2d at 1163-66; *In re Gilat Satellite Networks, Ltd.*, No. CV-02-

25   1510, 2005 WL 2277476, at *12 (E.D.N.Y Sept. 19, 2005) (disjunctive reading of safe

26   harbor represents "majority reading").

27   [7] As discussed below in Point F, Plaintiff has not alleged that Schlosberg or Kelly made

28   any of these statements, let alone that they did so with scienter.  Further, and contrary to

11-19).  As demonstrated in the Motion, this is not the law – Plaintiff must adequately allege that the purported problems rendered the statements *materially false or misleading*, and Plaintiff completely fails to do that, especially since Hansen *in fact disclosed* the challenges it was facing with the AB transition and sales of Allied products.

### 1.   The AB Transition

As explained in the Motion, Hansen posted extraordinary results after it began distributing its products through the AB network, including *record* sales in *each* quarter of the Class Period.  (MTD at 6).  Plaintiff does not dispute this fact.  Nor does it dispute that Hansen's profitability and market share for its flagship product – Monster – grew as well, as did Hansen's stock price.  (*Id.* at 7).  Other than to proclaim that Hansen's "success is irrelevant" (Opp. at 1) – despite the fact that its entire case is premised on the notion that the AB relationship was "actually harming the Company" (*id.* at 2, 5) – Plaintiff never even attempts to explain how, in light of Hansen's performance during the Class Period, Sacks could have lacked a reasonable basis for his positive statements about the AB relationship.

Confronted by this irreconcilable contradiction, Plaintiff concedes that Sacks' statements may have been "literally true," but argues that they nonetheless were misleading because Sacks failed to disclose various specific problems Hansen allegedly was facing with the AB distributors.  (Opp. at 16-17).  But as the legion of cases cited in the Motion explain (MTD at 20-21), "[a]lleging a litany of problems is not enough to refute specifically general statements that project optimism and [the Company's] growth." *Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1114 (N.D. Cal. 2009).  "Plaintiff['s] complaint was required to allege specific facts that show how these 'problems' and 'difficulties' translated into decreasing revenues." *Ronconi v. Larkin*, 253 F.3d 423, 434

---

Plaintiff's argument (Opp. at 12 n.5), the Complaint does not adequately allege that the May 2007 JP Morgan report contains any statement by Sacks or Schlosberg; as is apparent from the Complaint (¶ 79), the report merely repackaged their commentary. *See LeapFrog*, 527 F. Supp. 2d at 1051.

(9th Cir. 2001).  Not surprisingly, given its concession that Hansen's sales and profitability *increased* during the Class Period, Plaintiff has not made such a showing.[8]  That failing is fatal.  *See id.*; *In re Petco Animal Supplies Inc. Sec. Litig.*, No. 05-CV-0823, 2005 WL 5957816, at *21-24 (S.D. Cal. Aug. 1, 2005) (dismissal required where complaint failed to "quantify the financial impact that these operational problems had on [the company]" and the company "as a whole was still profitable").[9]

Moreover, as demonstrated in Defendants' Motion (MTD at 22-24), Hansen and Sacks *did disclose* the precise issues Plaintiff alleges were concealed.  Plaintiff grudgingly acknowledges these disclosures, but argues that they did not go far enough to address the extent of the supposed problems alleged by Plaintiff. (*See*, *e.g.*, Opp. at 14 n.7, 16, 19).  These arguments fail as a matter of law, however, because there is no duty under the securities law to disclose "all relevant facts"; under the PSLRA, Plaintiff must

---

[8] Plaintiff's refrain that the AB system did not stem Monster's "declining sales growth" (Opp. at 17) – in percentage terms – is baseless.  It was natural that, as Monster's sales expanded year-to-year in *dollar* terms, its growth rate in *percentage* terms would decline. No one could have reasonably expected Hansen to sustain Monster's growth rates in perpetuity, and the Complaint cites no securities analyst who did.  Just the opposite:  The Complaint alleges that analysts hailed Hansen's 2Q07 record sales results as extraordinarily positive (Compl. ¶¶ 84, 88), even though Hansen's year-over-year net sales growth in 2Q07 in percentage terms "declined" to 56.9% from 82.6% in 2Q06. (Exs. D at 47; N at 352).  As noted in Defendants' Motion (MTD at 6) – but conveniently ignored in Plaintiff's Opposition – Hansen's sales continued to increase dramatically in *dollar* terms in every quarter after the transition to AB.

[9] Although prominently featured in Defendants' Motion, Plaintiff offers no meaningful response to this line of authority. (*See* Opp. at 13 n.6).  Plaintiff relies on *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995), to argue that its allegations of "specific problems" with the AB transition suffice to demonstrate falsity. (Opp. at 11, 14).  But *Fecht* only highlights why the Complaint here is deficient.  In *Fecht*, the complaint alleged that the company's positive statements about its expansion program were false because, in truth, "the new stores were losing money and the program overall was doing so poorly that it would have to be curtailed or abandoned," as it was less than three months later.  *Fecht*, 70 F.3d at 1083.  Here, there is no allegation that the AB relationship caused Hansen to lose money or that Hansen terminated the relationship.

1  "specify the reason or reasons why the statements made by [defendants] were misleading

2  or untrue, not simply why the statements were incomplete." *Brody v. Transitional*

3  *Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).

4        Plaintiff also argues that Sacks' disclosures were inadequate because he did not

5  state that the alleged problems were "critical," "debilitating" or "insurmountable." (Opp.

6  at 2, 15, 17). These arguments also fail, because Plaintiff was required to plead *facts*, not

7  adjectives. *See*, *e.g.*, *Ley v. Visteon Corp.*, 543 F.3d 801, 808 (6th Cir. 2008) (company

8  not required to use "the negative characterizations that Plaintiffs suggest" or "pejorative

9  nouns or adjectives") (citation omitted); *In re Downey Sec. Litig.*, No. CV 08-3261, 2009

10 WL 2767670, at *6 (C.D. Cal. Aug. 21, 2009) (rejecting allegations "based on nothing

11 more than Plaintiff's own characterization" of loans as "toxic" and "horrible" without

12 supporting facts); *In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 865 (N.D.

13 Cal. 2004) (court not required to accept as true "allegations that are merely conclusory,

14 unwarranted deductions of fact, or unreasonable inferences") (citation omitted); *Rom-*

15 *bach*, 355 F.3d at 175 ("[P]laintiffs cannot rest on their say-so that these statements are

16 fraudulent; they must explain why.").

17        For example, while acknowledging that Sacks disclosed that alcohol regulations

18 adversely affected the ability of AB distributors to sell Hansen's products in some areas,

19 Plaintiff complains that Sacks did not disclose that these problems amounted to "insur-

20 mountable hurdles." (Opp. at 16 n.8). But nothing in the Complaint justifies this charac-

21 terization. Not even Plaintiff's witnesses suggest that AB's status as an alcohol distribu-

22 tor presented "insurmountable hurdles" for Hansen. Indeed, while Plaintiff contends that

23 AB was limiting the distribution of Hansen's products "throughout the country" (Opp. at

24 7, 8, 15, 16 n.8, 9), the Complaint identifies only *two states* – Texas and Michigan – sup-

25 posedly affected at all by these alleged limitations; even in those states, the alleged im-

26 pact was limited to certain (unidentified) locations. (Compl. ¶ 30). Moreover, the Com-

27 plaint's own witnesses explain that Hansen was overcoming these "hurdles" by, among

28 other things, retaining non-alcoholic distributors in areas impacted by alcohol regula-

tions, such as Cadbury Schweppes in Texas, and renting third-party trucks. (Compl. ¶¶ 16, 31, 32). Although Plaintiff vaguely alleges that these measures resulted in "increased costs" to Hansen (Opp. at 15), this allegation is meaningless, as Plaintiff never even attempts to quantify these alleged costs. *See Petco*, 2005 WL 5957816, at *24.

Similarly, while acknowledging that Sacks disclosed that some AB distributors lacked interest in the Allied brands, Plaintiff argues that what Sacks should have disclosed was that "AB" had "no interest" in the Allied brands and that "the problem was occurring throughout the country." (Opp. at 13-14 & n.7). But the Complaint does not plead facts to support these sweeping assertions. Only four of the Complaint's witnesses even marginally support the proposition that AB lacked interest in the Allied lines. These include (i) an employee of a single AB distributor in North Carolina – out of many hundreds of AB distributors nationwide – whose comments were limited to his own company's distribution of Lost in North Carolina; (ii) two former Hansen employees whose responsibilities were limited to two particular states (Louisiana and Texas), and whose comments were also limited to Lost; and (iii) a former Hansen employee who is alleged to have reported only that AB was mainly interested in Monster and had "little" interest in other products. (Compl. ¶¶ 16, 22, 23). These allegations simply do not contradict anything said by Sacks about the AB relationship.

Plaintiff's arguments about the impact of the AB transition on the Allied brands also ignore that, as Plaintiff now concedes, the Allied products were "a far smaller segment of Hansen's business than Monster" (Opp. at 17) – roughly 5% of Hansen's overall sales. Like the Complaint, the Opposition never explains how, if the AB relationship was having a positive effect on 95% of Hansen's business, any adverse impact on the Allied brands could render Sacks' positive statements about AB materially false.

Plaintiff's allegations concerning the reasons why Hansen entered into the On-Premise Agreement with AB in February 2007 are frivolous. Plaintiff claims that, in signing the On-Premise Agreement, Hansen hoped to incentivize additional AB distributors to distribute the Allied brands (Opp. at 6), but Sacks said precisely that when dis-

REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS

1   cussing the On-Premise Agreement in a conference call on February 27, 2007.  (Ex. X at

2   594).[10]  Plaintiff also objects to Hansen's characterization of the On-Premise Agreement

3   as opening a new sales channel for Monster.  (Opp. at 7, 14).  But that is precisely what

4   the On-Premise Agreement did: It gave Monster access to AB's distribution system in

5   the on-premise market, whereas under the May 2006 agreement, AB distributors were

6   limited to selling Monster in the off-premise market.  (*See* MTD at 5).[11]

7           Finally, although Plaintiff concedes that Sacks disclosed Red Bull's dominance in

8   the on-premise market and that Hansen would have to wait in certain areas for Red

9   Bull's exclusivity agreements to expire, it argues that Sacks failed to disclose that AB

10  was "locked out" of the on-premise market "not only because of Red Bull's exclusivity

11  agreements, but also because of alcohol regulations and the channel's practice of seg-

12  menting distributors."  (Opp. at 16).  But the On-Premise Agreement provided for distri-

13  bution only to establishments already licensed to serve alcohol (Ex. H at 140, Rec. 3),

14  and the Complaint does not allege that "alcohol regulations" limited AB's ability to sell

15  to such establishments.  (*See* Compl. ¶¶ 17, 33, 91).  Further, Plaintiff provides no source

16  to support its belief that on-premise establishments were increasingly "segmenting" their

17  distributors, let alone any facts to suggest this made it impossible for AB to sell Monster

18  in this market.  (*See* Compl. ¶ 33).

19  _____

20  [10]  Plaintiff argues that Sacks misled investors by stating in the February 27, 2007
    conference call that the signing of the On-Premise Agreement "resolved" the issues with

21  the transition.  (Opp. at 6-7).  But Sacks said no such thing.  Indeed, he noted that
    "[w]e're still working" to improve the distribution in areas impacted by the transition.

22  (Ex. X at 594).

23  [11]  Undeterred by the fact that the May 2006 agreement is entitled "Monster Beverages

24  *Off-Premise* Distribution Coordination Agreement" (Exs. C at 8; E at 96) (emphasis
    added), Plaintiff asserts that this agreement also included *on-premise* distribution.  (Opp.

25  at 4 n.2).  In support of this bizarre assertion, Plaintiff mischaracterizes (i) Sacks'
    statement in announcing the May 2006 agreement, which says nothing about the on-

26  premise market; and (ii) witness statements cited in the Complaint, which do not indicate

27  in any way that AB obtained rights to distribute in the on-premise market as part of the
    May 2006 agreement.  (*See* Ex. C at 11; Compl. ¶¶ 16-17).

28

### 2.     The Allied Brands

Plaintiff's arguments likewise fail to demonstrate that the Complaint adequately pleads falsity with respect to any of Sacks' statements regarding the Allied brands. Plaintiff focuses on Sacks' statements in the November 9, 2006 conference call – at the outset of the Class Period – to the effect that Hansen was optimistic about Lost and hoped to improve sales of the Allied brands and thereby increase its shelf space and off-set margin pressure in other areas.  (Opp. at 17).  Plaintiff argues that these statements were "false" because Hansen devoted roughly 90% of its marketing dollars to Monster compared to 10% for other products, abandoned high-profile marketing initiatives for the Allied products, and encountered difficulties in expanding Allied sales to certain customers, such as Walmart and Safeway.  (Opp. at 18-19).  Wholly lacking from Plaintiff's argument, however, is any explanation – beyond Plaintiff's conclusory say-so – of how these circumstances meant that Sacks' statements were untrue.[12]  Indeed, the Complaint never specifies *when* these various alleged circumstances arose, and provides no basis to believe that they did so before November 2006, let alone that Sacks was aware of them.

Plaintiff also seizes on Sacks' entirely innocuous statement, in Hansen's February 2007 press release announcing the On-Premise Agreement, that "[w]e look forward to working together to build on the success of Monster Energy® and our other energy drink brands."  (Opp. at 18; Ex. H at 138).  Here again, Plaintiff never explains how this statement was false.  Certainly Plaintiff cannot, and does not, dispute that Hansen had achieved success with its energy drinks, including Monster and the Allied brands.  In fact, sales of Lost, Rumba, Ace and Unbound (as well as Monster) all increased during 2006.  (Ex. L at 229).

---

[12] *See Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721, 727 n.4 (D. Md. 2001) (alleged marketing failures did not render optimistic statements misleading); *In re CBT Group PLC Sec. Litig., No.* C-98-21014, 1999 WL 1249287, at *3 (N.D. Cal. July 21, 1999) ("[E]ven if a company knows that a problem exists, it could still honestly and in good faith report that the company will continue to perform as expected.  Management simply may have been confident that they could overcome the problems . . . .").

1    Moreover, Plaintiff all but ignores Hansen's detailed disclosures (MTD 23-24)
2  that informed investors about the specific challenges facing the Allied products, includ-
3  ing that Lost had been adversely affected by the AB transition and had lost market share.
4  Remarkably, Plaintiff makes much of Hansen's "admission" that Lost had dropped from
5  the country's No. 8 energy drink to No. 10 (Opp. at 13, 34), without revealing that Han-
6  sen disclosed this fact towards the beginning of the Class Period in a February 9, 2007
7  press release. (Ex. H at 138; *compare* Ex. C at 10). Far from being an "admission" of
8  "falsity" as Plaintiff contends, this disclosure affirmatively demonstrates that Hansen
9  was *not* withholding negative information concerning its Allied brands during the Class
10  Period. In light of Hansen's specific disclosures, it cannot reasonably be argued that the
11  positive statements identified in the Opposition were misleading in any way.

12    Plaintiff also argues that the disclosures relating to the Allied brands were insuffi-
13  cient because Sacks should have disclosed that Hansen "had abandoned marketing the
14  product line." (Opp. at 19). But the Complaint's allegations do not support this exag-
15  gerated characterization; they merely suggest that Hansen devoted *more* resources to
16  Monster than to the Allied products, in a manner consistent with the fact that Monster
17  was responsible for 80-85% of Hansen's sales during the Class Period while the Allied
18  products represented only 5% of sales. (MTD at 4). Nor was Hansen required to pub-
19  licly proclaim that the Allied products "lacked name recognition" or suffered from "dis-
20  interest in the marketplace." (Opp. at 13, 18). *See In re Wyse Tech. Sec. Litig.*, No. 89-
21  1818, 1990 WL 169149, at *2 (N.D. Cal. Sept. 13, 1990) (companies are not required "to
22  denigrate their own products, and the failure to do so does not violate Rule 10b-5").

23    As demonstrated in the Motion (MTD at 24-25), Plaintiff's allegations really boil
24  down to a disagreement with how Hansen marketed the Allied products and managed the
25  AB transition. Plaintiff argues that this is not the case because it has alleged that Defen-
26  dants were "aware that mismanagement had occurred" and thus had a duty to disclose it.
27  (Opp. at 21-22). But if bootstrap allegations such as these were permitted, there soon
28  would be nothing left of the Supreme Court's rule in *Santa Fe Indus., Inc. v. Green*, 430

1  U.S. 462 (1977), that claims of corporate mismanagement are not actionable under the

2  federal securities laws.  *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 287-89 (7th

3  Cir. 1981) (rejecting such "bootstrap" allegations and recognizing that it is the "central

4  thrust" of the complaint's allegations, not the labels affixed by Plaintiff, that determines

5  whether a claim falls within the scope of the *Santa Fe* rule); *In re Craftmatic Sec. Litig.*,

6  890 F.2d 628, 638-39 (3d Cir. 1989) ("[W]e must be alert to ensure that the purpose of

7  *Santa Fe* is not undermined by 'artful legal draftsmanship.'").[13]

### C.  The Complaint Fails to Plead that the Statements Concerning the AB Transition and the Allied Brands Were Made with Scienter

Plaintiff's Opposition confirms what is apparent from the Complaint: Plaintiff has

alleged *no* facts showing that Sacks knew (or was deliberately reckless in not knowing)

that any statement was false when made.  Plaintiff does not reference even a *single* in-

criminating document, conversation or admission from which any inference could be

drawn – let alone the requisite "cogent and compelling" inference demanded by *Tellabs*

– that Sacks knew or believed his statements were false.

### 1.  The "Core Operations" Exception Does Not Apply

Tacitly acknowledging the Complaint's categorical failure to allege sufficient facts

to clear the high bar set by the PSLRA, Plaintiff principally seeks to establish scienter by

relying on the narrowly circumscribed "core operations" exception.  (*See* Opp. at 33-35).

The core operations doctrine is an exception to the general rule that "corporate manage-

ment's general awareness of the day-to-day workings of the company's business does

*not* establish scienter" absent allegations of "specific information *conveyed* to manage-

ment *and* related to the fraud."  *South Ferry LP, #2 v. Killinger*, 542 F.3d 776, 784-85

(9th Cir. 2008) (citation omitted) (emphasis added); *see* cases cited in MTD at 29.

The core operations exception is limited to those exceedingly "rare circum-

---

[13] Plaintiff's reliance on *In re Wells Fargo Sec. Litig.*, 12 F.3d 922 (9th Cir. 1993), is misplaced.  In *Wells Fargo*, the court found that the omission at issue involved allegations of accounting fraud, not mismanagement – the company had "deliberately" understated its loss reserves by excluding certain problem loans.  *Id.* at 926-27.

1    stances," *id.* at 786, where a company's senior management "must have known" of the

2    falsity of the information they were providing to investors "because the falsity of the in-

3    formation was obvious from the operations of the company." *Zucco Partners, LLC v.*

4    *Digimarc Corp.*, 552 F.3d 981, 1001 (9th Cir. 2009).  The exception applies "only . . .

5    where the falsity [of the information reported] is patently obvious," *id.* – "where the na-

6    ture of the relevant fact is of such prominence that it would be 'absurd' to suggest that

7    management was without knowledge of the matter."  *South Ferry*, 542 F.3d at 786.[14]

8        Here, Plaintiff fails to plead any facts of such magnitude that it would be "absurd

9    to suggest" that Defendants were unaware of them.  Apparently, Plaintiff seeks to impute

10   to Sacks knowledge of each and every detail of the alleged problems with the AB dis-

11   tributors as purportedly described by the Complaint's predominately low-level confiden-

12   tial witnesses – even though none of the confidential witnesses themselves say they ever

13   mentioned these matters to Sacks.  Thus, for example, Plaintiff wants to use the core op-

14   erations exception to assert that Sacks knew that a particular AB distributor in North

15   Carolina chose not to distribute Lost, or that a discount program in Texas and Arizona

16   was ineffective in increasing Rumba's sales, or how Michigan's liquor laws operated to

17   limit AB's distribution of Hansen's products. (Compl. ¶¶ 22, 30, 36).  These are the very

18   opposite of "prominent" facts.

19       It would not be "absurd to suggest" that Sacks was unaware of these details; if

20   anything, it would be absurd to suggest that – by virtue of his position alone – he *was*

21   aware of them.  Indeed, the vast majority of the supposedly adverse facts that Plaintiff

22   seeks to impute to Sacks involve the Allied brands, which made up only 5% of Hansen's

23   sales.  These products were not part of Hansen's "core operations" – Plaintiff's original

25   [14] *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987-89 (9th Cir. 2008)

26   (applying core operations exception where it would be "absurd to suggest" that top

27   management was unaware of stop-work orders on contracts worth tens of millions of

     dollars for the company's largest customer, which had a "devastating effect" on the

28   company's revenue).

complaint in this action expressly described them as Hansen's "*non-core* drink lines." (Complaint dated Sept. 11, 2008, ¶ 29, Docket # 1).  There is no reason to infer that Sacks "must have been" aware of the specifics of how these "non-core" products were being marketed or what decisions were being made in the field by Hansen sales personnel, customers and distributors with respect to such a relatively insignificant portion of Hansen's business.  *See Plumbers and Pipefitters Local Union 719 Pension Fund v. Zimmer Holdings Inc.*, No. 08-cv-1041, 2009 WL 4282940, at *23 (S.D. Ind. Dec. 1, 2009) (dismissing complaint and noting that the relative insignificance of the products at issue (6% of the business) "strongly" weighed against an inference of scienter).

Nor is this a case where the falsity of the statements in question could be described as "patently obvious."  Not only are the statements not false, but Plaintiff does not allege that Sacks misrepresented or concealed any specific objective fact.  Rather, Plaintiff faults Sacks' characterizations of the outlook for AB and the Allied brands and claims that he should have portrayed the problems he disclosed in a more negative light.  Under these circumstances, Plaintiff cannot look to the core operations exception to supply an inference of scienter where none otherwise exists.

### 2.   Plaintiff's Confidential Witnesses Do Not Support an Inference of Scienter

Nor do Plaintiff's confidential witnesses supply any inference of scienter.  Plaintiff ignores the Ninth Circuit's requirement that the witnesses' statements "must themselves be indicative of scienter," *Zucco Partners*, 552 F.3d at 995, and argues, without citation, that it is sufficient that the witnesses "put the executives in a position to know the information, which they have done."  (Opp. at 36).  Nowhere does Plaintiff explain what is meant by this conclusory assertion.  As one court recently held, merely alleging access to information is not enough; the complaint must also allege detailed facts regarding the information itself and explaining how that information was used and its connection to the defendants.  *See Konkol v. Diebold, Inc.*, 590 F.3d 390, 397 (6th Cir. 2009).

As set forth in the Motion, none of the Complaint's confidential witnesses provide

any particularized facts showing that Sacks intentionally or with deliberate recklessness made a false statement or engaged in fraud. (*See* MTD at 33-35). Indeed, the confidential witness allegations mention Sacks only once: At a national sales meeting in June or July 2007, Sacks is alleged to have expressed concern with the sales performance of Lost and the other Allied products and sought to incentivize sales personnel to sell more Allied products. (Compl. ¶ 42). But this meeting is not indicative of scienter at all, since it took place many months after Sacks allegedly made positive statements about the Allied products. If anything, the allegation contradicts the Complaint's refrain that Hansen lacked interest in promoting the Allied brands.

Further, Plaintiff has failed to meet the Ninth Circuit's test for establishing the reliability of the Complaint's confidential witnesses. Plaintiff argues that job titles alone are sufficient to establish the witnesses' reliability. (*See* Opp. at 45-48). But the Complaint must provide sufficient details about the witness to show that the facts attributed to him or her are based on "the witness' *personal knowledge*." *Zucco*, 552 F.3d at 995-96 (emphasis added). Simply alleging a witness' title is insufficient. *See*, *e.g.*, *Bus. Objects*, 2005 WL 1787860, at *6; *In re Lexar Media, Inc. Sec. Litig.*, No. C-04-2013, 2005 WL 1566534, at *5 (N.D. Cal. July 5, 2005). In this case, for example, the witnesses' titles alone do not establish that the witnesses' day-to-day responsibilities included any personal interaction with AB or its distributors. If the sales managers' responsibilities principally involved working with retailers (*see* Compl. ¶ 38), the allegations attributed to them would have significantly less weight.

In a vain attempt to distinguish *Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004), and *In re Zumiez Inc. Sec. Litig.*, No. 07-1980, 2009 WL 901934 (W.D. Wash. Mar. 30, 2009), Plaintiff asserts that its witnesses are not limited to low-level employees and "are highly likely" to have relevant company-wide information. (Opp. at 48). But the vast majority of the witnesses described in the Complaint are low-level, regional employees, and more importantly the information they purport to relate is limited to a handful of states – a mere six, according to Plaintiff's own count. (Opp. at

16 n.9).  *Chubb* and *Zumiez* held that a complaint attempting to establish company-wide or nationwide issues must plead facts showing that its witnesses were in a position to have knowledge of the information alleged.  *Chubb*, 394 F.3d at 149-51; *Zumiez*, 2009 WL 901934, at *7-8.  Here, Plaintiff has pled nothing to suggest that its witnesses were in a position to know the company-wide impact of the alleged problems.[15]

### D.    Plaintiff's "Insider Trading" Allegations Do Not Support an Inference of Scienter

*Amount and Percentage of Shares Sold*.  Plaintiff concedes that, when Sacks and Schlosberg's holdings are properly tabulated (*i.e.*, taking into account their individual stock, vested options and shares held jointly through various entities), they sold 13.15% and 13.86% of their holdings, respectively, during the Class Period.  (Opp. at 40 n.27).  Nevertheless, it ignores the authority set forth in Defendants' Motion and urges an un-warranted inference of scienter based on the *proceeds* derived from Defendants' stock sales.  (*See id.* at 39-40).

Contrary to Plaintiff's argument, the relevant inquiry focuses on the *percentage* of holdings sold relative to the total holdings.[16]  *See Middlesex Ret. Sys. v. Quest Software, Inc.*, 527 F. Supp. 2d 1164, 1185 (C.D. Cal. 2007) ("Typically, courts consider the per-centage of shares sold to determine whether insiders are taking advantage of insider knowledge regarding a scheme that will artificially inflate the company's price."); *Head v. NetManage, Inc.*, No. C97-4385, 1998 WL 917794, at *4 (N.D. Cal. Dec. 30, 2008) (rejecting plaintiff's argument that court take into account "the dollar amount and num-ber of shares sold" because "[s]uch numbers are relevant . . . only when considered in

---

[15] *In re Countrywide Fin. Corp. Deriv. Litig.* is inapposite. (Opp. at 48).  In that case, the complaint pled in great detail a *pattern* of "egregious" violations of the company's underwriting standards that led to a $417 million impairment charge and a loss reserve of $293 million.  554 F. Supp. 2d 1044, 1055-59 (C.D. Cal. 2008).

[16] Plaintiff misstates the holding of *Am. West*, 320 F.3d at 920.  In *Am. West*, the Court found that insider sales raised a strong inference of scienter – not because the sales to-taled $12 million – but because "[m]ost of the individuals sold 100% of their shares, with the lowest percentage being 88%."  *Id.* at 939.

conjunction with the percentage of shares held by the defendants").[17]

Plaintiff barely discusses Kelly's sales at all.  It offers no meaningful response to Defendants' showing that any inference of scienter as to Kelly is undermined by the fact that Kelly is not alleged to have made any false or misleading statements, and by the fact that Kelly's shares represent a tiny percentage (less than 4%) of the total insider sales alleged in the Complaint.  (*See* Opp. at 40 n.27; MTD at 38).

*Timing of Sales*.  Plaintiff offers no meaningful response at all to Defendants' showing that the stock sales at issue were not calculated to maximize a personal benefit from undisclosed inside information because the sales could not be said to have occurred at artificially inflated prices.  Specifically, Defendants showed that no inference of scienter could be drawn because (1) the sales took place at prices either *below* or in the same range as the average price of Hansen's stock after the "truth" allegedly came out on November 8, 2007; and (2) the sales all took place *before* the significant spike in Hansen's stock price just prior to November 8.  (MTD at 38-39).

Plaintiff skirts these points entirely, and advances a nonsensical argument about how Hansen's stock price bounced to an "inflat[ed]" intra-day high of $49.98 on August 8, following the announcement of its second quarter earnings, but then slid back to $41.05 a few days later.  (Opp. at 42).  This argument has no apparent relevance, since Plaintiff does not and cannot claim that any shares were sold at the "inflated" August 8 price, and should not distract from the fundamental point to which Plaintiff has no an-

---

[17] Plaintiff also argues, in a footnote (Opp. at 40 n.27), that the percentages of shares sold by Sacks and Schlosberg are suspicious because those percentages are far greater than the 2.1% at issue in *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226 (9th Cir. 2004).  But in that case, the stock sales by Oracle's CEO presented a "novel situation" because "few others could sell $900 million worth of stock and only sell 2.1% of their holdings."  *Id.* at 1232.  Thus, while the general rule is to give "great weight to the percentage of stock sold," where "stock sales result in a truly astronomical figure, less weight should be given to the fact that they may represent a small portion of the defendant's holdings."  *Id. Oracle*'s "astronomical exception" to the general rule is not applicable here.

1  swer: Defendants could not have sold shares at prices "artificially inflated" by fraud

2  when their sales were at essentially the same prices that prevailed *after* Plaintiff alleges

3  that the "truth" was disclosed.  *Ronconi*, 253 F.3d at 435 (sales not suspicious where in-

4  siders "sold at about what the stock was worth after the bad news was public").[18]

5  *Defendants' Historical Trading*.  Plaintiff does not dispute that, looking at the

6  yearly percentage of stock sales by Defendants, none of the sales during the Class Period

7  were out of line with their sales in previous years.  (*See* MTD at 40-41).  Plaintiff instead

8  offers the observation that in prior years, Defendants tended to sell in the months of

9  January, March, May, June, and November – though they sometimes also traded in Sep-

10  tember – whereas in 2007 they sold only in the months of August and September.  (Opp.

11  at 42-43).  Plaintiff pronounces this an "extremely suspicious deviation" from past prac-

12  tices, but unsurprisingly cites no authority in support of this novel and specious mode of

13  analysis.[19]

14  Finally, Plaintiff returns to the same technique of improperly segregating out the

15  holdings that Sacks and Schlosberg hold jointly so that Plaintiff can argue that Sacks and

16  Schlosberg sold "63% more of their personally held stock" in the Class Period than in the

17  "previous five years."  In 2006, Sacks and Schlosberg sold, respectively, 15.56% and

18  16.41% of their total holdings, consistent with their Class Period sales of 13.15% and

19

_____

20  [18] Plaintiff seeks to distinguish *Ronconi* by arguing that, in that case, the defendants were
21  alleged to have made additional false statements after their sales, which propelled the
22  stock price further.  (Opp. at 42 n.30).  That is a meaningless distinction; indeed, this
    circumstance was not even mentioned in the court's analysis.

23  [19] Neither *SeeBeyond* nor *Am. West* (Opp. at 43) endorses a month-by-month analysis.
24  Plaintiff also contends that the Court should analyze Defendants' trading history in a
    vacuum and ignore the existence of the informal SEC inquiry as a possible explanation
25  for the lack of trades by Defendants until August and September.  (Opp. at 40-41 n.28).
    But when evaluating scienter allegations, "the court must take into account plausible
26  opposing inferences."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323
27  (2007).  It is certainly plausible that a company's top management would not sell stock
28  in the midst of an option backdating investigation.

13.86%, respectively.  Kelly – whom the Plaintiff ignores – sold 100% of his holdings in 2004, 82.14% of his holdings in 2005, and 92% of his holdings in 2006, which was also well in line with his Class Period sales of 77.32%.

### E.   The Complaint Fails to Plead that Hansen's 2Q07 Quarterly Results Were Materially False

As demonstrated in Defendants' Motion, Plaintiff's claim that Hansen's second quarter 2007 financial statements under-reported certain promotional expenses fails adequately to allege that (i) there was any misstatement; (ii) any misstatement was material; or (iii) Sacks had any knowledge of this issue.  (MTD at 25-27).

Plaintiff's overblown rhetoric about "blatant manipulation," "altering company documents" and "accounting machinations" (Opp. at 23-24 & n.14) cannot substitute for what is missing from its Complaint: particularized and properly pled facts, as mandated by the PSLRA and Rule 9(b), demonstrating that Defendants intentionally violated accounting rules by failing to record the expenses in the second quarter of 2007.  As Defendants' Motion pointed out – and as Plaintiff does not refute – the Complaint does *not* specifically allege that the purportedly "withheld" promotional expenses were actually incurred in, or required under applicable accounting rules to be accounted for in, the second quarter of 2007, or that they were not actually accounted for in the second quarter.  (MTD at 26-27).  Contrary to Plaintiff's contention, the vague and unexplained allegation that expenses were "withheld" does not establish this most basic element of an accounting fraud claim.  That expenses were "withheld" could just as easily mean that Hansen decided to postpone the promotional event to the next quarter, in which case there would be no accounting impropriety at all.[20]

Indeed, Plaintiff's own belated citation to FASB Statement of Concepts No. 5 notes that "[a]n expense or loss is recognized *if it becomes evident* . . . that a liability has

---

[20] In addition, Plaintiff fails to address Defendants' point concerning how the supposedly "withheld" expenses would have affected the financials if Hansen had accrued for such expenses in advance of their being incurred.  (*See* MTD at 27 n.19).

1   been *incurred* . . . ." (Opp. at 24 n.15) (emphasis added).  Thus, it was incumbent upon

2   Plaintiff to plead facts showing that the promotional expenses were incurred in the sec-

3   ond quarter and that such expenses were not actually recognized during that quarter.  *See*

4   *In re Daou Sys., Inc.*, 411 F.3d 1006, 1016-18 (9th Cir. 2005).  It has failed to do so.

5        Plaintiff also does not dispute that it must plead with particularity its witness' role

6   in Hansen's accounting process or financial reporting.  (Opp. at 24; *see also* MTD at 26).

7   Yet Plaintiff offers only the *ipse dixit* that "[t]he National Account Manager's *direct role*

8   in Hansen's accounting machinations establishes that the witness was in a position to

9   know the information."  (Opp. at 24) (emphasis in Opp.).  But it points to not one fact in

10  the Complaint to support this bald assertion.  To the contrary, the Complaint suggests

11  that the "National Account Manager" would have no role in Hansen's accounting proc-

12  ess or financial reporting.  Virtually all of the allegations attributed to this witness deal

13  with sales and servicing Hansen's customers.  (*See* Compl. ¶¶ 36-37, 41).

14       In response to Defendants' showing that "hundreds of thousands of dollars" in

15  promotional expenses would have been immaterial to Hansen's 2Q07 financial state-

16  ments – which reported net sales of $244.8 million and operating income of $61.4 mil-

17  lion (MTD at 27) – Plaintiff's Opposition is telling.  Plaintiff does not, because it obvi-

18  ously cannot, even argue that the amount of promotional expenses allegedly withheld

19  was *quantitatively* material.  (Opp. at 25).  Rather, citing SEC Staff Accounting Bulletin

20  99 ("SAB 99"), Plaintiff argues solely that it has adequately pled *qualitative* materiality

21  because Defendants "intend[ed] to manipulate Hansen's results . . . ."  (Opp. at 25).  But

22  the Complaint alleges no facts showing that Defendants intended to manipulate Hansen's

23  reported earnings or any of the qualitative factors set forth in SAB 99.  *See* SAB 99,

24  1999 WL 1123073, at *3-5; *Landmen Partners Inc. v. Blackstone Group, L.P.*, 659 F.

25  Supp. 2d 532, 543 (S.D.N.Y. 2009) (dismissing complaint, in part, because none of the

26  qualitative considerations set forth in SAB 99 were implicated).

27       Plaintiff does not dispute that the Complaint is devoid of any allegations – from

28  the "National Account Manager" or otherwise – that Sacks had any knowledge of, or in-

24

volvement in, the alleged "withholding" of promotional allowances from Hansen's 2Q07 financial results.  It vainly advances two arguments in support of its scienter claim, but both are plainly meritless.

First, Plaintiff claims that Sacks was deliberately reckless in failing to uncover the purportedly withheld promotional expenses because he should have known, based on his Sarbanes-Oxley certification, access to "AC Nielsen sales data" and "accounting updates" from Kelly, that Hansen could not have exceeded analysts' expectations unless its results were fraudulent.  (Opp. at 37).  As Plaintiff concedes (*see id.* at 37 n.24), a "Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements."  *Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736, 747 (9th Cir. 2008) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).  Yet, as is evident from the Opposition, Plaintiff has not pled facts showing that Sacks "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions."  *Garfield*, 466 F.3d at 1266.[21]

In addition, general allegations about access to internal reports containing adverse information and regular accounting updates, without more, do not give rise to a strong inference of scienter.  *See*, *e.g.*, *In re Silicon Graphics Sec. Litig.*, 183 F.3d 970, 985 (9th Cir. 1999) (complaint must "contain at least some specifics from those reports as well as such facts as may indicate their reliability"); *Lockheed Martin*, 272 F. Supp. 2d at 956 (allegations that defendant "received regular updates regarding the status of the Com-

---

[21] The cases cited by Plaintiff undermine its Sarbanes-Oxley argument.  *See Backe v. Novatel Wireless*, 642 F. Supp. 2d 1169, 1180, 1185-87 (S.D. Cal. 2009) (allegedly false certifications did *not* give rise to strong inference of scienter despite company's admission that it violated GAAP and had inadequate internal controls); *In re Lattice Semiconductor Corp. Sec. Litig.*, No. CV04-1255, 2006 WL 538756, at *8-9, 19-23 (D. Or. Jan. 3, 2006) (pre-*Glazer* case in which company restated three quarters of earnings and admitted it had improperly recognized sales).

pany's major projects" insufficient to allege scienter).  Plaintiff also does not explain how publicly-available AC Nielsen sales reports would have informed Sacks about internally generated promotional cost information.

Second, Plaintiff argues that it is not required to plead a "direct link" between the information allegedly possessed by its witness and the Defendants' knowledge.  (Opp. at 38-39).  Not only is this argument wrong under the PSLRA, but it avails Plaintiff nothing, since its witness provides *no* link, direct or indirect, connecting Sacks to the alleged promotional expenses issue.  *See*, *e.g.*, *In re Invision Techs., Inc. Sec. Litig.*, No. C-04-3181, 2006 U.S. Dist. LEXIS 76458, at *23 (N.D. Cal. Aug. 31, 2006) (allegations insufficient where plaintiff failed to "link" defendants to the information); *In re Cadence Design Sys. Sec. Litig.*, 654 F. Supp. 2d 1037, 1047 (N.D. Cal. 2009) ("CW reports do not provide any concrete allegations that Individual Defendants actually knew about the accounting errors").[22]

## F.    The Complaint Fails to Plead a Section 10(b) Claim Against Schlosberg and Kelly

Despite Plaintiff's refrain that "Defendants" misled investors, nowhere does the Complaint allege that Schlosberg or Kelly made or were involved in the making of any statement in any conference call, press release or financial statement at issue.  (*See* MTD at 13 n.11).  Indeed, Kelly is not even named as a Defendant in the Complaint's first count for alleged false and misleading statements.

The Complaint's scienter allegations are similarly deficient with respect to Schlosberg and Kelly.  Other than alleging that they sold Hansen stock during the Class Period, which is addressed above, Plaintiff says very little as to them.  In fact, the Complaint is astonishingly silent as to Schlosberg's activities during the Class Period.  As for

---

[22] Plaintiff's argument that its inadequate scienter allegations somehow, in combination, plead the requisite strong inference of scienter (*see* Opp at 39 n.26) is incorrect: "zero plus zero plus zero plus zero plus zero" does not add up to something more. *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008).

1   Kelly, the Complaint alleges only that he had been informed of "poor internal controls at

2   Hansen" and that he was "very diligent." (Opp. at 37-38; Compl. ¶ 109). Such allega-

3   tions are wholly insufficient to plead scienter under the PSLRA. *See In re Vantive Corp.*

4   *Sec. Litig.*, 283 F.3d 1079, 1087 (9th Cir. 2002) (allegations that defendants had a

5   "'hands-on' management style" and "received internal reports" insufficient).

### G. Plaintiff Fails to Plead Loss Causation

7   The fundamental defect with Plaintiff's loss causation allegations is that they do

8   not identify any specific corrective disclosure that revealed any specific prior statement

9   to have been false. In its Opposition, Plaintiff identifies three supposed "corrective dis-

10  closures": (i) that Hansen "put the brake" on the AB transition because AB had "their fo-

11  cus on their own products" and had not "embraced the brand and the potential for the

12  brand," (ii) that "the Allied line had missed internal expectations by $10 million," and

13  (iii) that "Hansen reported significantly less sales and earnings growth than expected,"

14  which allegedly reflected the expenses withheld from 2Q07. (Opp. at 49). But none of

15  these alleged disclosures correct any alleged prior misstatements or omissions.

16  With respect to Sacks' comment in the November 2007 call that Hansen had "put

17  a brake" on the transition, Plaintiff attempts to evade the fact that Sacks previously stated

18  in May 2007, and again in August 2007, that the off-premise transition was "largely

19  done" (*see* MTD at 44) by asserting that "the Complaint makes clear that defendants

20  misrepresented the *reason* for putting a halt to the transition." (Opp. at 52 n.41; Compl.

21  ¶ 94) (emphasis in original). According to Plaintiff, Sacks "admitted" in the November

22  2007 call the real reasons why Hansen put a halt to the off-premise transition, but Plain-

23  tiff continues to distort what Sacks said. First, as shown in the Motion – and as Plaintiff

24  now concedes (Opp. at 52) – Sacks' comment about AB being "focus[ed] on their own

25  products" related solely to the on-premise agreement. It had nothing to do with the off-

26  premise agreement or the reasons why Hansen had previously decided to complete the

27  off-premise transition. (MTD at 44-45). Second, Sacks' comment about certain AB dis-

28

1  tributors[23] not "embrac[ing] the brand" was limited to "nonalcoholic accounts" such as

2  "small moms and pops" located in "dry areas."  (Ex. BB at 653).  It had nothing to do

3  with the reasons for completing the transition and, in any event, Sacks had made substan-

4  tially identical disclosures in May 2007 and November 2006.  (MTD at 45).[24]

5       Next, Plaintiff wrongly contends that Sacks' comment that the Allied line suppos-

6  edly "missed internal expectations by $10 million" was a corrective disclosure.  (Opp. at

7  49).  But Sacks never referred to Hansen's "internal expectations" or projections in dis-

8  cussing the Allied brands 3Q07 sales; rather, Sacks stated in response to an analyst's

9  question that sales of the "tertiary" brands on a year-over-year basis decreased by about

10  $6 million and then noted hypothetically that *if* Hansen had been projecting an increase,

11  it "*would have* made about a $10 million difference."  (Ex. BB at 657).  Yet even if that

12  were not the case, Plaintiff admits that Hansen never disclosed any internal projections

13  or expectations (Opp. at 49), nor did it have any duty to do so.  *See May v. Borick*, No.

14  CV 95-8407, 1997 WL 314166, at *10 (C.D. Cal. Mar. 3, 1997) (failure, "during a time

15  of strong earnings, to forecast that the company's prospects for the future might be

16  worse," "does not amount to securities fraud"); *Fisher v. Acuson Corp.*, No. C93-20477,

17  1995 WL 261439, at *9 (N.D. Cal. Apr. 26, 1995) ("Defendants have no duty to disclose

18  their internal forecasts or that they are not being met.").  Hence, this statement was not a

19  corrective disclosure either.

20       Equally groundless is Plaintiff's suggestion that the alleged accounting fraud in

21  2Q07 was disclosed because Hansen's 3Q07 reported sales and earnings "reflected" the

22

---

23  [23] Plaintiff disputes what is an obvious transcription error, arguing that the word
24  "certain" should really be "shouldn't."  (*See* Opp. at 52).  In any event, even if Sacks'
    comment was posed as a question, it would not materially change its meaning.

25  [24] Ex. Y at 608 ("we think the AB distributors don't go to as many accounts as we have
26  previously covered, some of the *small mom and pops*, by basically the non-alcoholic
    bottler that we had before"); Ex. W at 577 ("there are some states that fall into that
27  category whether it is for *dry areas* or just different channels *where they don't permit
28  alcoholic drinks to be sold*, and the result is that AB doesn't ordinarily go into it").

promotional expenses that Hansen purportedly withheld from 2Q07.  (Opp. at 49).  In the first place, the Complaint nowhere alleges that the promotional expenses were recorded in 3Q07.  Even if they were, Plaintiff itself alleges that the amount of the expenses was only in the hundreds of thousands of dollars and admits that this amount was not quantitatively material to Hansen's results.

Finally, Plaintiff does not dispute that the share price dropped in response not to the November 8 call, but to the press release announcing Hansen's 3Q07 results issued earlier that day, which is not alleged to have revealed any fraud and cannot be deemed a corrective disclosure.  *See*, *e.g.*, *Rackable*, 2010 WL 199703, at *10 (allegations that defendants "disclose[d] negative news" insufficient to plead loss causation); *In re IPO Sec. Litig.*, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2005) ("a failure to meet earnings forecasts has a *negative* effect on stock prices, but not a *corrective* effect") (emphasis in original).

## H.    Plaintiff's Other Claims Should Be Dismissed

Plaintiff does not seriously dispute that its insider trading cause of action is based on the exact same facts as its misstatement claim.  (*See* MTD at 46-47).  Accordingly, Plaintiff's insider trading claim fails for the reasons set forth above.  The insider trading claim also fails because Plaintiff fails to satisfy the contemporaneous trading requirement.  Plaintiff argues unpersuasively that it has met this requirement because it purchased Hansen stock before the alleged fraud was disclosed and 41 days after Defendants stopped trading.  (Opp. at 44-45).  But Plaintiff cites no case law finding that a 41-day gap between Plaintiff's and Defendants' trading is sufficiently contemporaneous.

Courts – including the cases cited by Plaintiff – require a significantly shorter time frame.  *See Johnson v. Aljian*, 257 F.R.D. 587, 595 (C.D. Cal. 2009) (concluding that "purchases made within *four days* after Defendants' sales . . . are properly treated as contemporaneous trades"); *Middlesex*, 527 F. Supp. 2d at 1196 (finding that trades executed within *eight days* of defendants' sales would be sufficient to allege contemporaneous trading); *see also Countrywide*, 588 F. Supp. 2d at 1205 (adopting rule that plaintiffs must "plead facts showing they traded . . . on the *same trading day, or one trading day*

*after*, the insider's transaction") (emphasis added throughout).  Forty-one days is too long a period to satisfy the contemporaneous trading requirement.  Thus, Plaintiff, in addition to failing to state a claim for insider trading, lacks standing to make such a claim.[25]

Finally, Plaintiff's argument that its boilerplate allegations of control are sufficient to plead a § 20(a) claim is unavailing.  *See Downey*, 2009 WL 2767670, at *15 (rejecting "boilerplate allegations"); *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (even CEO not automatically a control person).  In any event, Plaintiff does not dispute that, without a primary violation, there can be no control person liability under § 20(a).

## III.   CONCLUSION

For the foregoing reasons, the Consolidated Complaint should be dismissed in its entirety, with prejudice.

DATED: February 8, 2010          Respectfully submitted,

Mark T. Drooks
Thomas V. Reichert
BIRD, MARELLA, BOXER, WOLPERT,
    NESSIM, DROOKS & LINCENBERG, P.C.

Martin L. Perschetz
Gary Stein
William M. Uptegrove
SCHULTE ROTH & ZABEL LLP


By: _____/s/_____
                Thomas V. Reichert

Attorneys for Defendants Hansen Natural Corporation, Rodney C. Sacks, Hilton H. Schlosberg, and Thomas J. Kelly

---

[25] As Plaintiff has had ample opportunity during the approximately one year between the filing of its initial complaint and the amended Complaint to identify an appropriate Lead Plaintiff, Plaintiff's request for leave to join a representative should be denied.

REPLY MEMORANDUM IN FURTHER SUPPORT OF MOTION TO DISMISS