# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| | | | |
|---|---|---|---|
| Case No. | EDCV 08-1249-GW(JCx) | Date | July 12, 2010 |
| Title | *Marcelo Cunha v. Hansen Natural Corporation, et al.* | | |

Present: The Honorable    GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Wil Wilcox | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Christina A. Royce | Gary Stein |
| Shannon M. Matera | Martin Perschetz |
| | Mark T. Drooks |
| | Thomas V. Reichert |

**PROCEEDINGS:**    **DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT (filed 11/16/09)**

Hearing is held.  The tentative circulated is hereby adopted as the Court's final ruling (attached). Defendants' Motion to Dismiss the Consolidated Class Action Complaint is **granted with leave to amend.**  Counsel for plaintiff will have until August 27, 2010 to **manually** file an amended consolidated class action complaint at the court's civil intake department.

| | : | 07 |
|---|---|---|

Initials of Preparer    JG

*Cunha v. Hansen Natural Corp., et al.*, Case No. ED-CV-08-01249-GW (JCx)

Tentative Ruling on Motion to Dismiss the Consolidated Class Action Complaint

## I. Procedural and Factual Background

Lead plaintiff Structural Ironworkers Local Union #1 Pension Fund[1], representing a class of investors ("Plaintiffs"), sued Hansen Natural Corporation ("Hansen"), Rodney C. Sacks ("Sacks"), Hilton H. Schlosberg ("Schlosberg"), and Thomas J. Kelly ("Kelly," collectively "Defendants") for violations of the federal securities laws in connection with the sale and purchase of shares of Hansen stock. Defendants now move to dismiss. The operative complaint is the Consolidated Class Action Complaint for Violation of Federal Securities Laws, which was filed on August 28, 2009 (the "CC"). The CC, which covers a class period running from November 9, 2006 through November 8, 2007 (the "Class Period"), *see* CC ¶¶ 1, 65, contains the following allegations.

Hansen, through its operating subsidiaries, develops, markets, sells, and distributes beverages in the United States and Canada. *See id.* ¶¶ 8, 55. Among others, Hansen owns the following brand names: Monster Energy, Lost Energy, Joker Mad Energy, Unbound Energy and Ace, as well as Rumba Energy Juice. *See id.* ¶ 8. Sacks is Hansen's Chairman and Chief Executive, Schlosberg is Hansen's Vice Chairman, President, Chief Operating Officer and Chief Financial Officer, and Kelly is the Vice President of Finance of Hansen's operating subsidiary (defendants Sacks, Schlosberg, and Kelly are collectively referred to herein as the "Individual Defendants"). *See id.* ¶¶ 1, 56-58.

Hansen has two reportable segments: Direct Store Delivery ("DSD"), whose principal products comprise energy drinks (*i.e.*, the Monster and Allied energy lines – defined further below), and Warehouse, whose principal products comprise juice-based and soda beverages. *See id.* ¶ 9. Hansen's recent success has depended on its Monster Energy drink ("Monster"), which was created in 2002. *See id.* ¶¶ 10, 12. Hansen's sales

---

[1] Though, as captioned, Marcelo Cunha is listed as the class representative, the Structural Ironworkers Local Union #1 Pension Fund was appointed as the lead plaintiff by way of an order issued July 13, 2009.

and stock price grew between 2002 and 2006, and Monster almost single-handedly increased Hansen's revenues from $138 million in 2001 to $696 million in 2006. *See id.* Hansen's stock price jumped more than 5000% in response to this increase. *See id.*

After Monster's introduction, Defendants attempted to build on Hansen's success by introducing multiple new products, many of which failed. *See id.* ¶ 13. Other than Monster, if the product was an energy drink, it was almost exclusively designated as an "Allied" product. *See id.* Monster had its own segment, while Lost Energy ("Lost"), Joker Mad Energy, Rumba Energy Juice, Unbound Energy ("Unbound"), and Ace were grouped under the "Allied" segment. *See id.* While some of its new products did survive, Hansen remained almost entirely dependent on Monster for its growth, which started to slow[2]. *See id.* ¶ 14.

On May 9, 2006 (six months before the start of the Class Period), Defendants signed a distribution deal with Anheuser-Busch ("AB") that (according to Plaintiffs[3]) covered distribution to both "off-premise" (*e.g.*, convenience and grocery stores) and "on-premise" (*e.g.*, bars and restaurants) establishments. *See id.* Defendants promoted this new relationship by referring to it as a huge gain for Hansen, and its press release claimed that AB's "first-class distribution system…[would] enable Hansen to expand availability and improve the presence of [its] products across all channels, particularly in areas where [its] brands have historically been under-represented." *Id.* Analysts agreed with this statement and, in fact, a Canaccord Adams analyst estimated that the Hansen-AB agreement would increase Hansen's distribution to include 90% of the country and strengthen distribution in underperforming areas. *See id.*

However, the relationship with AB was not as beneficial as Defendants asserted. *See id.* ¶ 16. While Defendants allowed AB to distribute Monster in limited areas, they largely restricted AB's access to Monster. *See id.* AB wanted more access to Monster, and according to a Regional Sales Manager in Texas, the most significant disagreement

---

[2] The DSD division's quarterly net sales growth declined from 160% in 3Q05 to 106% by 2Q06. *See* CC ¶ 14. Still, the CC characterizes both of these figures as "impressive." *See id.*

[3] The parties' dispute concerning the coverage of Hansen's first agreement with AB is discussed in the Analysis section below.

between Hansen and AB pertained to the distribution of Monster.[4] *See id.* ¶¶ 16-17.

As the Hansen-AB relationship progressed, Monster's growth rates continued to decline. *See id.* ¶ 18. The DSD division, which contains both the Monster and Allied brands, declined from a year-over-year quarterly growth rate of 139.8% in 1Q06 to 79.84% by 3Q06. *See id.* In August 2006, Hansen's stock fell for the first time since it introduced Monster when Hansen missed analysts' estimates by one cent in 2Q06.[5] *See id.*

On November 9, 2006, the start of the Class Period, after having experienced the 35% drop in its stock price after missing analyst expectations in 2Q06, Hansen reported financial results for 3Q06 that were in line with analyst expectations. *See id.* ¶¶ 19, 65. At that time, Sacks told investors that the relationship with AB was "going to continue to help," and he conveyed the company's confidence that the relationship would improve the quality and quantity of Hansen products sold. *See id.* Defendants also emphasized that Lost was "still one of the top 10 selling brands in the country," with sales "up on last year" (despite some "disruption" that Hansen was experiencing with the AB transition), and claimed that the demand for Hansen's Allied brands was strong enough to offset margin pressure in the Monster line. *See id.* ¶¶ 20, 65-66. Allegedly in response to these statements (and others), Hansen's stock rose from $24.88 to over $38 in January 2007. *See id.* ¶ 69.

Plaintiffs allege that these statements were false, and that the AB relationship was actually harming Hansen. *See id.* ¶¶ 21, 67. According to a Senior Marketing Manager for Hansen, Hansen required AB to take on distribution of Lost and other energy drinks. *See id.* ¶ 21. However, according to the witness, AB did nothing with Lost, costing the company considerable market share. *See id.* According to Hansen, in May 2006, Lost was the eighth largest energy brand in the United States; however, by 1Q07, Lost had fallen to number ten. *See id.* Defendants admitted that Lost sales had suffered in 2006

---

[4] In this Sales Manager's region of Texas, AB was restricted to the "on-premise" distribution of Monster. *See id.* ¶ 17. Hansen shut AB out of the much more lucrative "off-premise" market segment when it came to Monster. *See id.*

[5] Hansen's stock dropped 35% in two days on 67 million shares. *See* CC ¶¶ 18, 65.

and early 2007 but blamed the loss on original distributors' lack of focus on the brand and on "spotty" initial execution by AB distributors, who were said to be adjusting to the distribution of non-alcoholic beverages. *See id.*

Plaintiff alleges that Defendants knew and concealed that the "disruption" was actually caused by AB's disinterest in Hansen's non-Monster brands. *See id.* ¶ 22, 67. Many (though only a few specified) AB distributors and former Hansen employees reported that AB had no interest in Hansen's Allied brands because the brands lacked name recognition and were not selling well. *See id.* ¶¶ 22, 75.

In a press release on February 9, 2007, Hansen announced what Plaintiffs characterize as a "new" on-premise agreement with AB, which would supposedly open a "significant new and incremental sales channel for Monster" that would "play an essential role in continuing the development of the image and personality" of Monster. *See id.* ¶¶ 24, 70. The release also quoted Sacks, who said that Hansen "look[ed] forward to working together to build on the success of Monster Energy® and [its] other energy drink brands." *See id.* ¶ 70. Defendants allegedly led investors to believe that the relationship was still proceeding smoothly. *See id.* ¶ 24. Indeed, Defendants claimed that AB had been "an outstanding business partner for the last eight months." *Id.* Analysts again responded positively. *See id.* ¶ 25.

On February 27, 2007, Hansen announced financial results for 4Q06 that met analyst expectations. *See id.* ¶ 71. In Hansen's 4Q06 report and during its year-end conference call, Sacks again promoted the new AB on-premise agreement, telling investors that AB would become "actively involved in jointly marketing this channel" and claiming that they believed the channel was "incremental," and that they were very excited by it. *See id.* Defendants also described the transition to AB as a "good system" that they were comfortable with, emphasizing that the relationship had "improved the quality of [Hansen's] distribution in stores" and "point of sale merchandising." *See id.* ¶ 72. However, Plaintiffs allege that Defendants entered into the supplemental agreement with AB to try to incentivize AB to distribute Lost. *See id.* ¶ 75. Yet, Defendants did not disclose these facts to investors. *See id.*

On May 7, 2007, Hansen announced its results for 1Q07 and attributed "record

revenues" to continued strong sales of Monster and the expansion of distribution of Unbound, one of Hansen's "Allied" energy drinks. *See id.* ¶ 76. Defendants also explained that the implementation of the off-premise distribution agreement was progressing well, and that Hansen was planning to execute its on-premise distribution agreement with AB prior to the end of 2Q07. *See id.* During a conference call the same day, Defendants allegedly continued to mislead investors by claiming that the AB relationship was "getting into place," and that Defendants were "still very positive about the relationship and about the quality of the distribution and the long-term strength that this system [would] bring to [the] Company." *See id.* ¶ 77.

While Defendants announced record revenues from Monster and expanded distribution of Unbound, Hansen's results were one cent below analyst estimates ($0.28 instead of the estimated $0.29). *See id.* ¶¶ 26, 78. These results caused Hansen's stock to decrease by up to 17%, dropping from its close of $39.32 on May 4, 2007 to an intra-day low of $36.04 on May 7, 2007. *See id.* Then, sometime before May 23, 2007, Sacks and Schlosberg met with JP Morgan analyst Dara Mohsenian and pushed the strength of Hansen's energy products and relationship with AB. *See id.* ¶¶ 27, 79. They told[6] Ms. Mohsenian that the benefits of transitioning to AB distributors were starting to increase after initial "hiccups," which they blamed on prior distributors' loss of focus and on AB's spotty "initial execution." *See id.* Sacks and Schlosberg additionally allegedly represented that these "hiccups" had been resolved. *See id.* They also told Ms. Mohsenian that Hansen's on-premise agreement with AB "should start to ramp up by the end of Q2." *See id.* ¶¶ 28, 79.

Ultimately, when Hansen reported its 2Q07 results on August 8, 2007, Defendants claimed that they were continuing to increase market share because of the relationship with AB. *See id.* ¶ 28. Plaintiffs allege that Defendants also continued to misrepresent the success of Allied, telling investors that they were looking forward to working with AB to "build on the success of Monster Energy® and [Hansen's] other energy drink brands." *Id.* ¶ 29. Defendants claimed that Hansen's 1Q07 "record revenues reflected

---

[6] Sacks and Schlosberg allegedly "told" Mohsenian this information, but (at least as it is presented in the CC), the information was conveyed in Mohsenian's report without quotation or attribution.

continued strong sales of Monster Energy® brand energy drinks, as well as the expansion of distribution of Unbound® brand energy drinks." *Id.* While they discussed the lower sales of Lost, they again comforted investors by attributing the decrease to the transition to AB distributors. *See id.* Defendants also claimed that Lost was "still one of the top 10 brands and [would] continue to grow," and they suggested that new packaging and products under the Lost name would offset the decline. *See id.*

As Plaintiffs allege they had been throughout the Class Period, Defendants' statements about its relationship with AB were again false or materially misleading. *See id.* ¶¶ 30, 67, 74, 81. In addition to AB's disinterest in Hansen's Allied brands, which damaged Lost's market share, Hansen faced problems in the off-premise setting because of AB's position as an alcohol distributor[7]. *See id.* ¶¶ 30, 67, 74, 81, 104. According (apparently) to a Senior Marketing Manager in Hansen's headquarters, AB was forced to find non-alcohol distributors to disperse Hansen products in areas with strict alcohol laws, increasing costs, minimizing distribution and leading to disagreements between wholesalers over territory. *See id.* ¶¶ 31, 67, 104. In addition, according to confidential witnesses employed in Texas and North Carolina, AB was unable or unwilling to perform critical tasks as a distributor due to the alcohol distribution regulations, also increasing costs and diminishing Hansen's overall distribution. *See id.* ¶¶ 32, 74, 81.

According to a Senior Marketing Manager, Hansen entered into the distribution agreement with AB to increase Monster's presence in the on-premise market, but Hansen ended up damaging its off-premise business as a result. *See id.* ¶ 33. The witness explained that Hansen found AB attractive as a distributor due to AB's connections with bars and restaurants; however, AB did not have connections with restaurants or stores that did not sell alcohol, and AB was often restricted from developing these connections due to strict regulations. *See id.*

Plaintiffs also allege that Defendants' statements about Hansen's Allied products were knowingly or recklessly false or materially misleading when made. *See id.* ¶¶ 34,

---

[7] For example, alcohol laws in Texas and Michigan hindered AB from distributing Hansen beverages in "certain locations." *See* CC ¶ 30.

68, 82, 105. Plaintiffs point to several (or, as they characterize it, "numerous" or "countless") former employees who described that the market was disinterested in those brands, and that Hansen's decision not to market Allied products influenced such disinterest. *See id.* Hansen devoted almost all of its resources to promoting Monster, leaving very little for the Allied line. *See id.* A Sales Manager in Northern California and a National Account Manager explained that this emphasis on Monster produced an obvious negative effect on the sales of non-Monster products. *See id.* ¶¶ 35, 68, 82, 105. In fact, 90% of Hansen's marketing budget went to Monster sponsorships, and Hansen devoted only two or three marketing employees to all non-Monster products, compared to the approximate seven devoted to Monster. *See id.* The Senior Marketing Manager confidential witness further explained that the Allied line had so few marketing resources because the line never gained enough of the market share for Hansen to justify additional spending and that the product line was designed not to succeed, but instead simply to take up shelf space. *See id.* ¶¶ 35, 105.

As a result of Hansen's focus on Monster, retailers and consumers allegedly had no interest in Allied. *See id.* ¶ 36, 68. Hansen and its distributors found it difficult to get Allied products on retailers' shelves because the Allied line was not well-known, was relatively new, and did not have a proven track record or brand name recognition. *See id.* ¶¶ 37-38. According to both a National Account Manager for the Monster and Allied lines in Northern California and a Regional Sales Manager in Texas, the Allied beverages could not gain traction because, among other reasons, Hansen did not provide adequate promotional support during their launch. *See id.* ¶ 37.

According to a Regional Sales Manager, the only Allied product to receive any marketing attention was Lost, but sales declined in part because Hansen sold the product in states that had no relation to surfing[8]. *See id.* ¶ 39. In April 2007, Hansen abandoned a Toyota FJ Cruiser promotion for Lost because Lost's sales did not justify giving away such an expensive car. *See id.* ¶¶ 40, 83, 107. Hansen started offering a 50% ($12) discount for cases of Allied products in an effort to increase sales and, by July 2007, had

---

[8] The brand was associated with the surf culture because it was a tie-in product with the surfboard and clothing company of the same name. *See* CC ¶ 39.

extended the promotion for what Plaintiffs characterize as an "unprecedented" six months. *See id.* ¶¶ 41, 83, 107.

Plaintiffs allege that Defendants had actual knowledge that Hansen's Allied products were suffering, and that the Allied line was not producing sales that would offset margin pressure in the Monster line. *See id.* ¶ 42. In June/July 2007, Hansen held a national sales meeting, during which Sacks expressed serious concern about the poor sales performance of Lost and other Allied products. *See id.* Management spent the last hour of the meeting "blasting" sales staff for Allied's low sales. *See id.* ¶¶ 42, 106. This was the first time the company directed any serious efforts at Allied. *See id.* ¶ 106. According to a Regional Sales Manager who attended the meeting, the sales personnel were "shocked" by the sudden stress on Allied sales, as those sales supposedly had never been a priority before the meeting. *See id.* ¶ 42. The next day, Hansen unveiled a new Monster drag racing car that the Regional Sales Manager estimated to have cost the company $5 million to sponsor. *See id.* ¶ 43. When the sales personnel returned from the meeting, they discovered that Hansen had docked 50% of their expected bonuses, that the bonuses for 2007 would depend on Allied sales, and that job safety would be dependent upon bringing in more Allied distribution agreements. *See id.* ¶¶ 43, 83, 106.

On August 8, 2007, Hansen announced results for 2Q07, reporting gross sales of $280.6 million (54.1% year-over-year growth), net sales of $244.8 million (56.9% growth), and a net income of $38.3 million or $0.39 per diluted share (35.9% growth). *See id.* ¶¶ 44, 84. Excluding one-time charges, Hansen's earnings were $45.9 million or $0.47 per diluted share (a year-over-year increase of 62.7%), exceeding analysts' expectations by $0.10 per share. *See id.* ¶¶ 44, 84. Analysts reacted positively to these results and about Hansen's prospects for the following quarter. *See id.* ¶ 45. As a result, Hansen shares rose 13%. *See id.*

According to the CC, Defendants used this opportunity to emphasize the strength of its relationship with AB. *See id.* ¶ 85. Defendants claimed that the relationship was "working" for them, that Hansen was "getting good solid distribution," and that they were "generally very happy" with the arrangement. *See id.* Defendants also claimed that they were putting a brake on some of the transition agreements in order to allow

Hansen's sales representatives to focus on selling their products during the summer. *See id.* Furthermore, Defendants assured investors that Hansen's results reflected the true demand for the company's products, and that Hansen's relationship with AB was progressing well but taking a little longer than Defendants would have liked. *See id.* ¶ 86. Sacks stated that sales in the first month of 3Q07 (July) were up 43.6% year-over-year, and analysts again reacted positively to these sales numbers. *See id.* ¶¶ 87-88.

Plaintiffs allege that Hansen's 2Q07 financial results were knowingly false or materially misleading. *See id.* ¶¶ 46, 89, 108. Given the market's reaction to Hansen's results in 2Q06 and 1Q07, Defendants allegedly knew that another poor showing would wipe out Hansen's stock and the value of their personal holdings. *See id.* Therefore, Defendants allegedly manipulated Hansen's results to exceed expectations. *See id.* A National Account Manager reported that Vice President of National Accounts, Richard Hastings, instructed the witness to "withhold reporting" hundreds of thousands of dollars in 2Q07 promotional costs associated with Hansen's Walmart account to improve results. *See id.* Defendants reported these 2Q07 financial results to the Securities Exchange Commission ("SEC"), and Sacks signed Sarbanes-Oxley certifications, which certified the accuracy of the reports[9] and gave him an obligation to assure the truthfulness of the results. *See id.* ¶ 108.

Kelly also allegedly had actual knowledge of the falsity of Hansen's financial reports. *See id.* ¶ 109. A former Cost Accountant described Kelly as "very diligent" in reviewing Hansen's financial information. *See id.* The witness further stated that he reported to Kelly about poor internal controls at Hansen, and in response, Kelly would "chew people out" but fail to correct the problem due to a lack of time and resources. *See id.* Additionally, every month the individual responsible for Sarbanes-Oxley compliance would tell Kelly about the discrepancies between Hansen's purchase orders and invoices, but Kelly allegedly failed to correct the problem. *See id.* A witness also reported that Kelly worked directly with Sacks and told him about important accounting issues. *See id.*

---

[9] In his certifications, Sacks stated that he had "designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." CC ¶ 108.

Plaintiffs further allege that Defendants' statements regarding their initial 3Q07 results were materially misleading when made. *See id.* ¶ 90. Defendants allegedly knew that the promotional costs that were not reported in 2Q07 would be reported in 3Q07 and would lower Hansen's profits that quarter. *See id.* Defendants also allegedly knew that buy-in prior to a 24-ounce Monster price increase in 2Q07 would have a material, adverse effect on 3Q07 results because retailers bought Monster in the 23-ounce can at the lower price in 2Q07 and would thus not require as much in 3Q07. *See id.*

According to the CC, Defendants' statements about Hansen's relationship with AB were once again false or materially misleading when made. *See id.* ¶ 91. Contrary to Defendants' claims, their relationship with AB was not working, and alcohol regulations and AB's disinterest in Hansen's Allied brand adversely affected Hansen's distribution. *See id.* ¶ 91. Also, contrary to Defendants' assertion that they were putting the brakes on transitioning to AB over the summer in order to give their employees time to focus on sales, Defendants allegedly did so because AB was not focusing on distributing Hansen products. *See id.* In addition, Plaintiff alleges that Defendants' statements about the on-premise agreement were materially misleading. *See id.* The delay allegedly occurred, not because AB was a "large corporation," but because AB did not have the necessary connections and was being restricted by numerous exclusivity agreements with Red Bull. *See id.*

In a less-than-one-month period after Hansen's stock increased by 13%, allegedly in response to the August 8, 2007, announcements, the Individual Defendants sold $75 million worth of Hansen stock. *See id.* ¶¶ 47, 92. Sacks and Schlosberg each sold more than $18.7 million worth of Hansen stock and an additional joint sale of $35 million, and Kelly sold more than $2.7 million. *See id.* ¶¶ 47, 92. The sales, which constituted between 66% and 100% of their stock holdings, also came only twelve weeks before Hansen announced its 3Q07 results, when it missed estimates by as much as 3 cents per share.[10] *See id.* ¶¶ 47-48, 93, 119.

The same day that Hansen disclosed its 3Q07 results, November 8, 2007, Sacks

---

[10] Hansen reported 3Q07 EPS of $0.46 (consensus estimates were $0.49). *See* CC ¶ 119. Sales were 4.3% below consensus estimates, and gross profits were 1.2% below estimates. *See id.* In addition, sales growth fell from 56.9% in the prior quarter to 38.4%, and fell 79.84% in year-over-year terms. *See id.*

disclosed that Hansen had stopped the AB deal because AB was not focusing on Hansen products. *See id.* ¶¶ 48, 94, 121. Sacks also disclosed that the Allied line showed overwhelmingly poor sales, coming in at $10 million below estimates and $6 million below sales the previous year. *See id.* ¶¶ 48, 94. Defendants also questioned the viability of the brand and what to do with the AB transition going forward. *See id.* Hansen's stock dropped 32.5% on volume of 18.4 million shares, from its close of $56.67 on November 7, 2007, to an intra-day low of $38.25 on the day of the announcement. *See id.* ¶¶ 49, 95, 122. Additionally, trading volume increased 1900% from the day before. *See id.* ¶ 122.

The CC reflects several accounts of the alleged practices taking place at Hansen within the Class Period, though none which directly tie any of the Individual Defendants to knowledge of any particular misstatements. However, Plaintiffs have alleged that during the Class Period, the Individual Defendants, as senior executive officers and/or directors of Hansen, were the highest ranking executive officers within Hansen[11] and were privy to confidential and proprietary information regarding Hansen, its operations, finances, financial condition, and present and future business prospects. *See id.* ¶¶ 60, 99. The Individual Defendants received (unspecified) regular briefing as to sales, growth, margins, distribution agreements, correspondence with the public market, and all other operations central to the management of Hansen. *See id.* ¶ 99. In the name of the company, the Individual Defendants[12] also attended, participated in, approved, and managed all major conference calls, press releases, and official interactions and communications with investors, the financial press and the public markets. *See id.*

Due to their positions in the company, the Individual Defendants allegedly controlled the conduct of Hansen's business. *See id.* ¶¶ 61, 99. They controlled and/or possessed the authority to control the contents of Hansen's reports, press releases, and presentations to securities analysts. *See id.* ¶¶ 62, 99. According to the CC, the individual Defendants were provided with copies of Hansen's allegedly misleading reports and press releases prior to or shortly after their issuance, and the Individual

---

[11] Though this allegation nominally includes Kelly, the characterization plainly does not apply to him.

[12] *See* Footnote 11, *supra.*

Defendants had the opportunity to prevent their issuance or cause them to be corrected.
*See id.* ¶ 62.

Plaintiffs assert that Defendants knew that there was a direct correlation between
sales growth and Hansen's stock price. *See id.* ¶ 100. Defendants monitored and
reviewed specific reports on sales growth and the success of Hansen's products and
allegedly knew that their representations during the Class Period were false and
misleading. *See id.* ¶ 101. A Regional Manager indicated that the company "lived and
died" by the Nielsen numbers, and that company executives would "freak out" if there
was even a half-percent drop in market share related to Monster. *See id.* The witness
also stated that Sacks was known to carry two or three binders that contained the Nielsen
numbers. *See id.* In addition, another Regional Sales Manager confirmed that the
company measured its performance by those Nielsen numbers. *See id.* Also, a former
Cost Accountant confirmed that all sales data were kept in a computer system and were
available almost immediately to those with access (which Plaintiffs presume would
include the Individual Defendants). *See id.*

Plaintiffs further allege that Defendants had actual knowledge that sales of
Monster and Allied were declining. *See id.* ¶ 102. An On-Premise Sales Manager for the
Monster and Allied lines indicated that each sales manager would disclose his/her sales
figures to the National On-Premise Sales Manager, who would then compile them into a
master spreadsheet. *See id.* Defendants repeatedly referenced this information during the
Class Period and allegedly knew or were reckless in disregarding that their Allied and
Monster sales were declining. *See id.* In addition, the same witness described monthly
conference calls during which On-Premise Sales Director, Dan Lamb, discussed sales
performance and strategy with other On-Premise Sales Managers. *See id.* This
information "filtered up" to the senior executives, and the witness described a yearly
meeting attended by Sacks and all sales personnel, during which they "undoubtedly"
discussed sales performance and strategy. *See id.*

Plaintiffs assert that Hansen's distribution agreements, such as the ones with AB
in May 2006 and February 2007, drove market penetration, sales growth, and the overall

success of Hansen products. *See id.* ¶ 103. The Individual Defendants[13] allegedly approved Hansen's distribution agreements with AB and were intimately aware of the terms and limitations of the agreements, as well as the problems and complications that developed. *See id.* Defendants made repeated reference to the status of the AB relationship throughout the Class Period and allegedly misrepresented the motivation behind the second AB agreement. *See id.*

Plaintiffs allege that the Individual Defendants' insider sales were suspicious in timing and amount, providing an additional inference of scienter. *See id.* ¶ 110. On August 24, 2007 and September 13 and 14, 2007, Sacks and Schlosberg sold over 65% of their personal stock holdings and over 15% of their stock and vested options holdings combined. *See id.* ¶¶ 47, 110-11. Kelly also sold 100% of his Hansen stock and over 50% of his stock and vested options holdings combined during the Class Period. *See id.* ¶ 110. According to Plaintiffs (though a full and complete analysis of the figures provided would not appear to back up this claim), the amount that Sacks and Schlosberg sold in less than one month during the Class Period far exceeded what they had sold in the previous five years combined. *See id.* ¶¶ 112-13. As for Kelly, the amount he sold in two days during the Class Period matched the entire value that he had sold in the previous five years (though the value had risen considerably from when he began trading in 2004 to his August/September 2007 trades). *See id.* While Plaintiffs acknowledge that the Individual Defendants' percentages sold are similar over time, Plaintiffs assert that the August/September 2007 sales took place at an atypical time of year. *See id.* Also, Defendants sold their Hansen stock shortly after announcing the allegedly false 2Q07 financial results. *See id.* ¶ 110. The sales also occurred weeks before Hansen disclosed disappointing sales and growth data, as well as "disillusioning aspects" of its AB relationship and Allied line performance in 3Q07. *See id.*

## II. Analysis

### A. <u>Governing Legal Standards – Section 10(b)/Rule 10b-5/Rule 12(b)(6)</u>

Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ,

---

[13] *See* Footnote 11, *supra.*

in connection with the purchase or sale of any security..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  SEC Rule 10b-5 implements § 10(b) by declaring it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made...not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  Thus, to make out a claim for securities fraud, a plaintiff must allege a material misrepresentation or omission, scienter, in connection with the purchase or sale of a security, reliance, economic loss and loss causation.  *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

Each statement alleged to have been misleading must be specified, along with "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1164 (9th Cir. 2009).  "[A] statement that is literally true can be misleading and thus actionable" at least where it as an omission that "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis added).

A fact or omitted fact is material if there is a substantial likelihood that a reasonable shareholder/investor would consider it important in deciding how to vote/whether to invest or, in other words, that it would have "significantly altered the 'total mix' of information made available." *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988) (citation omitted); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1177 (9th Cir. 2009), *petition for cert. filed*, 78 U.S.L.W. 3581 (U.S. Mar. 23, 2010) (No. 09-1156); *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W.*

*Holding Corp.*, 320 F.3d 920, 934 (9th Cir.), *cert. denied*, 540 U.S. 966 (2003).
Materiality assessments are "peculiarly within the province of the trier of fact," if for no
other reason than because a "fact-specific inquiry" is called for. *Siracusano*, 585 F.3d at
1178. Only where "reasonable minds cannot differ on the question of materiality" is the
element of materiality resolvable as a matter of law. *Id.*; *see also In re Cutera Secs.
Litig.*, 2010 WL 2595281, *3 (9th Cir. June 30, 2010) (affirming dismissal of securities
class action on materiality grounds at Rule 12(b)(6) stage even though the element
"should ordinarily be left to the trier of fact") (quoting *SEC v. Phan*, 500 F.3d 895, 908
(9th Cir. 2007))[14].

Like falsity, scienter must also be pled with particularity under the Private
Securities Litigation Reform Act ("PSLRA"). *See* 15 U.S.C. § 78u-4(b)(2); *Tellabs, Inc.
v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007); *Rubke*, 551 F.3d at 1164; *In re
Silicon Graphics Sec. Litig.*, 183 F.3d 970, 974 (9th Cir.), *reh'g & reh'g en banc denied*,
195 F.3d 521 (1999). In *Tellabs*, the Supreme Court took on the "task...to prescribe a
workable construction of the 'strong inference' standard" required by section 78u-
4(b)(2). *See* 551 U.S. at 322. In so doing, it laid out the following analytical construct.
As with any motion to dismiss for failure to plead a claim on which relief can be granted,
the court must accept all factual allegations in the complaint as true. *See id.* The court
must consider the complaint in its entirety, "as well as other sources courts ordinarily
examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents
incorporated into the complaint by reference, and matters of which a court may take
judicial notice." *Id.* The question "is whether *all* of the facts alleged, taken collectively,
give rise to a strong inference of scienter, not whether any individual allegation,
scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original).

In determining whether a "strong" inference of scienter exists, "the court must
take into account plausible opposing inferences." *Id.* at 323. This includes both
"plausible nonculpable explanations for the defendant's conduct, as well as inferences
favoring the plaintiff." *Id.* at 324. However, "[t]he inference that the defendant acted

---

[14] Defendants have provided the *Cutera* decision (as published on Westlaw) as an exhibit to their Notice of
Supplemental Authority filed on July 8, 2010 (Docket Number 63).

with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most

plausible of competing inferences." *Id.*  But the inference of scienter must be more than

merely "reasonable" or "permissible" – "it must be cogent and compelling." *Id.*  A

complaint survives "only if a reasonable person would deem the inference of scienter

cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." *Id.*  Elsewhere, the Court summarized this "strong inference" analysis as

follows:

> It does not suffice that a reasonable factfinder plausibly could infer from
> the complaint's allegations the requisite state of mind.  Rather, to
> determine whether a complaint's scienter allegations can survive threshold
> inspection for sufficiency, a court governed by § 21D(b)(2) must engage
> in a comparative evaluation; it must consider, not only inferences urged by
> the plaintiff…but also competing inferences rationally drawn from the
> facts alleged.  An inference of fraudulent intent may be plausible, yet less
> cogent than other, nonculpable explanations for the defendant's conduct.
> To qualify as 'strong' within the intendment of § 21D(b)(2)…an inference
> of scienter must be more than merely plausible or reasonable – it must be
> cogent and at least as compelling as any opposing inference of
> nonfraudulent intent.

*Id.* at 314; *see also id.* at 328 ("A plaintiff alleging fraud in a § 10(b) action…must plead

facts rendering an inference of scienter at least as likely as any plausible opposing

inference.").  In making this determination, the Ninth Circuit indicates that the Court is

obligated to take a "holistic" approach. *See Zucco Partners, LLC v. Digimarc Corp.*, 552

F.3d 981, 992 (9th Cir. 2009).

Loss causation, meanwhile, may not be pled by way of euphemism alone, even if

it need not necessarily be pled with "particularity." *See Metzler Inv. GMBH v.

Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062-64 (9th Cir. 2008); *see also Berson v.

Applied Signal Tech., Inc.*, 527 F.3d 982, 989 (9th Cir. 2008) (assuming, but not

deciding, that Rule 9(b) governs pleading of loss causation in 10b-5 case); *Sparling v.

Daou (In re Daou Sys., Inc.)*, 411 F.3d 1006, 1025 (9th Cir. 2005) ("[T]o prove loss

causation, the plaintiff must demonstrate a causal connection between the deceptive acts

that form the basis for the claim of securities fraud and the injury suffered by the

plaintiff."), *cert. denied*, 546 U.S. 1172 (2006).  However, a misrepresentation need only

be "one substantial cause of the investment's decline in value," meaning that "other

contributing forces will not bar recovery." *Daou*, 411 F.3d at 1025; *see also No. 84 Employer-Teamster*, 320 F.3d at 935-36.

Rule 12(b)(6) review is "generally limited to the face of the complaint, materials incorporated into the complaint by reference, and matters of which [the Court] may take judicial notice." *Id.* at 989. In undertaking this review, (except as disproven by other material permissibly considered) the Court is to "accept the plaintiffs' allegations as true and construe them in the light most favorable to plaintiffs" and will not dismiss unless the complaint fails to "state a claim to relief that is plausible on its face." *Id.* (quoting *Gompper v. VISX, Inc.*, 298 F.3d 893, 895 (9th Cir.2002), and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### B. The Alleged Misrepresentations/Omissions

Plaintiffs are required by the PSLRA to specifically identify the alleged fraudulent misrepresentations and/or omissions. Various representations and/or omissions are referenced throughout the CC, but the CC also contains an entire section headed "False and Misleading Statements During the Class Period." It is to only the statements/omissions in that section that the following analysis will apply. Any statements/omissions not found in that section have not been sufficiently specified.[15] This would include, for instance, the affirmative statements alleged in paragraph 29 of the CC which, though they are included in the Background section of this ruling, are only included there for context in light of their omission from the "False and Misleading Statements During the Class Period" section.

In order to avoid any confusion, the statements/omissions (and the speaker, if any

---

[15] In fact, even as to the statements specifically identified in that section, it is not always clear what exactly Plaintiffs have identified as the falsehood – whether it is a single sentence, or a phrase, or something else. Plaintiffs do reference general characterizations of at least portions of the quoted language (*see, e.g.*, CC ¶¶ 67, 74, 81 ("Defendants' statements about Hansen's relationship with AB"), and *id.* ¶¶ 68, 82 ("Defendants' statements about the success of Hansen's Allied products")) and give reasons why whatever statements fit within those general characterizations would be false, *see, e.g., id.* ¶¶ 67-68, but this is insufficient at least where Plaintiffs have block-quoted relatively large portions of quotations containing numerous separable statements. For this reason alone, Plaintiffs would have to amend the CC in order to comply with the PSLRA's specificity requirements. Plaintiffs cannot cure specificity/particularity deficiencies through the vehicle of an opposition on a motion to dismiss. That being said, in order to avoid unnecessary duplication of work, the Court will assess below the arguments the parties have presently raised insofar as it can make an educated guess about just what it is Plaintiffs believe is false about the various statements.

is identified) Plaintiffs have (or at least sufficiently clearly appear to have) included in the
"False and Misleading Statements During the Class Period" section are repeated verbatim
below (with any emphasis as it is included in the CC).

1. November 9, 2006 – Sacks

We think that the transition to Anheuser-Busch is really going to
continue to help us.

\* \* \*

We really are very happy with the transition.  The Anheuser-Busch
group are really a professional group.  We're getting good information
from them.  We really do see that they're very motivated at the distributor
level, and we are very confident that will improve both the quality and the
quantity of product being sold by them and distributed.

\* \* \*

In the energy category, we're still very positive about Lost.  It is still one
of the top 10 selling brands in the country, and it is up on last year even
with the disruption we've experienced.  It is doing pretty nicely in the
California market where the disruption was far less.

We do believe that these other brands, if you look at some of the
convenience [store] sales velocity, Joker is at a good velocity and so is
Unbound.  Looking at those products, their velocity is higher than some of
the Coke and Pepsi products, and on a per-point basis.  We really do
believe that those products do have good opportunity.

\* \* \*

The one we honestly believe – it's difficult to tell because it may
be very premature, but we do believe that Rumba has got a lot of legs
because as the category matures and becomes more mainstream, Rumba is
one of the only maybe not the only but one of the only energy drinks that
is non-carbonated and is 100% juice product.  We believe that that is
ideally placed for the morning consumer which is a big sector of the
category.

CC ¶ 65.

2. November 9, 2006 – Sacks (responding to an analyst's question)

[Q.] You think your gross margins will be affected by the increase
of 24-ounce cans [of Monster] going forward?

[A. Sacks] They might be a little bit, yes.  We were hoping that it
has been a little slow in getting out – that we would be able to offset that
partially by the 8-ounce and *we're hoping that we will also be able to
offset some of that percentage by the increased sales in Ace, Joker and*

18

*Unbound which are also in 16-ounce sizes which have more traditional margins, so we think those will also help improve our – on the other side would help improve it.*

The margins of Ace into the Cadbury Schweppes group are lower, and the margins of Joker into Cadbury Schweppes and some of the Circle-K group here has a lower margin, but we're not responsible for some of the promotional – most of the promotional costs on those items to those customers. That also has an effect on their gross profit, but other brands like Unbound are going through the traditional channel and *Joker and Rumba those will help pick up some margins.*

CC ¶ 66.

3. February 9, 2007 – Hansen/Sacks

**Hansen Natural Corporation and Anheuser-Busch Announce On-Premise Sales and Distribution Deal**

**Monster Energy® to be Sold and Distributed Through Anheuser-Busch, Inc. Wholesaler Network; Agreement Significantly Expands On-Premise Channel for Hansen's Monster Energy® Brand**

Corona, Calif. (Feb. 9, 2007) – Hansen Natural Corporation (Nasdaq: HANS) and Anheuser-Busch, Inc. (NYSE: BUD) today announced they have concluded an agreement under which Anheuser-Busch, Inc. will manage and coordinate the sales, distribution and merchandising of Monster Energy® energy drinks to on-premise retailers including bars, nightclubs and restaurants in territories approved by Hansen. Terms of the agreement were not disclosed. Select Anheuser-Busch wholesalers currently distribute Monster Energy®, Lost® Energy™ and Unbound® energy drinks, as well as Rumba™ energy juice, to off-premise accounts in certain U.S. markets following agreements signed between Anheuser-Busch and Hansen Natural Corporation in May 2006. This new agreement will provide Anheuser-Busch designated wholesalers with an opportunity to sell Monster Energy® to on-premise accounts.

* * *

"Anheuser-Busch has been an outstanding business partner for the last eight months, and we are excited to expand our relationship with them to include the on-premise channel – a significant and largely untapped market for our products," said Rodney C. Sacks, chairman and chief executive officer of Hansen Natural Corporation. "This agreement opens a significant new and incremental sales channel for Monster Energy® that will play an essential role in continuing the development of the image and personality of our Monster Energy® brand and provide extremely important sampling opportunities. We look forward to working together to build on the success of Monster Energy® and our other energy drink brands."

19

CC ¶ 70.

    4. February 27, 2007 – Sacks

    We're also looking at some alternative packages this year. Principally to cater for the on premise agreement that we have concluded a couple of weeks back with Anheuser-Busch Inc. Under that agreement, Anheuser-Busch Inc. at a corporate level will be responsible for selling and basically joined with us in marketing products to the on-premise channel…. *it will enable us to secure quite extensive distribution in the on-premise channel.*

    \* \* \*

    Obviously, the actual sales into the on-premise channel will still be handled by the Anheuser-Busch distributors. But Anheuser-Busch themselves as a corporation will be coming actively involved in jointly marketing to this channel with us. So, we think that's pretty exciting.

CC ¶ 71.[16]

    5. February 27, 2007 – Sacks (responding to an analyst's question)

    [Q.] [Y]ou had mentioned to me in December that you were taking a second evaluation of your switch to your – your off-premise distribution change over to Bud, and you were evaluating kind of where you stood and whether or not you would execute a second wave of change overs early in the year. Can you just give us an update on what that evaluation yielded and what your decision has been?

    [A. Sacks] We are – *we have been comfortable. We think that the quality of our sales to that system, by the system is, has improved the quality of our distribution in stores, execution, point of sale merchandising has improved. Generally so, we are happy with – with that system*….but we have – you know, we're looking at doing it on – on – sort of – not a slower bases [*sic*], but just maybe – you know, just a more controlled roll out…. *But generally, we are continuing to transition areas in to the AB system within the US. We think that is a good system.*

CC ¶ 72.

    6. February 27, 2007 – Sacks (responding to an analyst's question)

    [Q.] Can you also talk about what you are seeing in terms of Lost in number – how that transition is actually going there?

---

[16] Though it is not included in the block-quotation itself, Plaintiffs also identify the following statement (referring, presumably, to the on-premise "channel"): "we believe it is an incremental channel for us, and we're very excited by it." CC ¶ 71.

[A. Sacks]  What is happening Lost – Lost is up on sales for the
year from last year, but, it did suffer quite a bit of out of stocks and quite a
bit of disruption during the transition. *We're still working through some
of the areas we lost didn't lose distribution in this whole transition,
where we did get some resistance from those, Budweiser distributors
who didn't – weren't awarded Monster, who basically held out for
Monster and didn't take Lost. We think that will be, that situation will
be improved as we go forward with the on-premise because by [and]
large, all of the Budweiser distributors will be getting the on-premise
Monster,…and they will – those that sort of haven't taken Lost will take
Lost, and so, we think we'll be able to improve our distribution with Lost
as we go forward.* Pretty much that's just one of the, just the side effects
of the on-premise going forward.  Rumba has started to go to the system
and is doing quite nicely.

CC ¶ 73.

### 7.  February 27, 2007 – Omission

Charitably read (which, in truth, should never be a phrase resorted to in

connection with a Rule 12(b)(6) motion under the PSLRA), paragraph 75 of the CC

pleads a fraudulent omission with respect to the following alleged facts:

[T]he significant decline in Lost's market share came not because certain
AB distributors held out until they were awarded Lost but instead because
AB had no interest in distributing a product that was not well-known or
well-received in the marketplace.  Indeed, distributors viewed doing so as
potentially damaging their relationships and jeopardizing their market
share.  Defendants therefore entered into the supplemental agreement with
AB to try to incentivize AB to distribute products that it had no interest in
distributing.  At no time did defendants disclose these critical facts to
investors.

CC ¶ 75.

### 8.  May 7, 2007 – Hansen/Sacks

Hansen Natural Corporation (NASDAQ:HANS) today reported
record sales for the first quarter ended March 31, 2007.

        * * *

Rodney C. Sacks, chairman and chief executive officer, said the
record revenues reflected continued strong sales of Monster Energy®
brand energy drinks, as well as the expansion of distribution of Unbound®
brand energy drinks.  "The energy category continued to show strong
growth over the prior year, and the Monster Energy® brand grew well in
excess of the market.  Monster continued to gain increased distribution

during the quarter," Sacks said....

Sacks also noted that the implementation of the off-premise distribution arrangements with selected Anheuser-Busch wholesalers was progressing well, and effective mid April 2007, the Company commenced distribution arrangements with PepsiCo Canada. Sacks added that the Company is planning to implement its on-premise distribution agreement with Anheuser-Busch Inc. prior to the end of the second quarter.

CC ¶ 76.

### 9.  May 7, 2007

Going forward, the Anheuser-Busch relationship is getting into place. It is gearing up.

\* \* \*

Some of it is the fact that some of the – we think the AB distributors don't go to as many accounts as we have previously covered, some of the small mom and pops, by basically the non-alcoholic bottler that we had before. We think that will get addressed. We're also making changes to our staffing there to deal with that. So we think that those are markets that will improve and, we will, obviously, address the Northwest.

*But going forward, overall, we're still very positive about the relationship and about the quality of distribution and the long-term strength that this distribution system will bring to our Company* in addition to the existing hard core of our existing distributors who we are happy with.

CC ¶ 77.

### 10.  May 2007 – JP Morgan analyst Dara Mohsenian

We are reiterating our Overweight [rating] on Hansen following a recent positive management meeting with CEO Rodney Sacks and CFO Hilton Schlosberg. We continue to believe that the market is undervaluing Hansen's growth opportunity over the next few years.... *Near-term catalysts include expanding off-premise distribution, entry into the on-premise channel*, international expansion, pricing, and new products.

\* \* \*

**Benefits from A-B Wholesaler Off-Premise Distribution are Ramping Up**

Hansen's commentary was positive regarding the ongoing transition of Monster distribution to Anheuser-Busch distributors on a selective basis. There were initial hiccups in a number of transition markets in H2 [*sic*] of 2006 as prior distributors lost their focus on Hansen products prior to changes, and A-B distributors' initial execution was

spotty given the challenges in adjusting to distribute non-alcoholic
products for a distribution system previously focused on alcoholic
products.

CC ¶ 79.[17]

> 11. August 8, 2007

We sort of put a break on some of the transition arrangements during
summer *so we could get our guys focussed [sic] on out in the field,
focussed [sic] on selling and rather not focus on transition brands and
dealing with the numbers of the issues that go with that.* We will
probably continue to do a little bit of transitions after the summer but by
and large we are generally done in our mind at the moment with the
transition. *We think it is working for us, we're getting good solid
distribution, we're working with professional distributors, and so we are
generally very happy.*

CC ¶ 85.

> 12. August 8, 2007 – Omission

Plaintiffs allege that, at the time of the August 8, 2007, statements, Defendants
"conveniently failed to mention the fact that AB continued to neglect Hansen's Allied
products or that AB was focusing on its own products to the detriment of Hansen." CC ¶
85.

> 13. August 8, 2007 – Sacks (responding to an analyst's questions)

[Q.] I guess I'm just trying to get a sense for general demand here
at retail versus what it is in terms of how you're shipping the product.

[A. Sacks] I can only assume it follows. Distributors don't keep
inventory and they probably [*sic*] one of our problems is they buy on too
short notice. That's probably the biggest problem. But what we sell is
going through, it's going through to the retail stores and going th[r]ough to
consumers.

> \* \* \*

[Q.] Moving over to on premise, big opportunity for you, can you
maybe a little bit more, in terms of how you see that evolving over the
next year or two?

[A. Sacks] We really – it's really speculative. We just don't

---

[17] Though it is not included in the block-quotation itself, Plaintiffs also identify the following statement:
"on-premise agreement with Anheuser Busch should start to ramp up by the end of Q2." CC ¶ 79.

know. We know what's out there, we know the accounts, we know the opportunity. But we just really are still in the planning and execution stages. It is taking time, as I indicated a bit earlier, it's probably a little longer than we would have liked but again we have a very substantial partner in it and they are a large corporation. Things just don't happen overnight in any large corporation, unfortunately. But it is going at a good pace and we're very confident that we're going to be able to make real inroads in that section but it is going to take time….

So this all takes time, and so I know that there has been the analysis on the prebu[d] transition and postbu[d] transition, these do take time. In some markets we have disappointments, *by and large we're happy with the improvement, our sales have improved pretty much in most of the bu[d] markets.* That we've been into. And it is going to happen, it's just a long haul, it's building yourselves, single can by can, *but it is happening and we're continuing to increase our market share off a big base, as you're aware. I think the proof is in the pudding, it is happening for us and it will continue to, we think, improve, as we go forward. And the same thing applies to the onpremise. We think it's going to take time but it is going to happen and it's going to happen well for us. We are seeing some results coming in already but it's obviously – we've got much higher expectations than what we're seeing at the levels we're seeing now.*

CC ¶ 86.

14. August 8, 2007 – Sacks

Going forward, sales going into July, sales are up in July 43.6% in the company. Sales of Monster are up well over 50%. One of the issues, the sales would have – might appear at first glance to be a little lower than we've achieved as an increase in sales in the third quarter, but there are a number of reasons for that. It was a short month in deliveries, secondly, we had a buy in obviously in – we took up our processing of our 24-ounce product and there was a buying simply one of the effects of life and was normal, which obviously did boost sales a little bit in June, and then it took away from sales in July, we believe that will normalize as we go forward.

\* \* \*

Hello, just one of the things, I have got some numbers or [sic] August and last year, there was quite a substantial increase in August over the July, which had a similar trend. The June number last year was higher than the July number. Generally, the sales are both up to June, it then had a drop-off last year in July a little bit and then it was quite a good increase in August, and then continued, there was a slight corroborate [sic] back in September and then it started to level off but those are at much higher levels than earlier. What we are doing is trading off levels now that are

very much higher last year than the second quarter. So there was that very sort of similar trend where June was higher, July dropped off and then August was substantially higher. So just to give you that color in answer to that earlier question. Okay. As I said, thanks very much, we're happy with the results, we're excited to go forward, we think we've got a great new product line, we've got some new products coming and we're very excited about the second half of the year and for the category generally which is continuing to show really really strong and solid results for us. Thank you once again for your support, and hopefully we will be able to report to you positive results to you guys at the end of the third quarter. Thank you.

CC ¶ 87.

### 15. August 8, 2007 – Omission

Plaintiffs allege that Hansen's 2Q07 financial results were false because a National Account Manager had been instructed by Vice President of National Accounts, Richard Hastings, to "withhold reporting promotional costs associated with the Walmart account in 2Q07 to improve Hansen's results." CC ¶ 89. Plaintiffs allege that the withheld amount is estimated to be "hundreds of thousands of dollars of expenses," described by the National Account Manager as "significant" because of the extent of the promotions arranged at Walmart. *Id.*

### 16. August 8, 2007 – Omission

In what may also be understood as a separate omission allegation, Plaintiffs also allege that the results reported for 3Q07 were materially misleading when made because 1) Defendants knew that the Walmart promotional costs which were not reported in 2Q07 would then be reported in 3Q07, thereby lowering Hansen's profits for that quarter and 2) Defendants knew that "buy-in prior to the 24-ounce Monster price increase in 2Q07 would have a material adverse effect on 3Q07 results, as retailers bought Monster in the 24-ounce can at the lower price in 2Q07 and would not need as much product in 3Q07 as a result." CC ¶ 90.

## C. Defendants' Arguments – 10(b)/10b-5

Generally speaking, Defendants challenge Plaintiffs' pleading of misrepresentations/omissions, materiality, scienter and loss causation, though they do not appear to assert that each of these elements is lacking for each of the (at least) sixteen

alleged misrepresentations/omissions set out above.  In large respect, a full analysis of the parties' arguments on this motion is not possible in light of Plaintiffs' insufficient specification of the false/misleading statements/omissions and what, exactly, is false about any <u>particular</u> portion of such statements/omissions.  Therefore, to the extent that any arguments are not directly contemplated below, this should not be taken as an indication that the Court necessarily rejects any such argument.

### 1. **Insufficient Allegations re Misrepresentations/Omissions**

#### a. **Corporate Optimism**

Understandably somewhat uncertain about just what statements Plaintiffs believe constitute affirmative misrepresentations, Defendants have identified a number of phrases or statements in the numerous statements recited above that they believe constitute non-actionable "puffing" or "soft statements" of corporate optimism.  In particular, Defendants identify the following (with Defendants' emphases included):

- "We *think* that the transition to [AB] is really *going to continue to help us*.... We really are very *happy* with the transition." CC ¶ 65;

- "[W]e're still very *positive* about Lost.... Joker is at a *good velocity* and so is Unbound.... We really do *believe* that those products do have *good opportunity*.... [W]e do believe Rumba has got *a lot of legs*...." *Id.*

- "[W]e're *hoping* that we *will* also be able to offset [any potential decrease in gross margins due to the buy in for 24-ounce Monster cans] by the increased sales in Ace, Joker and Unbound..., so we *think* those will also help *improve* our [margins]." *Id.* ¶ 66.

- "We *look forward* to working together [with AB] to build on the *success* of Monster Energy® and our other energy drink brands." *Id.* ¶ 70.

- The AB on-premise agreement "*will enable us* to secure quite extensive distribution in the on-premise channel." *Id.* ¶ 71.

- The AB system "has *improved* the *quality* of our distribution in stores, execution, [and] point of sale merchandising....  Generally so, we are

*happy* with – with [the AB] system…." *Id.* ¶ 72

- "[W]e *think* we'll be able to *improve* our distribution with Lost *as we go forward*." *Id.* ¶ 73

- "But *going forward*, overall, we're still very *positive* about the relationship and about the *quality* of the distribution and the *long-term strength* that this distribution system will bring to our company…." *Id.* ¶ 77.

- "We *think* it is working for us, we're getting good *solid* distribution, we're working with professional distributors, and so we are generally very *happy*." *Id.* ¶ 85.

- "I *think* the *proof is in the pudding*, it is happening for us and it *will continue to, we think, improve, as we go forward*." *Id.* ¶ 86.

The Court would agree with Defendants with respect to the following phrases, such that Plaintiffs should not be able to rely on them for purposes of making out an actionable claim going forward: "going to continue to help us," *id.* ¶ 65; "good velocity," *id.*; "good opportunity," *id.*; "a lot of legs," *id.*; "quality," *id.* ¶¶ 72, 77; "long-term strength," *id.* ¶ 77; "solid," *id.* ¶ 85; and "proof is in the pudding," *id.* ¶ 86.[18] *See, e.g.*, *Cutera*, 2010 WL 2595281, *5. The use of these terms clearly does not fit within the narrow exception for such phrases carved out in such circumstances as the *Countrywide* litigation, *see In re Countrywide Financial Corp. Securities Litigation*, 588 F.Supp.2d 1132 (C.D. Cal. 2008). The other phrases, while somewhat vague and often referencing a subjective state of mind, are nonetheless more easily capable of verification (or contradiction) by external facts. For instance, Plaintiffs might be able to demonstrate that Defendants did not

---

[18] While Plaintiffs argue that there is an exception for puffery which is immediately preceded or followed by very specific statements of fact supplying a foundation for the optimism, the only example they give, *see* Plaintiffs' Opposition at 21:2-8, which corresponds with any of the phrases identified as non-actionable puffery above is the use of the term "solid" in paragraph 85. Yet, Plaintiffs' apparent "specific statement of fact" is the phrase "[w]e think it is working for us, **we're getting good solid distribution**, we're working with professional distributors, and so we are generally very happy." *Id.* at 21:5-7 (emphasis in Plaintiffs' brief). It is unclear what part of this entire quotation, let alone the bold portion, Plaintiffs feel qualifies for the exception making otherwise-puffery actionable, but it seems plain on its face that no part of it can qualify as a "specific statement of fact" supplying foundation for use of the word "solid" (which is the word Defendants – correctly – identified as non-actionable here).

"think" something (but said that they did) or were, in fact, negative or unhappy about the
relationship or future prospects (instead of "positive" or "happy").[19]

### b. Forward-Looking Statements

Defendants also argue that various statements identified in the CC are protected as
forward-looking statements, either under the "bespeaks-caution" doctrine or the PSLRA
statutory safe harbor. It is unclear just which statements Defendants believe are covered
by either of these protection mechanisms. Their only attempt to specify offers, in truth,
little specification. *See* Defendants' Motion to Dismiss at 17:3-5 ("Statements that
Hansen looks *forward* to working with AB, *expects* distribution to *continue* to improve,
and *hopes* that sales of Allied products will improve are forward-looking."). If
Defendants intend by this shorthand to refer to the same set of specified statements
identified in connection with their argument regarding statements of corporate optimism,
only one of those statements – that the on-premise agreement "will enable us to secure
quite extensive distribution in the on-premise channel," CC ¶ 71 – would appear to fit the
bill. Although certain aspects of many of the others obviously raise questions of future
performance or events, they also relate to the issues of what the Defendants "thought" or
"felt" or "hoped" would happen – present-sense conditions of the mind. Defendants have
not provided any authority for their proposal that they may supply their own definition of
forward-looking statements in their SEC reports in order to investors on further notice of
an expanded application of the PSLRA safe harbor. In short, this issue will likely remain
alive until Plaintiffs further specify what exactly it is that they believe is false about many
of the statements in question. Depending on the answer to that question, Defendants
might – as a forward-looking argument – be correct that the statements would be
protected.

As to the statement in CC ¶ 71, though Defendants have identified meaningful
cautionary language that might apply to the statement in question, *see* Defendants'

---

[19] As the *Cutera* court notes, puffery-like phrases are subject to both particularity and materiality
challenges. *See In re Cutera Secs. Litig.*, 2010 WL 2595281, *5 (9th Cir. June 30, 2010). As to the phrases
that survive the above analysis, it still may be shown that those phrases fail a materiality analysis in the
future, because of the subject matter of the particular comment and/or what was specifically said about that
subject matter.

Motion to Dismiss at 18:15-23 (quoting Defendants' Exhibits D at 61, L at 241, I at 174, K at 183, and P at 387), none of it appears to have been communicated at the same time as the statement in CC ¶ 71. While there was cautionary language uttered in connection with the February 27, 2007, oral forward-looking statement, it was not meaningful, nor did it meet the requirements of 15 U.S.C. § 78u-5(c)(1)(A)(i) or 15 U.S.C. § 78u-5(c)(2)(B), at the very least. *See* Defendants' Request for Judicial Notice, Exh. X, at 584. Because of the absence of meaningful cautionary language, the statement certainly could not be protected by the bespeaks caution doctrine. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005); *In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399, 1408 (9th Cir. 1996).

Nevertheless, Plaintiffs have not sufficiently alleged that any defendant had actual knowledge that the statement was false or misleading. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i). The statement would still therefore be protected under the statutory safe harbor, *see Cutera*, 2010 WL 2595281, *3, 6-7, even ignoring Defendants' argument – unsupported by any citation to Ninth Circuit authority – that where a complaint relies on the fraud-on-the-market theory, any cautionary statement <u>ever</u> uttered by an issuer should be considered as applicable to every forward-looking statement. Ultimately, however, because Plaintiffs will have the opportunity to amend, the Court cannot determine just yet that this particular statement is non-actionable as a matter of law.

### c. **General Insufficient Specificity of Falsity**

Defendants somewhat nebulously argue that Plaintiffs essentially do nothing more than disagree with Defendants' business decisions without actually being able to point to any facts which make any of the representations false. While Defendants are again relatively non-specific in their argument, at its core the point is largely valid. The CC acknowledges that Hansen, overall, was experiencing great success and that Monster was both an overwhelmingly large part of that success and the single dominant product in the company's liquid arsenal. *See, e.g.*, CC ¶¶ 10, 12. Indeed, the Plaintiffs admit that Hansen 1) met analyst expectations for 4Q06, 2) recognized "record revenues" for 1Q07, 3) announced that it was continuing to increase market share when the 2Q07 results were released, 4) that analysts saw the initiation of the company's relationship with AB as a

positive development, to put it somewhat mildly, and 5) and that Monster had historically been responsible for Hansen's success in the several years since its first introduction to the market. *See id.* ¶¶ 14, 28, 71, 76, 79. Most, if not all,[20] of these results or announcements are not implicated in Plaintiffs' allegations of fraud.

Similarly, while Plaintiffs take Defendants to task for continuing to report positively despite decreases in growth, growth is not perpetual. In these regards, it is hard to understand how Plaintiffs can characterize as false any statements about the general happiness or general success of the company. The company *was* generally successful, and taking into account the prominence of Monster in its operations, the relationship with AB *was* generally positive.[21] As the CC itself again establishes, Hansen's growth rate was still 106% (a number Plaintiffs themselves characterize as "impressive") and 79.84%, respectively, as of 2Q and 3Q06, and the company met analysts' estimates when it reported its 3Q06 financial results (which Plaintiffs do not allege were in any way fraudulent). *See* CC ¶¶ 14, 18-19. Plaintiffs cannot equate negative effects on Hansen's Allied brands or those brands' disappointing performance as overall negative news for Hansen as a whole, especially where it is clear from the CC (and the accounts of the confidential witnesses cited therein) that the Allied brands

---

[20] The 2Q07-related fraud appears to involve – or at least primarily involve – the omission of expense items, not Defendants' statements concerning market share.

[21] To the extent Plaintiffs rely upon the negative effects of various alcohol regulations limiting AB's ability to distribute Monster (and other similar "problems" the company faced as a general matter), *see, e.g.*, CC ¶¶ 30-31, 74, 81, these allegations similarly fail for lack of particularity and for failure to allege, in detail, the effect such potentially anecdotal experiences had on the company's overall operations or relationship with AB. If Plaintiffs indeed have "countless witnesses" attesting to some effect (the undertaking of undetailed "obligations and costs that should have been borne by the distributor") on Hansen's distribution "throughout the country," CC ¶ 81, they should be able to point to more specific facts than just those apparently general accounts provided by a Regional Sales Manager in Texas and a Trade Development Manager in the Midwest (who could only speak, respectively, to the effects in Texas and Michigan), *see id.* ¶ 30. While Plaintiffs also provide the viewpoint of a "Senior Marketing Manager" in the company's headquarters that Hansen "had trouble distributing Monster" in unspecified "states with strict alcohol laws," leading to "increased costs and minimized distribution," specificity is again obviously lacking from that account. The witness does not identify which (or even how many) states were affected or what the actual effect on costs or distribution was. Moreover, at least as to this confidential witness (and as to the National Account Manager for Walmart, as addressed further in the text below), Defendants appropriately argue that insufficient details about the witness have been provided for the Court to readily conclude that a "Senior Marketing Manager" would have reason to know about this topic in general or the answers to these specific questions.

constitute such a relatively minor proportion of the company's operations and focus.

It may be that a demonstration of falsity is more easily made in connection with statements concerning the Allied brands due to those products' difficulties (though other elements may be a barrier to those claims[22]), but for now general statements about the company's positive operations or the overall positive effect from the AB relationship would not appear to be false, or even misleading given the over-riding importance to the company of Monster[23]. *See Cutera*, 2010 WL 2595281, *3; *Brody*, 280 F.3d at 1006. For this reason and because it is frequently unclear just what Plaintiffs allege is false about the statements/omissions, the statements/omissions numbered 1, 3-5, 8-9, and 11-13 are presently insufficiently pled (at least in large part) and will remain so without significant further specificity.[24] Even as to the other statements/omissions, other elements (perhaps foremost, at least as developed thus far, scienter) are problematic.

### d. **Attribution of Analyst Statements**

Defendants correctly argue that, at least as presently pled, statement Number 10, which is the statement of a JP Morgan analyst, cannot form the basis for any defendant's liability in this action. *See, e.g., In re Syntex Corp. Secs. Litig.*, 95 F.3d 922, 934 (9th

---

[22] Among other things with respect to the Allied-related allegations, Plaintiffs will, in particular, have to pay close – and specific – attention to alleging that the statements were false or misleading when made, as opposed to proven wrong by later events.

[23] Nor does Hansen's decision to focus its efforts upon Monster even potentially render false any statements/omissions other than those relating to the Allied brands. Even as to the statements/omissions related to the Allied brands, however, it is hard to see how Hansen's decision to focus on its flagship product could render any of the statements/omissions specified above false or misleading. Hansen is not alleged, for instance, to have claimed that it was supporting the Allied brands with resources equal to those devoted to Monster.

[24] To the extent that Plaintiffs argue that certain of the statements were false or misleading because they described Hansen's second contract with AB to expand AB's distribution to the on-premise channel when, in fact (according to Plaintiffs), the first agreement already included an on-premise component, Plaintiffs have not come close to presenting specific facts supporting that latter factual allegation or even meeting the plausibility requirement of the Supreme Court's recent Rule 12(b)(6) jurisprudence kick-started by the *Twombly* decision. The paragraphs of the CC they cite to as support, *see* Plaintiffs' Opposition fn. 2 (citing CC ¶¶ 16-17), contain no timeframe references. Sacks' oblique reference to the first AB agreement as expanding the company's products' presence "across all channels" is nowhere near specific enough to support Plaintiffs' baseline characterization of the scope of that first agreement. Indeed, were Plaintiffs' allegation true, one would expect that Plaintiffs would have emphasized – if not focused upon – Sacks's February 9, 2007, comment that the second AB agreement opened a "significant new and incremental sales channel" as a <u>blatant</u> misrepresentation. *See* CC ¶ 70. Yet, that does not appear to be Plaintiffs' focus in the slightest. *See, e.g.*, CC ¶¶ 74-75.

Cir. 1996) (rejecting liability for analysts' statements because defendants "never endorsed or adopted the statements of analysts and "never put their 'imprimatur on the projections'") (quoting *In re Stac Elecs. Secs. Litig.*, 82 F.3d 1480, 1492 (9th Cir. 1996), *withdrawn and superseded by In re Stac Elecs. Secs. Litig.*, 89 F.3d 1399 (9th Cir. 1996)); *In re Harmonic Inc. Secs. Litig.*, 163 F.Supp.2d 1079, 1094-95 (N.D. Cal. 2001). Plaintiffs have not specifically pled what Sacks and/or Schlosberg might have said to the analyst, as opposed to the analyst's description, re-packaging and/or inferences from the communication. *See Cooper v. Pickett*, 137 F.3d 616, 624 (9th Cir. 1997). Nor, contrary to their Opposition, did they plead (at least plausibly) that Sacks and/or Schlosberg made the actual statements appearing in the analyst's report. If, indeed, Sacks and/or Schlosberg in fact "told," *see* CC ¶¶ 27, 79, the analyst, verbatim, what she included in her report, Plaintiffs should provide that particularity in any amended complaint (and the basis for their allegation in that regard). The report itself certainly does not appear to reflect or even suggest a transcription of any comments.

### e. **Disclosure of Problems**

Defendants also argue that, to the extent Plaintiffs rely upon omissions theories, Defendants disclosed the problems that Plaintiffs believe they have identified. *See* Defendants' Motion to Dismiss at 22:1-24:13. However, with the exception of statement/omission Number 7 listed above, the disclosures Defendants have identified do not actually relate to any of the omissions Plaintiffs have specifically pled in the CC. If Plaintiffs did intend to specifically plead actionable omissions relating to the subject areas Defendants discuss, they will first have to do so specifically before the Court will consider the bulk of Defendants' disclosures argument. As to Number 7, the disclosures Defendants have identified do not adequately address what Plaintiffs argue was hidden from the market about Lost. *Cutera* does not help Defendants here (at least at the Rule 12(b)(6) stage) because it cannot be said that those disclosures negated, as a matter of law, the possibility that the statements (and related omissions) concerning Lost were not still materially misleading. *See* 2010 WL 2595281, *3.

### 2. **Materiality and Falsity of 2Q07 Results**

In connection with Statement/Omission Numbers 14-16 recited above, Plaintiffs

rely, at least to some degree (if not entirely) on the allegation that Defendants 2Q07 financial results were materially false because a National Account Manager was instructed by the Vice President of National Accounts (not a defendant in this case) to "withhold" "hundreds of thousands of dollars" in promotional expenses related to the Wal-Mart account. Defendants are correct that this allegation is insufficient, at least as presently pled, for several reasons.

First, absent some context for what (if any)[25] effect such a "withholding" had on Hansen's 2Q07 financials, it is impossible to say that such a maneuver would be sufficiently material. While Plaintiffs argue (without citing any controlling authority) that a reasonable investor would find it material that Defendants were willing to withhold any expenses, this is not clearly so (or substantially likely, *see Basic*, 485 U.S. at 231). If the "withholding" had a negligible or no effect on the financials (again, a fact we do not know at this stage because of the CC's insufficiently particular falsity allegations), the responsible officials would have known this (or at least have been able to determine it) and a reasonable investor would have no reason to care whether a decision was intentionally made that had absolutely no effect. Moreover, there are no factual allegations that the Individual Defendants were willing to manipulate their books because there are no allegations tying the Individual Defendants to this "withholding."[26]

Second, as Defendants point out, the only facts reflecting this allegation have been developed from a Confidential Witness who is a National Account Manager. While he/she can speak to being instructed to "withhold" those expenses (whatever that meant to him/her), he/she has no apparent basis to speak to whether that instruction was also transmitted to the preparers of the financial statements, whether those expenses were in fact omitted from the financials, or whether they were even required, under relevant

---

[25] To the extent Plaintiffs reference other facts in their Opposition to support their case for falsity and materiality here that do not appear in the CC, *see* Plaintiffs' Opposition at 24:1-5 and 24:24-27, they can feel free to add those facts in upon amending the CC (though they might still be insufficient to plead at least materiality).

[26] Plaintiffs' assertion that "Defendants would not have intentionally manipulated Hansen's financial results to inflate its earnings if the manipulation was not material," Plaintiffs' Opposition at 25:11-12, assumes a hugely-significant necessary fact that Plaintiffs have not come close to alleging with particularity.

accounting rules, to be included in the second quarter.[27]  For these reasons, Plaintiffs have failed to even sufficiently specifically allege the falsity of the 2Q07 results and statement/omission Numbers 14-16.

### 3. Scienter

Defendants also persuasively argue that Plaintiffs' allegations are deficient when it comes to scienter as well.  There are no specific facts pled which tie any defendant to knowledge of any fact contrary to any of the statements/omissions Plaintiffs identify (at the time the statements/omissions were made), or even to a level of awareness such that it could be said that Defendants were sufficiently reckless in making any of the statements and/or omissions.  Plaintiffs do have specific reports from various confidential witnesses, but there is no link between the information conveyed by those witnesses and Defendants here.[28]

Instead, what Plaintiffs largely rely upon for purposes of their scienter showing is the core operations inference, that certain reports and various other information were "available" to the Individual Defendants, and what they perceive to be suspicious patterns of trading.  While those are permissible considerations in engaging in the scienter calculus under *Tellabs*, those factors all suffer from deficiencies significantly lessening their weight.

Even if one could say that any of the Individual Defendants should have known everything about Hansen's relationship with AB or the company's operations relating to Monster because of the importance of both of those elements to Hansen, as noted elsewhere herein, there are not even sufficient allegations of falsity with respect to the statements/omissions in those areas.  Thus, even if one could presume that the Individual Defendants "knew" everything there was to know about Monster and the AB

---

[27] While Plaintiffs argue that they have pled the intentional manipulation of accounting principles, the CC itself discusses precisely zero accounting principles.  If Plaintiffs are going to plead what they essentially assert is accounting fraud in conformity with the particularity the PSLRA requires (*i.e.*, why a statement is false) they must include some discussion of what the allegedly relevant accounting rules required under the situation (which, itself, is insufficiently pled at this stage).

[28] That Sacks may have carried various reports around with him does Plaintiffs little good in this regard where there are no specific allegations as to what those reports contained, let alone whether they contained any information which was contrary to any of the statements attributed to Sacks herein.

relationship, this would (at this stage) not help Plaintiffs' cause. While Plaintiffs might have a better case with respect to falsity in connection with the Allied line of drinks, their relative lack of importance to Hansen (as is in fact confirmed by the CC's allegations) means that they would clearly fall outside the core operations of the company, lest the "core operations" be defined writ large as the full scope of the company itself.

Though "access" to information can contribute to a scienter allegation sufficient to survive the *Tellabs* analysis, such allegations should be "detailed and specific…about management's exposure to factual information within the company," such as "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database" or that they "know exactly how much [they] have sold in the last hour around the world," or other "particular" details. *Zucco Partners*, 552 F.3d at 1000 (quoting *South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785 (9th Cir. 2008)); *see also Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) (indicating that court cannot ascertain whether there is any basis for officers' actual or constructive knowledge based upon existence of internal reports without detail of the contents of such reports or data purportedly included therein). Needless to say, Plaintiffs' "access" allegations here do not meet that standard. *See* CC ¶¶ 60, 99, 101-03.

With respect to the Individual Defendants' stock sales, the parties agree that the Court is to take into consideration the amount and percentage of stock sold, the timing, and the consistency with prior trading history. *See Metzler*, 540 F.3d at 1067; *Ronconi v. Larkin*, 253 F.3d 423, 435 (9th Cir. 2001). With respect to the first factor, both Sacks and Schlosberg sold a relatively small percentage of their holdings when both individual and jointly-held stock is taken into consideration. *See Ronconi*, 253 F.3d at 435. While Kelly sold a large portion of his stock, he consistently sold large proportions of his holdings, he is not alleged to have made any of the mis-statements at issue in this case, nor are there any specific allegations that he was aware of any falsehoods.[29]

---

[29] Kelly, of course, is only a defendant on the insider trading and control person claims. The allegations that do peg him with awareness of certain issues do not come close to attributing (with sufficient particularity, as required by the PSLRA) a sufficient level of scienter to him (or Sacks, by way of Kelly) in

Plaintiffs argue that the value of the stock alone, ignoring the proportion of holdings sold, is enough by itself to render the Individual Defendants' sales suspicious. Yet Defendants correctly observe that the case Plaintiffs cite to for this proposition involved a far larger amount than those recognized here. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (involving executive's sale of stock – for first time in five years – that produced almost $900 million and characterizing the appropriate focus on value, as opposed to proportion, as a "novel situation"). As such, though the Court would not entirely ignore the amounts gained by way of the sales here in the course of determining whether the sales were suspicious (and the over-arching consideration of whether scienter has been alleged under *Tellabs*), those amounts are entitled to terribly significant weight in that regard.

As to the issue of timing, Defendants first argue that this factor also weighs in their favor because they sold at prices which were roughly the same as the price the stock came to rest at after the alleged revelation of the truth. Yet, Plaintiffs are correct – Defendants could not possibly have known this at the time of their sales, and that fact is therefore of little assistance to Defendants. *But see Ronconi*, 253 F.3d at 435. Nevertheless, they do appropriately point out that all of their sales were made at least two months prior to the alleged disclosure of the truth. Yet, unlike the stock price itself, the timing of the disclosure would be something that the Individual Defendants could themselves have some influence over. All in all, for these reasons this factor neither weighs in favor of nor against a scienter determination at this stage.[30]

---

association with the Walmart expenses, let alone any of the other alleged misstatements/fraudulent omissions. *See* CC ¶¶ 101, 109.

[30] Defendants also assert that the timing of their sales makes sense because the sales began shortly after an SEC investigation had concluded. While Plaintiffs argue that the Court may not take account of this alleged fact on a Rule 12(b)(6) motion, Defendants correctly point out that the Court is ultimately required to take into consideration the relative plausibility of competing inferences when analyzing scienter under *Tellabs*. Moreover, Plaintiffs do in fact refer to the investigation (though not its termination date) in the CC. *See* CC ¶ 79. In that sense, therefore, Defendants should be able to rely on facts demonstrating the cessation of the investigation (and, ultimately, because any dismissal here would be with leave to amend, Plaintiffs would have the opportunity to plead facts contrary to Defendants' representations herein upon amendment). Nevertheless, in the absence of evidence actually tying the timing of those sales to the cessation of the SEC's investigation, there is no reason to necessarily conclude that the timing in that regard was something other than coincidental. In the same regard, unless and until Plaintiffs adequately allege both the material falsity of the 2Q07 financial results and that the Individual Defendants either knew

Defendants are correct, however, that the Individual Defendants' class period sales were not dramatically out of line with their trading histories. *See Metzler*, 540 F.3d at 1066-67 (indicating that suspicious stock sales by corporate insiders may constitute circumstantial evidence of scienter when they are "dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed inside information") (quoting *Silicon Graphics*, 183 F.3d at 986); CC ¶¶ 110, 112.  While Plaintiffs attempt to manufacture some measure of anomaly out of an apparent new-found interest on the part of the Individual Defendants in trading in August and September, they point to no authority which suggests such an analysis is useful, and there is little apparent reason why it (or attention to whether the Individual Defendants tended to prefer trading on, say, a Wednesday or Thursday) would be.  In fact, while it is true that the Individual Defendants primarily traded in other months, Kelly did trade in September on two occasions and Sacks and Schlosberg each (at least in terms of their individual holdings[31]) traded on only two occasions, both in June, meaning that Plaintiffs' argument would make trading in <u>any month other than June</u> suspicious. *See* CC ¶ 112.  Though the period of trading inactivity preceding the trades in question here (following periods of relatively frequent trading up until that time) might, on its own, be somewhat suggestive of scienter (ignoring Defendants' discussion of the recently-closed SEC investigation), all of the facts alleged in the CC, taken together, do not suggest a nefarious inference at least as cogent and compelling  than innocence. *See Tellabs*, 551 U.S. at 314, 322-24.  In any event, Plaintiffs have the opportunity to re-plead.

In sum, the core operations inference, access to information and stock sales allegations, which are the three primary types of evidence directly tied to the Individual Defendants, do not come close to being persuasive enough that the Court would consider it at least as cogent and compelling an inference that any of the Individual Defendants acted with the necessary scienter with respect to any of the alleged affirmative

---

or were sufficiently reckless in not knowing about that material falsity, the mere proximity in time of their trading activity to the release of those financial results does not lend significant credence to the overall question of their scienter.

[31] Hilrod Holdings, L.P. (Sacks and Schlosberg's jointly-held entity) traded on numerous occasions, including once in September. *See* CC ¶ 112.

misstatements (which Sacks alone is alleged to have uttered, at least as sufficiently pled
thus far) or omissions.[32]

### 4. **Loss Causation**

Defendants also challenge Plaintiffs' ability to satisfy the loss causation element.
They argue that loss causation is missing because the stock price declined prior to the
earnings call Plaintiffs identify as the corrective disclosure and because the statements
during that call did not constitute corrective disclosures, at least in certain instances
because Defendants believe that at least several issues had already been disclosed or
revealed at an earlier time or times.  Plaintiffs allege the following "revelation" (in
addition to results that missed analysts' expectations by $11 million and $0.03 per share,
among other financial results, *see* CC ¶¶ 93, 119), with emphases as they appear in the
CC:

> As I've indicated previously, by and large, the transition
> arrangements to the A-B system is largely complete. *We did put to brake
> on them* [*sic*]. *We are looking to, you know, as what we should be doing
> going forward.*  There will be some selected markets, where I believe we
> will continue to transition the additional markets to the A-B system, but
> that will be done on a carefully selected and determined basis.
>
> > \* \* \*
>
> We're working through some issues in sort of integrating the sales effort
> into the A-B sales team. *There are some challenges there because
> they've got their focus on their own products, as well.*
>
> > \* \* \*
>
> Some of the decreases that we had were in – Lost as a brand has
> sort of suffered some reductions in sales and making – taking steps to
> address that. Joker and Ace and Unbound are all products where – on the

---

[32] Plaintiffs' best case for making out a sufficient scienter allegation is related to their allegation that Sacks
was sufficiently aware of problems with the Allied brands that, in the Summer of 2007, he "berated"
salesmen at a conference, docked their bonuses and made future bonuses dependent upon sales of Allied.
*See* CC ¶¶ 42, 83.  The problem for Plaintiffs in this regard is that, with the possible exception of a portion
of Statement Number 14 recited above, Sacks' post-Summer 2007 (*i.e.*, by which time he appears to have
indisputably known about problems in the product line) comments by and large do not appear to relate to
the Allied line.  Even as to that portion of Statement Number 14 which could be understood as referring to
that product line, it is perhaps equally as cogent and compelling to believe that Sacks was betting on his
somewhat fiery approach to the sales personnel to have kick-started sales in the product line towards a rosy
3Q07 finish.  In any event, any scienter inference from those set of facts would implicate Sacks alone on
the present allegations.

> Allied product side, we have seen falloff in sales, which have been
> disappointing, and *we're looking at decisions on what we'd do with those
> lines and how we'd address them going forward.*
>
>     * * *
>
> The effect of the drop-off in sales of what I would call these Allied
> products was, in the quarter, *about $5.5 million. $5.5 to $6 million with
> Energy. So about $6 million was the drop-off in the other Energy
> products right from the previous year. Obviously, we had expected an
> increase. So, obviously, that has affected the numbers so quite
> dramatically.*
>
>     * * *
>
> If we had been projecting a 40% increase, or 50%, on the Allied products,
> what you've got – it's there in your numbers, *that would have made about
> a $10 million difference.*

CC ¶ 94; *see also id.* ¶¶ 120-21.  Defendants also allegedly revealed that, for independent

convenience stores, "the Budweiser system is not quite as strong" and "is an area that

obviously [Hansen has] to address with the A-B system," elaborating that AB distributors

had not adequately "embraced the brand and the potential for the brand" and indicating

that development of the on-premise channel was "probably coming along more slowly

than we had hoped for."  CC ¶ 121.

Though Defendants argue that statements made in the November 8, 2007, press

conference cannot be responsible for any loss because the stock had actually decreased

following the company's earnings announcement earlier that day and had *risen* following

the press conference, Plaintiffs correctly note that it would be difficult for the Court to

credit that point on a Rule 12(b)(6) motion where the theory is that the reasons for the

financial performance were later disclosed in the press conference.  This would seem to

be especially true in light of the fact that a disclosure need not consist of a single event or

statement.  *See Daou*, 411 F.3d at 1026-27; *In re New Century*, 588 F.Supp.2d 1206,

1236 (C.D. Cal. 2006).

A securities fraud plaintiff cannot plead loss causation by way of "euphemism."

*Metzler*, 540 F.3d at 1063-64.  That being said, while that might be a way of describing

all that Plaintiffs have alleged here with respect to certain of the 16 statements/omissions

specifically identified herein (or at least certain of the many conceivable fraudulent

statements/omissions contained within those at-this-stage ill-defined

statements/omissions), it would appear that at least a handful of them would likely survive such an argument. Insofar as Plaintiffs will have to amend the CC in any event (and may delete, or at the very least significantly refine, a number of the statements and/or omissions), a detailed loss causation analysis will benefit from a further refinement.

### D. <u>Defendants' Arguments – 10(b)/10b-5 Insider Trading</u>

Because Plaintiffs have thus far failed to sufficiently plead that the Individual Defendants had knowledge of any inside information contrary to any of the representations/omissions made, their insider trading claim also necessarily fails. *See Brody*, 280 F.3d at 1000 (indicating that Section 10(b) and Rule 10b-5, as they pertain to insider trading, "make it illegal in some circumstances for those possessing inside information about a company to trade in that company's securities unless they first disclose the information"); *In re Worlds of Wonder Secs. Litig.*, 35 F.3d 1407, 1427-28 (9th Cir. 1994).

Defendants also argue, however, that the claim fails for an independent reason – that Plaintiffs lack standing because they did not purchase their shares contemporaneously with Defendants' sales.[33] *See Brody*, 280 F.3d at 1001-02; *Neubronner v. Milken*, 6 F.3d 666, 669 (9th Cir. 1993). Here, there is a 41-day gap between the last of the Individual Defendants' sales and the lead plaintiff's purchase. In response, Plaintiffs simply argue that the contemporaneity requirement is dependent on the facts of each case and that it is satisfied so long as Plaintiffs' purchases occurred before the fraud was disclosed or during the period that Defendants were selling stock on the basis of insider information. However, the Ninth Circuit has indicated that a two-month time gap "exceeds any possible delineation of a contemporaneous trading period" and "would gut the contemporaneous trading rule's premise – that there is a need to filter out plaintiffs who could not possibly have traded with the insider, given the manner in which public trades are transacted." *Brody*, 280 F.3d at 1002. Although 41 days is

---

[33] In addition, they argue that Hansen itself cannot be a defendant on the claim because there is no allegation that it sold any shares. Plaintiffs do not appear to respond to this argument and would therefore appear to concede it. Any amendment of the claim should reflect this apparent concession.

obviously a shorter time period than two months, it is not appreciably so, would equally de-claw the contemporaneity requirement, and Plaintiffs have not directed the Court to any case holding that the instant time period is acceptable. *See Wilson v. Comtech Telecommunications Corp.*, 648 F.2d 88, 95 (2d Cir. 1981) (determining that one-month gap did not satisfy contemporaneity requirement); *see also Neubronner*, 6 F.3d at 670 (characterizing its decision as "adopt[ing] the Second Circuit's approach in *Wilson*," though the facts in the case offered no specific contemporaneity facts); *Johnson v. Aljian*, 257 F.R.D. 587, 595 (C.D. Cal. 2009) (finding four day gap sufficiently contemporaneous); *Middlesex Retirement Sys. v. Quest Software Inc.*, 527 F.Supp.2d 1164, 1196 (C.D. Cal. 2007) (finding eight day gap sufficiently contemporaneous and characterizing the Ninth Circuit's approach as meaning that "[g]enerally...the trades must occur within a few days of each other"); *In re Petco Animal Supplies Inc. Secs. Litig.*, No. 05-CV-0823-H (RBB), 2005 WL 5957816, *37 (S.D. Cal. Aug. 1, 2005) (finding seven or eight day gap sufficient because it "is on the border of an acceptable time period"); *In re Silicon Graphics, Inc. Secs. Litig.*, 970 F.Supp. 746, 761 (N.D. Cal. 1997) (concluding that six days is outer limit for contemporaneous trading). The Court would therefore conclude that the lead plaintiff does, indeed, lack standing to pursue a private insider trading action. As this is the first time the Court has considered the issue in this case, however, it should grant Plaintiffs leave to seek a substitute plaintiff.

## E.  **Defendants' Arguments – Control Person**

Because Plaintiffs have thus far failed to sufficiently plead an underlying primary violation, their control person claim must necessarily fail at this point. *See Cutera*, 2010 WL 2595281, *8 n.6; *Zucco Partners*, 552 F.3d at 990; *No. 84 Employer-Teamster*, 320 F.3d at 945.

## F.  **Defendants' Request for Judicial Notice**

The parties hotly contest whether many of the exhibits that are the subject of the Defendants' request for judicial notice should, in fact, be considered on this motion. As a practical matter, with only a few minor exceptions, the foregoing analysis has not depended, to any degree on the documents so provided. Instead, the defects in Plaintiffs' presently-pleaded case are readily apparent from the face of the CC itself. The only

exceptions to this conclusion are the documents Defendants cited in connection with their safe harbor/bespeaks caution argument.[34] The Court has considered them only for their contents (in order to determine whether in fact they included meaningful cautionary language), not for their truth. In any event, to the extent Plaintiffs would still object that such documents are not judicially noticeable (and it does not appear that Plaintiffs make such an objection), the end-result of the Court's analysis was favorable to Plaintiffs – the conclusion is that Exhibit X did not contain the necessary meaningful cautionary language – meaning that any error in its consideration would be harmless.

In short, with the exception of Exhibit X and the exhibits to which Plaintiffs do not object, the Court would deny Defendants' request for judicial notice (without prejudice as to the next motion to dismiss, if there is one) because there has been no need to rely upon them for present purposes.

### G. Conclusion

It may be that, at the core of their case, Plaintiffs are able to identify a potentially actionable fraudulent representation or omission. This is perhaps most likely – at least from what one can glean from their (improper) attempt to add specificity by way of their Opposition brief – with respect to statements concerning Hansen's Allied brands, though, as to those allegations, other elements may prove to be difficult to establish. For present purposes, it is enough to say that the CC obviously must be amended in many respects, and significantly. Presently, it principally lacks specificity as to what exactly is false about the 16 identified representations/omissions, how falsity <u>at the time of the representation/omission</u> is clear (a potentially onerous – but justified, given the PSLRA – burden, at least with respect to certain of the representations), and how any of the Individual Defendants can be justifiably charged with scienter. As the above discussion should make clear, however, Defendants' arguments thus far would only conclusively

---

[34] Though the Court's analysis does refer to Defendants' assertion that an SEC investigation was responsible for their trading inactivity for a certain period of time in Footnote 30, *supra*, as noted therein Plaintiffs themselves reference obliquely reference an "ongoing" stock option investigation, see CC ¶ 79, and it would not require any facts external to the CC for the Court to find it plausible that company officers would refrain from trading during such an investigation. Nevertheless, as also noted therein, in the absence of any facts (properly taken into consideration) that such a decision was actually made, there is no reason to conclude that such timing was other than coincidental at this stage for purposes of the *Tellabs* analysis.

rule out amendment with respect to certain discrete portions of the CC – those discussed in Section II.C.1.a, *supra*.[35]

---

[35] Though amendment is unlikely with respect to statement Number 10 (discussed in Section II.C.1.d, *supra*), Plaintiffs would be allowed the opportunity to cure the defects noted above if they can.